**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| JANE DOE, | |
|     Plaintiff, | Case No. 3:23-cv-00018-RSB |
|     v. | |
| THE UNIVERSITY OF VIRGINIA, RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA (UVA BOARD OF VISITORS), EMILY BABB, and AKIA HAYNES, | |
|     Defendants. | |

**AMENDED COMPLAINT**

Plaintiff JANE DOE[1] hereby files the following Amended Complaint against Defendants alleging violations of Title IX of the Educational Amendments of 1972, as well as Denials of Substantive and Procedural Due Process, Equal Protection, and Freedom of Speech Rights.

**JURISDICTION AND VENUE**

1.      This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*

2.      This is also an action to redress the deprivation of Plaintiff's constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. §1983.

3.      This Court has jurisdiction over this case under 28 U.S.C. §1331, which grants district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343,

---

[1] Jane Doe sues under a pseudonym to protect her identity.

1

which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

4.     The primary events giving rise to this lawsuit occurred in Albemarle County, Virginia, in the Western District of Virginia, and all Defendants reside in this district.

5.     Venue is proper in the United States District Court for the Western District of Virginia, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

## **PARTIES**

7.      Plaintiff Jane Doe is a resident of Fairfax County, Virginia, and was at all relevant times a student enrolled at the University of Virginia.

8.     Defendant University of Virginia ("UVA") was at all relevant times and continues to be a public educational institution in Charlottesville, Virginia, organized and existing under the laws of the state of Virginia.

9.     UVA receives federal funding and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).

10.     The UVA Board of Visitors is the governing body of UVA, the corporate name for which is The Rector and Visitors of the University of Virginia.

11.     Defendants UVA, and The Rector and Visitors of the University of Virginia are hereinafter collectively referred to as "the UVA Defendants."

2

12.     At all material times until December 2020, Defendant Emily Babb ("Babb"), in her official capacity, worked within Albemarle County, State of Virginia, and was an agent and/or employee of UVA, acting or failing to act within the scope, course, and authority of her employment and her employer.

13.     At all material times until December 2020, Babb was the Assistant Vice President for Title IX Compliance and the Title IX Coordinator for UVA.

14.     At all material times, Defendant Akia Haynes ("Haynes"), in her official capacity, worked within Albemarle County, State of Virginia, and was an agent and/or employee of UVA, acting or failing to act within the scope, course, and authority of her employment and her employer.

15.     At all material times, Haynes was the Deputy Title IX Coordinator for UVA, and from December 2020, she was also the Acting Title IX Coordinator for UVA.

## APPLICABLE LAW AND POLICY

16.     Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 (a), states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

17.     Title IX is implemented through the Code of Federal Regulations.  *See* 34 C.F.R. Part 106.

18.     34 C.F.R. § 106.8 (b) provides that a "recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

19.     In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally

violates Title IX and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

20.    In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student, rather than a teacher.

21.    *Davis* held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is: "a) deliberately indifferent to sexual harassment of which the recipient has actual knowledge; and b) the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 669-76.

22.    In *Doe v. Fairfax County School Board*, the U.S. Court of Appeals for the Fourth Circuit held that to establish a Title IX sexual harassment claim, a plaintiff must show: (1) she was a student at an educational institution receiving federal funds; (2) she suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived her of equal access to the educational opportunities or benefits provided by her school; (3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and (4) the school acted with deliberate indifference to the alleged harassment. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263–64 (4th Cir. 2021). Further,

> [A] school may be held liable under Title IX based on a single, pre-notice incident of severe sexual harassment, where the school's deliberate indifference to that incident made the plaintiff more vulnerable to future harassment, or otherwise had "the combined systemic effect of denying [equal] access to a scholastic program or activity." . . . Even a single incident of sexual harassment, if sufficiently

severe, can inflict serious lasting harms on the victim—physical, psychological, emotional, and social . . ..

*Id.* at 27-28, citing *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172-73 (1st Cir. 2007), *rev'd and remanded on other grounds*, 555 U.S. 246 (2009).

23.     The First Amendment to the United States Constitution provides that Congress shall make no law "abridging the freedom of speech." U.S. Const. amend. I.

24.     In *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), the Supreme Court held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."

25.     In *Healy v. James*, 408 U.S. 169 (1972), the Supreme Court held that the First Amendment applies with the same force at public universities as at other educational institutions.

26.     The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law" and that that no State shall "deny to any person within its jurisdiction the equal protection of the laws."   U.S. Const. amend. XIV, § 1.

27.     In *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), the Supreme Court ruled that local governments can be liable for monetary damages when deliberate indifference to the need for training and failure to train employees result in constitutional violations.

## FACTUAL ALLEGATIONS

28.     Plaintiff is an accomplished student and recent graduate of UVA.

29.     In the fall of 2018, after two years of working diligently at her local community college, Plaintiff was accepted to and transferred to UVA to complete her bachelor's degree.

5

30.     Plaintiff was excited to begin her classes at UVA, a prestigious university, and planned on attending law school and having a successful legal career after completing her undergraduate studies.

31.     When Plaintiff moved to Charlottesville, Virginia, to attend UVA, she endured an extremely difficult transition as she was living away from her parents, her friends, and her community support system for the first time in her life.

32.     In addition to being new to UVA, Plaintiff was still relatively new to the United States, having immigrated just four years earlier at age sixteen.

33.     Throughout her time at UVA, Plaintiff was an exemplary student, consistently attending her classes, engaging in class discussions, studying intently, and working hard to perfect each assignment she submitted.

34.     Plaintiff worked hard in her classes and received her undergraduate degree in the spring of 2020, graduating with an impressive grade point average of 3.98 on a 4.0 scale.

35.     However, Plaintiff's experience at UVA quickly went from a dream come true to a nightmare, as John Roe,[2] a professor Plaintiff trusted and admired, groomed, harassed, and sexually assaulted Plaintiff for more than a year.

**Roe's Grooming and Sexual Abuse of Plaintiff**

36.     Plaintiff met Roe during the fall of 2018 when Plaintiff enrolled in one of his undergraduate classes.

37.     Plaintiff was an active participant in the class and, like many students, met with Roe during his office hours outside of the classroom, as Roe had encouraged his students to do.

---

[2] John Roe is a pseudonym.

6

38. Roe often enthusiastically praised Plaintiff for her work in class, telling her how smart she was and that her writing was better than that of native English speakers.

39. Roe gave Plaintiff career advice, offered to write her a letter of recommendation for law school, and quickly became someone Plaintiff trusted and saw as a role model and mentor.

40. Plaintiff saw Roe as a trustworthy professor, someone that cared about her success, and someone who she thought she could rely on in a new environment where she lacked a support system.

41. Immediately, within the same semester, other students started to notice the attention and preference Roe paid to Plaintiff, often referring to her as a "teacher's pet" and making comments about how she received "A" letter grades "easily."

42. Upon information and belief, students began spreading rumors about Roe and Plaintiff's relationship.

43. In Roe's class, some female students began saying that Roe and Plaintiff flirted with each other.

44. Upon information and belief, faculty in the department were also aware of the rumors.

45. During this semester, Roe convinced Plaintiff to take his J-Term class, a two-week trip between the Fall and Spring semesters that took place in Austria and Hungary.

46. Roe praised Plaintiff, saying that it would be a great opportunity and that she was the best student in his class.

47. At first, Plaintiff was thrilled to have the opportunity to take another class with Roe, and she worked diligently to secure the scholarship funding she needed to participate in Roe's J-Term class.

48.     Roe insisted he and Plaintiff travel on the same flight to Austria and arrive together ahead of the other students taking the J-Term course, so Roe assisted Plaintiff with booking the flights and hotel for her early arrival to ensure they were on the same flight and would be staying in the same hotel when they arrived.

49.     Roe suggested he could show Plaintiff around and told her she should stay in the same hotel with him.

50.     Upon information and belief, no other faculty leading trips at UVA helped students book their flight, spent one-on-one time with them before the trip, offered to show them around, or insisted that they stay in the same hotel as their professor.

51.     A few weeks later, on or around December 25, 2018, Plaintiff and Roe were on the same plane headed to Vienna, Austria, with both arriving two days before the rest of the students enrolled in the semester.

52.     On or around December 26, 2018, during their first day in Vienna, Roe showed Plaintiff the city.

53.     Several times throughout the day, Roe told Plaintiff she was "photogenic" and asked her to send him photos from the day.

54.     Plaintiff found Roe's comments throughout the day odd and uncomfortable, especially when Roe insisted that she call him a nickname instead of Professor since he claimed they were "friends now."

55.     Although Plaintiff thought these comments were odd, she believed Roe was just trying to be kind, as he had been so helpful to her during the time that she had known him.

56.     On or around December 27, 2018, Roe again showed Plaintiff around Vienna, including Roe's father's former home.

57.     On this same day, Professor Asher Biemann ("Biemann"), the co-instructor for the J-Term course, arrived in Vienna.

58.     Roe and Plaintiff made plans to have dinner that night with Biemann and his girlfriend who arrived that same day.

59.     Before dinner, Plaintiff sent Roe a message via WhatsApp to ask if she could borrow his electric adapter, as she needed to charge her laptop and did not have an adapter.

60.     Roe agreed to loan Plaintiff the adapter, so Plaintiff went to his hotel room and took the adapter back to her room to let her computer charge.

61.     Plaintiff, Roe, Biemann, and Biemann's girlfriend had dinner as planned that night.

62.     After dinner, Roe, Plaintiff, and Biemann returned to the hotel, and once at the hotel, Plaintiff brought Roe's adapter back to his hotel room.

63.     When Plaintiff arrived at Roe's hotel room, Roe asked her if she wanted to come in.

64.     This surprised Plaintiff, but she again believed Roe was simply trying to be kind, so she agreed to go in his hotel room.

65.     When Plaintiff went into his hotel room, he invited her to sit on the bed.

66.     Although this made Plaintiff uncomfortable, she agreed to do so as she did not know what else to do.

67.     Plaintiff then began reading a book to try to make clear that she was only interested in a collegial relationship.

68.     Despite this, Roe laid down on the bed beside Plaintiff.

69.   This made Plaintiff even more uncomfortable, but at this point she did not know what to do because she was alone in a foreign country with Roe, so she continued to try to read the book and ignore him.

70.   Roe then reached over and hugged Plaintiff tightly, which shocked Plaintiff, and she froze.

71.   Instead of acknowledging Plaintiff's discomfort and leaving her alone, Roe then began to sexually assault Plaintiff.

72.   Roe started rubbing Plaintiff's back and stomach, touching her buttocks and breasts, and kissing Plaintiff's neck.

73.   Roe then began rubbing his erect penis against Plaintiff's back.

74.   Plaintiff was frozen in fear as Roe, a professor she had once admired and who was more than forty years her senior, repeatedly sexually assaulted her.

75.   After several minutes of touching Plaintiff, Roe told Plaintiff that he loved being with her, but that he could not "do anything."

76.   Plaintiff had no idea what this meant as Roe was obviously doing something to Plaintiff in that very moment.

77.   As soon as Roe stopped touching Plaintiff, she escaped his hotel room and fled to her hotel room, confused and terrified at what had just happened.

78.   Plaintiff did not sleep that night, as she repeatedly replayed the sexual assault in her head.

79.   Plaintiff did not believe that she would be able to endure the remaining two weeks of the trip following the assault, as she was in a foreign country surrounded by people she had never met before.

80.     Plaintiff did not think anyone would believe her if she disclosed Roe's actions – he was a beloved professor leading a group of students who knew him well, and she had no personal relationship with any of them, due in part to the rumors that caused damage to her good name and reputation.

81.     The next day, on December 28, 2018, the rest of the students participating in the J-Term class arrived in Vienna.

82.     Plaintiff was extremely uncomfortable around Roe but was worried about ruining what had otherwise been a good relationship with a supportive professor, so she decided she needed to speak with Roe about what had happened the previous night.

83.     Later that night, Plaintiff asked Roe if she could go to his room to talk, to which he agreed.

84.     While in Roe's room, Roe again grabbed Plaintiff and began touching her body without her consent.

85.     Plaintiff tried to talk with Roe about what happened the previous night and tell him that she had been uncomfortable, but Roe refused to acknowledge his actions and, instead, acted as though nothing happened, making Plaintiff fear she was overreacting.

86.     Plaintiff got more and more upset throughout the conversation and eventually started crying as Roe continued to minimize and dispute her concerns.

87.     Plaintiff eventually left Roe's room and sat in the lobby of the hotel crying, filled with overwhelming anxiety about completing the rest of the study abroad trip and the semester.

88.     While Plaintiff was in the lobby crying, a classmate found her and tried to comfort her.

89.     Plaintiff told her classmate about Roe's sexual abuse.

90.     The classmate told Plaintiff he was concerned and uncomfortable about the nature of her relationship with Roe.

91.     Plaintiff was confused about what her classmate was saying because she did not believe she had any relationship with Roe other than that of student-professor.

92.     The classmate advised Plaintiff to tell Professor Biemann and end her relationship with Roe.

93.     The classmate said it was Plaintiff's fault that Roe had assaulted her because she had been in a relationship with him.

94.     This confused Plaintiff even more, as she did not have a relationship with Roe and did not understand why it was her fault that she had been sexually assaulted.

95.     The classmate's response confirmed Plaintiff's fear that she was fully alone and that her classmates would not support or help her.

96.     Upon information and belief, the classmate did not share this information with Biemann or Roe.

97.     Upon information and belief, the classmate shared what Plaintiff had told him with other students and they began gossiping about the "relationship" between Plaintiff and Roe.

98.     Several days later, after the class had completed a trip to another part of Austria, everyone returned to Vienna.

99.     That night, Roe again asked Plaintiff to come to his hotel room.

100.    Terrified and feeling as though she had no control and no support, Plaintiff agreed to go to Roe's hotel room.

101.    That night, Roe sexually assaulted Plaintiff again.

102.    Roe kissed Plaintiff without her consent, attempted to take her clothes off, and took all his own clothes off.

103.    Plaintiff again went into a state of shock and told Roe that she had never had sex before in a desperate effort to express to Roe how uncomfortable she was.

104.    Roe forced Plaintiff to straddle him and began touching her breasts.

105.    Roe then pushed Plaintiff's pelvis towards his mouth and held her in place as he performed oral sex on her without her consent.

106.    Plaintiff felt embarrassed and trapped, convinced that no one would believe her, and unable to tell the other students or professors about what happened.

107.    The J-Term group then took a trip to Budapest.

108.    During the trip to Budapest, Roe sexually assaulted Plaintiff several times.

109.    During the assaults in Budapest, Roe attempted to digitally penetrate Plaintiff and rubbed his penis on her vagina without her consent.

110.    Several days later, after returning from Budapest, Roe came to the door of Plaintiff's hotel room and tried to get her to let him in.

111.    Plaintiff's roommate on the trip saw that Roe was intoxicated and trying to flirt with Plaintiff in the doorway of the room.

112.    Plaintiff felt humiliated as she saw her roommate watch the incident unfold as she knew her roommate was likely just going to gossip about her "relationship" with Roe to other students.

113.    Roe eventually left and went back to his hotel room.

114.    Later that night, Roe summoned Plaintiff to his hotel room again.

115.    Plaintiff felt as though she had no choice but to go as Roe had demonstrated that he would come to her room and humiliate her if she did not accede to his demands.

116.    Plaintiff again went to Roe's hotel room, where he again sexually assaulted her, and she again froze.

117.    Plaintiff was still unable to process what had occurred and was terrified of what would happen when she began taking Roe's class in the Spring semester at UVA.

118.    Roe assured Plaintiff everything would be fine, and that he would still be her professor the next semester.

119.    Students were clearly aware of the nature of the relationship between Plaintiff and Roe, and they openly discussed the amount of time they spent together and how they saw her coming and going from his hotel room.

120.    Plaintiff was embarrassed and humiliated by the gossip and felt there was no way for her to confide in any of her classmates as a result.

121.    Once she returned to Charlottesville after the trip, Plaintiff hoped against hope that her relationship with Roe would return to a normal student-professor relationship.

122.    During the spring semester of 2019, Plaintiff was enrolled in Roe's The Holocaust and the Law course.

123.    In February 2019, Roe invited Plaintiff to his home.

124.    Naively, Plaintiff believed that the sexual abuse was limited to the J-Term trip, and she went to his home thinking that they would be discussing classwork.

125.    After Plaintiff arrived at Roe's home, he began kissing and cuddling her, and then attempted to penetrate her vagina with his penis without her consent.

126.    Plaintiff was terrified and told Roe again that she had never had sex before.

14

127.    Roe responded by asking Plaintiff to use her hands on his penis, which Plaintiff agreed to do because she felt it was preferable to vaginal intercourse.

128.    Afterward, Roe made Plaintiff take a shower and got in the shower with her without her consent.

129.    Plaintiff was embarrassed and didn't know how to react and again froze.

130.    Plaintiff, who was already feeling alone and alienated from her family and friends in Charlottesville, began to feel even more isolated and depressed.

131.    Plaintiff decided that, if Roe was trying to pursue a romantic relationship with her, she should acquiesce rather than continuing to fight him, because she valued him as a professor and had no family or friends who she could turn to for help.

132.    Plaintiff convinced herself that if she voluntarily agreed to be in a relationship with Roe, it would mean that his sexual advances had not been abuse.

133.    Plaintiff also convinced herself that if she was in a voluntary romantic relationship with Roe, then she would no longer feel depressed.

134.    On or around February 11, 2019, Plaintiff again visited Roe's home.

135.    During this visit, Plaintiff told Roe she was willing to be in a romantic relationship with him.

136.    To Plaintiff's shock, Roe told Plaintiff he was not interested in such a relationship.

137.    Roe's rejection of Plaintiff romantically – which made clear to her that he was literally only using her for sex – caused her to withdraw further, and her depression worsened.

138.    Plaintiff finished spring semester but was regularly absent from Roe's class because of the stress and anxiety of seeing him.

139.    Plaintiff's depression worsened, and she began to feel so exhausted that she was unable to attend class.

140.    In the summer of 2019, Plaintiff lived in Washington, D.C., for several weeks as she participated in an internship program.

141.    During this time, Roe would drive from Charlottesville to Washington and rent a hotel room so that he could spend time with Plaintiff.

142.    Plaintiff met up with Roe because she had begun to believe that his continued pursuit of her might mean that he did want to have a romantic relationship with her after all.

143.    The idea that Roe wanted to have a romantic relationship with her allowed Plaintiff to believe that he might really care about her, which helped assuage her depression and loneliness.

144.    On one visit to Washington, Roe took Plaintiff out to dinner, and when they returned to the hotel, he invited Plaintiff to come to his hotel room, which she did.

145.    On this night, Roe sexually penetrated Plaintiff for the first time, and Plaintiff spent the night in his hotel room.

146.    During the middle of the night, Plaintiff woke up to Roe attempting to penetrate her vagina with his penis without her consent.

147.    Even though Plaintiff knew this was wrong and that Roe was attempting to rape her, she ignored this knowledge, because she was trying to convince herself that Roe cared about her.

148.    Plaintiff was at this point so isolated, lonely, and depressed that she believed that a relationship with Roe on his terms was better than no relationship at all.

149.    Plaintiff also convinced herself that she loved Roe and that he was interested in pursuing a romantic relationship with her.

150.    Plaintiff told herself that Roe loved her back because he had traveled to see her, and she had let him take her virginity.

151.    By convincing herself that Roe loved her and wanted a relationship with her, Plaintiff found it easier to write off the previous sexual assaults.

152.    Soon after that trip, Plaintiff left for a study abroad program at the University of Oxford in England for the remainder of the summer.

153.    While Plaintiff was at Oxford, Roe told her that he did not miss her and that there was no future for their relationship.

154.    This caused Plaintiff to sink back into severe depression and anxiety, as she realized that not only did Roe not love her, but that she had to face the fact that he had sexually assaulted her numerous times by this point.

155.    Plaintiff became so distraught that her classmates began asking if she was okay.

156.    Plaintiff talked with other students at Oxford about what she was going through and told them that Roe was the cause of her distress.

157.    This was the first time Plaintiff ever had the experience of telling someone who believed her and supported her.

158.    Plaintiff returned to Charlottesville to start the fall 2019 semester and again experienced severe depression and anxiety over Roe's rejection of her.

159.    In October 2019, Roe approached Plaintiff and told her that he had changed his mind and decided he wanted to have a romantic relationship with her.

160.    Roe invited Plaintiff to come to his home, which she did.

161.    Plaintiff was overjoyed as she believed that Roe had realized he was in love with her; as a result, she no longer had to be depressed.

162.    For the next few months, Plaintiff would go to Roe's home regularly, and they would have sex in his bed.

163.    Each time Plaintiff stayed at Roe's home, she would awake to Roe trying to digitally penetrate her without her consent.

164.    Again, although Plaintiff knew this was wrong, she ignored it because she did not want to face the fact that her professor, who she now believed loved her, might also be sexually assaulting her.

165.    In or around January 2020, Roe arranged for Plaintiff to serve as a research assistant for a colleague in Austria who needed a candidate with Spanish fluency.

166.    Plaintiff speaks native Spanish.

167.    Roe told Plaintiff he wanted to "help" her and that was why he was connecting her with his colleague.

168.    Plaintiff went to Austria for a few weeks and worked on a specific part of Roe's colleague's project.

169.    The position was unpaid.

170.    In or around February 2020, Plaintiff discovered that Roe was using dating websites.

171.    Plaintiff was devastated by this discovery, as she had convinced herself that Roe loved her.

172.    Plaintiff broke off her relationship with Roe.

173.    Roe's betrayal devastated Plaintiff emotionally, and she quickly fell into a state of extreme depression and anxiety.

18

**UVA Responsible Employees' Failure to Report Roe's Abuse of Plaintiff**

174.    As discussed previously, during the Vienna trip in December 2018, Plaintiff, Roe, Biemann, and Biemann's girlfriend had dinner together.

175.    Biemann did not ask Plaintiff any questions about whether she was safe or comfortable joining dinner as Roe's date or companion.

176.    Biemann did not intervene or object in any way in Roe bringing a female undergraduate student to dinner in a foreign country with Biemann and his girlfriend.

177.    Also during the Vienna trip, Biemann saw Roe standing in the hallway outside Plaintiff's hotel room when Roe was intoxicated, as Biemann happened to walk by at the same time.

178.    Biemann observed Roe talking to Plaintiff and attempting to flirt with her while he was intoxicated.

179.    Biemann did not intervene or object in any way to Roe drunkenly flirting with a female undergraduate student at her hotel room door.

180.    Biemann did not reach out to Plaintiff to find out if she was safe or if she was comfortable with Roe's advances.

181.    Biemann would later admit this was not typical behavior from a professor with a student.

182.    Biemann would later admit that during the J-Term trip, Plaintiff did not seem like her usual self; she acted more reserved and was not as engaged in class as she was prior to the trip.

183.    Despite all of this, Biemann did nothing to help or protect Plaintiff, and did not make a report to the Title IX office or anyone else at UVA.

184.     Biemann was a "Responsible Employee" who was required to report potential Title IX violations to the Title IX office: "A Responsible Employee is required to report to the University's Title IX Coordinator all relevant details (obtained directly or indirectly) about an incident of Prohibited Conduct that involves any Student as a Complainant, Respondent, and/or witness, including dates, times, locations, and names of parties and witnesses."[3]

185.     Further, since 2018, Biemann has been the Co-Director of UVA's Virginia Center for the Study of Religion.[4]

186.     Pursuant to UVA's Title IX policy, Biemann had an added level of responsibility regarding reporting Title IX violations due to his supervisory and managerial role as a program director:

> **Responsibility to Report Prohibited Conduct Where Either the Complainant or the Respondent Is an Employee:** Under this policy, supervisors, management and human resources professionals are required to report to the University's Title IX Coordinator all relevant details about an incident of Prohibited Conduct where either the Complainant or the Respondent is an Employee. Reporting is required when such supervisors, management and human resource professionals know (by reason of a direct or indirect disclosure) or should have known of such Prohibited Conduct. For academic faculty, supervisors include department chairs, deans, and other unit administrators.[5]

187.     UVA's Title IX policy defined incidents of Prohibited Conduct to include Sexual Harassment, defined as follows:

> **Sexual Harassment** is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when the conditions outlined in (1) and/or (2), below, are present….
>
> (1) Submission to or rejection of such conduct is made, either explicitly or implicitly, a term or condition of a person's employment, academic standing,

---

[3] Def.'s Mot. to Dismiss, Ex. 1, ECF No. 11-1 at 10.
[4] *Asher Biemann Curriculum Vitae*, UNIVERSITY OF VIRGINIA JEWISH STUDIES PROGRAM, https://jewishstudies.as.virginia.edu/sites/jewishstudies.as.virginia.edu/files/biemann_short_cv_19.pdf, last visited Aug. 16, 2023.
[5] Def.'s Mot. to Dismiss, Ex. 1, ECF No. 11-1 at 10 (emphasis added).

or participation in any University programs and/or activities or is used as the basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment); or

(2) Such conduct creates a hostile environment. A "hostile environment" exists when the conduct is sufficiently severe, persistent, or pervasive that it unreasonably interferes with, limits, or deprives an individual from participating in or benefitting from the University's education or employment programs and/or activities. Conduct must be deemed severe, persistent, or pervasive from both a subjective and an objective perspective. In evaluating whether a hostile environment exists, the University will consider the totality of known circumstances, including, but not limited to:

- The frequency, nature and severity of the conduct;
- Whether the conduct was physically threatening;
- The effect of the conduct on the Complainant's mental or emotional state;
- Whether the conduct was directed at more than one person;
- Whether the conduct arose in the context of other discriminatory conduct;
- Whether the conduct unreasonably interfered with the Complainant's educational or work performance and/or University programs or activities; and
- Whether the conduct implicates concerns related to academic freedom or protected speech.[6]

188.    Based on his observations during the Vienna trip, in which Roe brought Plaintiff to dinner with another couple and drunkenly came to Plaintiff's hotel room, flirting with her and was turned away, Biemann knew or should have known that Roe was, at a minimum, sexually harassing Plaintiff.

189.    Upon information and belief, Biemann ignored the clear evidence of Roe's abuse of Plaintiff because of his close, personal friendship with Roe.

190.    In or around February 2020, the culmination of nearly two years of trauma hit Plaintiff, and she became so emotionally distressed that she felt suicidal and had to go to the UVA University Hospital ("University Hospital") Emergency Department.

---

[6] Def.'s Mot. to Dismiss, Ex. 1, ECF No. 11-1 at 17.

191.    Once there, Plaintiff was immediately admitted and held overnight on a psychiatric hold because medical staff determined that she had both suicidal ideation and suicidal intent.

192.    While at University Hospital, Plaintiff sent Biemann an email telling him that she would not be in his class the upcoming Monday because she was in the hospital.

193.    Biemann offered to visit Plaintiff in the hospital, but she declined and assured him that she would meet with him once she was released to discuss her situation.

194.    On or around February 17, 2020, Plaintiff met with Biemann in his office on campus and disclosed that she had been in a relationship with Roe since the 2018 J-Term.

195.    Plaintiff did not tell Biemann that Roe had done anything that was not consensual, because she was afraid that he would report it to UVA, and she thought she would receive discipline as severe as expulsion for being in a relationship with a professor.

196.    Following the meeting, Biemann wrote a memo to document what Plaintiff had disclosed to him.

197.    The next day, when Plaintiff again met with Biemann and she disclosed the full extent of his abuse, including the fact that Roe's sexual acts were not consensual, Biemann wrote a second memo to document her disclosures.

198.    Upon information and belief, Biemann contacted the chair of the German department, Jeffrey Grossman ("Grossman"), the following day.

199.    Upon information and belief, Grossman is friends with Roe.

200.    Upon information and belief, Grossman did not want to report the allegations because he wanted to protect Roe.

201.    Upon information and belief, Grossman and Biemann agreed not to report the matter to the Title IX office, but instead to report it to the International Studies office.

202.   Upon information and belief, this decision was made to protect Roe.

203.   Upon information and belief, Biemann reported the incident to Dudley Doane ("Doane") in the International Studies office.

204.   Upon information and belief, Biemann and Doane then decided to report the incident to Dean of Students Laurie Casteen ("Casteen").

205.   Upon information and belief, Casteen then decided to contact Plaintiff.

206.   Upon information and belief, Biemann, Grossman, Doane, and Casteen were all responsible employees under UVA's Title IX policy and were required to immediately report allegations of sexual misconduct to the Title IX office.

207.   Upon information and belief, Biemann, Grossman, Doane, and Casteen did not report the allegations to the Title IX office.

208.   On or around February 24, 2020, Casteen contacted Plaintiff and asked to meet with her.

209.   Plaintiff agreed to meet with Casteen but was hesitant to tell her all the details of Roe's abuse because she was afraid of getting in trouble or being disciplined.

210.   Despite her fear, Plaintiff did tell Casteen about some of Roe's abuse.

211.   After the meeting, Casteen told Plaintiff that there was nothing she could do to help Plaintiff because "the relationship was reported as consensual."

212.   This statement devastated Plaintiff, and she again became severely depressed and experienced suicidal ideation.

213.   Plaintiff was hospitalized a second time due to severe mental health-related symptoms.

214.    Plaintiff began to process her abuse and the betrayal of the prestigious university that had once been her dream to attend.

215.    Plaintiff also enrolled in an intensive outpatient program where she began seeing therapists three times a week and seeing a counselor at UVA's Counseling and Psychological Services ("CAPS").

216.    Plaintiff was later diagnosed with post-traumatic stress disorder ("PTSD") and an eating disorder, on top of prior diagnoses of depression and anxiety which had been diagnosed in 2018.

### UVA's Protracted and Inadequate Title IX Investigation

217.    On or around March 11, 2020, Plaintiff emailed Casteen and notified her that she wanted Roe to be held accountable for his abuse.

218.    Finally, Casteen made a report to UVA's Title IX office, which Defendant Babb oversaw.

219.    On or around March 31, 2020, Plaintiff received a notification that UVA was commencing a formal Title IX investigation. This was the first time that Plaintiff was ever notified about her right to a Title IX investigation.

220.    In the more than a month that passed between Plaintiff's first conversation with Casteen and the beginning of the formal Title IX investigation, no measures were put into place to protect Plaintiff or any other student in Roe's classes.

221.    UVA did not even offer Plaintiff any protective or supportive measures.

222.    While UVA's Title IX policy stated that the investigation should be completed within 35 days, [7] and the entire process including an outcome should take 60 days,[8] the process took almost <u>500 days</u> from start to finish.

223.    Throughout the investigation, Plaintiff was responsive and compliant, engaging in multiple interviews as requested and providing all necessary documentation to investigators.

224.    On May 29, 2020, nearly two months after the Title IX office began its investigation, and just one day before the expiration of the sixty-day period, UVA informed Plaintiff that it would be extending the deadline and expected to produce a report two months later, on July 31, 2020.

225.    On June 25, 2020, almost three months following the commencement of the Title IX investigation, Defendant Babb issued a "mutual no-contact directive" prohibiting her and Roe from communicating with each other, for reasons that were never explained to Plaintiff.

226.    Although Plaintiff had made significant and serious allegations of abuse against Roe, he had made no similar allegations against her.

227.    Plaintiff was given no information about how to challenge or appeal the no-contact directive implemented against her.

228.    Because of the mutual no-contact directive, Plaintiff began avoiding certain areas on campus and disengaging from her classes to avoid Roe, as she was afraid of getting in trouble or being disciplined for violating the directive.

229.    On July 31, 2020, UVA again informed Plaintiff that the investigation would take additional time, citing only the amount of evidence the parties submitted as justification.

---

[7] Def.'s Mot. to Dismiss, Ex. 1, ECF No. 11-1 at 38.
[8] Def.'s Mot. to Dismiss, Ex. 1, ECF No. 11-1 at 34.

230.     No expected timeline for completion of the investigation was provided to Plaintiff at that point.

231.     Despite the investigation beginning in March 2020, a preliminary report was not issued until August 26, 2020, nearly five months after the investigation began.

232.     The final investigative report was not issued until more than eight months later, on April 30, 2021.

233.     UVA has never provided Plaintiff any explanation as to why the final investigative report alone took more than one year to complete.

234.     Upon reviewing all the evidence contained in the final investigative report, a 319-page document outlining others' observations about her interactions with and abuse by Roe in painful, chronological detail, Plaintiff learned for the first time that several UVA faculty members and administrators had likely known about her abuse by Roe and failed to report it.

235.     In the final investigative report, investigators found credible evidence that Roe had assaulted and harassed Plaintiff on multiple occasions in violation of the school's Title IX policy.

236.     Roe still denied the allegations, and a review panel meeting was held over Zoom on July 1, 2021.

237.     No explanation was provided to Plaintiff as to why it took two months to schedule a review panel meeting.

238.     On July 7, 2021, the review panel issued a decision affirming the findings in the investigative report that Roe had repeatedly harassed and assaulted Plaintiff.

239.     The review panel recommended that Roe be terminated from his position at UVA.

240.    On July 9, 2021, Roe resigned from his position at UVA, a position he had continued to hold for more than a year throughout the Title IX investigation process with no suspension or administrative leave, and willful, unfettered access to students.

241.    On August 6, 2021, UVA Executive Vice President and Provost M. Elizabeth Magill ("Magill") issued a final remedial measures letter responding to Roe's challenge with modified sanctions, which only included that Roe was unable to be hired for any future position at the university and would not be eligible for emeritus status.

242.    No explanation was provided as to why it took more than a month after the review panel meeting to produce a final outcome letter.

243.    Upon receiving the letter from Magill, Plaintiff understood for the first time that Roe had likely been drawing out the investigation to allow himself to continue as long as possible before ultimately resigning without any accountability, and that UVA Title IX staff had allowed this to happen.

244.    Also on August 6, 2021, Plaintiff received a letter from Defendant Haynes stating that UVA was offering her the following "remedial measure:"

> The University will reimburse you for any out-of-pocket cost you have incurred or will incur from the date of the Notice of Investigation (March 31, 2020) through December 31, 2021 related to this matter up to a total of $5000.00 for (1) professional counseling services and (2) holistic healing services such as acupuncture, massage, or chiropractic services provided by a licensed or certified professional.

245.    This offer was useless to Plaintiff as she had not sought any counseling or "holistic healing" assistance during the investigation other than a few sessions with a therapist, as she was afraid to have any expenses billed to her father's health insurance for fear of having to disclose what had occurred to her father, and Plaintiff was unable to afford to pay out-of-pocket for these costs.

27

246.     At no time did Defendant Haynes, Defendant Babb, or any other UVA employee ask Plaintiff what type of remedial measures would be helpful to her.

### UVA's Violations of Federal Law and Guidance and Its Own Policies

247.     Throughout the Title IX process, into which Plaintiff was hesitant to enter, the timeline was extended without explanation, with the entire process taking 493 days to complete.

248.     UVA's failure to provide explanations to Plaintiff as to why the investigation took 433 days longer than promised was a violation of its Title IX policy, which read:

> Typically, the period from commencement of an investigation through resolution (finding and sanction, if any) will not exceed sixty (60) calendar days. This timeframe may be extended for good cause, which may exist if additional time is necessary to ensure the integrity and completeness of the investigation, to comply with a request by external law enforcement for temporary delay to gather evidence for a criminal investigation, to accommodate the availability of witnesses, to account for University breaks or vacations, to account for complexities of a case, including the number of witnesses and volume of information provided by the parties, or for other legitimate reasons. The Investigator will notify the parties in writing of any extension of this timeframe and the reason for such extension.

249.     Pursuant to U.S. Department of Education guidance in effect from September 22, 2017, through August 26, 2020, UVA was required to "designate[] and follow[] a reasonably prompt time frame for major stages of the complaint process."[9]  Further, "[t]here is no fixed time frame under which a school must complete a Title IX investigation. OCR will evaluate a school's good faith effort to conduct a fair, impartial investigation in a timely manner designed to provide all parties with resolution."[10]

250.     Pursuant to Title IX regulations enacted on August 14, 2020, which superseded the September 2017 *Q&A on Campus Sexual Misconduct* guidance, and which remain in effect as of the date of filing this Amended Complaint, UVA's Title IX grievance process was required to:

---

[9] OFFICE FOR CIVIL RIGHTS, Q&A ON CAMPUS SEXUAL MISCONDUCT at 3, U.S. DEP'T. EDUC. (Sep. 22, 2017) (rescinded Aug. 26, 2020), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.
[10] *Id*.

Include reasonably prompt time frames for conclusion of the grievance process, including reasonably prompt time frames for filing and resolving appeals and informal resolution processes if the recipient offers informal resolution processes, and a process that allows for the temporary delay of the grievance process or the limited extension of time frames for good cause with written notice to the complainant and the respondent of the delay or extension and the reasons for the action. Good cause may include considerations such as the absence of a party, a party's advisor, or a witness; concurrent law enforcement activity; or the need for language assistance or accommodation of disabilities....[11]

251.     Pursuant to Title IX regulations enacted on August 14, 2020, which remain in effect as of the date of filing this Amended Complaint, UVA is required to:

[M]aintain for a period of seven years records of—...

(D) All materials used to train Title IX Coordinators, investigators, decision- makers, and any person who facilitates an informal resolution process. A recipient must make these training materials publicly available on its website, or if the recipient does not maintain a website the recipient must make these materials available upon request for inspection by members of the public.[12]

252.     As of the date of filing this Amended Complaint, UVA has made any of these required training materials available on its Title IX websites.[13]

### UVA Was on Notice of Roe's Abuse of Plaintiff Since December 2018

253.     The final investigative report included the following analysis:

Biemann stated that, in February 2020, [Doe] told him that all sexual activity between the parties was consensual; Biemann explained that despite this statement, [Doe] appeared to him to be uncertain if the activity truly was consensual. Biemann recalled that [Doe] stated that [Roe] 'simply grabbed' her during the first encounter in Vienna....

Based on a careful review of all evidence, the Investigators find that there is sufficient evidence to establish that it is more likely than not that [Roe] lacked Affirmative Consent to engage in Sexual Contact with [Doe] on December 27, 2018.... By contrast, there is reliable evidence from Complainant, Student 1,[14]

---

[11] 34 C.F.R. § 106.45(b)(1)(v).

[12] 34 C.F.R. § 106.45(b)(10)(i).

[13] *See generally* TITLE IX, UNIVERSITY OF VIRGINIA, https://titleix.virginia.edu/ (last visited Aug. 16, 2023); and TITLE IX AND SEXUAL MISCONDUCT, UNIVERSITY OF VIRGINIA OFFICE FOR EQUAL OPPORTUNITY AND CIVIL RIGHTS, https://eocr.virginia.edu/title-ix, (last visited Aug. 16, 2023).

[14] Student 1 is a pseudonym.

Student 2,[15] and Biemann that the Sexual Contact occurred suddenly and surprised [Doe].

The Investigators also note two general observations about [Doe] with the respect to the events of J-term. First, [Doe] does not dispute that she initially told both Biemann and Dean Casteen that the parties' sexual activity during J-term was consensual. While the Investigators find these facts relevant, they do not find these facts to be dispositive as to the issue of Affirmative Consent. Notably, Biemann stated that while [Doe] told him she "think[s]" the sexual activity between the parties during J-term was consensual, [Doe] appeared to be uncertain about this fact.

> ...[S]he said, "I think it was consensual." It's something actually did stay with me. I must say I was so shocked to hear the story, that at the beginning I just didn't quite know what to do with it myself. It by total surprise, by total shock, and for other reasons. Not just because of the story itself, because it involved somebody I've known so long, a friend I'm with and supported for so many years. So, I didn't know what to do with it. It stayed with me when she said that, "I think it was consensual." It suggest[ed] that she didn't quite know herself. That's how I understood it, at least, what to make of the relationship. But what was certainly clear to me is that in the months to follow, it seems to be a year to follow, that this point it was a consensual relationship.

With respect to what she shared with Dean Casteen, [Doe] recalled that she was able to clarify that she felt the incidents were not all consensual after meeting with CAPS and being able to "really think things through." Further, the Investigators highlight that a determination of whether [Doe] granted [Roe] Affirmative Consent, as defined by the Title IX Policy, requires a careful fact-specific analysis of each alleged instance of Sexual Contact or Sexual Intercourse between the parties to ascertain whether [Doe] communicated to [Roe] through clear words or actions her agreement to engage in the specific Sexual Contact or Sexual Intercourse at issue. Therefore, [Doe]'s conclusive statements to Biemann and Dean Casteen that that her sexual activity with [Roe] was or may have been "consensual" does not foreclose the Investigators from drawing an alternative conclusion if the evidence so dictates. As previously discussed, a careful review of the evidence indicates that [Roe] more likely than not did not receive Affirmative Consent from [Doe] on December 27th to engage in Sexual Contact….

254.    Upon reading the final investigative report on April 30, 2021, Plaintiff realized the following things for the first time:

---

[15] Student 2 is a pseudonym.

    a.   That Biemann had understood that, even though Plaintiff said she thought her sexual encounter with Roe was consensual, she was "uncertain," and "didn't quite know herself."

    b.   That Biemann had reported his concerns to multiple colleagues, including Casteen.

    c.   That Biemann later decided that the sexual encounter may have been consensual—without consulting with her—because of "the months to follow" in which he concluded—without consulting her—that she and Roe were in a "consensual relationship."

    d.   That it was likely that Biemann knew or should have known that Roe was abusing her at the time of the Vienna trip in December 2018, but ignored the signs of abuse due to his close, personal relationship with Roe.

255.    Prior to reading the final investigative report, Plaintiff had had no way of knowing that Biemann had realized that it was possible that her sexual encounter with Roe was nonconsensual, nor that other faculty and administrators at UVA would also have known that.

256.    Prior to reading the final investigative report, Plaintiff had had no way of knowing that Biemann would have had such a long and close relationship with Roe that he might have been motivated, consciously or otherwise, to protect his friend by ignoring her statement that she was not sure that her encounter with Roe was consensual.

257.    Prior to reading the final investigative report, Plaintiff had no way of knowing that Biemann decided, of his own volition, that her sexual encounter with Roe in Vienna must have been consensual because it appeared to him that she and Roe were later in a "consensual relationship."

258.    Any assumptions Biemann made about whether the sexual encounter in Vienna was consensual based on his observations of later actions by Plaintiff and/or Roe, and his failure to report his concerns about lack of consent as a result, violated the Affirmative Consent provision of UVA's Title IX policy, which read, in relevant part: ""…even in the context of a relationship, Affirmative Consent to one sexual act does not, by itself, constitute Affirmative Consent to another sexual act, and Affirmative Consent on one occasion does not, by itself, constitute Affirmative Consent on a subsequent occasion."

259.    Plaintiff did not and could not have known that Biemann was making assumptions about her actions, and failing to make a report as a result, in a manner that violated the UVA Title IX policy.

**Harms Caused to Plaintiff**

260.    As a result of processing the trauma and abuse inflicted by Roe's abuse and UVA's inability to properly and timely investigate her complaint, Plaintiff has been unable to find stable employment and her health and well-being has suffered.

261.    Plaintiff has been diagnosed with PTSD and an eating disorder and struggles with ongoing episodes of suicidal ideation because of the abuse, which was exacerbated by the lengthy Title IX investigation that was ongoing until August 2021, over a year after Plaintiff graduated.

262.    After her graduation in spring 2020, Plaintiff was eventually able to find an unpaid internship position in January 2021.

263.    This unpaid, part time position was the only form of employment that could accommodate her during the Title IX investigation process, as she had to regularly take time off to meet with investigators, review documents and reports, and to cope with her ongoing mental health struggles that made full time employment impossible.

264. Until the conclusion of the investigation, Plaintiff was unable to hold gainful employment due to time constraints imposed on her by the investigation and her ongoing mental health crisis due to having to be immersed in her trauma throughout the entire 493-day investigation.

265. However, Plaintiff has still been unable to find a full-time, paid position since the conclusion of the investigation a year and a half ago.

266. Plaintiff secured a temporary, paid consulting position in the summer of 2022, but the job was only for a few weeks, and Plaintiff has not found another gainful position since.

267. Plaintiff had originally planned to attend law school after graduation from UVA.

268. However, once her relationship with Roe dissolved, Plaintiff had lost both her mentor and her closest faculty recommender, and she was terrified to ask Roe's friends in the department for recommendation letters.

269. Because she had lost all her possible sources of recommendations, Plaintiff believed it would be impossible to get accepted to law school, so she gave up her dream.

270. Plaintiff had to move back in with her father due to being unable to find employment and has been consistently applying for full-time jobs in her field with no success, despite her qualifications and her impressive academic credentials.

## COUNT I
### Violation of Title IX
### Deliberate Indifference to Sex Discrimination
### 20 U.S.C. §§ 1681 *et seq.*
### (The UVA Defendants)

271. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

272.    This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq*.

273.    Defendants created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX because:

a.    Plaintiff was a member of a protected class based on her sex;

b.    Plaintiff was subjected to sex discrimination in the form of sexual assault and sexual harassment;

c.    Plaintiff was subjected to discrimination based on her sex; and

d.    Plaintiff was subjected to a hostile educational environment created by the Defendants' lack of effective action to properly prevent, investigate, address, and remedy the sex discrimination.

274.    From December 2018 until March 2020, Plaintiff was subjected to sex-based abuse and harassment committed by Roe.

275.    From December 2018 until February 2020, Plaintiff was subjected to ongoing sex-based abuse and harassment by Roe due to Biemann's failure to report the incidents he personally observed on the Vienna trip, which he knew or should have known constituted, at a minimum, sexual harassment of Plaintiff.

276.    Defendants, through Biemann as a Responsible Employee and a supervisor and manager, were on notice of Roe's abuse of Plaintiff starting in December 2018.

277.    From December 2018 to August 2021, Defendants engaged in repeated acts of deliberate indifference to Plaintiff's multiple reports of sex discrimination perpetrated by her professor as outlined previously in this Complaint, by failing to timely investigate and respond to the ongoing harassment of Plaintiff; failing to produce any interim measures to protect her from

Roe as the investigation was pending; failing to take prompt and appropriate action against Roe once the investigation was complete; failing to comply with federal law and regulations and UVA's own Title IX policy; and failing to adequately train and supervise their staff with respect to the handling of Title IX complaints.

278.    Defendants failed to take immediate, effective remedial steps to resolve Plaintiff's complaints of sex discrimination and instead acted with deliberate indifference to Plaintiff's claims.

279.    Defendants had actual knowledge of Roe's acts of sex-based discrimination against Plaintiff and, instead of protecting her from him, imposed a "mutual no-contact directive" against her and forced her through an investigation process that lasted almost 500 days.

280.    Defendants are also liable for their failure to remedy the hostile educational environment experienced by Plaintiff by failing to offer appropriate remedial measures and accommodations, which could have provided her with equal access to educational opportunities and benefits, and for failing to remedy a known sexually hostile environment.

281.    Defendants' failure to promptly and appropriately respond to the sex discrimination experienced by Plaintiff and to comply with federal laws and guidance and their own policies and procedures resulted in Plaintiff being excluded from participation in, denied the benefits of, and subjected to discrimination, on the basis of her sex, in UVA's education program in violation of Title IX.

282.    Defendants persisted in their actions and inactions despite having actual knowledge of the discrimination to which Plaintiff was subjected.

283.    Defendants engaged in a pattern and practice of behavior designed to discourage and dissuade students who had experienced sexual assault and discrimination from seeking assistance and protection.

284.    Defendants' actions were independently and cumulatively so unreasonable under the known circumstances that they amounted to deliberate indifference.

285.    Defendant's deliberate indifference made Plaintiff more vulnerable to future harassment and had the combined systemic effect of denying her equal access to a scholastic program or activity.

286.    As a direct and proximate result of the Defendants' wrongful acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, economic loss; loss of earnings and earnings capacity; pain and suffering; physical harm in the form of an eating disorder; mental and emotional distress in the forms of anxiety, mental anguish, humiliation, and embarrassment; damage to her good name; and loss of the ordinary pleasures of everyday life.

## COUNT II
### Denial of Substantive and Procedural Due Process
### 42 U.S.C. § 1983 and the Fourteenth Amendment
### (Defendants Babb and Haynes)

287.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

288.    Defendants are state actors and at all relevant times were acting under color of law.

289.    Plaintiff alleges violations of 42 U.S.C. § 1983 against the above-named Defendants in their individual capacities due to deprivation of their property and liberty interests without adequate notice or a meaningful opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment.

36

290.    Defendant Babb, as Title IX Coordinator, and Defendant Haynes, as Deputy Title IX Coordinator and Acting Title IX Coordinator, were responsible for oversight of the Title IX policies, procedures, and systems throughout the university and ensuring that UVA complied with its legal obligations under Title IX.

291.    Defendants' failure to comply with the procedural requirements of federal Title IX regulations and UVA's Title IX Policy deprived Plaintiff of her substantive due process rights to her liberty interest in bodily integrity and her property interest in her education.

292.    Defendants subjected Plaintiff to violations of her liberty and property interests by failing to comply with the procedures and timelines outlined in UVA's own policies and procedures, failing to timely investigate and respond to her complaints of sex discrimination, failing to ensure that the effects of sex discrimination against her were fully remedied, and failing to adequately train and supervise their staff with respect to the handling of Title IX complaints.

293.    Defendant Babb's issuance of a "mutual no-contact directive," without providing Plaintiff with a right to be heard prior to depriving her of her liberty interests in free speech and association, was a violation of her right to procedural due process.

294.    Plaintiff's right to due process under the law is one of which reasonable officials in Defendants' positions would have known.

295.    Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.[16]

296.    As a direct and proximate result of the Defendants' wrongful acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, economic loss; loss of earnings and earnings capacity; pain and suffering; physical harm in the form of an eating disorder;

---

[16] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

mental and emotional distress in the forms of anxiety, mental anguish, humiliation, and embarrassment; damage to her good name; and loss of the ordinary pleasures of everyday life.

**COUNT III**
**Denial of Equal Protection**
**42 U.S.C. § 1983 and the Fourteenth Amendment**
**(Defendants Babb and Haynes)**

297.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

298.    Plaintiff alleges violations of 42 U.S.C. § 1983 against Defendants due to discrimination on the basis of sex that denied Plaintiff equal protection under the law in violation of the Equal Protection Clause of the Fourteenth Amendment.

299.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

300.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to intermediate scrutiny.

301.    Defendants' discrimination against Plaintiff on the basis of sex was not substantially or rationally related to any legitimate government interest.

302.    Defendants Babb and Haynes subjected Plaintiff to discrimination on the basis of her sex which deprived her of her liberty and property interests by failing to timely investigate and respond to reports of sexual assault; failing to provide any remedial or supportive measures to ensure Plaintiff's safety; failing to timely and properly investigate a Title IX report; failing to comply with the requirements of UVA's own Title IX policy; and failing to adequately train and supervise their staff with respect to the handling of Title IX complaints.

303.    Defendants' discrimination against Plaintiff on the basis of sex endangered her safety, privacy, security, and well-being.

304.    Defendants treated Plaintiff as a second-class citizen at her school.

305.    This selective treatment was related to Defendants' interest in covering up sexual misconduct; in other words, this selective treatment was not substantially or rationally related to any legitimate government interest.

306.    It is clearly established that failing to properly investigate allegations of sex discrimination violates the Equal Protection clause.

307.    First, "a State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause."[17]

308.    More recently, the Supreme Court heard a case in which petitioners filed suit against the local school district's governing board and superintendent, alleging that their response to allegations of peer-on-peer sexual harassment of petitioners' daughter was inadequate and constituted unconstitutional sex discrimination in schools in violation of 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment.[18]

309.    The Supreme Court held that "Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights," and "§ 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools," including in the case of school officials' inadequate responses to an allegation of peer-on-peer sexual harassment.[19]

---

[17] *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989).
[18] *Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246, 250 (2009).
[19] *Id.* at 258.

310.     Plaintiffs' right to equal protection under the law is one of which reasonable officials in Defendants' positions would have known.

311.     Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.

312.     As a direct and proximate result of the Defendants' wrongful acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, economic loss; loss of earnings and earnings capacity; pain and suffering; physical harm in the form of an eating disorder; mental and emotional distress in the forms of anxiety, mental anguish, humiliation, and embarrassment; damage to her good name; and loss of the ordinary pleasures of everyday life.

### COUNT IV
**Denial of Right to Free Speech and Expression and Prior Restraint**
**42 U.S.C. § 1983 and the First Amendment of the U.S. Constitution**
**(Defendant Babb)**

313.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

314.     Plaintiff alleges violations of 42 U.S.C. § 1983 against Defendant Babb in her individual capacity due to deprivation of her constitutional right to free speech and expression via the mutual no-contact order, which constitutes both a content-based restriction on her speech and a "presumptively unconstitutional" prior restraint on her speech and expression, "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 559 (1976); *see also CBS v. Davis*, 510 U.S. 1315, 1317 (1994); *New York Times Co. v. United States*, 403 U.S. 713, 723–24 (1971) (Douglas, J., concurring).

315.     "A 'prior restraint' on speech is a law, regulation or judicial order that suppresses speech – or provides for its suppression at the discretion of government officials – on the basis of

the speech's content and in advance of its actual expression." *U.S. v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (internal citations omitted).

316.   "The main purpose of the First Amendment is to prevent all such previous restraints upon publications as had been practiced by other governments."  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 557, 49 L. Ed. 2d 683, 96 S. Ct. 2791 (1976) (internal citations and quotes omitted).

317.   A prior restraint on speech violates the First Amendment if it places "unbridled discretion in the hands of a government official or agency." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1988).

318.   "'A law subjecting the exercise of First Amendment freedoms to the prior restraint of a license' must contain 'narrow, objective, and definite standards to guide the licensing authority.'" *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131, 112 S. Ct. 2395, 120 L. Ed. 2d 101 (1992) (quoting *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150-151, 89 S. Ct. 935, 22 L. Ed. 2d 162 (1969)).

319.   As a result of the mutual no-contact order, Plaintiff was chilled from exercising her right to free speech and expression protected by the First and Fourteenth Amendments to the United States Constitution, by forcing her to limit her speech, avoid areas at her school, and reduce or eliminate her engagement in classes and campus activities repeatedly throughout the duration of her remaining time at UVA.

320.   In evaluating the constitutionality of prior restraints, courts "must ask . . . whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest."  *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994).

321.    The mutual no-contact order served no significant UVA interest, as UVA had no legitimate reason to believe Roe needed protection from Plaintiff and there was no allegation that Plaintiff had engaged in any wrongdoing.

322.    Issuing a no-contact order against Plaintiff was an action directly intended limit her rights to free speech and expression under the law.

323.    Plaintiff's rights to free speech and expression under the law are rights of which reasonable officials in Defendant Babb's position would have known.

324.    Defendant Babb's actions violated clearly established Constitutional law; thus, she is not entitled to qualified immunity.

325.    As a direct and proximate result of the Defendants' wrongful acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, economic loss; loss of earnings and earnings capacity; pain and suffering; physical harm in the form of an eating disorder; mental and emotional distress in the forms of anxiety, mental anguish, humiliation, and embarrassment; damage to her good name; and loss of the ordinary pleasures of everyday life.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment against Defendants for an award of compensatory damages in whatever amount Plaintiff is found to be entitled; exemplary and punitive damages in whatever amount Plaintiff is found to be entitled; attorney fees and costs incurred in pursuing this matter; and any other legal or equitable relief the Court deems appropriate.

**Plaintiff demands trial by jury.**

Respectfully submitted,

/s/ *Devon J. Munro*

Date: August 16, 2023

Devon J. Munro (VSB # 47833)
Munro Byrd, P.C.
120 Day Ave. SW, First Floor
Roanoke VA 24016
(540) 283-9343
dmunro@trialsva.com

Elizabeth Abdnour
Pro Hac Vice
Abdnour Weiker, LLP
500 E. Michigan Ave., Ste. 130
Lansing, MI 48912
(517) 994-1776
liz@education-rights.com

Co-Counsel for Plaintiff