**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

|   |   |
|---|---|
| JANE DOE, | |
| Plaintiff, | Case No. 3:23-cv-00018-RSB |
| v. | |
| THE UNIVERSITY OF VIRGINIA, et al., | |
| Defendants. | |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANTS' MOTION TO DISMISS**

Plaintiff Jane Doe, through undersigned counsel, respectfully submits this Response to Defendants' Memorandum in Support of their Motion to Dismiss Plaintiff's First Amended Complaint ("Motion") (ECF No. 23). Plaintiff respectfully requests that this Court deny the Motion with respect to her Title IX claim (Count I). Plaintiff withdraws her remaining claims against Defendants Babb and Haynes.

## TABLE OF CONTENTS

I.     STATEMENT OF FACTS ................................................................................................ 3

II.     PROCEDURAL BACKGROUND .................................................................................. 6

III.     STANDARD OF REVIEW ............................................................................................ 6

IV.     LAW AND ARGUMENT ............................................................................................... 7

     A.     **Statute of limitations** ...................................................................................... 7

        1.     *Deliberate indifference* ........................................................................... 7

        2.     *Due Process and Equal Protection claims against Defendant Babb* ........................ 10

        3.     *Due Process claim – bodily integrity* ............................................................... 10

        4.     *First Amendment claim* ................................................................................ 10

     B.     **Plaintiff properly states a claim under Title IX** ...................................... 10

        1.     *Actual knowledge* ....................................................................................... 10

        2.     *Deliberate indifference* ............................................................................... 14

        3.     *Emotional distress* ...................................................................................... 20

     C.     **Equal Protection claim against Defendant Haynes** ................................. 28

V.     CONCLUSION ............................................................................................................ 29

## I.  STATEMENT OF FACTS

Plaintiff began attending UVA in fall 2018.  Am Compl. ¶ 31, ECF No. 21.  When she moved to Charlottesville, Virginia, to attend UVA, she endured an extremely difficult transition as she was living away from her parents, her friends, and her community support system for the first time in her life. ¶ 31.  She was also still relatively new to the United States, having immigrated just four years earlier at age sixteen. ¶ 32.  Plaintiff met Professor John Roe[1] in fall 2018 when she enrolled in one of his classes. ¶ 36.  Roe often enthusiastically praised Plaintiff for her work in class, telling her how smart she was and that her writing was better than that of native English speakers. ¶ 38. Roe gave Plaintiff career advice, offered to write her a letter of recommendation for law school, and quickly became someone Plaintiff trusted and saw as a role model and mentor. ¶ 39. Plaintiff saw Roe as a trustworthy professor, someone that cared about her success, and someone who she thought she could rely on in a new environment where she lacked a support system. ¶ 40.

During the semester, Roe convinced Plaintiff to take his J-Term class, a two-week trip between the Fall and Spring semesters that took place in Austria and Hungary. ¶ 45. Roe insisted he and Plaintiff travel on the same flight to Austria and arrive together ahead of the other students taking the J-Term course, so Roe assisted Plaintiff with booking the flights and hotel for her early arrival to ensure they were on the same flight and would be staying in the same hotel when they arrived. ¶ 48. On or around December 25, 2018, Plaintiff and Roe were on the same plane headed to Vienna, Austria, with both arriving two days before the rest of the students enrolled in the semester. ¶ 51. Roe began giving Plaintiff compliments, and although Plaintiff thought these comments were odd, she believed Roe was just trying to be kind, as he had been so helpful to her

---

[1] John Roe is a pseudonym.

during the time that she had known him. ¶¶ 52-55.  Two days later, Professor Asher Biemann ("Biemann"), the co-instructor for the J-Term course, arrived in Vienna. ¶ 57. Plaintiff, Roe, Biemann, and Biemann's girlfriend had dinner together that night. ¶ 61. Biemann did not ask Plaintiff any questions about whether she was safe or comfortable joining dinner as Roe's date or companion. ¶ 175.  Later that night, Plaintiff took Roe an adapter she had borrowed back to his hotel room, and Roe sexually assaulted Plaintiff.  ¶¶ 62-73.  Plaintiff froze during the assault and then fled Roe's room, feeling confused and alone.  ¶¶ 74-80.

Plaintiff tried to confront Roe about his assault the following day, but he minimized and disputed her concerns, as did a classmate in whom she confided, leaving her feeling even more isolated. ¶¶ 81-96.  Several days later, Roe sexually assaulted Plaintiff again.  ¶¶ 98-106.  Roe sexually assaulted Plaintiff several more times during a trip to Budapest immediately after that, and again back at their hotel in Vienna.  ¶¶ 107-116.  Due to both Roe's and the classmate's minimizing of her experiences, and students gossiping about her, Plaintiff felt there was no one she could turn to for help.  ¶¶ 117-120.  Biemann also watched Roe attempting to flirt with Plaintiff while intoxicated and did not intervene or object in any way, nor did he reach out to Plaintiff to find out if she was safe or if she was comfortable with Roe's advances. ¶¶ 177-180.  Biemann later admitted that Roe's behavior was not typical, and that Plaintiff was more reserved and less engaged during the trip.  ¶¶ 181-182.  Despite this, and despite being both a Responsible Employee and a program director, Biemann did not report Roe's conduct to UVA's Title IX Office or do anything to try to help Plaintiff.  ¶¶ 183-189.

After returning to Charlottesville from Vienna, and on trips to Washington, D.C., Roe continued sexually abusing and grooming Plaintiff into the summer 2019 semester, when he broke off relations with her.  ¶¶ 121-153.  This caused Plaintiff to go into a severe depression as she had

convinced herself that Roe was in love with her.  ¶¶ 148-158.  In October 2019, Roe again pursued Plaintiff, and began sexually assaulting her again.  ¶¶ 159-164.  In around February 2020, Plaintiff finally broke off relations with Roe for good when she discovered he was using dating websites, which caused her to again become severely depressed and anxious, leading to suicidal ideation and intent and a hospitalization. ¶¶ 170-173, 190-191.  Plaintiff then sought help from Biemann, but instead of reporting anything to the Title IX Office, Biemann discussed the matter with several UVA colleagues, and all agreed not to make a report.  ¶¶ 192-197.

On or around February 24, 2020, UVA Dean of Students Laurie Casteen, one of the individuals to whom Biemann had disclosed, contacted Plaintiff, and asked to meet with her.  ¶ 208.  Plaintiff disclosed Roe's abuse to Casteen, and Casteen told Plaintiff that there was nothing she could do to help Plaintiff because "the relationship was reported as consensual."  ¶¶ 209-211.  This caused another onset of severe depression and suicidal ideation, and Plaintiff was hospitalized for a second time and diagnosed with post-traumatic stress disorder ("PTSD") and an eating disorder.  ¶¶ 212-216.

On or around March 11, 2020, only after Plaintiff stated that she wanted Roe held accountable, Casteen finally made a report to the Title IX Office, and an investigation was opened. ¶¶ 217-219.  Plaintiff was not offered any protective or supportive measure, and while UVA's Title IX policy stated that the investigation should be completed within 35 days, and the entire process including an outcome should take 60 days, the process took almost 500 days from start to finish.  ¶¶ 220-222.  On June 25, 2020, almost three months following the commencement of the Title IX investigation, Defendant Emily Babb issued a "mutual no-contact directive" prohibiting her and Roe from communicating with each other, despite Roe making no allegations against Plaintiff, and which Plaintiff was not given any information on how to appeal.  ¶ 225-227.

When Plaintiff received the preliminary investigation report in the Title IX investigation on April 30, 2021, she learned for the first time that Biemann had had concerns that Roe's sexual advances against her may not have been consensual, and that it was likely that Biemann knew or should have known that Roe was abusing her at the time of the Vienna trip in December 2018, but ignored the signs of abuse due to his close, personal relationship with Roe.  ¶ 254.

As a result of the harms inflicted by Defendants, Plaintiff has suffered PTSD, an eating disorder, depression, and anxiety; was unable to attend law school; has struggled to hold down a full-time job; and was unable to pursue her chosen career path. ¶ 260-270.

## II.  PROCEDURAL BACKGROUND

On April 29, 20023, Plaintiff filed this action. ECF No. 1. In response, Defendants filed a Motion to Dismiss for Failure to State a Claim on July 5, 2023. ECF No. 10.  Plaintiff filed an Amended Complaint on August 16, 2023. ECF No. 21.  Defendant filed a Motion to Dismiss for Failure to State a Claim on August 30, 2023. ECF No. 22.  Plaintiff files this brief in response to that Motion.

## III. STANDARD OF REVIEW

The United States Supreme Court has held that a complaint is only properly dismissed under Rule 12(b)(6) when it does not allege "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Robinson v. American Honda Motor Co., Inc.*, 551 F.3d 218, 222 (4th Cir. 2009). This plausibility standard is more than a sheer possibility, but it is not a probability requirement. *See Twombly*, 550 U.S. at 556.  The Supreme Court has also held that:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" In addition, when ruling on a

> defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.

*Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (quoting *Twombly*, 550 U.S. at 555-56).

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) tests the "legal sufficiency of the complaint" but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992); *Eastern Shore Markets, Inc. v. J.D. Assoc. Ltd. Partnership*, 213 F.3d 175, 180 (4th Cir. 2000).

A court "should view the complaint in the light most favorable to the plaintiff." *Mylan Labs, Inc. v. Matkar*, 7 F.3d 1130, 1134 (4th Cir. 1993). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Therefore, "a well-pleaded complaint may proceed even if it strikes a savvy judge that the actual proof of the facts alleged is improbable and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal citations omitted).

## IV. LAW AND ARGUMENT

### A. Statute of limitations

#### 1. Deliberate indifference

Defendants assert that Plaintiff's Title IX deliberate indifference claim—to the extent that it is based on Biemann's notice of Roe's harassment in December 2018—accrued at that time and is thus barred by the applicable two-year statute of limitations. Mot. to Dismiss 8, ECF No. 23. Yet Defendants have failed to meet their burden of proving this affirmative defense on the face of the Amended Complaint.

"Ordinarily, a defense based on the statute of limitations must be raised by the defendant through an affirmative defense, *see* Fed. R. Civ. P. 8(c), and the burden of establishing the affirmative defense rests on the defendant." *Goodman v. Praxaire, Inc.*, 494 F.3d 458, 464 (4th

Cir. 2007).  Thus, courts are only able to resolve the merits of a limitations defense on a motion to dismiss in "the relatively rare circumstances" where "all facts necessary to the affirmative defense 'clearly appear on the face of the complaint.'"  *Goodman*, 494 F.3d at 464 (quoting *Richmond, Fredericksburg Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)).

Courts in the Fourth Circuit generally borrow the state statute of limitations for personal injury for Title IX claims.  *Doe 1 v. Roanoke Cnty. Sch. Bd.*, 7:22-cv-163 (W.D. Va. Mar. 29, 2023); *see also Wilmink v. Kanawha*, 214 F. App'x 294, 296 n.3 (4th Cir. 2007).  Thus, the two-year statute of limitations from VA. Code § 8.01-243(A) is applicable to Plaintiff's Title IX claims.  *See Graham v. City of Manassas*, 390 F.Supp.3d 702, 709 (E.D. Va. 2019).  A claim accrues when the plaintiff "has or should have 'possession of the critical fact that [s]he has been hurt and who has inflicted the injury."  *V.E. v. Univ. of Md. Balt.*, 1:22-cv-2338-JRR (D. Md. Apr. 21, 2023) (quoting *United States v. Kubrick*, 444 U.S. 111, 122 (1979)).  Accordingly, in this instance, Plaintiff's Title IX claim did not accrue until she knew or had reason to know that a UVA official with the authority to take corrective action—such as Biemann—knew of Roe's harassment and failed to respond appropriately.  *Id.* (citing *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 704 (6th Cir. 2022)).

Defendants' statute of limitations argument is limited to the portion of Plaintiff's Title IX claim concerning Roe's sexual abuse and harassment from December 2018 to February 2020.  This claim is based on Biemann's failure to report incidents he personally witnessed on the December 2018 trip to Vienna, namely Roe drunkenly flirting with Plaintiff at her hotel room door.  Mot. to Dismiss 9, ECF No. 23.  Defendants more specifically assert that this claim accrued in December of 2018, because at that time, "Plaintiff [ ] knew that Biemann, a UVA employee with alleged

8

responsibility to report harassment, had witnessed her being sexually harassed by Roe but took no action to intervene, allowing the harassment to continue." *Id.*

Yet, the face of the Amended Complaint does not state that Plaintiff became aware of Biemann's notice of Roe's abuse during the December 2018 trip to Vienna. For instance, the Amended Complaint does not specify whether Plaintiff personally saw Biemann witnessing Roe's harassment at her hotel room door or whether she learned of Biemann's observation of this incident at a later date from another source such as the Title IX final investigative report. *See* Am. Compl. ¶¶ 177-179, ECF No. 21. This conclusion is bolstered by Plaintiff's later allegation that it was not until reading the final investigation report issued on April 30, 2021 "outlining others' observations about her interactions with and abuse by Roe" (*id.* at ¶ 234) that she realized for the first time "it was likely that Biemann knew or should have known that Roe was abusing her at the time of the Vienna trip in December 2018, but ignored signs of abuse due to his close, personal relationship with Roe." *Id.* at ¶ 254(d). Thus, construing the facts alleged in the Amended Complaint and crediting reasonable inferences in the light most favorable to Plaintiff as is required at the motion to dismiss stage, Defendants have not shown that it is apparent on the face of the Amended Complaint that Plaintiff knew or should have known that Biemann was aware of Roe's harassment and failure to report in December 2018.

Moreover, even assuming Plaintiff saw Biemann witnessing Roe flirting outside her hotel room, which would not be an appropriate inference at the motion to dismiss stage, nothing in the Amended Complaint indicates that Plaintiff would have known at that time the extent to which Biemann observed this incident or that Plaintiff knew Biemann understood Roe's conduct to be harassment. Nor is it apparent from the pleadings that Plaintiff would have had cause to suspect that despite his observations, Biemann decided not to report due to his close relationship with Roe.

9

*Id.* In sum, this is not a rare instance where a claim appears plainly time-barred on the face of the complaint, and Defendants have not met their burden of proving that Plaintiff's Title IX claim based on Biemann's failure to act accrued in December 2018. *See Goodman*, 494 F.3d at 464.

### 2. Due Process and Equal Protection claims against Defendant Babb

Based on a thorough review of Defendants' arguments and cited law, Plaintiff withdraws her Due Process and Equal Protection claims against Defendant Babb.

### 3. Due Process claim – bodily integrity

Based on a thorough review of Defendants' arguments and cited law, Plaintiff withdraws her Due Process claim against Defendant Haynes.

### 4. First Amendment claim

Based on a thorough review of Defendants' arguments and cited law, Plaintiff withdraws her Due Process claim against Defendant Babb.

## B. Plaintiff properly states a claim under Title IX

### 1. Actual knowledge

The Amended Complaint plausibly alleges that UVA was on notice of Roe's sexual harassment of Plaintiff beginning in December of 2018 when Professor Biemann, who had a responsibility to report harassment, *personally witnessed* Roe sexually harassing Plaintiff by drunkenly flirting with her outside of her hotel room and being turned away. Am. Compl. ¶¶ 177-178, 275, ECF No. 21.

As noted above, an institution may be liable under Title IX for sexual harassment when "an official who has the authority to address the alleged harassment and to institute corrective measures, has actual notice or knowledge of the alleged harassment" and fails to adequately respond. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 264 (4th Cir. 2021) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 646-52 (1999)); *accord Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290-92 (1998); *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir.

2007) (en banc).  The actual notice requirement is objective, meaning that whether the school official was in fact subjectively aware of the harassment is irrelevant.  *Doe v. Fairfax Cnty.*, 1 F.4th at 265.  Thus, when an official with authority to act "received a report that can objectively be construed as alleging sexual harassment, that receipt established actual notice . . . ."  *Id.*; *see also Doe v. Glaster*, 768 F.3d 611, 614 (7th Cir. 2014) ("[t]o have actual knowledge of an incident, school officials must have witnessed it or received a report of it.").

Defendants' arguments to the contrary are unpersuasive.  Defendants first argue that Biemann's observation of Plaintiff's harassment in 2018 fails to satisfy the notice requirement, and in doing so, appear to assert that a report of abuse is needed to meet the actual notice requirement for deliberate indifference, as opposed to an official with authority to respond personally witnessing the harassment.  Mot. to Dismiss 13-16, ECF No. 23.  Such an approach would be contrary to both case law and common sense.  Defendants cite no authority holding that a school official's witnessing of sexual harassment would not amount to actual notice.  Citing *Doe v. Fairfax Cnty*, 1 F.4th at 265, Defendants later conclude that notice in the form of a report is merely "preferable."  Mot. to Dismiss 16, ECF No. 23. Yet, nothing in *Doe v. Fairfax County* suggests that notice must come in the form of a report or that a report would be "preferable" to an official witnessing the harassment firsthand.  Specifically, that case happened to involve a student's report of sexual assault, and the court found such a report to be sufficient.  *Doe v. Fairfax Cnty.*, 1 F.4th at 261, 268.  But the Fourth Circuit described its approach as consistent with that of the Seventh Circuit, which has expressly held that *either* personally witnessing or receiving a report of an incident would satisfy the actual notice requirement.  *Id.* at 265 (citing *Glaster*, 768 F.3d at 614); *see also Carroll K v. Fayette Cnty. Bd. of Educ.*, 19 F.Supp.2d 618, 621 (S.D. W. Va. 1998) (finding actual notice adequately alleged where teacher witnessed student's assault).

Thus, an affirmative report is not the sole basis for notice; Plaintiff has adequately pled that Biemann gained actual notice of Roe's sexual harassment in December 2018 when he witnessed Roe, intoxicated, flirting with Plaintiff at her hotel room door and being turned away, which objectively constituted sexual harassment.  Am. Compl. ¶¶ 177, 178, 188, 275-276, ECF No. 21.

Defendants also go to great lengths to establish that an institution must have actual knowledge of the alleged harassment or abuse as opposed to knowledge of a mere possibility of abuse.  Mot. to Dismiss 14-15, ECF No. 23.  However, the Amended Complaint plausibly alleges that as of December 2018 Biemann had actual knowledge of Roe's sexual harassment, not knowledge of simply the potential for abuse.[2]  Moreover, Defendants fail to argue (much less demonstrate) that the hotel room incident—as alleged in the Amended Complaint—did not constitute sexual harassment.  Thus, the allegations that Biemann witnessed the incident and was required to report it provided Biemann—and by extension, UVA—actual notice of Plaintiff's abuse.  The cases Defendants cite are distinguishable in that they each involve a set of facts where the institution at issue was aware of incidents that may have raised a suspicion of abuse (physical contact, the buying of gifts, a teacher giving rides home, etc.) but did not involve the institution's awareness of an instance of harassment or abuse, as is the case here.  *Id.* at 15-16.  Here, Biemann witnessed an actual incident of sexual harassment, and moreover, Defendants have set forth no argument that the 2018 hotel room incident did not objectively constitute sexual harassment.  Accordingly, Defendants' argument that the Amended Complaint does not adequately plead that UVA had actual notice of Roe's sexual harassment starting in December of 2018 fails.  That

---

[2] Defendants argue pro-movant inferences from the language in the Amended Complaint that Biemann "knew or should have known" that the 2018 hotel incident constituted sexual harassment.  Am. Compl. ¶¶ 188, 275, ECF No. 21.  Yet this statement speaks to the fact that the incident *objectively* amounted to sexual harassment.  The Amended Complaint clearly alleges that "Defendants, through Biemann . . . were *on notice* of Roe's abuse starting in December 2018," (*id.* at ¶¶ 188, 276), and otherwise sets forth facts which plausibly allege that Defendants had actual notice of Roe's harassment starting in December 2018, not just the possibility of harassment (*id.* at ¶¶ ¶¶ 177, 178, 188, 275-276, 282).

Biemann later claimed to be "shocked" by Plaintiff's subsequent report of sexual harassment and assault has no bearing on the objective harassment he witnessed, which is undisputed by Defendants.

Defendants further assert that Plaintiff's subsequent reports to Biemann and Casteen in February of 2020 did not provide UVA with actual knowledge of Roe's sexual harassment and abuse, because "[w]hen Plaintiff initially spoke with Biemann and Casteen in February 2020, she did not share everything about her relationship with Roe and never described it as not consensual." *Id*. at 14.   Defendants' argument misrepresents the facts presented in the Amended Complaint, which plausibly alleges that Plaintiff's reports to Biemann and Casteen in February 2020 could "objectively be construed as alleging sexual harassment . . . ."   *Doe v. Fairfax Cnty.*, 1 F.4th at 265.

The Amended Complaint alleges that "[o]n or around February 17, 2020, Plaintiff met with Biemann in his office . . . and disclosed that she had been in a relationship with Roe since the 2018 J-Term."  Am. Compl. ¶ 194, ECF No. 21.  At that first meeting, "Plaintiff did not tell Biemann that Roe had done anything that was not consensual, because she was afraid that he would report it to UVA, and she thought she would receive discipline as severe as expulsion for being in a relationship with a professor."  *Id*. at ¶¶ 195.  Yet, an excerpt from UVA's final investigative report included in the Amended Complaint provides that according to Biemann, Plaintiff "appeared to him to be uncertain if the activity truly was consensual" and that Plaintiff had stated "*I think* it was consensual."  *Id*. at ¶ 253.  Biemann further stated that Plaintiff had told him that "[Roe] 'simply grabbed' her during the first encounter in Vienna . . . ."  *Id*. at ¶ 253.  In addition, "*[t]he next day* . . . Plaintiff again met with Biemann and . . . disclosed the full extent of his abuse, including the fact that Roe's sexual acts were not consensual . . . ."  *Id*. at ¶ 197) (emphasis added).  The Amended

Complaint also states with respect to Plaintiff's February 2020 meeting with Casteen that although Plaintiff "was hesitant to tell [Casteen] all the details of Roe's abuse because she was afraid of getting into trouble or being disciplined [. . . .] Plaintiff did tell Casteen about some of Roe's abuse." *Id*. at ¶¶ 209-210.   Thus, it is apparent based on the facts alleged in the Amended Complaint, reasonably construed in Plaintiff's favor, that in addition to Defendants' actual notice of Roe's sexual harassment via Biemann in December 2018, Plaintiff has adequately pled that Defendants received further notice of Roe's abuse in February 2020 through Plaintiff's reports to Biemann and Casteen.

### 2. *Deliberate indifference*

Plaintiff alleges Defendants acted with deliberate indifference to their actual notice of Plaintiff's sexual harassment and abuse.   To bring a Title IX claim based on sexual harassment, a plaintiff must allege that:

> [S]he was a student at an education institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.

*Jennings*, 482 F.3d at 695. Regarding the final element, "[a]n institution can be held liable for a Title IX violation only if 'an official who . . . has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination in the [institution's] programs and fails adequately to respond' or displays 'deliberate indifference' to discrimination." *Id.* at 700 (quoting *Gebser*, 524 U.S. at 290.

Contrary to Defendants' contention, the Amended Complaint sets forth facts plausibly alleging that UVA's response to Plaintiff's complaints of sexual harassment and assault between March 2020 and August 2021 amounted to deliberate indifference.   An institution can be held

liable under Title IX only if an official with actual knowledge of the harassment "fails to adequately respond" or "displays 'deliberate indifference.'"  *Jennings*, 482 F.3d at 700 (quoting *Gebser*, 524 U.S. at 290).  Here, UVA completely failed to respond following its notice of Roe's harassment in 2018 and continued to sit on its hands following Plaintiff's subsequent reports to Biemann and Casteen in February 2020.  Am. Compl. ¶¶ 201-213, ECF No. 21.

Around February 17, 2020, Plaintiff reported Roe's abuse to Biemann.  *Id.* at ¶¶ 194-197.  Rather than report to UVA's Title IX Office as he was required to do, Biemann contacted Jeffrey Grossman, the head of the German Department.  *Id.* at ¶ 198.  The Amended Complaint alleges that Grossman and Biemann agreed not to report Plaintiff's serious allegations of long-term sexual harassment and abuse to the Title IX Office to protect Roe.  *Id.* at ¶¶ 199-202.  They instead notified Dudley Doan in the International Studies office, all three then deciding to contact the Dean of Students, Laurie Casteen.  *Id.* at ¶ 204.  Casteen also failed to report to the Title IX Office and instead contacted Plaintiff and erroneously told her there was nothing she could do to help.  *Id.* at ¶¶ 208-211.  Casteen did not inform Plaintiff of her right to an investigation under Title IX.  *Id.* at ¶ 219.  Being informed by Casteen that Roe could not be held accountable for his sexual abuse caused Plaintiff to experience an episode of severe depression resulting in her admission to the hospital for a second time with suicidal ideation.  *Id.* at ¶¶ 212-213.  Casteen did not report Plaintiff's claims of abuse to the Title IX Office until after Plaintiff contacted her for a second time on March 11, 2020, and expressly told her she wanted Roe to be held accountable.  *Id.* at ¶ 217.  Plaintiff was then informed on March 31, 2020, that UVA was commencing a formal Title IX investigation.  *Id.* at ¶ 219.

Importantly, Defendants do not contest that UVA's alleged lack of response to Plaintiff's harassment and abuse prior to the March 2020 amounted to deliberate indifference (including

Biemann's failure to report sexual harassment he witnessed in 2018 (*id.* at ¶ 183), Biemann, Grossman, Doane, and Casteen's failure to report her abuse to the Title IX Office, and Casteen erroneously telling Plaintiff there was nothing she could do to help). *Id.* at ¶¶ 201-213. Defendants' attempt to separate out their initial, complete lack of response from December 2018 to late March of 2020 from the steps they began to take at that point gives an incomplete picture of their overall response, which Plaintiff has adequately pled amounted to deliberate indifference.  Defendants' approach of arguing that some aspects of its response were reasonable is futile, as "[a]n institution cannot avoid Title IX liability if some of its responses were adequate but others were clearly unreasonable." *Foster v. Bd. of Regents of Univ. of Mich.*, 952 F.3d 765 (6th Cir. 2020).

Defendants also mischaracterize the timeline and assert that UVA responded reasonably by initiating a formal investigation in March 2020, the same month Plaintiff told Casteen she wanted Roe to be held accountable.  Mot. to Dismiss 18, ECF No. 23.  This, of course, neglects consideration of Biemann's earlier notice as to Plaintiff's initial February 2020 reports. Defendants prefer that the Court start the clock on UVA's response on March 11th.  Yet, it makes little sense, especially prior to discovery, to limit the scope of facts the Court may consider in assessing Plaintiff's deliberate indifference claim, which requires an examination of UVA's response upon receipt of actual notice of Roe's abuse, not after it finally started a formal investigation.

In addition to Defendants' initial delay in reporting the complaint and commencing a Title IX investigation, UVA provided no interim measures to protect Plaintiff from Roe until approximately three months into the investigation, when it issued a "mutual no-contact directive" prohibiting Plaintiff and Roe from communicating with each other.  Am. Compl. ¶ 225, 277, ECF No. 21.  Defendants argue that UVA's failure to put in place interim measures to protect Plaintiff

does not evince deliberate indifference because Plaintiff ended her relationship with Roe in February of 2020 and in March 2020, UVA suspended in-person classes due to COVID-19.  Mot. to Dismiss 19, ECF No. 23.  The Amended Complaint provides no basis upon which to conclude that Plaintiff ceased to be at risk of further sexual harassment and abuse by Roe after Plaintiff ended their relationship.   In fact, such a conclusion would be inconsistent with Plaintiff's allegations that she faced unwanted and nonconsensual sexual abuse by Roe over the course of years.  Am. Compl. ¶¶ 194-195, 197, 210, ECF No. 21.

Moreover, the suspension of in-person classes did not occur for almost a month after Plaintiff's reports to Biemann, and in any case, several instances of sexual abuse occurred off-campus, at Roe's home.  Mot. to Dismiss 4, ECF No. 23; Am. Compl. 162-164, 194, ECF No. 2; *see also Travina v. Univ. of Tex.*, No. A-21-CV-1040-RP (W.D. Tex. May 2, 2022) (rejecting the defendant's argument that the COVID-19 pandemic "somehow modified" "its obligations under Title IX").  Thus, Plaintiff's allegations regarding Defendants' failure to implement any protective measures whatsoever for months after being informed of the long-term sexual abuse of a professor states a plausible claim for relief.  *See, e.g.*, *Joyce v. Wright State Univ.*, No. 3:17-cv-387 (S.D. Ohio Jun. 15, 2018) (finding plaintiff adequately pled deliberate indifference based on the institution's alleged failure to take any action for *three days* after receiving report of sexual assault).

Defendants further argue that the length of time UVA took to resolve the Title IX complaint once it started the investigation does not go to show that UVA's response was clearly unreasonable.  Mot. to Dismiss 17, ECF No. 23; Am. Compl. ¶ 222, ECF No. 21.  Yet, delays in the investigative process have been held sufficient to constitute deliberate indifference when assessing the adequacy of an institution's response to a Title IX complaint.  *See, e.g.*, *Williams v. Bd. of Regents Univ.*,

477 F.3d 1282, 1296-97 (11th Cir. 2007) (considering eleven-month delay in conducting disciplinary hearing, at which time two of the assailants no longer attended the university, to find allegation of deliberate indifference adequate at motion to dismiss stage).

UVA twice extended the deadline to issue an investigation report (Am. Compl. ¶¶ 224, 229, ECF No. 21), and puzzlingly took eight months to issue a final report after producing a preliminary report (*id*. at ¶ 231). The length of time UVA took to resolve the Title IX complaint ultimately totaled over 500 days. *Id*. at ¶ 222. Defendants claim that the delays in resolving Plaintiff's complaint were not clearly unreasonable given the complexity of the case and duration of the sexual abuse. Mot. to Dismiss 18, ECF No. 23. Yet, supplying a substantive explanation for the delays is not appropriate at this stage of the case, particularly given Plaintiff's contrary factual assertion that Roe had likely intentionally "been drawing out the investigation to allow himself to continue as long as possible before ultimately resigning without any accountability, and that UVA and Title IX staff [ ] allowed this to happen." Am. Compl. ¶ 243, ECF No. 21. Thus, Plaintiff's allegations concerning UVA's unexplained delays throughout the investigation process, which resulted in no meaningful action prior to Plaintiff's graduation and permitted Roe to maintain his position uninhibited for over a year after the investigation commenced, provide further examples of how UVA responded with deliberate indifference to Plaintiff's harassment and abuse.

Defendants also assert that the remedy provided Plaintiff, reimbursement for out-of-pocket expenses up to $5,000 incurred during the investigation and the subsequent four months for counseling and holistic healing services, was not a clearly unreasonable response. Mot. to Dismiss 19, ECF No. 23. Yet, as Plaintiff alleges in the Amended Complaint, she did not seek counseling or "holistic healing" services during the investigation other than a few sessions with a therapist due to her fear that the expenses would show up on her father's health insurance and her inability

to pay for such services out-of-pocket.  Am. Compl. ¶ 245, ECF No. 21.  Accordingly, Plaintiff has alleged that she was effectively offered no counseling or meaningful remedial measures, which is a relevant consideration when assessing the adequacy of an institution's response.  *See Doe v. Russell Cnty. Sch. Bd.*, 292 F. Supp. 3d 690, 710 (W.D. Va. 2018) (denying summary judgment on Title IX deliberate indifference claim in part due to the defendant school board's failure to offer counseling or other remedial measures).

In sum, Defendants' attempt in their Motion to Dismiss to argue that certain *de minimis* actions they took were not clearly unreasonable, while leaving out other actions and context is unavailing, and Plaintiff has adequately set forth allegations going to show that Defendants responded with deliberate indifference to Plaintiff's sexual harassment and abuse.  This includes Biemann's failure to respond after witnessing Roe sexually harassing Plaintiff in 2018, Biemann and several other officials' failure to report Plaintiff's February 2020 complaints of sexual abuse to the Title IX Office, UVA's delays in commencing an investigation and its delays throughout the investigation, and Defendants' failure to provide interim protections to Plaintiff—including for several months following her February 2020 reports of abuse.  This also includes Defendants' failure to provide any counseling or remedial measures and Defendants' acceptance of Roe's resignation prior to his termination, sheltering him from the professional fallout of being fired.

Finally, Defendants make a perfunctory argument that "UVA's response did not cause Plaintiff to undergo further sexual harassment or assault by Roe or make her more vulnerable to it."  Mot. to Dismiss 20, ECF No. 23.  This argument is, however, entirely undeveloped, and therefore waived.  *Smith v. Walmart, Inc.*, No. 7:22-cv-568, n.2 (W.D. Va. Aug. 14, 2023).  In any event, as the Fourth Circuit recently held, "a school may be held liable under Title IX based on a single, pre-notice incident of severe sexual harassment, where the school's deliberate indifference

to that incident made the plaintiff more vulnerable to future harassment or otherwise had 'the combined systemic effect of denying [equal] access to a scholastic program or activity.'" *Doe v. Fairfax Cnty.*, 1 F.4th at 274 (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172 (1st Cir. 2007), *rev'd and remanded on other grounds*, 555 U.S. 246 (2009)).

Defendants' complete lack of response from December 2018 to February 2020 subjected Plaintiff to repeated instances of sexual abuse.  Am. Compl. ¶ 275, ECF No. 21.  Following Plaintiff's reports to Biemann and Casteen in February 2020, Plaintiff was given zero protection from future abuse (*id.* at ¶ 277) and continued to suffer from severe mental health issues to the point of being hospitalized with suicidal ideation (*id.* at ¶ 213).  This undoubtedly denied her equal access to her education program.  Moreover, after graduating, UVA's protracted investigation continued to deny Plaintiff the full benefits of her educational program.  Due to the time constraints related to her participation in the investigation as well as having to relive her trauma, Plaintiff was unable to obtain fulltime employment in her field.  *Id.* at ¶¶ 261-268.

### 3.  *Emotional distress*

Defendants assert that Plaintiff's emotional distress claims should be dismissed, in full, based on the United States Supreme Court's April 28, 2022, decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, wherein the Court held, for the first time, that emotional distress damages are not recoverable in private actions to enforce the antidiscrimination provisions of the Rehabilitation Act and the Affordable Care Act.  212 L. Ed. 2d 552, 142 S. Ct. 1562, reh'g denied, 213 L. Ed. 2d 1081, 142 S. Ct. 2853 (2022).

This Court is not bound to apply *Cummings* here, but even if it chooses to do so, other compensatory and consequential damages remain recoverable even in ACA and Rehabilitation Act actions post-*Cummings*.  Defendants attempt to conflate these other classes of loss with those for emotional distress damages, suggesting that any losses incurred are tied to and therefore

indistinguishable from Plaintiffs' emotional damage claims.  That reading contradicts the courts' well-settled understanding of distinct classes of damages, misconstrues the holding in *Cummings,* and is further inconsistent with numerous courts' interpretation and application of the *Cummings* rule since that decision was rendered.

The lynchpin of the *Cummings* decision is the Court's holding that recovery in private actions brought in accordance with legislative acts passed under the Spending Clause should be limited to those remedies traditionally available in actions for breach of contract—which have not traditionally allowed damages for mental anguish.  Accordingly, a brief discussion of damages in suits for breach of contract is instructive.

*Cummings* and its progeny cite to the Restatement (Second) of Contracts in defining "traditional" contract remedies that remain available in Spending Clause cases.  According to the Restatement, "[e]very breach of contract gives the injured party a right to damages against the party in breach," and subject to certain limitations, "the injured party is entitled to recover for all loss actually suffered." Restatement (Second) of Contracts §§ 346, 347 (1981).

Addressing remedies for contractual breach, the Restatement explains that "[o]rdinarily, when a court concludes that there has been a breach of contract, it enforces the broken promise by protecting the expectation that the injured party had" upon entering the contract.  The court will therefore "attempt[ ] to put him in as good a position as he would have been … had there been no breach." Restatement (Second) of Contracts § 344(a) (1981).  This "expectation interest," however, is not the only interest that may be protected.  *Id.*  If the beneficiary of the contract "changed his position in reliance on the contract by, for example, incurring expenses in preparing to perform, in performing, or in foregoing opportunities to make other contracts… the court may recognize a claim based on his reliance rather than on his expectation." *Id.*  "The interest protected

in this way is called "'reliance interest.'" *Id.* Remedies to protect these interests are non-exclusive. Restatement (Second) of Contracts § 345(a) (1981).

Damages in cases of contractual breach "are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts § 347 (1981). In some cases, "the sum awarded will do this adequately as, for example, where the injured party has simply had to pay an additional amount to arrange a substitute transaction and can be adequately compensated by damages based on that amount." *Id.* In other cases, however, "the sum awarded cannot adequately compensate the injured party for his disappointed expectation as, for example, where a delay in performance has caused him to miss an invaluable opportunity." *Id.* Such losses are described in the Restatement as follows:

> Items of loss other than loss in value of the other party's performance are often characterized as incidental or consequential. Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction. Consequential losses include such items as injury to person or property resulting from defective performance.

*Id.* (internal citations omitted). As the Restatement also cautions, "[t]he terms used to describe the type of loss are not, however, controlling, *and the general principle is that all losses, however described, are recoverable*." *Id*. (emphasis added).

The Supreme Court has held that compensatory damages are available for intentional violations of Title IX. *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 70-71 and 76 (1992). Thus, even where Courts have found that *Cummings* bars claims for emotional distress damages under Title IX, they have still found that "there is nothing in the decision that bars a plaintiff from

seeking other forms of compensatory damages under these three statutes." *A.T. v. Oley Valley Sch. Dist.*, No. CV 17-4983, 2023 WL 1453143, at *4 (E.D. Pa. Feb. 1, 2023) (denying summary judgment and permitting Plaintiffs to proceed to trial on claims for lost income, lost opportunity, fringe benefits, attorney fees, costs, and any other non-emotional distress damages). *Williams v. Colorado Dep't of Corr.*, No. 21-CV-02595-NYW-NRN, 2023 WL 3585210, at *7 (D. Colo. May 22, 2023) (dismissing claims for emotional distress damages but permitting requests for damages for economic loss and physical pain and suffering to remain). Accordingly, Courts have repeatedly found that *Cummings* does not bar a plaintiff's Title IX claims where they seek compensatory damages and other remedies beyond emotional distress damages. *Doe v. Town of N. Andover*, No. 1:20-CV-10310-IT, 2023 WL 3481494, at *12 (D. Mass. May 16, 2023). Because Plaintiff has incurred expenses and economic losses because of Defendants' violations of Title IX, they are "entitled to recover for all loss[es] actually suffered." *See* Restatement (Second) of Contracts § 347 (1981). Accordingly, Plaintiff is entitled to seek compensatory damages for expenses and other financial losses she incurred because of UVA's wrongful conduct and has properly pled those in the Amended Complaint.

Courts have also found that plaintiffs remain entitled to recover for medical treatment necessitated by injuries resulting from violations of anti-discrimination Acts following *Cummings*. The same is true for any physical injuries incurred as a result. These holdings are consistent with *Cummings,* as it is widely accepted that damages are available for personal injury in breach of contract actions. *See* 11 Corbin on Contracts § 59.1; UCC § 2-715(2)(b). By way of example, in *Pennington v. Flora Community Unit School District No. 35*, plaintiffs alleged that their damages went "beyond those sought in *Cummings* because Plaintiffs were diagnosed with PTSD, which 'can cause physical symptoms' and is 'also associated with long-term physical health conditions

like diabetes and heart disease,' and they incurred medical costs to treat their condition." No. 3:20-CV-11-MAB, 2023 WL 348320, at *2 (S.D. Ill. Jan. 20, 2023). The *Pennington* court denied the School District's request to dismiss plaintiffs' claims under the Rehabilitation Act and the ADA, finding "Plaintiffs alleged that they suffered an economic loss in the form of medical expenses, and Defendant did not present any argument that this type of compensatory damages is not recoverable." *Id.* at *4. In coming to this holding, the court opined:

> Plaintiffs did not only request emotional damages, as the School District contends. Plaintiffs very clearly requested medical expenses, which the allegations attribute to treatment for physical injuries they suffered as a result of bullying, as well as treatment for the psychological injuries (*see, e.g.*, Doc. 73, p. 10) (alleging that James R. was stabbed in the arm with a pencil by another student and had to have it surgically removed and that James R. was hospitalized due to suicidal ideations). As the Court sees it, these are compensatory damages for economic losses, which *Cummings* did not preclude. The School District's contention that Plaintiff is only claiming emotional damages is therefore without merit.

*Id.* at *3. *See also Doe v. City of Pawtucket*, C. A. 17-365-JJM-LDA (D.R.I. Sep. 29, 2022) (holding claim for medical treatment for injuries remains available following *Cummings*).

Here, Plaintiff has sought to recover damages for physical injuries and medical care resulting from UVA's failures alleged herein. All of these are indisputably the kind of physical injuries and compensatory and consequential damages that are traditionally available in contract actions, and they remain available to plaintiffs in Spending Clause cases. While these injuries may suggest a component of emotional distress, the cases cited above suggest that damages associated with treatment of these injuries should still be treated as compensatory.

It was under that reasoning that the *Pennington* court found in favor of the plaintiffs in that case—who argued that "PTSD… 'can cause physical symptoms' and is 'also associated with long-term physical health conditions….'"—holding that plaintiffs' requests for medical expenses

incurred as a result of physical as well as psychological injuries from bullying, including but not limited to the hospitalization of one plaintiff due to suicidal ideation, were permissible and should not be precluded by *Cummings*. The same is true here regarding Plaintiff's request for compensatory damages for medical treatment and physical injuries incurred because of UVA's Title IX violations.

Courts have held that under *Cummings,* plaintiffs can still recover loss of opportunity damages in Spending Clause cases.  In *Chaitram v. Penn Med.-Princeton Medical Center*, the Court held that "*Cummings* does not foreclose compensatory damages under an expectation-interest theory," and denied defendants 12(b)(6) motion to dismiss where the plaintiff, in addition to seeking damages for emotional distress, also sought injunctive relief injunctive relief and compensatory damages for claims involving violations of the Americans with Disabilities Act, the Rehabilitation Act, and the Affordable Care Act.  No. CV2117583MASTJB, 2022 WL 16821692, at *2 (D.N.J. Nov. 8, 2022).  While the plaintiff could not recover on claims for "shame, anxiety, frustration, emotional distress, fear and discrimination," compensatory damages "such as loss of opportunity damages, dignitary harm damages, and nominal damages" were still available post-*Cummings. Id.*

In another case involving violations of the ADA and Rehabilitation Act, *Montgomery v. District of Columbia*, the District Court reasoned that, in addition to suffering emotional distress and reputation damages, "the District's failure to accommodate his disability allegedly harmed [the plaintiff] in a different way—by depriving him of the opportunity to meaningfully access and fully participate in his interrogations." No. CV 18-1928 (JDB), 2022 WL 1618741, at *25 (D.D.C. May 23, 2022).  The court found that damages for this loss of opportunity were still recoverable:

> *Cummings* does not require a different conclusion. Using the contract analogy applied in that case here, the District agreed to

> receive federal funds in exchange for promising to refrain from
> discriminating against qualified individuals with disabilities.
> Montgomery, as a third-party beneficiary, alleges that the District
> failed to uphold that promise, which resulted in him losing the
> benefit of the bargain—i.e., being able to participate fully in his
> interrogations. A damages remedy for this type of alleged harm
> would be entirely appropriate in a traditional contract case.

*Id.* (internal citations omitted).  Because this loss of opportunity was "the type of injury that would normally be recoverable in a breach of contract case," *Cummings* did not bar recovery.  *Id.* On that basis, the *Montgomery* court denied summary judgment, finding that "while this loss of opportunity may have caused Montgomery only slight harm, the harm is not necessarily non-existent," and "the Court will not usurp the role of the jury and attempt to quantify such damages in the summary judgment setting." *Id.*

In the context of Title IX, lost educational opportunities are particularly relevant. "Lost educational opportunities lie at the heart of Title IX private right of action cases…. 'The statute makes clear that, whatever else it prohibits, students must not be denied access to educational benefits and opportunities on the basis of gender.'"  *Doe v. Fairfax Cnty. Sch. Bd.*, No. 118CV00614MSNIDD, 2023 WL 424265, at *5 (E.D. Va. Jan. 25, 2023) (citing *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999)).  Accordingly, courts have held that damages for lost educational opportunities remain available following *Cummings*.  For instance, in *Doe v. Fairfax County School Board*, the U.S. District Court for the Eastern District of Virginia held that the plaintiff's claims for damages sustained because of lost educational opportunities would not be dismissed under *Cummings*.  No. 118CV00614MSNIDD, 2023 WL 424265, at *5 (E.D. Va. Jan. 25, 2023).

In her complaint, the plaintiff identified lost educational opportunities, and record evidence established two "concrete, negative effect[s]" her alleged sexual assault had on her ability to

participate in educational opportunities and benefits provided by the school, as (a) her academic performance and class attendance declined after the assault, and (b) she modified her behavior, isolated herself, and missed the band's end-of-year concert so at to avoid coming into contact with her assailant.  *Id.*  The Court explained:

> Although it is true that principles of contract law place the burden on the plaintiff to prove damages with reasonable certainty, Restatement (Second) of Contracts § 352 cmt. a (1981), compensatory damages that are not based upon specific monetary harm but stem directly from lost opportunities suffered as a result of discrimination can nonetheless serve as a basis for damages in private right of action cases based on Spending Clause statutes. Accordingly, this Court finds that such losses of educational opportunities remain recoverable post-*Cummings* and that it would be premature at this time to preclude Plaintiff from presenting evidence related to compensatory damages for lost educational opportunities and benefits.

*Id.* (citing *Montgomery*, 2022 WL 1618741, at *25 n.39, *26; *Chaitram*, 2022 WL 16821692, at *2; Final Jury Instrs., *Nancy Roe v. Purdue Univ.*, No. 4:18-cv-89-JEM (N.D. Ind. Sept. 23, 2022), ECF No. 140 (Instr. No. 24) (instructing jury to "determine the amount of money that will fairly compensate [plaintiff] for any injury that you find she sustained as a direct result of being denied equal access to educational opportunities").

"Consequential damages for lost earning capacity are available in breach of contract cases where a plaintiff alleges the loss of identifiable professional opportunities that the defendant's breach actually adversely influenced or affected." 24 Williston on Contracts § 66.4 (4th ed. 2022) (internal quotations omitted).  Thus, consistent with the Court's ruling in *Cummings,* damages for loss of future earnings or employment opportunities remain available in cases like this one.  *See Doe v. Texas Christian Univ.*, No. 4:22-CV-00297-O, 2022 WL 17631668, at *4 (N.D. Tex. Dec. 13, 2022) (denying summary judgment on economic damages and loss of future earnings claims

where plaintiff provided sufficient evidence of economic damages were "not 'entirely speculative'"); *Rullo v. Univ. of Pittsburgh*, No. 17-1380, 2021 WL 633381, at *3–4 (W.D. Pa. Feb. 18, 2021) (finding plaintiff adequately pled loss of identifiable professional opportunities where alleged Title IX violations led plaintiff to transfer to lower ranked law school and therefore lose access to certain caliber of jobs) (cited with approval in a post-*Cummings* Title IX case in *Doe v. Fairfax Cnty. Sch. Bd.*, No. 118CV00614MSNIDD, 2023 WL 424265, at *6–7 (E.D. Va. Jan. 25, 2023) (finding plaintiff could not recover for loss of future earnings where she failed to plead any identifiable opportunity foreclosed by discrimination and alleged loss was to attenuated from violations because breach occurred while Plaintiff was in high school); *Unknown Party v. Ariz. Bd. of Regents*, No. CV-18-01623-PHX-DWL, 2022 WL 17081309, at *17 (D. Ariz. Nov. 18, 2022) (finding loss of identifiable professional opportunities where both parties conceded Plaintiff was likely to become wrestling coach).

In the present case, Plaintiff asserts claims for loss of opportunities suffered due to UVA's failures. These losses are compensable, and Plaintiff has alleged sufficient facts on which they can justifiably be expected to prevail at trial. These losses of opportunity, among others that may be shown at trial, are and remain compensable in Title IX actions, regardless of the application of *Cummings.* Plaintiff has sufficiently pleaded facts to support these loss of opportunity damages. Therefore, Defendants' Motion to Dismiss should be denied.

### C.  Equal Protection claim against Defendant Haynes

Based on a thorough review of Defendants' arguments and cited law, Plaintiff withdraws her Equal Protection claim against Defendant Haynes.

## V.      CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants'

Motion to Dismiss her Amended Complaint with respect to her Title IX claim (Count I).  Plaintiff

withdraws her remaining claims against Defendants Babb and Haynes.

Date: September 27, 2023                    Respectfully Submitted,

Devon J. Munro (VSB # 47833)
Munro Byrd, P.C.
120 Day Ave. SW, First Floor
Roanoke VA 24016
(540) 283-9343
dmunro@trialsva.com

*s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour
Pro Hac Vice
Abdnour Weiker, LLP
500 E. Michigan Ave., Ste. 130
Lansing, MI 48912
(517) 994-1776
liz@education-rights.com

Co-Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I, Elizabeth K. Abdnour, counsel for Plaintiff, certify that on September 27, 2023, I filed
this document by use of this Court's ECF system, which will serve copies to all counsel of record.

/s/ Elizabeth K. Abdnour