# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | | |
|---|---|---|
| **JANE DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RECTOR AND VISITORS OF THE** | ) | |
| **UNIVERSITY OF VIRGINIA,** | ) | |
| | ) | **Case No. 3:23-cv-00018-RSB** |
| **Defendant.** | ) | |
| | ) | |
| _____ | ) | |

## <u>DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS</u>
## <u>MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................................ii

INTRODUCTION.............................................................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS.................................................................. 3

LEGAL STANDARD ...................................................................................................................... 20

ARGUMENT .................................................................................................................................. 20

   I.    PLAINTIFF'S DECEMBER 2018 OR JANUARY 2019 TITLE IX CLAIM IS FOREVER
      TIME-BARRED.................................................................................................................. 21

   II.   THE UNDISPUTED FACTS ESTABLISH THAT UVA WAS NOT DELIBERATELY
      INDIFFERENT .................................................................................................................. 23

      A.    THERE IS NO BASIS TO IMPUTE LIABILITY BECAUSE NO UVA OFFICIAL HAD
         ACTUAL NOTICE OR KNOWLEDGE OF THE HARASSMENT UNTIL PLAINTIFF'S
         REPORT IN 2020.................................................................................................. 24

      B.    UVA'S RESPONSE TO PLAINTIFF'S MARCH 2020 TITLE IX COMPLAINT WAS
         NOT CLEARLY UNREASONABLE ................................................................. 27

   III.    THE DAMAGES PLAINTIFF SEEKS ARE UNAVAILABLE UNDER TITLE IX .......... 34

CONCLUSION ............................................................................................................................... 39

CERTIFICATE ............................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Slaey v. Adams*,
   No. 1:08cv354, 2008 U.S. Dist. LEXIS 103903 (ED. Va. Dec. 23, 2008)............................21

*A.T. v. Oley Valley Sch. Dist.*,
   2023 U.S. Dist. LEXIS 16619 (E.D. Pa. Feb. 1, 2023) ..........................................................36

*K.C. ex. rel. Africa H. v. Shipman*,
   716 F.3d 107 (4th Cir. 2013) ..................................................................................................34

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................................................20

*Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*,
   548 U.S. 291 (2006)................................................................................................................35

*B.R. v. F.C.S.B*,
   No. 1:19-cv-917, 2024 U.S. Dist. LEXIS 57019 (E.D. Va. Feb. 26, 2024) .....................35, 36

*Buscemi v. Bell*,
   964 F.3d 252 (4th Cir. 2020) ..................................................................................................34

*Butters v. James Madison University*,
   208 F. Supp. 3d 745 (W.D. Va. 2016) .........................................................................24, 27, 28

*Cummings v. Premier Rehab Keller*,
   P.L.L.C., 596 U.S. 212 (2022) ...........................................................................35, 36, 37, 38

*Davis v. Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629 (1999).................................................................................................... *passim*

*Doe v. Bd. of Educ.*,
   605 Fed. Appx. 159 (4th Cir. 2015).........................................................................23, 24, 28

*Doe v. Bd. of Educ.*,
   982 F. Supp. 2d 641 (D. Md. 2013) ........................................................................................29

*Doe v. Bd. of Educ.*,
   982 F. Supp. 641 (D. Md. 2013) .............................................................................................28

*Doe v. Fairfax Cnty. Sch. Bd.*,
   1 F.4th 257 (4th Cir. 2021) .........................................................................................23, 24, 27

*Doe v. Fairfax Cnty. Sch. Bd.*,
No. 1:18-cv-00614, 2023 U.S. Dist. LEXIS 13886 (E.D. Va. Jan 25, 2023) ........................35

*Doe v. Galster*,
768 F.3d 611 (7th Cir. 2014) ...................................................................................24

*Doe v. Manhattan Beach Unified Sch. Dist.*,
No. 23-55233, 2024 U.S. App. LEXIS 4077 (9th Cir. Feb. 22, 2024) ....................................28

*Doe v. Old Dominion Univ.*,
No. 2:17cv15, 2017 U.S. Dist. LEXIS 228131 (E.D. Va. June 26, 2017).............................29

*Doe v. Univ. of Miami*,
446 F. Supp. 3d 1000 (S.D. Fla. 2020) ..................................................................28

*Emily O. v. Regents of the Univ. of Cal.*,
No. CV-20-08159-AB-JEM, 2021 U.S. Dist. LEXIS 78082 (C.D. Cal. Mar. 9,
2021) ..................................................................................................................28

*Fachetti v. Bridgewater Coll.*,
No. 5:15cv00049, 2016 U.S. Dist. LEXIS 41899 (W.D. Va. Mar. 3, 2016) ........................27

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998)..........................................................................................24, 27

*Isle of Wight Cnty. v. Nogiec*,
281 Va. 140 (2011) .............................................................................................36

*Jacobs v. N.C. Admin. Office of the Courts*,
780 F.3d 562 (4th Cir. 2015) ...............................................................................20

*Kelly v. Yale Univ.*,
No. 3:01-cv-1591, 2003 WL 1563424 (D. Conn. Mar. 26, 2003) .........................................28

*Kenny v. Wilson*,
885 F.3d 280 (4th Cir. 2018) ...............................................................................34

*King v. Inova Health Care Servs.*,
No. 1:19-cv-31, 2020 U.S. Dist. LEXIS 77433 (E.D. Va. May 1, 2020) ...............................34

*M.R. v. Burlington Area Sch. Dist.*,
No. 21-cv-1284, 2023 U.S. Dist. LEXIS 129829 (E.D. Wis. July 27, 2023) ........................35

*McAvoy v. Dickinson Coll.*,
No. 1:20cv1327, 2023 U.S. Dist. LEXIS 172332 (M.D. Pa. Sep. 26, 2023) ........................28

*McAvoy v. Dickinson Coll.*,
No. 23-2939, 2024 U.S. App. LEXIS 20732 (3d Cir. Aug. 16, 2024) ...................................28

*Md. Shall Issue, Inc. v. Hogan,*
    971 F.3d 199 (4th Cir. 2020) ............................................................34

*Mercer v. Duke Univ.,*
    50 Fed. Appx. 643 (4th Cir. 2002) ....................................................36

*Nasim v. Warden, Md. House of Corr.,*
    64 F. 3d 951 (4th Cir. 1995) (en banc) ..............................................21

*Peabody v. Rector & Visitors of the Univ. of Va.,*
    No. 3:21-cv-44, 2022 U.S. Dist. LEXIS 77263 (W.D. Va. Apr. 27, 2022)............................21

*Rice v. Cmty. Health Ass'n,*
    203 F.3d 283 (4th Cir. 2000) ...............................................35, 36, 38

*Smith v. McLaughlin,*
    289 Va. 241 (2015) .............................................................................36

*Sunrise Continuing Care, LLC v. Wright,*
    277 Va. 148 (2009) .............................................................................36

*Tigrett v. Rector & Visitors of the Univ. of Va.,*
    290 F.3d 620 (4th Cir. 2002) .............................................................29

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021)........................................................................34

*United States v. Kubrick,*
    444 U.S. 111 (1979)............................................................................21

*V.E. v. Univ. of Md. Balt. Cnty.,*
    No. 1:22-cv-02338-JRR, 2023 U.S. Dist. LEXIS 70334 (D. Md. Apr. 21,
    2023) ..................................................................................................21

*Wai Man Tom v. Hosp. Ventures LLC,*
    980 F.3d 1027 (4th Cir. 2020) ...........................................................20

**Rules**

Fed. R. Civ. P. 26.................................................................................38

Fed. R. Civ. P. 34.................................................................................38

Fed. R. Civ. P. 37(c)(1).........................................................................38

Fed. R. Civ. P. 56(a) ............................................................................20

## **INTRODUCTION**

This is a case is about Plaintiff's dissatisfaction with UVA's response to her Title IX complaint, which not only prevented any further harassment of Plaintiff and provided her supportive measures but also held her harasser accountable and ensured that he would never teach at UVA again. Plaintiff brings two Title IX claims because: (1) she asserts, without any evidence to back it up, that a co-instructor knew of sexual violations in December 2018 or January 2019 and he did not report, and (2) she claims that UVA's response to her March 2020 Title IX complaint was inadequate and took too long. Both claims fail as a matter of law.

On March 15, 2020, Plaintiff, then an undergraduate in her final semester, reported that a UVA professor had grabbed her without her consent in a sexual manner during a J-Term study-abroad course in December 2018 and/or January 2019. At that time, Plaintiff reported no other instances of sexual harassment/sexual assault, and she explained that she had been in a consensual relationship with this professor for over a year. On February 15, 2020, after Plaintiff discovered that the professor was dating another woman, Plaintiff broke off her relationship with the professor.

A month later, Plaintiff decided to hold the professor accountable for his actions during the December 2018-January 2019 J-Term. With Plaintiff's agreement, on March 19, 2020, UVA initiated a formal Title IX investigation for a single claim of nonconsensual sexual contact during the December 2018-January 2019 J-Term. Because Plaintiff raised new allegations of potential policy violations each time she was interviewed by UVA's investigators, UVA expanded the scope of the investigation to 11 instances of nonconsensual sexual contact, which Plaintiff alleged happened over a 13-month period in various locations abroad and in the U.S. and mostly while the Plaintiff and the professor were engaged in a sexual and romantic relationship. In total, UVA's extensive, thorough, and comprehensive investigation required 23 witness interviews and resulted

1

in a 319-page final report with 57 exhibits totaling 1,737 pages. To be sure, the investigation required about a year of work and resulted in a recommendation that the professor be found responsible for sexual assault in violation of UVA policies.

After the professor challenged the recommended findings, UVA held a hearing, found the professor responsible, and recommended that his employment be terminated. Two days later, the professor resigned. Even after his resignation, UVA imposed the most serious sanction against the professor, making sure that the professor could never be rehired or be eligible for any honorary status at UVA, ever again. That professor has never worked again, anywhere.

Plaintiff now claims that UVA violated Title IX because UVA's process took too long, and because she claims that UVA should have protected her from the professor, even though UVA determined that a no-contact directive was not required under the circumstances – and it was right. Plaintiff and the professor have not had contact since the filing of her Title IX complaint in March 2020. None. Plaintiff's preferences on the duration of UVA's investigation and the no-contact directive, which would have made no difference in her case, fail to establish a dispute of a material fact.

Not only did UVA provide a fair, thorough, and impartial Title IX investigation and adjudication that resulted in the professor never being able to work at UVA again, UVA communicated with and supported Plaintiff at each step along the way. When Plaintiff reported mental health challenges, UVA connected her with counseling services and support and approved accommodations for all of Plaintiff's classes and staff reached out to faculty to explain Plaintiff's difficulties. To remedy the professor's actions, UVA offered Plaintiff $5,000 to cover the costs of counselling and holistic healing. Plaintiff earned a perfect 4.0 in the Spring 2020 semester and graduated on schedule in May 2020 with a 3.98 GPA.

The undisputed evidence is that UVA complied with its Title IX legal obligations. No reasonable jury could find that UVA acted with deliberate indifference, and UVA is entitled to summary judgment on Plaintiff's Title IX deliberate indifference claim regarding its response to Plaintiff's March 15, 2020 Title IX complaint as a matter of law.

As to Plaintiff's claim that UVA acted with deliberate indifference based on her allegation that a co-instructor knew of the professor's harassment during the December 2018-January 2019 J-Term, this claim is forever time-barred. Plaintiff possessed every fact necessary to bring suit no later than January 2021, or August 2022 at the latest, and she failed to do so. There is also no evidence that the co-instructor had actual notice or knowledge of the violations.

Additionally, none of Plaintiff's claimed damages are recoverable under Title IX, and thus, her entire case must be dismissed.

There is no material dispute of facts at issue in this case. UVA more than satisfied its obligations under Title IX. Plaintiff's case should be dismissed, with prejudice, in its entirety.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      In the fall of 2018, Plaintiff transferred as an undergraduate student to UVA. Ex. 1 - Pl. Dep. 206:1-2. In December 2018 and January 2019, Plaintiff was enrolled in a J-Term course that took place in Austria and Hungary ("J-Term"). Ex. 2 - Biemann Decl. ¶¶ 6, 8. Professors John Roe[1] ("Roe") and Asher Biemann ("Biemann") taught the J-Term. Ex. 2 at ¶ 6.

2.      On December 27, 2018, the night before the J-Term began, Plaintiff, Roe, Biemann, and Biemann's then-girlfriend met for dinner. Ex. 3 - Biemann Dep. 59:11-21. No other students

---

[1] UVA has no position regarding whether "John Roe" should continue to be referred to by this pseudonym, and has indicated the same to Plaintiff's counsel. For the deposition of Plaintiff, Plaintiff's counsel requested that all references to John Roe's real name be changed to John Roe.

had arrived yet. Ex. 2 at ¶ 9. Biemann and Roe used this dinner to discuss the details of the upcoming course. Ex. 3 at 59:22-60:19. During the J-Term, Roe and Biemann frequently shared meals with students, and Biemann considered it normal for Plaintiff to join this dinner so she could eat and not be alone because she was the first student to arrive. Ex. 2 at ¶ 10; Ex. 3 at 59:22-60:19. Plaintiff and Roe interacted normally during the dinner. Ex. 3 at 64:4-15, 65:19-66:1. During the dinner, Roe did not touch Plaintiff in a sexual manner or kiss her and did not say anything sexually suggestive to her. Ex. 1 at 181:1-182:1.

3.     Later that evening, Plaintiff went to Roe's hotel room and Roe touched her in a sexual manner. Ex. 4 – Final Report 23-27. On other occasions during the J-Term, Plaintiff went to Roe's room and additional instances of sexual contact occurred. *Id.* at 42-120.

4.     During the beginning days of the J-Term, Plaintiff was physically ill. Ex. 3 at 101:22-103:14. Biemann checked on Plaintiff, told her to rest, and observed that Plaintiff recovered. *Id.* at 102:5-19. Biemann noted that Plaintiff spoke less during the J-Term compared to her previous classroom behavior and told her to let him know if she needed anything. Biemann Ex. 2 at ¶ 14. Biemann thought Plaintiff's behavior was due to being abroad and having been sick. *Id.*

5.     On January 11, 2019, the final night of the J-Term, Biemann and Roe stopped by the hotel room of Plaintiff and her roommate, another UVA student, as they did with other students, and chatted with them prior to their departure the following morning. Ex. 1 at 146:7-147:4, 168:12-22; Ex. 2 at ¶ 16. Biemann and Roe stood next to each other outside of the hotel room, Roe leaned on the door frame, and Plaintiff could see them both. Ex. 1 at 148:7-14, 163:13-19. Roe joked and engaged in conversation with Plaintiff and her roommate. *Id.* at 167:16-168:6; Ex. 4 at 962. Roe did not make any sexually suggestive comments or gestures during this interaction. Ex. 1 at 165:3-

4

18, 169:1-170:11. Roe did not touch Plaintiff in any way during this interaction. *Id.* at 163:13-164:3. Roe and Biemann had been to a wine bar that evening. Ex. 4 at 108.

6.      During the J-Term, Biemann never saw Roe touch Plaintiff in a sexual manner, and he did not hear Roe make any sexually suggestive comments to or about Plaintiff. Ex. 3 at 99:12-100:8. Plaintiff never told Biemann that Roe had made sexual advances towards her. Biemann Ex. 2 at ¶ 15.

7.      Over the following year, Plaintiff and Roe entered into a relationship and continued to have sexual interactions at Roe's home and, in the summer of 2019, at a hotel room in Washington, D.C. Ex. 4 at 127-175, 191-221.

8.      On February 15, 2020, Plaintiff ended her relationship with Roe after discovering that he was having a relationship with another woman on a dating website. Ex. 4 at 219. Plaintiff and Roe have not had any contact since February 16, 2020. Ex. 1 at 51:14-52:5; Ex. 4 at 230.

9.      Around 5:30PM on February 17, 2020, Plaintiff told Biemann that she had been in a consensual sexual relationship with Roe since the J-Term. Ex. 2 at ¶ 21. Biemann was shocked and surprised by Plaintiff's disclosure. *Id.* at ¶ 22. Biemann had not previously suspected Roe was having a sexual and romantic relationship with Plaintiff, nor had he heard any rumors that Roe and Plaintiff were in a relationship. Ex. 2 at ¶ 22-24; Ex. 3 at 28:21-29:3, 71:3-16. After their conversation, Plaintiff went to stay with her father in Northern Virginia for a week. Ex. 2 at ¶ 25.

10.     The next day, Biemann reported Roe's relationship with Plaintiff to Roe's supervisor. *Id.* at ¶ 26. On February 19, 2020, Biemann reported it to the head of UVA's International Studies Office and Laurie Casteen ("Casteen"), the Associate Dean of Students. *Id.* at ¶¶ 28-29.

11.     At 1:19PM on February 19, 2020, Casteen reported the consensual sexual relationship to the Title IX Coordinator. Ex. 5 - Casteen Decl. ¶ 12. That same day, because her role included providing support and guidance to students on an array of personal and academic matters, Casteen reached out to Plaintiff and offered to meet the following day. *Id.* at ¶¶ 3, 13. Plaintiff was still out of town, and they agreed to meet in person on February 24, 2020, once Plaintiff had returned to Charlottesville. *Id.* at ¶ 13. When they met, Plaintiff told Casteen about her relationship with Roe and emphasized that it was a consensual romantic relationship. Ex. 4 - Final Report 227-28, 241; Ex. 5 at ¶ 14. Casteen advised Plaintiff how she could support her personally and academically. Ex. 5 at ¶ 14. Casteen encouraged Plaintiff to follow up with UVA's Counseling and Psychological Services ("CAPS") for mental health support. *Id.*

12.     UVA was on spring recess from March 7 through March 15, 2020. Ex. 6 – 2019-2020 UVA Calendar 6. On March 11, 2020, UVA announced that it was moving all classes online in response to the COVID-19 pandemic. Ex. 7 – UVA COVID-19 Comms. 45-46. UVA encouraged all students, including those living off Grounds,[2] to return home to attend their online classes. *Id.* at 46. On March 17, 2020, UVA cancelled all events on-Grounds and mandated all faculty telecommute with limited exceptions for UVA Health employees and faculty without home technology capabilities. *Id.* at 29-30.

13.     Plaintiff was in Northern Virginia for spring recess when UVA announced that classes would be remote going forward. Ex. 1 at 54:16-55:1. Plaintiff never attended any in-person classes at UVA after March 11, 2020. *Id.* at 53:19-22.

14.     Between March 11 and March 15, 2020, Plaintiff and Casteen exchanged emails regarding Plaintiff's interest in holding Roe accountable for initiating sexual contact during the J-

---

[2] Campus at UVA is referred to as "Grounds."

Term. Ex. 5 at ¶ 17; Ex. 8 – Mar. 11-16, 2020 Casteen Emails. Plaintiff told Casteen that she did not have any romantic feelings or physical attraction to Roe at the time of the first sexual contact between them, and that Roe grabbed her in the hotel room in Vienna. Ex. 5 at ¶ 17. On March 14, 2020, Casteen confirmed with Plaintiff that it sounded like, upon reflection, that Plaintiff felt the initial incident during the J-Term was not consensual. *Id.* Plaintiff did not report any other non-consensual contacts at this time. *Id.* ¶ 32.

15.     On Sunday, March 15, 2020, Casteen filed a Title IX report about what Plaintiff had told her, which was received by the Title IX Coordinator and the Title IX Evaluation Panel. *Id.* ¶ 19. The Evaluation Panel reviewed all Title IX complaints and decided whether to launch formal investigations and if law enforcement should be contacted. Ex. 9 - Babb Dep. 41:9-42:2, 43:12-18.

16.     On Monday, March 16, 2020, the Title IX Evaluation Panel discussed Plaintiff's Title IX complaint about Roe's actions during the J-Term. Ex. 5 at ¶ 20. The Evaluation Panel determined they needed more information from Plaintiff regarding her preferences for how she wanted to proceed. *Id.* That same day, Casteen spoke with Plaintiff who, after asking many questions about the process, expressed her preference for a formal resolution through a Title IX investigation and that she would like to see Roe no longer employed by UVA. *Id.* ¶ 21. Casteen also discussed supportive measures regarding academics and mental health with Plaintiff. *Id.* Casteen encouraged Plaintiff to stay in contact with her counsellor at CAPS. *Id.*

17.     Plaintiff's last class taught by Roe was in the Spring 2019 semester. Ex. 10 - Roe Dep. 47:17-48:464:19-65:3. Roe was on academic leave for the entire Spring 2020 semester, and thus was not teaching at UVA, nor did he teach in Summer 2020. Ex. 4 at 159, 217; Ex. 10 at 65:4-21. After UVA suspended in-person classes due to COVID-19, Roe complied with UVA's

mandate—he did not go to UVA's Grounds until July 2021 after he resigned to clean out his office. Ex. 10 at 69:2-70:12.

18.     Before their call on March 16, 2020, Casteen emailed Plaintiff to inform her of available resources and that she had the right to seek appropriate protective measures, provided the Title IX Policy and a document with examples of protective and remedial measures, and explained the details of the next steps in the Title IX process. Ex. 1 at 39:11-20; Ex. 11 - Casteen Mar. 16, 2020 Email to Pl.; Ex. 12 – Resource and Reporting Guide for Students 7. Casteen's primary objective was to support Plaintiff and connect her with resources. Ex. 5 at ¶ 22.

19.     Casteen asked Plaintiff questions to assess her physical safety and identified Plaintiff's suicidal ideation and mental health issues as the only threat to Plaintiff's safety. *Id.* at ¶ 23. Plaintiff never told Casteen that Roe posed a threat to her physical safety. *Id.* Plaintiff's emphasis was on holding Roe accountable for his actions during the J-Term. *Id.*

20.     On Thursday, March 19, 2020, the Evaluation Panel met again and initiated a formal Title IX investigation. *Id.* at ¶ 26. That same day, Casteen told Plaintiff that UVA was opening a formal Title IX investigation. Ex. 13 – Mar. 19, 2020 Casteen Email to Pl. Casteen again informed Plaintiff that protective and remedial measures were available to her. Ex. 5 at ¶ 26.

21.     The Title IX Coordinator did not issue a no-contact directive in this matter. Ex. 9 at 86:22-87:17. In determining whether to issue a no-contact directive, the Title IX Coordinator considered factors such as the facts and circumstances of the reported conduct, the requests of the parties, whether the parties had been communicating, and the likelihood of the parties interacting. *Id.* at 86:22-87:17.

22.     On March 16, 2020, at Plaintiff's request, Casteen requested flexibility for Plaintiff from one of Plaintiff's professors because Plaintiff was a complainant in a Title IX matter. Ex. 5 at ¶ 25. Casteen advised Plaintiff that the professor was fully supportive. *Id.*

23.     On March 18, 2020, UVA granted Plaintiff academic accommodations, which included extended time to complete assignments and modifications of assignment deadlines and attendance policies, for the rest of the semester and notified her professors of the same. Ex. 14 – Zunder Decl. ¶ 10; Ex. 15 – Pl.'s Accommodations.

24.     On Saturday March 28, 2020, Casteen informed Plaintiff that the notice of investigation would be issued the following week and let her know what to expect from the investigation. Ex. No. 5 at ¶ 28.

25.     Under the Title IX Policy, the notice of investigation advised the complainant and the respondent that an investigation had commenced, provided details of the alleged prohibited conduct, identified the potential Title IX violations, and prohibited the parties from committing acts of retaliation. UVA Title IX Policy and Procedures, ECF No. 11-1 at 33.

26.     On March 30, 2020, the Title IX Coordinator advised Plaintiff that the notice of investigation would go out the next day, and she offered to meet to discuss the notice and next steps. Ex. 1 at 91:16-93:1; Ex. 16 – Mar. 30, 2020 Babb Email to Pl.

27.     Under the Title IX Policy, a complainant could contact the Title IX Coordinator to challenge a protective measure or the failure to impose protective measures or to take other measures. ECF No. 11-1 at 30. Plaintiff never contacted the Title IX Coordinator to request or challenge any protective measures. Ex. 1 at 93:17-21.

28.     On March 31, 2020, UVA issued a Notice of Investigation to Plaintiff and Roe, commencing a formal Title IX investigation. *Id.* at 61:1-16; Ex. 17 - Mar. 31, 2020 Notice of

Investigation; Ex. 18 – Mar. 31, 2020 Babb Email to Pl. Based on Plaintiff's report, the scope of the March 31, 2020 Notice of Investigation was the hotel-room incident during the J-Term where Roe allegedly grabbed Plaintiff in a sexual manner without her consent. Ex. 1 at 61:17-62:18; Ex. 17 at 1. Roe's alleged actions implicated UVA's Title IX Policy regarding sexual harassment and sexual assault and UVA's faculty conflict of interest policy. Ex.17 at 1-2. The Title IX Coordinator informed Plaintiff that she was not required to participate in the investigation and that the investigators would not draw any adverse inferences from a decision not to participate. *Id.* at 3. The Title IX Coordinator assigned two investigators, Tosha Barnes and Stuart Evans ("Investigators"), to the investigation. Ex. 19 - Barnes Decl. ¶ 8. The Title IX Coordinator gave Plaintiff a copy of the Title IX Policy, which set out examples of remedial and supportive measures, and informed her that she could seek remedial and protective measures, and provided her a guide about requesting such measures. Ex. 17 at 3, 5; Ex. 18; ECF No. 11-1 at 8.

29.     The March 31, 2020 Notice of Investigation informed Roe and Plaintiff that retaliation against someone for making a Title IX report was prohibited. Ex. 4 at 394; Ex. 17 at 4.

30.     The Title IX Coordinator and Casteen informed Plaintiff of her right to an advisor. Ex. 5 at ¶ 21; Ex. 17 at 4. Plaintiff retained an attorney who represented her throughout the Title IX process, including at all of her interviews and at the Review Panel hearing. Ex. 1 at 66:9-14, 236:3-22; Ex. 19 at ¶ 11.

31.     On April 1, 2020, Casteen and the Title IX Coordinator had a call with Plaintiff so she could ask questions about the Title IX investigation, and they could explain their roles. Ex. 5 at ¶ 29. During the call, the Title IX Coordinator and Casteen answered Plaintiff's questions, and Casteen explained that she was not part of the investigation but was available to provide Plaintiff with supportive measures and connect her with resources. *Id.* at ¶ 29.

32.      On April 3, 2020, the Investigators contacted Plaintiff to set up an interview. Ex. 19 at ¶ 10. Per Plaintiff's request, the Investigators delayed this initial interview to allow Plaintiff a chance to meet with her attorney. Ex. 20 – Apr. 7, 2020 Investigators Email. The Investigators then scheduled the interview for April 14, 2020, to allow time to review evidence Plaintiff provided. Ex. 19 at ¶ 10. The first interview lasted approximately two-and-a-half hours but did not cover everything that Plaintiff and her attorney wanted to share. *Id.* at ¶ 12.

33.      The following day, the Investigators emailed Plaintiff to schedule a follow-up interview. *Id.* ¶ 13. To accommodate Plaintiff's and her attorney's schedules, the Investigators scheduled the interview for April 20, 2020. *Id.* On April 20, 2020, Plaintiff cancelled the interview. *Id.* at ¶ 14. The Investigators rescheduled the interview for April 24, 2020. *Id.* When Plaintiff missed that interview, the Investigators rescheduled it for April 27, 2020. *Id.* at ¶ 15.

34.      On April 24, 2020, Plaintiff's attorney proposed limiting the interviews to two-hours going forward, and the Investigators agreed. *Id.* at ¶ 16.

35.      The Investigators then interviewed Plaintiff on April 27, 2020 and May 1, 2020 but had outstanding questions and thus scheduled a fourth interview for May 8, 2020. *Id.* at ¶¶ 18-19. On May 8, 2020, Plaintiff canceled, citing her mental health, and the interview was rescheduled for May 11, 2020. *Id.* at ¶ 20. On May 10, 2020, Plaintiff asked to reschedule the May 11, 2020 interview, and it was moved to May 13, 2020. *Id.* at ¶ 21. After Plaintiff requested to reschedule the May 13, 2020 interview, the Investigators told Plaintiff they would contact her on May 18, 2020, after her graduation. *Id.* at ¶ 22.

36.      Plaintiff graduated from UVA on May 17, 2020. Ex. 21 – Pl.'s UVA Academic Tr. During her final semester, Plaintiff obtained a perfect 4.0 GPA for her five classes, including one

A+. *Id.* Plaintiff graduated with distinction and a GPA of 3.98 on a 4.00 scale. *Id.* Plaintiff earned a 3.94 GPA in Spring 2019 and a 4.00 GPA in Fall 2020. *Id.*

37.     On May 18, 2020, the Investigators asked Plaintiff for a fourth interview. Ex. 19 at ¶ 23. On May 21, 2020, the Investigators interviewed Plaintiff for the fourth time. *Id.* at ¶ 24.

38.     The Investigators had to interview Plaintiff four times in April and May 2020 because of the new potential policy violations she reported piecemeal during the interviews, the number of interactions between Plaintiff and Roe over more than a year, and to accommodate Plaintiff's time limitation on the interviews. *Id.* at ¶ 27.

39.     Because of additional allegations of nonconsensual contact reported by Plaintiff during her four interviews, on May 21, 2020, the Title IX Coordinator sent Plaintiff and Roe an Amended Notice of Investigation, which expanded the scope of the investigation. Ex. 1 at 83:3-20; Ex. 19 at ¶ 29. Instead of one incident, the Investigators were now investigating 11 incidents of alleged policy violations from December 27, 2018 through February 2020. Ex. 19 at ¶ 30; Ex. 22 – May 21, 2020 Am. Notice of Investigation at 1-2.

40.     Per its Title IX Policy, UVA had a goal of resolving typical Title IX complaints within 60 days of giving notice of the investigation. ECF No. 11-1 at 34. This timeframe could be extended for a variety of reasons, including to account for the complexity of a case, to accommodate the schedules of witnesses, the number of witnesses, the volume of evidence, and to ensure the completeness of the investigation. *Id.* at 34-35. Investigators would notify the parties in writing of any extension of the timeframe and provide the reason for the extension. *Id.* at 35.

41.     On May 29, 2020, the Investigators notified Plaintiff that the anticipated release date of the Draft Report was being extended due to delays in obtaining information from parties/witnesses, the increased scope of the investigation, and issues related to the COVID-19

global pandemic. Ex. 1 at 103:15-104:18; Ex. 23 – May 29, 2020 Evans Email. All interviews, hearings, submissions of evidence, and meetings with complainants and respondents were being conducted remotely because of the pandemic—a change from the in-person nature of UVA's Title IX investigations prior to COVID-19. Ex. 19 at ¶ 33. The Investigators told Plaintiff that they anticipated that the Draft Report would be issued on or before July 31, 2020, but noted that this timeframe could be extended for good cause. *Id.* ¶ 34.

42.     On June 4, 2020, Plaintiff expressed to the Investigators that the delay in the investigation up to that point was in great part her fault. *Id.* ¶ 35. On June 5, 2020, the Investigators told Plaintiff she should not blame herself and that there were other factors affecting the pace of the investigation, including that the scope and timeline of the allegations were large. *Id.*

43.     In June and July 2020, the Investigators interviewed Roe on three occasions and conducted sixteen interviews with fourteen other witnesses, including Biemann. Ex. 4 at 11; Ex. 19 at ¶ 36. The Investigators also received and reviewed hundreds of pages of text and WhatsApp messages exchanged between Plaintiff and Roe. Ex. 19 at ¶¶ 37, 40. With these initial interviews complete, the Investigators dedicated themselves to summarizing the evidence gathered in the Draft Report. *Id.* at ¶ 38.

44.     On July 31, 2020, the anticipated date of the Draft Report was extended to August 2020 due to "the significant volume of evidence" Plaintiff and Roe had submitted. *Id.* at ¶ 39; Ex. 24 – July 31, 2020 Evans Email to Pl.

45.     On August 26, 2020, the Investigators sent Plaintiff and Roe the 172-page Draft Report and its 46 exhibits, which summarized the information gathered in the investigation. Ex. 19 at ¶ 40; Ex. 25 – Aug. 26, 2020 Barnes Emails. The Draft Report's exhibits totaled 1,037 pages and included 386-pages of texts and WhatsApp messages and 151-pages of emails provided by the

parties and transcripts of all the interviews conducted up to that time, including Biemann's interview. Ex. 19 at ¶ 40; Ex. 26 – Draft Report at 9, 432-925, 1081-1123. Per the Title IX Policy, the Investigators gave Plaintiff and Roe an opportunity to respond to the Draft Report and identify additional witnesses and evidence. Ex. 19 at ¶ 43; ECF No. 11-1 at 36.

46.     Plaintiff read the Draft Report on August 26, 2020. Ex. 27 – Aug. 27-30, 2020 Casteen Emails 3.

47.     The day the Investigators sent out the Draft Report, Casteen reached out to Plaintiff to offer support. Ex. 5 at ¶ 31. When Plaintiff shared that she had been unable to connect with her therapist in Northern Virginia and was having trouble with an unpaid UVA medical bill, both Casteen and Plaintiff's former UVA counsellor encouraged Plaintiff to continue using CAPS even though she had graduated and provided resources about resolving the billing issue. *Id.*

48.     On September 7, 2020, both Plaintiff and Roe responded to the Draft Report. Ex. 19 at ¶ 45. From September 15 to October 8, 2020, the Investigators engaged in additional investigatory steps based on the parties' responses to the Draft Report, including interviewing a new witness identified by Plaintiff. Ex. 4 at 11; Ex. 19 at ¶ 46. On October 19, 2020, after the Investigators shared the additional information from these steps, Plaintiff and Roe submitted responses. Ex. 4 at 11; Ex. 19 at ¶ 48. Roe also submitted additional evidence. Ex. 19 at ¶ 48.

49.     In her October 19, 2020 response, Plaintiff made new allegations that Roe had engaged in nonconsensual sexual acts with her while she was sleeping at his house and requested to discuss this with the Investigators. Ex. 4 at 2001-02; Ex. 19 at ¶ 49. The Investigators proposed interviewing Plaintiff for a fifth time on October 22 or 23, 2021. Ex. 19 at ¶ 50. Plaintiff's attorney was not available on the proposed dates, and the Investigators conducted the follow up interview on October 27, 2020, during which Plaintiff raised the new allegations. *Id.* at ¶ 50.

14

50.     On November 2, 2020, the Title IX Coordinator issued the Second Amended Notice of Investigation, which clarified Plaintiff's allegations in the Amended Notice of Investigation and included Plaintiff's new allegations that Roe had initiated nonconsensual sexual acts while she was sleeping on one occasion in June 2019 and on multiple occasions between October 2019 and February 2020. *Id.* at ¶ 52; Ex. 28 – Nov. 2, 2020 2nd Am. Notice of Investigation 3-4. The Investigators attempted to interview Roe in November regarding the new allegations. Ex. 19 at ¶ 53. Roe declined, but on December 15, 2020, after obtaining an extension to consult with his attorney, he submitted a 36-page written response to the new allegations. Ex. 4 at 175, 2004-2059; Ex. 19 at ¶ 53. The Investigators gave Plaintiff until January 6, 2021 to respond to Roe's December 15, 2020 submission if she chose to do so. Ex. 19 at ¶ 54. On January 7, 2021, after obtaining an extension, Plaintiff, through her attorney, submitted a response. *Id.* at ¶ 54.

51.     On January 8, 2021, the Investigators informed Plaintiff that they were turning their attention to preparing the Final Investigation Report ("Final Report"), which they would strive to complete in February 2021, but they anticipated that it would take time due to the significant volume of information submitted and the timeline of the allegations. *Id.* at ¶ 55.

52.     On February 26, 2021, the Investigators updated Plaintiff on the status of Final Report, which they anticipated would likely double in size from the Draft Report. *Id.* at ¶ 57. The Investigators told Plaintiff that they had been working on the Final Report but that they anticipated it would not be sent until late March 2021. Ex. 29 – Feb. 26, 2021 Evans Email. The Investigators explained that the reason for this extension was the new evidence submitted after the Draft Report, the scope of the investigation, and the time needed to incorporate and analyze the information gathered. Ex. 19 at ¶ 57.

53.     On March 31, 2021, the Investigators sent Plaintiff a final update on the status of the Final Report and informed her that they anticipated that the Final Report would be released in April 2021. *Id.* at ¶ 58. They explained that "incorporating and analyzing the large volume of evidence submitted" had "taken longer than anticipated." Ex. 30 – Mar. 31, 2021 Evans Email.

54.     The Investigators worked on the Final Report from January through April 2021. Ex. 19 at ¶ 56.

55.     On April 30, 2021, UVA sent Plaintiff and Roe the 319-page Final Investigation Report and its 57 exhibits totaling 1,737 pages. *Id.* at ¶ 60. In over 88-pages of analysis, the Investigators evaluated the evidence to determine if Roe violated UVA's Conflict of Interest Policy and its Title IX Policy on 11 separate occasions. Ex. 4 at 231-318. The Investigators made recommended findings that there was sufficient evidence to find Roe responsible for violating the Conflict of Interest Policy and for five incidents of sexual assault in violation of the Title IX Policy, including three incidents during the J-Term. *Id.* at 2. The Investigators also recommended a finding of insufficient evidence for sexual or gender-based harassment and six other allegations of sexual assault. *Id.* at 2.

56.     In May 2021, UVA held an in-person graduation ceremony for students, like Plaintiff, whose ceremony was cancelled because of the COVID-19 pandemic. Ex. 1 at 14:20-15:2. UVA's Title IX Coordinator confirmed and communicated to Plaintiff's attorney that Roe would not attend graduation. *Id.* at 188:4-189:4; Ex. 10 at 67:15-68:5.

57.     At her deposition, Plaintiff could not identify any information in the Final Report that she said supported her belief that Biemann knew or should have known at the time of the J-Term that Roe was abusing her that she had not received at least by August 26, 2020, when she received the Draft Report and its exhibits, which included Biemann's interview transcript, even

after defense counsel gave her uninterrupted time to review the Final Report. Ex. 1 at 143:8-187:12. Plaintiff explained that the way the Investigators "put it into context, the way they made sense of it, it really helped." *Id.* at 185:6-186:7.

58.     Roe contested the recommended findings against him in the Final Report. Ex. 19 at ¶ 63. Plaintiff did not contest any recommended findings. Ex. 1 at 119:4-8.

59.     Pursuant to its Title IX Policy when one party contests the recommend findings, UVA convened a Review Panel with three faculty members, and a non-voting chair. Ex. 19 at ¶ 64; ECF No. 11-1 at 38-39.

60.     The Title IX Coordinator scheduled the remote hearing on July 1, 2021, after the attorney advisors for Plaintiff and Roe were not available for earlier dates. Ex. 1 at 127:6-128:12. UVA paid for Plaintiff's travel and lodging so she could be physically present with her attorney advisor during the July 1, 2021 remote Review Panel hearing. *Id.* at 128:13-22.

61.     On July 7, 2021, the Review Panel issued a written decision that affirmed the recommended findings of the Investigators and recommended that Roe be terminated from his position at UVA. Ex. 31 - July 7, 2021 Review Panel Decision. Termination of employment was the harshest penalty that could be recommended, and Plaintiff agreed with the Review Panel's recommendation. Ex. 1 at 133:9-16; ECF No. 11-1 at 41.

62.     Pursuant to UVA's Title IX Policy, the provost reviewed the decisions and recommended sanctions made by Review Panels in Title IX complaints where there was an academic faculty respondent. Ex. 32 – Magill Decl. ¶ 5. The provost had seven days to review the supporting documentation, affirm or reject the Review Panel's decision on the findings of responsibility, determine the final sanction, and notify the Title IX Coordinator of the decision. Ex. 32 – Magill Decl. ¶ 5; ECF No. 11-1 at 41-42.

63.     On July 7, 2021, the acting Title IX Coordinator sent the executive vice president and provost, M. Elizabeth Magill ("Provost), the Review Panel's determination and sanction recommendation along with the Final Report and its exhibits. Ex. 32 at ¶ 8.

64.     Consistent with her routine practice, the Provost printed and reviewed hard copies of the documents provided by the Title IX Coordinator. *Id.* at ¶ 20. Prior to making her decision, the Provost reviewed the 319-page Final Report and all of its exhibits—in total 2,059 pages. *Id.*

65.     On July 9, 2021, two days after the Review Panel recommended Roe's termination to the Provost, Roe resigned from UVA. Ex. 10 at 50:2-15.

66.     The Provost requested extensions to complete her review and determine an appropriate sanction because of previously scheduled time out of the office, the length of the Final Report, the volume and length of the exhibits, her other obligations as executive vice president and provost, and the need to obtain legal counsel before finalizing her decision. Ex. 32 at ¶ 21. For these reasons, the Title IX Coordinator granted the Provost two extensions until August 6, 2021 to issue her decision. *Id.* at ¶¶ 12, 14-15. The Provost did not seek extensions to benefit Roe. *Id.* at ¶ 22.

67.     On August 6, 2021, the Title IX Coordinator sent the parties the Provost's decision and sanction. Ex. 33 - Haynes Hale Decl. ¶ 9. The Provost affirmed the Review Panel's findings of responsibility against Roe and imposed a sanction of barring him from all future employment and volunteer roles at UVA and disqualifying him from emeritus status. Ex. 32 at ¶ 16; Ex. 34 – Aug. 5, 2021 Executive Review. The Provost crafted these sanctions to make sure Roe was no longer part of the UVA community. Ex. 32 at ¶ 23.

68.     Roe has not worked anywhere since July 9, 2021. Ex. 10 at 19:15-17. UVA did not give Roe any severance or any other benefit when he resigned. *Id.* at 21:18-20.

69.     On August 6, 2021, the Title IX Coordinator told Plaintiff that UVA would reimburse out-of-pocket expenses up to $5,000 incurred between March 31, 2020 and December 31, 2021 for counseling and holistic healing services, which was the highest amount of reimbursement awarded by the Title IX Office at that time. Ex. 35 – Haynes Hale Dep. 53:18-54:16; Ex. 36 – Aug. 6, 2020 Haynes Letter. On August 10, 2021, UVA informed Plaintiff that it could directly pay a counselor or vendor if she preferred that to being reimbursed. Ex. 33 at ¶ 11.

70.     After commencement of the Title IX investigation, Plaintiff obtained positive letters of recommendation from Biemann and another UVA professor. Ex. 1 at 208:17-20; Ex. 2 at ¶ 37.

71.     Since Plaintiff's graduation from UVA in May 2020, she has held two paid jobs for a combined period of less than 12 months of employment. Ex. 1 at 209:22-211:4. Plaintiff worked as a social media and event consultant and as a paralegal. Ex. 37 - Pl. Resume Provided to Verzilli. Plaintiff also worked as an unpaid research assistant from January 2021 through May 2022. Ex. 1 at 209:2-19; Ex. 37. Plaintiff was interested in attending law school while a student at UVA, but she has never taken the LSAT or applied to law school. Ex. 1 at 198:6-11; Ex. 38 - Pl.'s Father Dep. 92:20-93:3.

72.     Plaintiff claims that UVA has caused her the following injuries and damages: loss of earnings and earning capacity; damage to her good name; harm to her educational experience and opportunities and academic and intellectual progress; generalized anxiety disorder and major depressive disorder and accompanying symptoms; an eating disorder; PTSD; a fall in October 2022 due to lack of eating; an abortion in October 2023 because she lacked a stable career and employment; and engagement in risky sexual behavior resulting in the contraction of a sexually transmitted disease after having sexual intercourse with a stranger in France in August 2019. Am. Compl. ¶ 286, ECF No. 21; Ex. 39 – Pl.'s Apr. 24, 2024 Initial Disclosures 4; Ex. 40 - Sept. 6,

2024 Pl.'s Supp. Resp. to Def.'s 1st Disc. Reqs.; Ex. 41 - Pl.'s Resp. to Def.'s 2nd Disc. Reqs. 4;

Ex. 42 - Sept. 10, 2024 Pl.'s Supp. Resp. to Def's 1st Disc. Reqs. 4-5. Plaintiff seeks reimbursement

for out-of-pocket expenses related to medical and psychological care. Ex. 39 at 4.

73.    Plaintiff retained an economics expert to opine that Plaintiff has a loss in earning

capacity in the range of $847,308 to $3,276,383 because she did not enroll in law school in the fall

of 2020 and subsequently become a licensed attorney. Ex. 43 - Verzilli Report.

## LEGAL STANDARD

A party is entitled to summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving

party . . . [and] [a] fact is material if it might affect the outcome of the suit under the governing

law." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (citations

omitted). Material facts are those necessary to establish the elements of a party's cause of action.

*See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "When determining whether a

genuine issue of material fact has been raised, the court must construe all reasonable inferences

and ambiguities against the movant and in favor of the nonmoving party." *Wai Man Tom v. Hosp.

Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020).

## ARGUMENT

Plaintiff's Title IX deliberate indifference claims fail for the following four reasons. *First*,

Plaintiff's claim based on her unsupported allegation that Biemann knew of the harassment and

failed to report it in December 2018 or January 2019 is time-barred. *Second*, Plaintiff cannot

establish that Biemann had actual notice or knowledge of the harassment during the J-Term in

2018 or 2019. *Third*, Plaintiff's qualms with UVA's investigation and duration of UVA's response to her March 2020 Title IX complaint fails to establish deliberate indifference, as the overwhelming evidence establishes that no reasonable jury could find that UVA acted in a way that is clearly unreasonable, given the known circumstances. *Fourth*, Plaintiff cannot recover any of the damages she seeks and thus her damages must be struck and claims dismissed.

## I.   PLAINTIFF'S DECEMBER 2018 OR JANUARY 2019 TITLE IX CLAIM IS FOREVER TIME-BARRED

Title IX claims are governed by a two-year statute of limitations. *Peabody v. Rector & Visitors of the Univ. of Va.*, No. 3:21-cv-44, 2022 U.S. Dist. LEXIS 77263, at *10 (W.D. Va. Apr. 27, 2022). The accrual date for such claims is when the plaintiff "possesses sufficient facts about the harm done to [him] that reasonable inquiry will reveal [his] cause of action." *Id.* (quoting *Nasim v. Warden, Md. House of Corr.*, 64 F. 3d 951, 955 (4th Cir. 1995) (en banc) (citing *United States v. Kubrick*, 444 U.S. 111, 122-24 (1979)). A plaintiff has sufficient facts when she knows that she has been hurt and who inflicted the injury. *Nasim,* 64 F. 3d at 955 (citing *United States v. Kubrick*, 444 U.S. 111, 122-24 (1979)). "When the plaintiff becomes aware of these two facts, he is on inquiry notice and has a duty to inquire about reasonably discoverable details." *Slay v. Adams*, No. 1:08cv354, 2008 U.S. Dist. LEXIS 103903, at *26 (ED. Va. Dec. 23, 2008) (citing *Nasim,* 64 F. 3d at 955). "Claim accrual does not require" that the plaintiff have "notice or knowledge of all underlying facts" her claim. *V.E. v. Univ. of Md. Balt. Cnty.*, No. 1:22-cv-02338-JRR, 2023 U.S. Dist. LEXIS 70334, at *6 (D. Md. Apr. 21, 2023).

On April 29, 2023, Plaintiff filed her Complaint, ECF No. 1, alleging a Title IX violation because Biemann allegedly failed to report sexual harassment to UVA's Title IX office that he witnessed during the J-Term, which concluded on January 11, 2019. Ex. 2 at ¶ 16. This claim is time barred for at least two reasons.

*First*, on January 11, 2019, Plaintiff possessed sufficient facts that a reasonable inquiry would have revealed her cause of action. Plaintiff relies on an interaction outside of her hotel room on the final day of the J-Term to claim that Biemann knew about Roe's abuse. Ex. 1 at 168:12-22; Ex. 41 at 4. On January 11, 2019, however, Plaintiff knew that Biemann witnessed Roe's alleged "flirtatious" interaction with her outside her hotel room. Ex. 1 at 148:7-18. At her deposition, Plaintiff testified that she could see that Biemann was with Roe when he allegedly was "drunk," "leaning over the door frame," and "act[ing] in a flirtatious way" outside of Plaintiff's hotel room on the J-Term, and Plaintiff saw Biemann allegedly shake his head, "kind of like, this guy." Ex. 1 at 146:7-17, 166:14-167:1-8. Based on these allegations, Plaintiff claims that Biemann "should have probably intervened." *Id.* at 167:10. On January 11, 2019, Plaintiff knew that Biemann witnessed the alleged flirtatious interaction, and she knew that he did not report it to UVA's Title IX office. Thus, as of January 11, 2019, Plaintiff's claim accrued, and because she did not file her Complaint on or before January 11, 2021, this claim is time-barred.

*Second*, Plaintiff skirted by UVA's statute of limitations argument in its motion to dismiss because she claimed to have not been aware that Biemann knew of Roe's flirtatious interaction described above until UVA released its Final Report on April 30, 2021. Am. Compl. ¶ 234; Pl.'s Resp. to Defs.' Mot. to Dismiss, ECF No. 31 at 9; Mem. Op., ECF No. 42 at 7. As discussed *supra*, this is inaccurate. Even assuming *arguendo* that Plaintiff was later enlightened as to Biemann's knowledge by information she obtained from UVA, Plaintiff can point to no information in the Final Report that informed her about Biemann's alleged knowledge that was not also provided to her on August 26, 2020, when she received the Draft Report and its exhibits, which included a transcript of Biemann's interview. Ex. 1 at 143:8-187:12; Ex. 25.

In other words, none of the information Plaintiff relies on proves that Biemann had actual notice or knowledge about the sexual violations in January 2019, but even if it did, Plaintiff possessed all of the information necessary to know that she had been hurt and who inflicted the injury when she received the Draft Report on August 26, 2020. Ex. 19 at ¶ 40. Because Plaintiff did not file her Complaint on or before August 26, 2022, her Title IX claim based on Biemann's alleged actual knowledge and failure to report is barred by the two-year statute of limitations.

## II.     THE UNDISPUTED FACTS ESTABLISH THAT UVA WAS NOT DELIBERATELY INDIFFERENT

Plaintiff cannot present a triable Title IX deliberate indifference claim for two reasons: (1) there is no evidence that any UVA employee had actual notice or knowledge of Roe's harassment of Plaintiff in December 2018 or January 2019 during J-Term and (2) there is no material factual dispute that UVA's response to Plaintiff's March 15, 2020 Title IX complaint fails to meet the high standard of deliberate indifference. Both of Plaintiff's Title IX claims fail as a matter of law.

To present a triable claim for a violation of Title IX based on professor-on-student harassment, Plaintiff must present evidence that she: (1) was a student enrolled at an educational institution receiving federal funds, (2) who was subjected to harassment based on sex, (3) the harassment was sufficiently severe and pervasive to create a hostile environment in an educational program or activity, and (4) there is a basis for imputing the harasser's liability to the institution. *Doe v. Bd. of Educ.*, 605 Fed. Appx. 159, 164 (4th Cir. 2015); *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650-51 (1999). To prove that there is a basis to impute liability to UVA, UVA must have had "actual knowledge of the [professor]-on-student[3] harassment and then acted

---

[3] The actual-knowledge requirement is equally applicable in teacher-on-student and student-on-student harassment cases. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 264 n. 7 (4th Cir. 2021) (citing *Davis*, 526 U.S. at 642-43, 647, 650).

with deliberate indifference to such harassment." *Doe v. Bd. of Educ.*, 605 Fed. Appx. at 165. The fourth element is at issue in this case.

### A.   THERE IS NO BASIS TO IMPUTE LIABILITY BECAUSE NO UVA OFFICIAL HAD ACTUAL NOTICE OR KNOWLEDGE OF THE HARASSMENT UNTIL PLAINTIFF'S REPORT IN 2020

Plaintiff's Title IX claim based on Biemann's alleged failure to report in December 2018 or January 2019 fails as a matter of law because there is no evidence that Biemann had actual notice or knowledge of Roe's violations.

Put another way, to impute liability to UVA, Plaintiff must show that an official with authority to address the alleged discrimination and to institute corrective measures had actual notice or knowledge of harassment and failed to adequately respond. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263-64 (4th Cir. 2021) (citing *Davis*, 526 U.S. at 646-52); *see Butters v. James Madison University*, 208 F. Supp. 3d 745, 754 (W.D. Va. 2016) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). To establish actual notice, a report must be *objectively* construed as alleging sexual harassment. *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 264-65 (emphasis added). Witnessing objective sexual harassment, as viewed through the lens of a reasonable official, satisfies the actual notice requirement. *Id.* at 267-68 (citing *Doe v. Galster*, 768 F.3d 611, 614 (7th Cir. 2014)).

In the instant matter, Plaintiff claims UVA is deliberately indifferent because Biemann had actual knowledge of Roe's sexual violations because he witnessed it during the J-Term on January 11, 2019. This claim is unsupported by the record.

At her deposition, Plaintiff testified that on January 11, 2019, the final day of the J-Term, Biemann saw Roe, who had been drinking alcohol, have a conversation with Plaintiff and her roommate outside their hotel room, in which Roe joked with them, leaned on the doorframe, and

acted in a "flirtatious" way. Ex. 1 at 146:7-18, 167:15-168:6. Roe did not touch Plaintiff or make any sexually suggestive comments or gestures. *Id.* at 163:13-164:3, 165:3-18, 169:1-170:11. When asked about what facts she relied on to claim Roe's behavior was "flirtatious," Plaintiff retorted, in part, that "a girl knows when a guy's flirting with her. It's not rocket science. I cannot emulate it for you, but it was evident" and "in the context of after the assault of him touching me, him grabbing me[,] I don't think it's a stretch to think that him knocking at my door all giggly and giddy that late at night after all that had happened, I don't think it's a stretch to think he had some sort of inappropriate thoughts in mind." *Id.* at 166:1-13l, 169:22, 170:1-2.

The Investigators interviewed Plaintiff's roommate about this interaction, and she stated that Roe and Biemann knocked on their door and asked if they were ready to go the next day. Ex. 4 at 109-10, 962. The roommate said that Roe was kind of leaning on the doorframe and laughing and talking. *Id.* at 963. The roommate stated that she and Plaintiff laughed after shutting the door and Roe asked if they were laughing at him. *Id.*

The evidence shows that Biemann and Roe stopped by the hotel room of Plaintiff and her roommate, as they did for other students on the final night of J-Term to make sure they were ready to depart the following day. Ex. 1 at 146:7-147:4, 168:12-22; Ex. 2 at ¶ 16; Ex. 41 at 4. At this time, Biemann did not have knowledge of any of the sexual encounters that Plaintiff had with Roe, all in Roe's hotel room, during the J-Term. Ex. 1 at 167:11-15; Ex. 2 at ¶¶ 11-12, 15, 18.

As a matter of law, Plaintiff's recital of what happened on January 11, 2019 cannot be objectively construed as sexual harassment or sexual assault to establish actual notice or knowledge. To be sure, no reasonable official witnessing this interaction would have understood that he had just witnessed an incident of sexual harassment or sexual assault that required reporting to UVA's Title IX office. Plainly, Plaintiff's subjective opinion, which was colored by knowledge

that only she held about her prior sexual contacts with Roe, that this interaction constituted flirting fails to be meet the objective standard required to establish actual notice or knowledge.

To the extent Plaintiff is still asserting that Biemann gained actual knowledge of sexual harassment during the dinner on December 27, 2018, Plaintiff cannot point to anything that occurred during the dinner that objectively amounts to sexual harassment. Plaintiff admits that during that dinner Roe did not touch her in a sexual manner or kiss her, and he did not say anything sexually suggestive to her. Ex. 1 at 181:1-182:1.

Likewise, no information from Biemann's interview with the Investigators, or anything else in the Draft and Final Reports, establishes actual notice or knowledge in January 2019. In his interview in June 2020, after Biemann had learned of Plaintiff's relationship with Roe, he recounted that during the beginning of the J-Term that Plaintiff seemed uncomfortable, and he thought at the time it may be because it was her first time being abroad with students she did not know and because she fell ill with the flu. Ex. 4 at 568. During the J-Term, Biemann asked Plaintiff how she was doing, and Plaintiff said she was okay and that the trip was exhausting. *Id.* Biemann did not think much of it, made sure Plaintiff was okay after being ill, and told her, "If you need anything, let me know." *Id.* Biemann's acknowledgment that Plaintiff was uncomfortable, ill, and not herself at times during the J-Term is insufficient to establish actual notice or knowledge to impute liability to UVA.

Accordingly, Plaintiff's claim that UVA acted with deliberate indifference in December 2018 or January 2019 fails because the undisputed material facts do not show Biemann was notified of or witnessed acts that could objectively be construed as sexual harassment.

**B. UVA'S RESPONSE TO PLAINTIFF'S MARCH 2020 TITLE IX COMPLAINT WAS NOT CLEARLY UNREASONABLE**

Plaintiff cannot impute liability to UVA because the unrefuted evidence is that UVA did not act with deliberate indifference in response to Plaintiff's March 2020 Title IX complaint. To prove a Title IX claim, a plaintiff must prove that that the institution's response to the third-party harassment was so inadequate to constitute deliberate difference. *Butters*, 145 F. Supp. 3d at 754 (citing *Gebser*, 524 U.S. at 290; *Davis*, 526 U.S. at 642). Deliberate indifference pertains to "an official decision by the [institution] not to remedy the violation." *Gebser*, 524 U.S. at 290. Put another way, an institution is deliberately indifferent only "where its 'response to the [alleged] harassment or [the] lack [of any such response] is clearly unreasonable in light of the known circumstances.'" *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th at 271 (quoting *Davis*, 526 U.S. at 648) (alterations in original). Title IX does not require that an institution remedy harassment but respond to known harassment in a manner that is not clearly unreasonable. *Butters*, 208 F. Supp. at 754 (citing *Davis*, 526 U.S. at 648-49). Even a response to harassment that is so inadequate as to constitute negligence is insufficient to establish "deliberate indifference." *Fachetti v. Bridgewater Coll.*, No. 5:15cv00049, 2016 U.S. Dist. LEXIS 41899, at *15 (W.D. Va. Mar. 3, 2016). Instead, the institution must make an official decision "not to remedy the violation" and "the deliberate indifference, must, at a minimum 'cause [the plaintiff] to undergo' harassment or 'make [her] liable or vulnerable' to it." *Davis*, 526 U.S. at 644-45.

Institution officials need not adopt a complainant's "particular remedial demands" to avoid liability, *Davis*, 526 U.S. at 648, and even an institution's failure to comply with federal regulations or its own procedures do not establish deliberate indifference. *Gebser*, 524 U.S. at 291-92. "Whether [the university] could have designed a more victim-friendly system, whether it could have taken steps to protect [the complainant] better, or even whether [the university] followed its

own policy to the letter, are not dispositive." *Butters,* 208 F. Supp. 3d at 763 (citing *Kelly v. Yale Univ.*, No. 3:01-cv-1591, 2003 WL 1563424, at *5 (D. Conn. Mar. 26, 2003) (recognizing that schools must consider the rights of the accused when determining an alleged victim's entitlement to protection)).

For instance, in *Doe v. Bd. of Educ.*, the Fourth Circuit held that defendant's response was not clearly unreasonable as a matter of law and affirmed an award of summary judgment to defendant, where the plaintiffs' Title IX claim alleged failure to discern an escalating pattern of harassment, ineffective corrective actions, speculation about what the defendant might have known had school employees more thoroughly investigated, and failure to adhere to its Title IX policy. 605 Fed. Appx. at 167-68. There, the Fourth Circuit found that all the substantive steps taken by defendant, to include investigating each reported incident, disciplining the abuser, and implementing several preventative measures, did not equate to deliberate indifference. *Id.* at 167 (citing *Doe v. Bd. of Educ.*, 982 F. Supp. 641 (D. Md. 2013)).[4]

---

[4] *See e.g., Doe v. Manhattan Beach Unified Sch. Dist.*, No. 23-55233, 2024 U.S. App. LEXIS 4077, *1-4 (9th Cir. Feb. 22, 2024) (affirming summary judgment to defendant, where it was not idle in the months between learning of plaintiff's allegations and launching Title IX investigation, defendant offered counseling, met with plaintiff, and there is no evidence of any deliberate attempt to sabotage plaintiff's complaint); *McAvoy v. Dickinson Coll.*, No. 23-2939, 2024 U.S. App. LEXIS 20732, *29 n.16 (3d Cir. Aug. 16, 2024) (affirming summary judgment to defendant and stating university's decision to rescind no contact order is not enough to create a genuine dispute of material fact for deliberate indifference, as there is no evidence that the accused was on campus at the time of recission and he then withdrew and never returned); *Doe v. Univ. of Miami*, 446 F. Supp. 3d 1000, 1007-9 (S.D. Fla. 2020) (granting defendant summary judgment where plaintiff claimed investigation was unjustifiably delayed and institution did not immediately suspend the accused, issue a formal no contact order, or immediately issue sanctions after finding accused responsible, where defendant conducted formal investigation that included interviews and reviewing witness testimonies and messages, held a hearing, and found the respondent responsible and expelled him); *McAvoy v. Dickinson Coll.*, No. 1:20cv1327, 2023 U.S. Dist. LEXIS 172332, at *17-22 (M.D. Pa. Sep. 26, 2023) (granting defendant summary judgment, where plaintiff claimed defendant purposefully prolonged investigation in violation of the Title IX Policy timeline and defendant should have done more but defendant investigated, repeatedly offered support and assistance to plaintiff, and sanctioned respondent); *Emily O. v. Regents of the Univ. of Cal.*, No.

Deliberate indifference is a "high standard." *Id.* at 642-43. Indeed, because this standard is so high, it "precludes a finding of deliberate indifference in all but limited circumstances." *Doe v. Old Dominion Univ.*, No. 2:17cv15, 2017 U.S. Dist. LEXIS 228131, at *34 (E.D. Va. June 26, 2017) (citing *Doe v. Bd. of Educ.*, 982 F. Supp. 2d 641, 654 (D. Md. 2013) (citing *Davis*, 526 U.S. at 643)). Moreover, courts should "refrain from second guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648; *Tigrett v. Rector & Visitors of the Univ. of Va.*, 290 F.3d 620, 629-30 (4th Cir. 2002) ("In the absence of a constitutional or statutory deprivation, the federal courts should be loathe to interfere with the organization and operation of an institution of higher education.").

Here, Plaintiff cannot prove UVA acted with deliberate indifference. Plaintiff claims that UVA acted with deliberate indifference because UVA allegedly failed to offer Plaintiff any protective or supportive measures. Am. Compl. ¶ 221. This is refuted by the record.

Casteen, the Associate Dean of Students, sent Plaintiff on March 16, 2020, the day Plaintiff confirmed her preference for a formal Title IX investigation, UVA's Title IX Policy and its Resource and Reporting Guide for Students, which explained available remedial and protective measures as well as other available supports and resources. Ex. 5 at ¶ 22; Ex. 11; Ex. 12. Moreover, Casteen provided Plaintiff with remedial measures by connecting her with counseling and mental health supports and by obtaining academic accommodations for Plaintiff. Ex. 5 at ¶¶ 14, 21, 31. Casteen also reached out to one of Plaintiff's professors to request that he provide her with flexibility due to being a Title IX complainant. *Id.* at ¶ 25 As seen in the record, Casteen supported

---

CV-20-08159-AB-JEM, 2021 U.S. Dist. LEXIS 78082, * (C.D. Cal. Mar. 9, 2021)(finding nine month delay merely negligent, lazy, or careless and insufficient to establish deliberate indifference).

Plaintiff every step of the way, by regularly checking on her to see if she needed further resources and by serving as her point of contact for questions and requests for assistance.

In addition, UVA granted Plaintiff academic accommodations for her final semester, such as additional time to complete assignments. Ex. 2 at ¶ 35; Ex. 14; Ex. 15. UVA provided Plaintiff with counseling services during her Title IX complaint process when she was a student and offered continued counseling and mental health support after her graduation when Plaintiff communicated issues with being seen by her counselor in Northern Virginia. Ex. 1 at 58:15-60:15; Ex. 5 at ¶ 31. UVA also prohibited Roe from retaliating against Plaintiff for making the Title IX complaint. Ex. 4 at 394. Plaintiff cannot establish a dispute of material fact based on her unsupported assertion that UVA failed to provide any protective or supportive measures.

Plaintiff's claim that UVA's investigation was inadequate and took too long to allow Roe to teach for as long as possible and resign without accountability also is unsupported by the record and fails to establish deliberate indifference. Am. Compl ¶¶ 222-224, 243, 247-48. The record contains no evidence that UVA purposefully drew out the investigation to allow Roe to teach as long as possible and resign without any consequence. Am. Compl. ¶ 243; Ex. 19 at ¶ 67; Ex. 32 at ¶ 22. Plaintiff's Title IX complaint, which was not typical, could not have been completed in 60 days. Ex. 19 at ¶¶ 36, 42, 62. Rather than indicate idleness, the facts show that this was an active matter from start to finish. Ex. 19; Ex. 32. When the Investigators and the Provost extended their anticipated dates to complete portions of the Title IX process, they did so for valid reasons, to include accounting for the volume of evidence and the scope of the investigation. Ex. 19 at ¶ 66; Ex. 32 at ¶¶ 21-22. Plaintiff's unsubstantiated opinion that UVA should have moved faster fails to create a material fact in dispute.

Moreover, the record shows that UVA's response was not clearly unreasonable. On March 15, 2020, Casteen filed a Title IX complaint and, after confirming Plaintiff's desire to proceed with formal resolution, UVA launched a formal Title IX investigation regarding Plaintiff's then sole allegation of sexual assault that occurred during the J-Term. Ex. 5 at ¶¶ 19, 26; Ex. 17. Because each time Plaintiff was interviewed by the Investigators she raised new allegations of potential policy violations, UVA broadened the scope of its investigation and proceeded to thoroughly investigate 11 allegations sexual violations, that Plaintiff alleged happened over a 13-month period in various locations abroad and in the U.S. and while the Plaintiff and the professor were reportedly engaged in a consensual sexual and romantic relationship. Ex. 4 at 2; Ex. 19 at ¶¶ 27-28. The investigation consisted of 23 interviews, including five interviews of the Plaintiff. Ex. 4 at 7. The investigation was large-scale and took considerable man hours. Investigators diligently worked on Plaintiff's Title IX complaint and kept Plaintiff informed of their progress and the investigation's status. Ex. 19 at ¶ 32, 39, 55, 57-58. Additionally, the investigation was delayed, in part, because of Plaintiff and her attorney's cancellations, scheduling conflicts, and other preferences, which UVA honored and accommodated.

Within about five months, the Investigators produced a 172-page Draft Report, to which Plaintiff and Roe responded by raising new issues to be investigated, new witnesses to interview, and new evidence to be analyzed. Ex. 4 at 11; Ex. 19 at ¶¶ 46, 48-51. Because of the newly submitted evidence, Investigators told Plaintiff that the Final Investigation Report would take time to draft and that it would likely double in size. Ex. 19 at ¶¶ 55, 57. After months of diligent work, on April 30, 2021, UVA's Investigators issued its 319-page Final Investigation Report and 57 exhibits totaling 1,737 pages. The Investigators analyzed each alleged policy violation and recommended that the professor be found responsible for five instances of sexual assault. UVA

then held a full panel hearing and found the professor responsible for violating UVA's Title IX Policy and recommended Roe's employment be terminated. Roe resigned two days later, before UVA had the chance to fire him. But UVA imposed a sanction that Roe could never work at UVA again or obtain emeritus status. Plaintiff's assertion that UVA's response was inadequate is nothing more than her unsupported opinion, which is flatly contradicted by the record. No reasonable jury could find that UVA's response to Plaintiff's Title IX complaint was clearly unreasonable in light of known circumstances.

Likewise, Plaintiff's assertion that UVA violated Title IX because it allegedly issued a mutual no-contact directive on June 25, 2020, three months into the investigation, fails as a matter of law to establish a dispute of a material fact. Am. Compl. ¶¶ 277, 279. Plaintiff claims that because of this mutual no-contact directive she began "avoiding certain areas on campus and disengaging from her classes to avoid Roe, as she was afraid of getting in trouble or being disciplined for violating the directive." Am. Compl. ¶¶ 225-228. For starters, Plaintiff has admitted that this allegation is inaccurate, because she graduated from UVA in May 2020. Ex. 1 at 196:18-22, 197:1-15. Plaintiff never had to avoid certain areas on-Grounds or disengage from her classes to avoid Roe or fear of getting into trouble because she had already graduated when she claims the no-contact directive was entered.

In addition, UVA's decision to not issue a no-contact directive while Plaintiff was still a student was not clearly unreasonable under the circumstances known at the time. Remedial and protective measures are designed to address a complainant's safety and well-being and continued access to educational opportunities and prevent further harassment. ECF No. 11-1 at 8. Here, in step with its Title IX Policy, "based on all available information," UVA never issued a no-contact directive in this case. Ex. 9 at 86:22-87:17; ECF No. 11-1 at 8. No-contact directives were issued

based on the facts and circumstances of the matter and the relevant factors, which included the needs and requests of the parties, if health and safety risks were at play, if the parties had been communicating, if there was a need for communication, and if there was a likelihood of the parties interacting on Grounds. Ex. 9 at 63:1-5, 64:5-11, 87:1-17; Ex. 12 at 6-7. Here, the Title IX Coordinator considered these factors and determined a no-contact directive was inappropriate. Ex. 9 at 86:22-87:17. Plaintiff did not request a no-contact directive from the Title IX Coordinator, and the parties had not had any contact since February 16, 2020. Ex. 1 at 51:14-52:5, 93:17-21. Plaintiff's complaint did not arise out of a violent incident, the parties had been in a reported year-long consensual relationship, and Roe never threatened Plaintiff with physical harm. *Id.* at 225:14-16. UVA moved all classes online on March 11, 2020 for the entire Spring 2020 semester because of the COVID-19 pandemic and, on March 17, 2020, cancelled all on-Grounds activities. Ex. 7 at 29-30, 45-46.

Plaintiff learned that UVA had moved its classes online while on Spring Recess at her home in Northern Virginia and she stayed in Northern Virginia for the Spring semester. Plaintiff graduated from UVA on May 17, 2020, and thus she never attended another in person class at UVA after filing a Title IX complaint. Ex. 21. Roe also was on academic leave in the 2020 Spring Semester and was not coming to Grounds to teach even before UVA mandated him to stay away because of the pandemic. Roe had not taught a class with Plaintiff since Spring 2019. There was no likelihood of the parties crossing paths at UVA given these circumstances. UVA thoughtfully and carefully weighed all the relevant factors regarding issuing a no-contact directive and decided it was not a needed measure. Ex. 9 at 86:22-87:17. UVA was correct. The parties never had contact after Plaintiff filed her Title IX complaint, nor did Plaintiff ever contact the Title IX Coordinator to address any concerns about a no-contact directive, as she was directed to do in UVA's Title IX

33

Policy, nor can she recall asking Casteen for any protective measures. Ex. 1 at 46:12-47:6, 93:17-21; ECF No. 11-1 at 8.

At bottom, Plaintiff is not entitled to any specific remedial measures under Title IX. *Davis*, 526 U.S. at 648. UVA's reasonable decision regarding a no-contact directive clearly did not prejudice or harm the Plaintiff in any way. UVA's decision not to issue a no-contact directive fails to establish deliberate indifference.

In sum, this Court should afford UVA's administrators the deference they are due, especially here with a record that demonstrates that UVA responded in a timely manner, diligently investigated, and held Roe accountable. No reasonable jury could find that UVA's response amounted to deliberate indifference.

## III.   THE DAMAGES PLAINTIFF SEEKS ARE UNVAILABLE UNDER TITLE IX

A plaintiff must demonstrate standing for each claim and "'form of requested relief' for that claim to proceed." *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 209 (4th Cir. 2020) (quoting *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018)). When a plaintiff claims an injury that the court cannot redress, there is no case or controversy. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "[The] plaintiff must show that the court has the power to grant the plaintiff's requested relief." *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020) (citing *K.C. ex. rel. Africa H. v. Shipman*, 716 F.3d 107, 116-17 (4th Cir. 2013) (finding "injury was not redressable, because the Court was 'powerless to provide the very relief' the appellant requested")); *see e.g., King v. Inova Health Care Servs.*, No. 1:19-cv-31, 2020 U.S. Dist. LEXIS 77433, at *33-34 (E.D. Va. May 1, 2020).

The scope of remedies available for claims under antidiscrimination statutes, including Title IX, is analyzed under contract law, and thus, plaintiffs may only seek statutory damages and

damages "traditionally available in suits for breach of contract." *Cummings v. Premier Rehab Keller*, P.L.L.C., 596 U.S. 212, 220-21 (2022). To determine whether a particular category of damages is available in private suits to enforce the Spending Clause statutes, the Court should ask "a simple question: Would a prospective funding recipient, at the time it 'engaged in the process of deciding whether [to] accept' federal dollars have been aware that it would face such liability?" *Id.* at 220 (quoting *Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 296 (2006)). "If yes, then [the] damages are available; if no, they are not." *Id.*

Accordingly, damages for emotional distress, medical expenses associated with treating emotional distress damages, and speculative lost earnings are not recoverable under Title IX, an antidiscrimination statute enacted under the Spending Clause, as these damages are not traditionally available in breach of contract actions. *Cummings*, 596 U.S. at 230; *Doe v. Fairfax Cnty. Sch. Bd.*, No. 1:18-cv-00614, 2023 U.S. Dist. LEXIS 13886, at *6, 8-10, 16-17 (E.D. Va. Jan 25, 2023); *B.R. v. F.C.S.B*, No. 1:19-cv-917, 2024 U.S. Dist. LEXIS 57019, at *10 (E.D. Va. Feb. 26, 2024); *see also Rice v. Cmty. Health Ass'n*, 203 F.3d 283, 289-90 (4th Cir. 2000) (holding consequential damages for lost earning capacity are too speculative unless plaintiff pleads and proves identifiable professional opportunities that would have been available absent the breach and that were contemplated by the parties when they formed the contract).

In *B.R.,* for instance, the court held that plaintiff's damages for emotional distress; fear; anxiety; mental anguish; humiliation and embarrassment; personal and social limitations; loss of dignity; depression; nightmares and flashbacks; eating disorders and other psychiatric disabilities and deficits; physical manifestations of emotional or psychiatric distress; emotional deficits; loss of enjoyment of life and life's pleasures; and medical expenses to treat these mental or emotional distress damages were barred by *Cummings*. 2024 U.S. Dist. LEXIS at *10-13 (citing *M.R. v.*

35

*Burlington Area Sch. Dist.*, No. 21-cv-1284, 2023 U.S. Dist. LEXIS 129829, at *11 (E.D. Wis. July 27, 2023) (recognizing "mental health treatment costs" are "mere proxies for emotional distress damages and therefore unrecoverable" under *Cummings*); *A.T. v. Oley Valley Sch. Dist.*, 2023 U.S. Dist. LEXIS 16619, at *9 (E.D. Pa. Feb. 1, 2023) (granting summary judgment to defendant on plaintiff's damages for medical expenses for bipolar disorder, anxiety, humiliation, embarrassment, frustration, alcohol and drug addiction, and emotional pain and suffering). In addition, the court found that plaintiff's claim for lost future earnings and earning capacity, based on the plaintiff's expert who opined plaintiff would have been a successful lawyer or surgeon but for the alleged assaults, was "too speculative and attenuated." *B.R.* at *20. Indeed, the Fourth Circuit has made it clear that damages for lost economic opportunities are not recoverable merely because a plaintiff specifies an aspirational position in breach of contract actions. *Id.* at *21 (citing *Rice*, 203 F.3d at 289).

In addition, punitive damages are not available under Title IX, as they are not traditionally available in breach of contract actions. *See Cummings*, 595 U.S. at 224; *Mercer v. Duke Univ.*, 50 Fed. Appx. 643, 644 (4th Cir. 2002). Likewise, damages for reputational damage and loss of standing in the community and good name are unavailable. *Smith v. McLaughlin*, 289 Va. 241, 265-66 (2015) (citing *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 156 (2009)); *Isle of Wight Cnty. v. Nogiec*, 281 Va. 140, 148-49 (2011); *Rice*, 203 F.3d at 288.

Here, because none of Plaintiff's requested damages are available, UVA is entitled to summary judgment on the entire action. In her Amended Complaint, Plaintiff requests punitive damages and damages for economic loss, loss of earnings and earnings capacity, pain and suffering, an eating disorder, mental and emotional distress for anxiety, mental anguish, humiliation, and embarrassment, damage to her good name, and loss in the ordinary pleasures of

36

everyday life. Am. Compl. ¶ 286 & p. 42 "Relief Requested." In written discovery, Plaintiff explained that she is claiming generalized anxiety disorder and major depressive disorder, an eating disorder, PTSD, engagement in risky sexual behavior resulting in contraction of a sexually transmitted disease after having sexual intercourse with a stranger in France in summer of 2019, and an abortion in October 2023 because she lacks a stable career and employment more than three years after she graduated from UVA. Ex. 40 at 4-7; Ex. 41 at 4; Ex. 42. at 4-5.

Squarely, all of Plaintiff's claimed emotional distress damages and medical treatment for those damages fall under *Cummings*' prohibition on emotional distress damages. Plaintiff also has never identified any expert witness who would testify that any of her emotional distress damages resulted in physical damages that were caused by UVA. Moreover, UVA certainly did not and could not have anticipated that at the time it decided to accept federal dollars that it would face liability for damages related to engagement in risky sexual behavior with an individual in a foreign country with no association to UVA or a student's choice to have an abortion three years after her graduation because she claims not to have stable employment. These speculative damages are not available pursuant to the Supreme Court's holding in *Cummings*.

Likewise, Plaintiff's future earnings and earning capacity damages, in which she fails to identify any specific lost opportunity that would have been available but for UVA's actions, are not recoverable. Plaintiff does not plead or prove any specific lost opportunity. She has not identified a vocational expert to opine that she would even be qualified to be an attorney, instead relying solely on her previous aspirational goal of being a lawyer – though she has never taken the LSAT or even applied to law school – to claim lost earnings and lost earning capacity. Plaintiff's economic expert merely assumes Plaintiff would have gone to some law school, passed a bar, become some type of lawyer, and worked someplace in the U.S. to opine she would have earned

$847,308 to $3,276,383 as an attorney per national income data. Ex. 43. Under *Rice* and *Cummings*, this is not enough. Plaintiff's damages must be struck.

Plaintiff's damages must also be struck for failure to comply with Rule 26. In her Rule 26(a)(1) disclosures, Plaintiff sought compensatory damages for educational experience, academic progress, future earning capacity, and reimbursement for unidentified out-of-pocket expenses, and expenses for "medical, psychological, and educational needs, and services." Ex. 39. Plaintiff provides no computation of her claimed damages, neither a specific amount in total nor a specific damage amount for any category of claimed damages.[5] Plaintiff failed to comply with the requirement that a party must provide in its initial disclosures "a computation of each category of damages claimed by the disclosing party-who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Rule 26(a)(1)(A)(iii). Accordingly, Plaintiff is not permitted to present information about the calculation of her damages supporting her claimed economic loss and physical injuries on a motion or at trial. Rule 37(c)(1). For this additional reason, Plaintiff's damages must be struck.

Because Plaintiff can recover none of the damages she requests, this Court can provide no redress and this action must be dismissed.

---

[5] To date, Plaintiff has not produced any bills or invoices for claimed damages except a list of all co-pays that Plaintiff has made from January 2018 through August 2024 that accompanied Plaintiff's medical records. Plaintiff has not identified which, if any, of these co-pays she claims she incurred because of UVA.

## CONCLUSION

For the foregoing reasons, this Court should grant the Defendant's Motion for Summary Judgment, dismiss this action with prejudice, and award the Defendant any further such relief the Court deems necessary and appropriate.

Dated: September 25, 2024                    Respectfully submitted,

**THE RECTOR AND VISTORS OF THE UNIVERSITY OF VIRGINIA**

By Counsel:    */s/ Christopher P. Bernhardt*
Christopher P. Bernhardt* (VSB No. 80133)
Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone:(804) 371-0977
Facsimile: (804) 371-2087
Email: cbernhardt@oag.state.va.us
*Counsel of Record for Defendant*

Amy E. Hensley* (VSB No. 80470)
Associate University Counsel/Assistant Attorney
General
1827 University Avenue
Charlottesville, Virginia 22904
Telephone: (434) 924-3685
Email: aehensley@virginia.edu
*Counsel of Record for Defendant*

Jason S. Miyares
Attorney General of Virginia

Thomas J. Sanford
Deputy Attorney General

Jacqueline C. Hedblom
Senior Assistant Attorney General/ Trial Section Chief

## CERTIFICATE

I hereby certify that on September 25, 2024, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system.

/s/ Christopher P. Bernhardt
Christopher P. Bernhardt* (VSB No. 80133)
Assistant Attorney General
