UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| JANE DOE, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| v. | )  Case No. 3:23-cv-00018-RSB |
| | ) |
| RECTOR AND VISITORS OF THE | ) |
| UNIVERSITY OF VIRGINIA, | ) |
| | ) |
|       Defendant. | ) |
| | ) |

## DECLARATION

I, Laurie Casteen, pursuant to 28 U.S.C. § 1746, hereby declare and state as follows:

1. I am over the age of eighteen, and I am competent to testify to the matters described in this Declaration. Unless otherwise indicated, I have personal knowledge of the facts and statements in this Declaration and am prepared to testify to them, among other things, at a hearing or trial related to this matter or the issues or facts discussed in this Declaration.

2. I retired from the University of Virgnia ("UVA") in April 2022 after almost 26 years of service. I started my career at UVA in September 1996.

3. I held the role of Associate Dean of Students for UVA from on or about July 1, 2009, to April 2022. In that role I was responsible for providing support, resources, and guidance to undergraduate and graduate students on an array of personal and academic matters.

4. In 2020, one of my responsibilities was to provide students with supportive measures during Title IX investigations.

5. As Associate Dean of Students, I was familiar with UVA's Policy on Sexual and Gender-based Harassment and Other Forms of Interpersonal Violence ("Title IX Policy"). I received regular training regarding the Title IX Policy and related procedures.

6. I was not personally involved in investigating or adjudicating Title IX matters.

7. In 2020, I headed the "dean on-call" team to respond to student issues and emergencies that came up.

8. I am aware of the true identities of the Plaintiff, Jane Doe, and the former UVA professor referred to as John Roe in the above-styled lawsuit. I am aware that there was a Title IX investigation involving Jane Doe and John Roe that is the subject of the above-styled lawsuit.

9. On February 19, 2020, Dudley Doane, the Director of UVA's International Studies Office, contacted me to report that Jane Doe had disclosed to Asher Biemann on February 17, 2020, that she had been involved in a consensual relationship with John Roe, Biemann's co-faculty leader from a 2019 J-Term course. Asher Biemann was also on this call. I was told that the relationship may have started in December of 2018 and apparently had continued since that time. According to Asher Biemann, Jane Doe told him that the relationship with John Roe was consensual. Biemann also told me that Jane Doe had told him that she had sought assistance regarding suicidal ideation.

10. Biemann and Doane expressed that they were concerned about the student's wellbeing, whether the Title IX Policy was implicated, and whether John Roe's relationship with Jane Doe implicated UVA's policy on student and faculty relationships.

11. I explained that a consensual relationship likely did not implicate the Title IX Policy unless or until we learned something new from the student that suggested non-consensual

2

behaviors by John Roe. In the meantime, I told Doane and Biemann that my focus would be on providing support for Jane Doe's mental and physical health. Doane affirmed that he would follow up with the Provost's office regarding the implications of the reported incident on UVA's policy on student and faculty relationships because he was best situated to report a matter involving faculty conduct in a study-abroad program that he oversaw.

12. At 1:19PM on February 19, 2020, I made a report to the Title IX Coordinator regarding what Biemann told me about Jane Doe reporting a consensual sexual relationship with John Roe. I also spoke with someone in the Title IX office and shared what I understood about the situation between John Roe and Jane Doe. From that conversation, I understood that the Title IX Policy was not implicated unless I learned of some non-consensual sexual activity between John Roe and Jane Doe.

13. On February 19, 2020, I reached out to Jane Doe by email and offered to meet the following day. Jane Doe responded and let me know she was still out of town and staying with her father. We agreed to meet in person on February 24, 2020, once she had returned to Charlottesville.

14. On February 24, 2020, I met with Jane Doe, and she told me about her relationship with professor John Roe. We had been scheduled to speak for 30 minutes. When we started, I told Jane Doe that she could tell me as little or as much as she wanted but my goal was to find out how I could support her. We spoke for close to 90 minutes because Jane Doe shared the trajectory of the entire relationship with John Roe. Jane Doe described her relationship with John Roe as consensual and romantic. As Jane Doe told me about different interactions with John Roe, I asked her questions about the consensual nature of each incident of sexual contact with John Roe. Jane Doe consistently denied a lack of consent. Jane Doe and I discussed a variety of things that I could do to support her personally and academically. Because Jane Doe had shared previous suicidal

ideation and hospitalization, I encouraged her to immediately follow up with UVA's Counseling and Psychological Services ("CAPS") for continuity of care. I told Jane Doe that if at any point she came to understand that parts of the relationship with John Roe were nonconsensual, she could report that to me and I would engage the Title IX office to discuss any additional action she might wish to explore.

15. On March 11, 2020, UVA announced that it was moving all classes online in response to the COVID-19 pandemic. At that time, UVA encouraged all students, including those living off Grounds, to return to their homes to attend their online classes. On March 17, 2020, UVA cancelled all events on Grounds regardless of size and mandated all faculty, with limited exceptions, to telecommute. For the rest of the Spring 2020 semester, there was no UVA required reason for undergraduates like Jane Doe to be on Grounds. UVA discouraged students from coming to Grounds at this time due to COVID-19.

16. From March 9 through 11, 2020, I was out of the office at a conference.

17. In March 2020, Jane Doe and I exchanged emails regarding her interest in holding Roe accountable for initiating sexual contact during the J-Term. Jane Doe indicated to me that since we had spoken on February 24, 2020, she had had spoken with her therapist and Professor Biemann and had the opportunity to further reflect on John Roe's actions. On March 11, 2020, Jane Doe shared additional information with me regarding the first incident where John Roe and she had sexual contact during J-Term course. She told me that John Roe physically grabbed her in a hotel room in Vienna, and at that time she did not have any romantic feelings or physical attraction to him. Jane Doe's description of this event was different from what she had shared with me on February 24, 2020, when she had stressed that her interactions with John Roe had been consensual.

18. On Saturday, March 14, 2020, I asked Jane Doe if she wanted me to make a report of what she shared as a Title IX case because it sounded like, upon reflection, that she felt that the initial incident with John Roe during the J-Term trip was not consensual. On Sunday March 15, 2020, Jane Doe told me in an email that John Roe had invited her to his hotel room and grabbed her in a sexual manner during the J-Term. In that same email, Jane Doe also told me that she wanted John Roe to be held accountable by UVA for his actions towards her during the J-Term, although she had concerns about whether what happened to her would fall under UVA's Title IX Policy. She also expressed a desire for other female students to be protected from Roe. I have reviewed the emails marked with Bates numbers UVA004567-4571, and they are fair and accurate copies of emails I sent to Jane Doe and received from Jane Doe from March 11 through March 16, 2020.

19. On Sunday, March 15, 2020, I filed a Title IX report with the Title IX Office online using Safe Grounds, UVA's incident management system that would immediately notify the Title IX Coordinator and other Title IX staff. When a report was made through Safe Grounds that implicated Title IX Policy, Safe Grounds would also notify members of the Title IX Evaluation Panel that reviewed all reports that potentially implicated the Title IX policy. I have reviewed the document marked with Bates numbers UVA005315-5345, and it is a fair and accurate copy of the report I made using Safe Grounds on March 15, 2020.

20. On Monday, March 16, 2020, the Title IX Evaluation Panel met to discuss the Title IX report I had made the prior day regarding Jane Doe's report of John Roe's actions during the J-Term trip. I was not part of the Evaluation Panel, but I had provided it with information through my Safe Grounds' entry. The members of the Evaluation Panel determined they needed more

information from Jane Doe regarding her preferences for how she wanted to proceed. I agreed to contact Jane Doe about her preferences.

21. On March 16, 2020, that same day, I spoke with Jane Doe to discuss her preferences for next steps. I informed Jane Doe about the options available to her, including requesting a formal Title IX investigation or an informal resolution. Jane Doe asked me many questions about the Title IX process, which I answered. She then expressed her preference for a formal resolution through a Title IX investigation. She told me that her desired outcome from the Title IX investigation would be to see John Roe no longer employed by UVA. Jane Doe expressed that she was fearful that she would not be believed due to some consensual acts between her and John Roe. I explained to Jane Doe that the investigators are trained to explore individual moments and actions and determine when and where consent was given or not given and will fully hear her story with respect to each. I also advised Jane Doe that she would have the right to an advisor who could be an attorney and who could give her legal advice, which appeared to encourage her. After we finished discussing the Title IX process, we discussed her well-being and need for supportive measures regarding academics and mental health. When we spoke, I encouraged her to stay in contact with her counsellor at CAPS. I provided Jane Doe with my cell phone number and told her she could text me if needed.

22. Also on March 16, 2020, I emailed Jane Doe about resources available to her, and to provide her with a link to a document called the "Resource and Reporting Guide for Students" that had examples of protective and remedial measures. I also provided Jane Doe with details of the next steps regarding the Title IX process. I told Jane Doe that my primary objective was to support her and told her that I would be happy to continue to connect her with resources. I have

6

reviewed the email marked with Bates number UVA004572-4573, and it is a fair and accurate copy of the email I sent to Jane Doe on March 16, 2020.

23. At no time did Jane Doe express to me that she believed that John Roe posed a threat to her physical safety—Jane Doe's emphasis was on holding John Roe accountable for his actions the prior year during the J-Term trip. Whenever I spoke with students regarding potential Title IX incidents, I would ask questions about physical safety even when the known facts did not indicate any danger to the student's physical safety. I asked Jane Doe such questions when I spoke with her. My understanding from communicating with Jane Doe was that she and John Roe had no further communication after they broke up in February 2020 before I first spoke with her. I identified the only threat to Jane Doe's safety to be her suicidal ideation and her other mental health issues that she shared with me. If I had identified any physical threat to Jane Doe posed by John Roe, I would have discussed with her practical safety measures based on the articulated dangers, and I would have shared the identified physical threat with the Title IX Coordinator and the threat assessment team, if applicable.

24. Jane Doe never expressed any concern to me about running into John Roe. Jane Doe never asked me for assistance in avoiding contact with John Roe.

25. When I spoke with Jane Doe on March 16, 2020, she told me she was uncomfortable with asking one of her professors, Allen Lynch, for flexibility on some of her assignments due to the stress and mental health issues she was facing, and she explicitly asked me to reach out to him and disclose that she was involved in a Title IX matter. On March 16, 2020, after I spoke with Jane Doe, I reached out to this professor regarding him providing Jane Doe with flexibility because she was under stress because she was a complainant in a Title IX case. That

7

professor was fully supportive of Jane Doe and this request. On March 18, 2020, I let Jane Doe know that this professor was fully supportive.

26. On Thursday, March 19, 2020, the Evaluation Panel met again and, consistent with Jane Doe's preference, initiated a formal Title IX investigation into John Roe's actions during the J-Term course. That same day, I informed Jane Doe by email of the Evaluation Panel's decision and that there would be a formal Title IX investigation. I informed Jane Doe that protective and remedial measures were available to her. I told Jane Doe that she could choose her level of participation in the Title IX investigation, and that I would remain available to provide her with support and resources. I have reviewed the email marked with Bates number UVA004583-4584, and it is a fair and accurate copy of the email I sent to Jane Doe on March 19, 2020.

27. On March 19, 2020, Jane Doe texted me to express some concerns and questions about what I had emailed her that day. I addressed her concerns, and Jane Doe told me that my reply helped her calm down.

28. On Saturday March 28, 2020, I emailed Jane Doe to inform her that the notice of investigation, which would officially commence the formal Title IX investigation, would go out the following week. I told her what she could expect from the investigation, including that she would be interviewed by investigators.

29. After the Title IX Coordinator sent out the notice of investigation on March 31, 2020, I remained in contact with Jane Doe to offer her support and resources. On April 1, 2020, I joined a call with Jane Doe and Emily Babb, the Title IX Coordinator, so Jane Doe could ask questions about the Title IX investigation. The Title IX Coordinator and I answered her questions and explained what our different roles were in the Title IX investigation. I explained I would not

be part of the investigation but was available to provide her supportive measures and connect her with resources.

30. On May 28, 2020, I sent Jane Doe an email to congratulate her on her graduation, and to see if she was connected with mental health resources at home or from CAPS. I told her that I remained available to assist her however I could. On May 29, 2020, Jane Doe responded to my email and told me that she was concerned about John Roe teaching in the fall. I advised Jane Doe that I was not privy to details related to human resources matters for other employees but that respondents in Title IX investigations are afforded the presumption of non-responsibility until the conclusion of the matter. I acknowledged that this was not what she wanted to hear. I told her to not hesitate to reach out to me whenever I might be helpful to her.

31. The Title IX office alerted me that it would send the Draft Investigation Report to Jane Doe on August 26, 2020. On August 26, 2020, I reached out to Jane Doe to see how she was doing after receiving the report and to offer support. Jane Doe shared with me that she had been unable to connect with her therapist at home, and that she was having trouble with an unpaid UVA medical bill. We exchanged multiple emails about options for mental health support and care. I encouraged Jane Doe to continue using CAPS even though she had graduated, including for afterhours calls. I also provided Jane Doe with resources about resolving the billing issue. When Jane Doe expressed concerns about the content of the Draft Investigation Report, I provided her reassurance and validation about her own experiences. I have reviewed the emails marked with Bates numbers UVA004915-4918, and they are fair and accurate copies of emails I sent to Jane Doe and received from Jane Doe from August 26 through August 30, 2020.

32. After our emails exchanged from March 11 through March 15, 2020, Jane Doe and I never discussed the facts of any incidents between her and John Roe because after I made the

9

report to Title IX, the factual investigation was the responsibility of the Title IX investigators. The only incident between Jane Doe and John Roe that I was aware of that potentially violated Title IX was the Austria hotel incident that Jane Doe shared with me in these emails. Prior to those emails, Jane Doe had emphasized that all of her sexual interactions with John Roe were consensual.

33. In our conversation on February 24, 2020, Jane Doe explicitly described all aspects of her relationship with John Roe as consensual and denied any non-consensual activity when probed. Jane Doe's email of March 11, 2020, articulating a new understanding of lack of consent in her relationship with John Roe and her desire that John Roe be held accountable was my first awareness of any allegation of non-consent. Aside from the specific reference to an incident in the hotel in that email, I did not know then, or at any time later, which other, if any, aspects were alleged to be non-consensual because fact finding was the responsibility of the Title IX investigators from that point forward.

34. I declare under penalty of perjury that the foregoing is true and correct.

Executed on  09 / 24 /2024.

*Laurie Casteen*

Laurie Casteen