In the Matter of:

Jane Doe
v.
The University of Virginia, et al.

Emily Babb

August 20, 2024



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
                                                             1
                    Emily Babb                         8/20/2024
```

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF VIRGINIA
2                    Charlottesville Division

3    --------------------------------------+
     JANE DOE,                              :
4                    Plaintiff,             :
                                            :CASE NUMBER:
5    vs.                                    :3:23-cv-00018-RSB
                                            :
6    THE UNIVERSITY OF VIRGINIA, et al.,    :
                    Defendants.             :
7    --------------------------------------+

8                                  Tuesday, August 20, 2024

9                       EMILY BABB,

10   called for examination by counsel on behalf of

11   Plaintiff, Jane Doe, pursuant to Notice taken via Zoom,

12   at approximately 10:00 a.m., before Janie Arriaga, a

13   certified Verbatim Reporter and a Notary Public in and

14   for the Commonwealth of Virginia, when there were

15   present on behalf of the respective parties.

16

17

18

19

20

21

22
```

```
 1                  P R O C E E D I N G S

 2           (Thereupon, EMILY BABB, having been first duly

 3   sworn by the court reporter and notary public, was

 4   examined and testified, as follows:)

 5           EXAMINATION BY COUNSEL FOR PLAINTIFF:

 6   BY MS. ABDNOUR:

 7       Q   Ms. Babb, my name is Liz Abdnour.  I represent

 8   the plaintiff in the matter of Doe v. UVA.  I'm going to

 9   have some questions for you today.  But first I want to

10   do just a little bit of introductory information for

11   you.

12           First, would you prefer I call you Ms. Babb,

13   Emily, something else?  What is more comfortable for

14   you?

15       A   Emily is fine.

16       Q   Great.  Thank you so much.

17           So just a few things that I need you to know

18   to make our court reporter, Janie's job as easy as

19   possible today.  First, I need you to answer all the

20   questions that I ask you verbally.  So if it's a yes or

21   no question, I need a yes or no.  A shrug or a nod or

22   something like that isn't going to be helpful for the
```

```
 1   dropping off a letter to our office.
 2           If a report was received through Just Report
 3   It, that created a record within Safegrounds, our case
 4   management system.
 5           If the report came into our office through
 6   some other means, phone call, email, handwritten note,
 7   drop in, then the person who receives that would create
 8   a report within the Safegrounds to memorialize that.
 9           Every report that came in involving the
10   university's policy on sexual and gender based
11   harassment and other forms of interpersonal violence was
12   reviewed through our evaluation panel.
13           The evaluation panel consisted of
14   representatives from the Title IX office, the office of
15   the dean of students, the university policy department,
16   and others, such as H.R. if there was an employee
17   involved.
18           The evaluation panel would make certain
19   decisions on whether the university would report out to
20   local law enforcement or the prosecuting attorney, which
21   is called the Commonwealth Attorney in Virginia, based
22   on case law in Virginia that required certain cases to
```

1   be reported out with or without identifying information.

2   That would be memorialized in the Safegrounds records.

3           Typically we met twice a week to review those

4   cases.  I believe Mondays and Thursdays.  But if

5   something came in that had happened within the last 24

6   hours, we would conduct an expedited EP, or evaluation

7   panel, to make that determination within -- correction.

8   If it came within the last 72 hours, we would review it

9   to make that evaluation panel decision within 24.

10          And when I say "72 hours," I mean the alleged

11  act occurred within 72 hours.  We would review it on an

12  expedited basis.

13          When a case came in, we had the Title IX side,

14  as well as the office of dean of students.

15          Our office of dean of students assigned -- ran

16  our dean on call.  So they were often the first person

17  responding to a report.  So if a report came in

18  involving a student, the dean on call would do outreach,

19  typically by email, to the individual who we would

20  consider the complainant or the person who experienced

21  the conduct.

22          That outreach would provide them with

```
 1   information about resources, their rightful law

 2   enforcement, medical resources, offer to meet with them

 3   and explain a little bit of the process.

 4          That dean on call would typically be the

 5   person who met with the complainant to understand their

 6   report, walk through options, and then they would be

 7   part of the team that reviewed this at evaluation panel.

 8          If there was a preference for resolution, that

 9   would also be an opportunity for the individual to

10   correct that in response to the outreach email or during

11   that meeting with the dean on call.

12          During the evaluation panel, we would review

13   all available information in evidence to us.  So if

14   there was any attachment to that report; if there had

15   been anything shared, we would include, and make a

16   determination both on law enforcement and Commonwealth

17   Attorney reporting required in the State of Virginia, as

18   well as what, if any, resolution we would be taking.

19          If we did not have enough information to

20   proceed, we could hold that evaluation panel or

21   supplemental evaluation panel to give ourselves an

22   opportunity to meet with the complainant to better
```

```
 1      A    No.  We did not issue a mutual no-contact
 2   directive in every formal investigation.  We considered
 3   the facts and circumstances of the matter, the requests
 4   of the parties, and evaluating whether to issue a
 5   one-sided or mutual no-contact directive.
 6   BY MS. ABDNOUR:
 7      Q    So let me ask this first, was there ever a
 8   situation in which you did not issue any no-contact
 9   directives?
10      A    Yes.
11      Q    Okay.  And then sometimes there were
12   situations in which you were issued one-sided,
13   no-contact directives, correct?
14      A    Yes.
15      Q    And then sometimes there were situations in
16   which you issued mutual no-contact directives, correct?
17      A    Yes.
18      Q    But you testified that you don't recall
19   issuing a mutual no-contact directive in this case; is
20   that right?
21      A    Yes.  I do not recall issuing a mutual
22   no-contact directive in this case.
```

```
 1        Q    Do you recall issuing a one-sided no-contact
 2   directive in this case?
 3        A    No, I do not recall issuing any no-contact
 4   directive in this case.
 5        Q    What are the factors that you would be
 6   considering to issue a no-contact directive or not?
 7        A    We would consider the request of the parties.
 8   We would consider the likelihood of the actions.  We
 9   would consider whether there were health and safety
10   risks at play that would lend itself to a no-contact
11   directive.
12        Q    And do you think a no-contact directive was
13   appropriate for this matter?
14             MR. BERNHARDT:  Objection; form.
15        A    I did not issue a no-contact directive in this
16   matter.
17   BY MS. ABDNOUR:
18        Q    Why not?
19        A    As I recall, that was not -- I don't see any
20   documentation that that was requested by either party.
21   And we -- I'm not sure the rationale of the time, but we
22   would have considered those factors in determining
```

```
 1        A    Yes.  Safegrounds was our document repository

 2   system.  So the support dean would have uploaded their

 3   email communication or made a note about something, and

 4   that would have been saved in the case file, the

 5   Safegrounds case file for the pending investigation.

 6        Q    As Title IX coordinator, did you have access

 7   to entries made by a support dean into a Safegrounds

 8   file?

 9        A    Yes.  Safegrounds was a shared system, so the

10   support dean's entry were part of the file on that case,

11   and I would have access to that.

12        Q    You testified regarding UVA having a different

13   approach to no-contact directives after August 2020 in

14   terms of one-sided, no-contact directives.  Am I

15   understanding that there was a change there?

16        A    Yes, that is correct.

17        Q    The Title IX office evaluate the need for a

18   no-contact directive -- did that also change after

19   August of 2020?

20        A    No.  The way we evaluated whether to issue a

21   no-contact directive was consistent.

22        Q    Based on the factors that UVA Title IX office
```

```
 1   considered during plaintiff's, Jane Doe's,
 2   investigation, did any of those indicate a need for a
 3   no-contact directive?
 4        A    So we didn't issue a no-contact directive, and
 5   we would have considered those factors at the time.  And
 6   some things that we would look at, and we like to look
 7   at, is did the parties request a no-contest directive?
 8   Have they been communicating?  Is there a need for
 9   communication?  Is there a likelihood of them
10   interacting on campus in the same residence hall or the
11   same office building?
12             We would look at all of that in the time
13   frame, right?  We were fully remote at the initiation of
14   this investigation, and for my time here overseeing it,
15   and that would have been a factor that we would have
16   considered, whether they would have had a demonstrated
17   communication, whether they asked for it.
18             Also, whenever a no-contact directive was
19   issued, it was issued in writing to the parties.  So
20   there would have been a letter to each of the parties,
21   whether it was one-sided or mutual, explaining the
22   no-contact directive had been put in place, what that
```

```
 1   meant, and the clear communication for each of them.
 2       Q    What is your understanding regarding Jane
 3   Doe's status as a student after June of 2020?
 4       A    It's my understanding that she graduated from
 5   the institution at the end of the 2019-2020 academic
 6   year.
 7       Q    How would a complainant student's status
 8   affect the evaluation of whether the no-contact
 9   directive would be appropriate?
10       A    If a student or employee was not affiliated
11   with the institution, we would be limited in the ability
12   to put a no-contact directive in place because there's
13   not an opportunity to enforce it.
14            Enforcement of a no-contact directive against
15   a student would process through our standard of conduct
16   against an employee through our employee conduct.
17            So it can be impactful, the affiliation within
18   the institution, as to whether we have the ability to
19   enforce the no-contact directive.
20       Q    Ms. Babb, what is your understanding of
21   whether new employees to UVA were required to attend and
22   complete Title IX trainings when they were hired during
```

```
 1            CERTIFICATE OF NOTARY PUBLIC

 2         I, Janie Arriaga, Court Reporter, before

 3   whom the foregoing deposition was taken, do hereby

 4   certify that the witness whose testimony appears in

 5   the foregoing deposition, was duly sworn by me; that

 6   the testimony of said witness was taken by me

 7   stenographically, and that I, thereafter, reduced it

 8   to typewriting; that said deposition is a true

 9   record of the testimony given by said witness; that

10   I am neither counsel for, related to, nor employed

11   by any of the parties to the action in which this

12   deposition was taken; and further, that I am not a

13   relative or employee of any attorney or counsel

14   employed by the parties thereto; nor financially or

15   otherwise interested in the outcome of the action.

16   _____

17   Janie Arriaga

18   Notary Public in and for the

19   Commonwealth of Virginia

20

21

22
```