UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

JANE DOE, )
)
    Jane Doe, )
)
v. ) Case No. 3:23-cv-00018-RSB
)
RECTOR AND VISITORS OF THE )
UNIVERSITY OF VIRGINIA, )
)
    Defendant. )
)

## DECLARATION

I, LaTosha Barnes, pursuant to 28 U.S.C. § 1746, hereby declare and state as follows:

1. I am over the age of eighteen, and I am competent to testify to the matters described in this Declaration. Unless otherwise indicated, I have personal knowledge of the facts and statements in this Declaration and am prepared to testify to them, among other things, at a hearing or trial related to this matter or the issues or facts discussed in this Declaration.

2. My legal name is LaTosha Barnes. I also go by the name Tosha Barnes.

3. I worked at the Office for Equal Opportunity and Civil Rights at the University of Virginia ("UVA") from August 2016 to June 2022. My title was Equal Opportunity and Civil Rights Specialist. My primary responsibility in this role was as an investigator of complaints related to Preventing and Addressing Discrimination, Harassment, and Retaliation ("PADHR"). I also assisted UVA's Title IX Office, which was part of the Office for Equal Opportunity and Civil Rights, with investigations of alleged violations of UVA's Title IX policy.

4. I have a law degree from Wake Forest University School of Law.

1

5. As of March 2020, I was familiar with UVA's Policy on Sexual and Gender-based Harassment and Other Forms of Interpersonal Violence ("Title IX Policy"). I received regular training regarding the Title IX Policy and related procedures. Before March 2020, I had previously investigated violations of Title IX Policy at UVA.

6. I am aware of the true identities of the Plaintiff, Jane Doe, and the former UVA professor referred to as John Roe in the above-styled lawsuit. I was personally involved in the Title IX investigation involving Jane Doe and John Roe that is the subject of the above-styled lawsuit.

7. On March 11, 2020, UVA announced that it was moving all classes online in response to the COVID-19 pandemic. At that time, UVA encouraged all students, including those living off Grounds, to return to their homes to attend their online classes. On March 17, 2020, UVA cancelled all events on Grounds regardless of size and mandated all faculty and other staff, with limited exceptions, to telecommute.

8. In March 2020, I learned from my supervisor and the Title IX Coordinator, Emily Babb, that I has been assigned to be an investigator regarding a reported violation of Title IX Policy where Jane Doe was the complainant and John Roe was the respondent. The Title IX Coordinator assigned Stuart Evans ("Evans") to be the co-investigator on this matter. Evans and I shared responsibility for the investigation.

9. On March 31, 2020, UVA notified Jane Doe and John Roe that it had commenced a formal Title IX investigation regarding John Roe's actions towards her. In the March 31, 2020, Notice of Investigation, the Title IX Coordinator informed Jane Doe that the scope of the investigation was John Roe's actions the night before the J-Term trip began where he allegedly grabbed Jane Doe in a sexual manner without her consent in a hotel room in Vienna, Austria. John

Roe's alleged actions implicated the Title IX Policy regarding sexual and gender-based harassment and UVA's faculty conflict of interest policy.

10. On April 3, 2020, Evans and I contacted Jane Doe to set up an interview. Jane Doe requested time to meet with an attorney before the interview. Evans and I scheduled the initial interview on April 14, 2020, to allow Jane Doe a chance to meet with an attorney and for us to have time to review the messages Jane Doe provided.

11. Jane Doe was represented by attorney Palma Pustilnik throughout the Title IX proceedings. Pustilnik was present at all of our interviews of Jane Doe and at the Review Panel hearing. We copied Pustilnik on our emails to Jane Doe. Lyndsey Raynor was a paralegal who worked with Pustilnik on Jane Doe's case and who communicated with us regarding Jane Doe.

12. On April 14, 2020, Evans and I conducted the first interview of Jane Doe. The interview lasted approximately two-and-a-half hours but did not cover everything that Jane Doe and her attorney wanted to share.

13. The following day, Evans and I emailed Jane Doe to schedule a time to finish the interview. To accommodate Jane Doe's and her attorney's schedules, Evans and I scheduled the next interview for April 20, 2020. I have reviewed the emails marked with Bates numbers UVA004744-4745 and they are fair and accurate copies of the emails I received on April 15, 2020.

14. On April 20, 2020, Jane Doe emailed me and Evans to cancel the interview scheduled for that day. We rescheduled the interview for April 24, 2020. I have reviewed the emails marked with Bates numbers UVA004758 and they are fair and accurate copies of the emails I received on April 20, 2020.

15. Jane Doe missed the rescheduled interview on April 24, 2020, and we rescheduled the interview for April 27, 2020.

16. On April 24, 2020, Pustilnik proposed that we limit the interviews with Jane Doe to two-hours going forward, and Evans and I agreed. I have reviewed the emails marked with Bates numbers UVA004760-4761 and they are fair and accurate copies of the emails I received on April 24, 2020.

17. Under Title IX Policy, it was up to Jane Doe how much she wanted to participate in the Title IX investigation. By policy, Evans and I would not make any adverse inferences against Jane Doe if she did not participate in the investigation.

18. Evans and I then interviewed Jane Doe on April 27 and May 1, 2020, but we were not able to completely cover the history of Jane Doe's interactions with Roe.

19. Evans and I scheduled a fourth interview with Jane Doe for May 8, 2020. I have reviewed the emails marked with Bates numbers UVA004778 and they are fair and accurate copies of the emails I received on May 1 and 4, 2020.

20. On May 8, 2020, Jane Doe canceled the scheduled interview citing her mental health. We rescheduled the interview for May 11, 2020. I have reviewed the emails marked with Bates numbers UVA007389 and they are fair and accurate copies of the emails I received on May 8, 2020.

21. On May 10, 2020, Jane Doe asked to reschedule the interview scheduled for May 11, 2020. We then scheduled the interview for May 13, 2020. I have reviewed the emails marked with Bates numbers UVA007412-7413 and they are fair and accurate copies of the emails I received on May 11, 2020.

22. Jane Doe then requested to reschedule the May 13, 2020 interview. After this request to reschedule, Evans proposed to Jane Doe that we could regroup on May 18, 2020. I have

reviewed the emails marked with Bates numbers UVA004804-4805 and they are fair and accurate copies of the emails I received on May 11-13 and 18, 2020.

23. On May 18, 2020, Evans wrote Jane Doe to check in about setting up the fourth interview. Evans informed Jane Doe that it was up to her if she wanted to meet again for another interview. Evans informed Jane Doe that the investigation was still in the beginning phase and that an amended notice of investigation would be issued soon. I have reviewed the emails marked with Bates numbers UVA004814 and they are fair and accurate copies of the emails I received on May 18, 2020.

24. On May 21, 2020, Evans and I interviewed Jane Doe for the fourth time.

25. In conducting the four interviews of Jane Doe in April and May 2020, Evans and I accommodated and worked around Jane Doe's schedule. We were mindful that she had coursework to finish and that she was receiving mental health treatment. We also accommodated Jane Doe's attorney in scheduling the interviews.

26. It was not common for investigators in a Title IX matter to need to interview the complainant four times.

27. In this investigation, Evans and I needed to interview Jane Doe four times in April and May 2020 because of the number of interactions between Jane Doe and John Roe over more than a year, Jane Doe's attorney's request to break up the interviews, and Jane Doe sharing new information during each interview about incidents that had been discussed during prior interviews. Although the investigation began with one incident, as the interviews progressed, more and more incidents came to light. Evans and I then inquired about each of these incidents to determine if they were potential violations of the Title IX Policy.

28. From our four interviews of Jane Doe in April and May 2020, Evans and I determined that there were other incidents of conduct by John Roe that implicated the Title IX Policy and that were not covered by the March 31, 2020 Notice of Investigation. We recommended that the Title IX Coordinator issue an amended notice of investigation to include what we had learned during the four interviews.

29. On May 21, 2020, the Title IX Coordinator sent Jane Doe and John Roe an Amended Notice of Investigation, which expanded the scope of the investigation to reflect the allegations made by Jane Doe regarding John Roe's conduct during her four interviews.

30. Instead of a single incident of conduct, Evans and I were now investigating eleven incidents of John Roe's conduct alleged to have occurred from December 27, 2018 through February 2020.

31. UVA had an internal goal of resolving typical Title IX complaints within 60 days of giving notice of the investigation. Under the Title IX Policy, the timeframe for resolving complaints could be extended for a variety of reasons, including to account for the complexity of a case, to accommodate the schedules of witnesses, the number of witnesses, the volume of evidence provided by the parties, and to ensure the completeness of the investigation. Investigators were to notify the parties in writing of any extension of the aspirational timeframe and provide the reason for the extension.

32. On May 29, 2020, Evans notified Jane Doe that the anticipated date of distribution of the Draft Report was being extended due to delays in obtaining information from parties/witnesses, the increased scope of the investigation, and issues related to the COVID-19 global pandemic. The reasons that Evans provided Jane Doe for the extension were accurate.

6

33. Because of the pandemic, all interviews, hearings, submissions of evidence, and meetings with complainants, respondents, and witnesses were conducted remotely. This was a change from UVA's Title IX investigations prior to COVID-19, which were conducted in person.

34. Evans told Jane Doe that we anticipated that the Draft Report would be issued on or before July 31, 2020, but that this timeframe could be extended again for good cause. I have reviewed the email marked with Bates numbers UVA005146 and it is a fair and accurate copy of the email I received on May 29, 2020.

35. On June 4, 2020, Jane Doe admitted that the length of the investigation up to that point was in "great part" her fault. On June 5, 2020, Evans assured Jane Doe that she should not blame herself for delaying the investigation and told her that there were other factors affecting the pace of the investigation and that the scope and timeline of the allegations in the case were large and, therefore, the investigation was going to take longer than other investigations.

36. In June 2020, Evans and I interviewed John Roe on three occasions. We conducted sixteen interviews with fourteen other witnesses, including an interview with Asher Biemann and students who had been on the J-Term trip with Jane Doe and John Roe. This investigation involved significantly more witness interviews than a typical Title IX investigation.

37. Evans and I also collected evidence from John Roe, Jane Doe, and other sources from April through December 2020.

38. After completing the interviews, Evans and I turned to preparing the Draft Report. In the Draft Report, Evans and I were responsible for summarizing the information gathered in the investigation but not for making recommended findings.

39. On July 31, 2020, Evans informed Jane Doe that the anticipated date of the distribution of the Draft Report was being extended to August 2020 due to the significant volume

7

of evidence she and Roe had submitted. The reason that Evans provided for the extension was accurate. It was also time consuming to summarize the numerous interviews we conducted.

40. On August 26, 2020, I sent Jane Doe and John Roe the 172-page Draft Report and its 46 exhibits. Evans and I co-authored the Draft Report. The Draft Report's exhibits totaled 1,037 pages and included 386-pages of text and WhatsApp messages and 151-pages of emails provided by the parties. The exhibits to the Draft Report that I sent Jane Doe included transcripts of all the interviews conducted up to that time, including the interview we conducted with Asher Biemann.

41. I have reviewed the document marked with Bates numbers UVA000024-001234, and it is a fair and accurate copy of the Draft Report and exhibits that Evans and I prepared and sent to Jane Doe on August 26, 2020. I have reviewed the emails marked with Bates numbers UVA004898-4899 and UVA004902, and they are fair and accurate copies of the emails I sent Jane Doe on August 26, 2020, to provide her the Draft Report and its exhibits.

42. The Draft Report in this case was among the longest draft reports I ever worked on while at UVA.

43. Jane Doe and John Roe had the opportunity to respond to the Draft Report and identify additional witnesses and evidence.

44. On August 31, 2020, I notified Jane Doe that John Roe had requested an extension of time to respond to the Draft Report until September 7, 2020, and that both sides would have until September 7, 2020, to respond.

45. On September 7, 2020, both Jane Doe and John Roe responded to the Draft Report.

46. From September 15 to October 8, 2020, Evans and I engaged in additional investigatory steps based on the responses to the Draft Report, including interviewing a new witness identified by Jane Doe.

47. On October 8, 2020, I emailed Jane Doe to provide her with an update on the status of the investigation and to schedule a follow up interview. I informed Jane Doe that if she wanted to respond to the information contained in John Roe's response to the Draft Report or the transcript of the additional interview, she could do so by October 19, 2020. I told Jane Doe that Evans and I wanted to interview her to gather additional details before preparing the Final Investigation Report ("Final Report"). I proposed October 22 or 23 for dates for the interview.

48. On October 19, 2020, Jane Doe and John Roe submitted responses to the new evidence and the responses the other party had made to the Draft Report. John Roe also submitted additional evidence.

49. In her October 19, 2020, response, Jane Doe made new allegations that John Roe had engaged in nonconsensual sexual acts with her while she was sleeping at his house, and requested an opportunity to discuss this with me and Evans.

50. Evans and I proposed interviewing Jane Doe on October 22 or 23, 2021. Jane Doe's attorney was not available on the proposed dates, and Evans and I conducted the follow up interview on October 27, 2020. During that interview, Jane Doe provided us with details about the new allegations that Roe engaged in sexual acts while Jane Doe was asleep on multiple occasions.

51. Based on the information we learned from Jane Doe during the October 27, 2020, interview, Evans and I determined that there were other incidents of conduct by John Roe that implicated the Title IX Policy and that were not covered by the May 21, 2020, Amended Notice of Investigation. We recommended that the Title IX Coordinator issue a second amended notice of investigation to include the new information.

52. On November 2, 2020, the Title IX Coordinator issued the Second Amended Notice of Investigation, which clarified Jane Doe's allegations in the Amended Notice of investigation

9

and included Jane Doe's new allegations that John Roe had initiated nonconsensual sexual acts while she was sleeping on one occasion in June 2019 and on multiple occasions between October 2019 and February 2020.

53. Evans and I attempted to interview Roe in November 2020. John Roe declined to be interviewed regarding the new allegations in the Second Amended Notice, but requested an extension of time to respond to the new allegations so he could consult with his newly retained attorney. Evans and I agreed to the extension. On December 15, 2020, John Roe submitted a 36-page written response to the new allegations in the Second Amended Notice.

54. Because we had granted John Roe a similar extension and because Evans and I were out of the office while UVA was closed between December 19, 2020, and January 4, 2021, Evans and I gave Jane Doe until January 6, 2021, to respond to John Roe's December 15, 2020, submission, if she chose. On January 7, 2021, after obtaining a one-day extension, Jane Doe, through her attorney, responded to John Roe's December 15, 2020 statement.

55. On January 8, 2021, Evans informed Jane Doe that we would not be conducting any additional investigative steps and were turning our attention to preparing the Final Report. Evans stated that our goal was to complete the Final Report in February 2021 but that we anticipated that it would take us time due to the significant volume of information submitted and the timeline of the allegations. I have reviewed the email marked with Bates numbers UVA005155 and it is a fair and accurate copy of the email I received on January 8, 2021.

56. Evans and I then worked on preparing the Final Report from January through April 2021. By the end of February 2021, Evans and I determined that we would not be able to finish the Final Report in February and would likely need another month to complete it.

57. On February 26, 2021, Evans provided Jane Doe with an update on the status of Final Report. Evans told Jane Doe that we anticipated the Final Report would likely double in size from the Draft Report. Evans told Jane Doe that we had been working on the Final Report but that we anticipated it would not be sent to her until late March 2021. Evans explained that the reason for the extension of the timeline was the new evidence submitted after the Draft Report, the scope of the investigation, and the time needed to incorporate and analyze the information gathered. The reasons that Evans provided Jane Doe for the extension were accurate. I have reviewed the email marked with Bates number UVA009271 and it is a fair and accurate copy of the email I received on February 26, 2021.

58. On March 31, 2021, Evans sent Jane Doe another update on the status of the Final Report and informed her that we now anticipated that the Final Report would be released in April 2021. Evans explained that incorporating and analyzing the large volume of evidence submitted had taken longer than anticipated. The reasons that Evans provided Jane Doe for the extension were accurate. It was particularly time consuming for us to prepare the analysis of each of the incidents alleged to have violated the Title IX Policy. I have reviewed the email marked with Bates number UVA009305 and it is a fair and accurate copy of the email I received on March 31, 2021.

59. In April 2021, Evans and I completed the Final Report and submitted it for internal review and approval. Evans and I co-authored the Final Report.

60. On April 30, 2021, the Title IX Coordinator, Akia Haynes, sent Jane Doe and John Roe the 319-page Final Report and its 57 exhibits. The 57 exhibits totaled 1,737 pages. The Final Report included over 88-pages of analysis. Evans and I evaluated the evidence for each of the incidents for which it was alleged that Roe had violated Title IX Policy and UVA's Conflict of Interest Policy. Evans and I also set out our recommended findings as to whether there was

11

sufficient evidence to support findings of violations of the Title IX Policy and the Conflict of Interest Policy. I have reviewed the document marked with Bates numbers UVA 002446 – 004504, and it is a fair and accurate copy of the Final Report and its exhibits that Evans and I prepared, and that was sent to Jane Doe on April 30, 2021.

61. Evans and I concluded that there was sufficient evidence to find John Roe responsible for five incidents of sexual assault in violation of the Title IX Policy, including three incidents during the J-Term trip. We also concluded that there was insufficient evidence to find John Roe responsible for sexual or gender-based harassment and six other allegations of sexual assault. Finally, Evans and I concluded that there was sufficient evidence that Roe had violated UVA's Conflict of Interest Policy.

62. The Final Report in this case was the longest final report I ever worked on while at UVA.

63. John Roe contested the recommended findings against him in the Final Report. Jane Doe did not contest any of the recommended findings.

64. On July 1, 2021, there was a hearing before a Review Panel with three faculty members, and a non-voting chair. Evans and I both appeared before the Review Panel and answered questions that were posed to us.

65. Evans and I had no further involvement in this matter after the Review Panel hearing.

66. Evans and I only extended the timeframe to complete the investigation to account for the complexity of the incidents to be investigated, the number of witnesses, the volume of evidence provided by the parties, to accommodate the schedules of witnesses and the parties and their attorneys, other good cause, and to ensure the completeness of the investigation.

67. During the investigation, Evans and I never made decisions with the intent to benefit John Roe at the expense of Jane Doe. Evans and I did not extend the timeline of the investigation to assist John Roe to avoid any consequences. None of our supervisors ever asked Evans and me to take any action regarding the investigation to benefit John Roe at the expense of Jane Doe or to assist John Roe in avoiding any consequences.

68. John Roe cooperated with the investigation. I did not perceive that John Roe took any steps designed to draw out the investigation rather than to defend himself from the allegations he faced.

69. From the time the March 31, 2020, Notice of Investigation was issued to April 30, 2021, when the Final Report was released, the investigation, which included preparing the Draft and Final Reports, into John Roe's actions was active. At no time did Evans and I close or pause the investigation, and none of our supervisors told us to pause, delay, or close the investigation.

70. At no time during the investigation did Jane Doe ask me and Evans for protection from John Roe. If Jane Doe had requested any type of protection, I would have passed this information to the Title IX Coordinator at the time.

71. Jane Doe never expressed any concern to me about running into John Roe. Jane Doe never asked me for assistance in avoiding contact with John Roe. If Jane Doe had expressed such concerns, I would have passed this information onto the Title IX Coordinator at the time.

72. During the investigation, it was my understanding that Jane Doe and John Roe did not have any contact with each other after February 16, 2020.

73. During the course of the investigation into this matter, I did not learn of any UVA faculty members that were aware of Roe's and Jane Doe's sexual relationship before Jane Doe disclosed the relationship to Asher Biemann in February 2020.

74. There is nothing in the Draft Report or the Final Report that I co-authored that states that Asher Biemann at the time of the J-Term course in December 2018 and January 2019 was aware of John Roe and Jane Doe having any sexual contact during the J-Term course or was aware that John Roe was sexually harassing Jane Doe during the J-Term course.

75. I declare under penalty of perjury that the foregoing is true and correct.

Executed on 09 / 23 /2024.

_LaTosha Barnes_