In the Matter of:

Jane Doe
v.
The University of Virginia, et al.

**Andrew C. Verzilli, M.B.A.**

September 9, 2024



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1   VIRGINIA

 2                IN THE UNITED STATES DISTRICT COURT

 3              FOR THE WESTERN DISTRICT OF VIRGINIA

 4                     Charlottesville Division

 5   JANE DOE,                        )
                                      )
 6                 PLAINTIFF,         )
                                      ) CASE NUMBER:
 7   v.                               ) 3:23-cv-00018-RSB
                                      )
 8   THE UNIVERSITY OF VIRGINIA, et al., )
                                      )
 9                 DEFENDANTS.        )

10

11                              Monday, September 9, 2024

12

13   Remote Deposition of

14              ANDREW C. VERZILLI, M.B.A.

15   a witness, called for oral examination by counsel for

16   the defendants, pursuant to notice and agreement of the

17   parties as to time and date, taken remotely, on the 9th

18   day of September 2024, beginning at 9:30 a.m., before

19   Jayne R. Kirby, a Certified Verbatim Reporter and

20   Notary Public in and for the State of Virginia, when

21   there were present on behalf of the respective parties:

22
```

 1   Whereupon,

 2                        ANDREW VERZILLI

 3   a witness was called for examination by counsel on

 4   behalf of the defendants, and after having been duly

 5   sworn by the Court Reporter, was examined and testified

 6   as follows:

 7               EXAMINATION ON BEHALF OF THE DEFENDANTS

 8               BY MS. HENSLEY:

 9      Q    Mr. Verzilli, is that how you pronounce your

10   name, Verzilli?

11      A    Yes, yes.

12      Q    I didn't want to mess that up.  Just a couple

13   of ground rules that I'd like to go over at first.  I'm

14   going to be asking questions.  Obviously, the Madam

15   Court Reporter will be taking down your answers.  It is

16   very important that you give an audible response.

17   Please no "uh-huhs," "unh-huh," things like that,

18   shaking the head.  We need yes or no audible responses

19   so we can have a clear transcript and make sure you're

20   giving the answer you intend to the question that I

21   give.

22               Is there any reason today you can't testify

1   doing those kinds of services of your 50-hour workweek?

2       A    It depends.  I mean, like, last week was

3   pretty much -- I would -- I didn't have any trials.  I

4   didn't have any trials last week, so I was in the

5   office.  There's weeks where I'm on -- I have to go to

6   trial, or like today there's -- you know, we have a

7   deposition.

8            So I mean I'm generally working on some type

9   of -- you know, all my -- most -- except for a few

10  projects a year that come in, like business valuations,

11  it's all some type of litigation.  So I'm generally

12  working either in -- if I'm in a trial or writing

13  reports is part of that, you know, 50-plus hours.

14      Q    Okay, so if I'm hearing you right, most of

15  those 50 hours a week, you are working on expert work

16  in civil litigation, but you do have a few projects a

17  year where you might be doing something for a business;

18  is that fair?

19      A    Yes, and they don't -- I mean I think last

20  year there might have only been one -- it's one or two.

21  I mean there are very few.  And other than, which don't

22  take, you know, that much of my time, you know, maybe a

1   that you have done in the last four years?

2       A    These are just the trial -- either have been

3   deposed or tried.  This is not every case I've worked

4   on.

5       Q    Okay.  Within the list in your CV for these

6   four years, how many cases have you been retained by

7   the Plaintiff or Plaintiff's counsel?

8       A    Oh, on these, I think there's only one or two

9   defense matters that I was the defense expert.  These

10  are pretty much -- and the other one might have been in

11  '19, so I'd have to go -- yeah, I think now it's '19,

12  so I think in this list there's only one defense

13  deposition.

14      Q    Okay.

15      A    If there's -- at the most there'd be two, but

16  I know there's definitely one.

17      Q    Performing expert work in litigation is your

18  primary source of income; is that correct?

19      A    It's my income, yeah, yes.

20      Q    In any of the cases in which you were

21  retained for or by the Plaintiff, did you ever conclude

22  that there had not been lost earning capacity?

 1          MR. MUNRO:  I'll object to form, but go

 2     ahead.

 3          THE WITNESS:  There's -- there are times

 4     where it's limited.  I -- I know that there are some

 5     matters where I'll get, like, a lifecare plan and get

 6     involved with medical costs, and either they're telling

 7     me someone was only out for two weeks, I'm told there's

 8     no loss of earnings.

 9          There's matters where, you know, I've

10     concluded that, you know, it's a past loss only, or

11     that the loss may be limited, just it doesn't extend,

12     you know, as here, and I know we haven't talked about

13     this matter yet.  But there are times where it may be

14     limited, you know, due to certain circumstances.

15          BY MS. HENSLEY:

16     Q    But in all of those reports and your

17     testimony, you have concluded that the Plaintiff was

18     entitled to some sort of lost earning or lost wage; is

19     that accurate?

20     A    Well, I mean I don't ever say someone is

21     entitled, but I do say if there is, you know, my

22     opinion that there is -- I mean the entitlement is that

Andrew C. Verzilli, M.B.A.,

```
 1   I am given a statement of causation.

 2            I'd have to go back to some of these matters.

 3   Some of them just involve medical costs, so it would

 4   just be, you know, hey, this would be the present value

 5   of the medical care due to some injury.  If I'm giving

 6   a -- if I'm called to court, obviously I'd opine to

 7   some measure of economic loss.

 8      Q    In your entire career, which how many years

 9   is that now, 30 --

10      A    1992, I began actually authoring reports, so

11   we're 32 years into this.

12      Q    Within that 32 career -- 32-year career, how

13   many cases would you estimate that you testified in or

14   provided deposition testimony in?

15      A    I don't know.  I mean you can add up the last

16   four years.  Probably in my career, I would think I'm

17   over 500 at some point.  Now, early on, from '92 to

18   2007, I didn't testify as much.  You know, I was -- my

19   dad was my partner.  He actually did the bulk of the

20   trial, the depositions.

21            So '92, you know, those early years, I only

22   maybe had, you know, two trials, three trials, you
```

1    in preparation for your deposition?

2        A    Yes.  So in the complaint, I -- I didn't go

3    through.  I didn't read every -- I mean I kind of read

4    through it, you know, skimmed it.  I brought it back in

5    my memory.  I had to look at her resume and her

6    transcript.  I don't think I looked at the '23 W2.

7            I don't recall.  I mean, and I did -- I

8    looked over the labor market data I used, and then, you

9    know, those sources, yes.

10       Q    Okay.  So these documents here that you list

11   within your report, again the amended complaint,

12   resume, transcript, the 2023 W2, and the various

13   publications, are those all of the documents that you

14   reviewed before writing your June 12th, 2024, letter to

15   Plaintiff's counsel?

16       A    Yes.

17       Q    Did you review any other documents before

18   creating that report?

19       A    No.

20       Q    Did you have any interviews before you

21   created that report?

22       A    No.

1   case?

2            MR. MUNRO:  Objection to form.

3            THE WITNESS:  Yes, I -- I was asked -- when

4   I'm looking at loss of earning capacity, I have to

5   estimate what was someone's potential had something not

6   happened to them, some event, and compare that to what

7   their mitigation is.

8            So here with Ms. Doe, when I was retained by

9   Ms. Abdnour, it was indicated to me that something

10  happened to her at the University of Virginia, and she

11  wanted to go to law school and hasn't gone to law

12  school, and I then needed to get information.  So I

13  read the complaint to get an understanding of that.

14           BY MS. HENSLEY:

15       Q    What is your understanding of the reason why

16  Ms. Doe did not go to law school?

17       A    Because she felt she didn't have someone to

18  write her recommendations, and she talked about it in

19  the deposition.  I didn't have it at the time.  That

20  was my understanding.  But although my -- but it's also

21  my understanding she still hopes or has aspirations to

22  go -- to enroll in law school.

1        Q    What's the basis for your understanding that

2   she still has aspirations or hopes to attend law

3   school?

4        A    I had -- it was indicated from counsel.  When

5   I -- when I was doing my report, I wanted -- I have to

6   make an assumption if I have to estimate mitigation,

7   and I inquired, you know, is Ms. Doe, is she going to

8   -- is she still planning to enroll in law school.  That

9   affects one of the alternatives, and it was indicated

10  to me that she still would like to go to law school,

11  that's one of her goals.

12       Q    And that was from Plaintiff's counsel?

13       A    Yes.

14       Q    With respect to those letters of

15  recommendation, do you have any understanding whether

16  or not she was able to get letters of recommendation?

17       A    I'd have to look at the deposition, and I

18  don't recall.  I know it was asked of -- we talked --

19  it was talked about in the deposition, and now I'd just

20  -- I'd have to go back and look at it in that section.

21  I don't recall.  I don't remember.

22       Q    If she had been able to get letters of

1   recommendation, would that change the opinions that you

2   have espouse in your June 12 letter?

3        A    No, at least how I -- again, the factual

4   information to me is that she -- the plan was to start

5   in the fall of 2020, and she didn't.  So we know that

6   she hasn't, you know, and that's why I did one

7   alternative that if it would be a delay, but it doesn't

8   change my opinion.  I assumed that she -- that was the

9   -- that was her intent, and that didn't happen.

10       Q    Right, but I'm saying if she had obtained

11  letters of recommendation -- I understand you're

12  assuming she didn't, but if she had, would that change

13  your opinions?

14       A    What I said was I -- even if she got the

15  letters, she hadn't -- she hasn't -- she didn't go to

16  law school.  So I assumed -- I have assumed that that

17  was what her initial plan was, and it hasn't happened.

18       Q    Would it change your opinion as to her lost

19  earning capacity if she had letters of recommendation

20  in hand right after -- the year after she graduated?

21            MR. MUNRO:  Object to form.

22            THE WITNESS:  No, but that goes to -- again,

Andrew C. Verzilli, M.B.A.,

1   I'm assuming, you know, while we're here that her

2   original career path was to go to law school in the

3   fall of 2020, and she hasn't.  I think that may go to

4   entitlement.

5           I mean this is an assumption.  If you change

6   that assumption, then obviously my opinion would

7   change.  But I -- it was my understanding that that's

8   what her plan was.

9           BY MS. HENSLEY:

10      Q    So if she had letters of recommendation in

11  hand, that would change your assumption, and then that

12  would change your opinions; is that correct?

13      A    I didn't say that.

14          MR. MUNRO:  Object to form.

15          THE WITNESS:  I said if you change an

16  assumption, it would change my opinion, but I don't --

17  I can't give -- that's not -- I'm not giving an opinion

18  that she should have gone to law school in the fall of

19  2020.  I assume that she would have went to law school.

20          That's an assumption that, you know, under

21  this factual basis -- if it is determined, if you

22  change that and say, well, she would have started in

1   2021, that would affect my opinion.

2          But I'm not giving an opinion of when she

3   would have started law school.  I had assumed it, that

4   that's what the plan was.

5          BY MS. HENSLEY:

6      Q    I see.

7      A    And can we take a quick break?  I drank a lot

8   of tea.

9      Q    Absolutely, sure.

10     A    I'm sorry, I just --

11         MR. MUNRO:  I was about to ask, so that's

12  good.

13         MS. HENSLEY:  My apologies.

14         THE WITNESS:  No, no, no, it's okay.  I just

15  want to just get more tea and just --

16         MS. HENSLEY:  Absolutely.  How many minutes

17  do you think you need?  Are we thinking five or ten?

18  What would be best?

19         THE WITNESS:  Five, yeah.  I mean I've just

20  got to run down, heat the water, and run to the men's

21  room, and --

22         MS. HENSLEY:  Okay, so how about ten to

1      Q    And this is when she worked for a paralegal

2   for law office of Paul S. Haar, P.C.; is that right?

3      A    Yes.

4      Q    I'd like to mark this as Defense Number 5.

5                          (The document referred

6                          to above was marked for

7                          identification as

8                          Defendant's Exhibit 5.)

9           BY MS. HENSLEY:

10     Q    What information in this W2 from 2023 did you

11   deem relevant to your proposed expert opinions?

12     A    That she made $10,000 last year.

13     Q    And why was that relevant?

14     A    I had assumed, absent all this, that she

15   would have graduated from law school by then.  So I

16   just was -- I just knew that she had earned $10,000

17   last year.

18     Q    Aside from just you knowing that she earned

19   $10,000, that didn't factor into your analysis and

20   opinions?

21          MR. MUNRO:  I'll object to form.

22          THE WITNESS:  No, because I assumed

1  graduation from law school in '23, but I did reflect a

2  period, you know, passing the bar and all that.  So I

3  actually started the estimate when she turned 26, which

4  would have been March of this year.

5        So if I assumed she would have been working

6  as a lawyer in '23, I would have subtracted it, but it

7  just again was a piece of factual information.

8        BY MS. HENSLEY:

9    Q    So you didn't take into consideration these

10  earnings with respect to Ms. Doe's total loss of

11  earning capacity?

12   A    I --

13        MR. MUNRO:  Object to form.

14        THE WITNESS:  I didn't take out the $10,000.

15        BY MS. HENSLEY:

16   Q    So your calculations don't reflect the

17  earnings that she received from the law office of Paul

18  S. Haar; is that correct?

19   A    That's correct.

20   Q    Did your analysis likewise not take into

21  account any earnings she received at her other places

22  of employment, namely Atlantic Council?

1            MR. MUNRO:  Object to form.

2            THE WITNESS:  In '22, no, I did not.  And I

3    don't -- I don't -- I didn't have those earnings, so I

4    don't know what she earned, but I did not.  I did not

5    subtract it out.

6            BY MS. HENSLEY:

7       Q    Okay.  So if she had earned wages for

8    Atlantic Council, would that change the opinions in

9    your report?

10      A    I don't know.  How I looked at this was

11   typically people -- students in law school work, you

12   know, the summer.  They get internships or work at law

13   firms.  So I didn't -- I inherently assumed if she did

14   that, that it probably would have been similar to what

15   she earned, so I didn't -- I didn't offset those

16   earnings.  I really started the loss when I assumed she

17   would have started working as an attorney.

18            I mean if you want to take out ten grand, you

19   can.  I don't know what she earned at Atlantic Council,

20   but that may -- you know, if that's considered to be

21   mitigation, you could subtract it.  But I inherently,

22   you know, assumed that she would have had some kind of,

Andrew C. Verzilli, M.B.A.,

```
 1        Q    And I think you mentioned this before, that

 2   you are not a vocational expert, but you also do not

 3   intend to opine that the position of an attorney would

 4   be an appropriate occupation for the Plaintiff; is that

 5   correct?

 6        A    No.  I'm assuming she -- that was her

 7   potential.  I'm not giving a vocational opinion.  There

 8   is a difference between a vocational expert and an

 9   economist.  And the one thing that sometimes gets lost

10   with vocational experts is the labor market data is not

11   vocational data; it's economic data.

12             So I am just assuming she will go to become

13   an attorney, that that -- and that that income stream

14   is where I'm applying the economics.

15        Q    And Ms. Doe graduated from the University of

16   Virginia in May 2020.  Is that your understanding?

17        A    That's right, which was the -- yeah, and I

18   think maybe the ceremony was later.  I -- I'm not sure,

19   because I remember that all the colleges had gone

20   virtual by March or so of -- March of 2020, but she

21   finished everything on virtual, but she was -- but she

22   did graduate in May of 2020, or received her degree.
```

1   of course, if you shorten a period, then the resulting

2   loss is going to be shorter.

3            So, yes, it would have an impact.

4            BY MS. HENSLEY:

5       Q    If Ms. Doe didn't apply to law school for

6   fall of 2020 because she didn't want to go to law

7   school while classes were remote during COVID-19

8   pandemic, would that change your opinions?

9            MR. MUNRO:  Same objection.

10           THE WITNESS:  It changes the assumption, so

11  it was indicated to me that she had -- her goal was to

12  go in the fall of 2020.  If you change that, it does

13  change my opinion.  I can't tell you how much unless

14  you give me a specific assumption, and I would have to

15  take some time to do some math, because it's not

16  something you can just change off the top of your head,

17  but it would be lower.

18           BY MS. HENSLEY:

19      Q    Do you have any understanding of why Ms. Doe

20  has not been employed for nearly a year?

21      A    No.  Again, I'd have to go -- I read --

22  again, I didn't have the document for that long.  I've

 1    read it.  To the extent it might be in there, I'm just

 2    not -- off the top of my head, I don't recall.

 3         Q    What was the basis with respect to your

 4    opinions for considering losses in potential income for

 5    a paralegal position?

 6         A    Because that's what she did in '23, and it

 7    was some measure of mitigation of if she -- as some

 8    measure of mitigation, and I broke down what, you know,

 9    paralegals earn and considered that as an alternative.

10         Q    So you had no other independent information

11    provided to you that would indicate Ms. Doe has any

12    intention of becoming a paralegal; is that right?

13              MR. MUNRO:  Objection to form.

14              THE WITNESS:  I -- I knew that she worked at

15    it for some period in 2023, and that would be another

16    measure for potential in lieu of as compared to an

17    attorney.  That was just how I looked at that.

18              BY MS. HENSLEY:

19         Q    Why didn't you also evaluate -- do an

20    economic analysis based on her position with Atlantic

21    Council?

22         A    I didn't have any income from that, and it

Andrew C. Verzilli, M.B.A.,

1         In other words, and I'll rephrase, your

2   assumption presumes she would have entered into a law

3   school and graduated from a bar; is that right?

4         MR. MUNRO:  Objection to form.

5         THE WITNESS:  That is correct, knowing that

6   she had earned her undergraduate degree, and I knew

7   what her grades were.

8         BY MS. HENSLEY:

9     Q    So based on her undergraduate degree and her

10  grades, that was something you relied on to assume that

11  she would be able to successfully apply to law school

12  and pass the bar?

13    A    I don't know if I -- again, I'm not giving

14  the opinion -- I'm making the assumption, but it was

15  reasonable for me to assume she had the career

16  potential to work as an attorney, that she had the 3.9.

17  So I wasn't -- you know, if I was -- when I've seen

18  grades before, and someone's -- you know, they've got a

19  2.2 average, I probably would have thought, rethought

20  an attorney assumption, without some kind of a facial

21  input.

22         But here, I thought it was a reasonable

1    assumption that she had the potential to work as -- go

2    to school and go to law school and become an attorney.

3        Q    If Ms. Doe's high school transcript reflects

4    that she was a student who earned As, Bs, and Cs, would

5    that change your opinions?

6            MR. MUNRO:   Objection to form.

7            THE WITNESS:   No.

8            BY MS. HENSLEY:

9        Q    Why is that?

10       A    She graduated from college, and I was making

11   the assumption that she had the potential to go to law

12   school.   I didn't even ask for her high school

13   transcripts.

14       Q    How many students nationally applied for law

15   school in 2020, fall?

16       A    I did not look at that statistic.   I don't

17   know.

18       Q    Did you look at those statistics for 2021,

19   2022, 2023, or 2024?

20       A    I have not looked at law school applicants

21   nationwide.

22       Q    Did you factor any acceptance rates into your

1   analysis for any of those years?

2       A    I said I didn't make any opinion as to the

3   vocational impact, you know, the aspect of her going to

4   law school.  I assumed she would have went to law

5   school.

6       Q    What is your understanding of the criteria to

7   get into law school?

8       A    I'd have to look at it.  I don't know.  I

9   don't know off the top of my head.  I know you have to

10  have -- graduate.  I don't even know if you have to --

11  yeah, I think you have to have an undergraduate degree

12  and a certain score on the LSAT.

13      Q    Do you know if Ms. Doe has ever taken the

14  LSAT?

15      A    I think I said earlier she hasn't taken the

16  LSAT.  I think she's -- at least in the deposition,

17  which I didn't have at my report, she's done some

18  studying and took practice tests, but she has not taken

19  the official LSAT test yet.

20      Q    Do you know if she has ever signed up for an

21  LSAT prep course?

22      A    I don't know if the practice test was through

1   a prep course, or -- I don't recall that specifically.

2   I just know that she has studied for it, but hasn't

3   taken the test.

4        Q    Do you know if Ms. Doe did anything to

5   prepare to apply to enter law school in fall of 2020?

6        A    I don't -- I don't think she did.  I know she

7   said something about trying to study off and on for the

8   LSAT.  She never took the LSAT.  There was some talk

9   about the recommendation letters at that time around

10  graduation or around that she did not feel comfortable.

11            I think there were recommendation letters

12  written, a couple, but I don't know if it said specific

13  dates, but that's my understanding, but I don't think

14  she really -- I know -- I know she didn't take the

15  LSAT, and I know she didn't make any applications.

16       Q    Do you know when an applicant needs to -- do

17  you know when an applicant has to apply to law school

18  in any given academic year?

19       A    I don't know.

20       Q    Do you know when the LSAT is offered?

21       A    No.

22       Q    Do you know what the median score for an Ivy

```
 1   League law school is for the LSAT?

 2        A    No.

 3        Q    Do you know if Ms. Doe has an LSAT account?

 4        A    I don't know if the -- where she referenced

 5   practice tests, I don't know if that's through an LSAT

 6   account, so I'm not sure.

 7        Q    Do you know if she has asked anyone

 8   specifically for letters of recommendation for law

 9   school?

10        A    There were two -- I recall other professors

11   she was asking about letters of recommendation.  I

12   assume that was for law school, but without the

13   deposition in front of me, I am not -- I assume.  I

14   knew there were some letters of recommendation.

15           That's what I recall in the deposition, not

16   from Professor Roe, but from two other professors.  I

17   don't remember their names, but I thought there was

18   something mentioned.

19        Q    I'm a little confused, because I thought

20   earlier this morning you testified that you assumed Ms.

21   Doe did not obtain any letters of recommendation.  Is

22   that not true?
```

1            MR. MUNRO:  Object to form.

2            THE WITNESS:  I said she was afraid, and then

3    I thought I said she may have subsequently and I

4    couldn't recall, and I think she might have, but at the

5    time of the graduation, I didn't think she had.

6            BY MS. HENSLEY:

7        Q    Okay.  Do you know if Ms. Doe participated in

8    prelaw at the University of Virginia?

9        A    I don't have the transcript.  I don't think

10   it was -- I don't think it was a prelaw curriculum.  It

11   doesn't appear that it was, but I don't know what a

12   prelaw -- I don't know what prelaw -- I don't know if

13   there is a specific prelaw designation at University of

14   Virginia.  I'm not sure I can answer that.

15       Q    Do you know what law schools or schools the

16   Plaintiff is interested in attending for law school?

17       A    I'm not sure.  It may have been in the --

18       Q    Do you know if the Plaintiff -- I'm sorry.

19       A    It may have been in the depo, but I don't --

20   I don't recall.  It was a pretty lengthy deposition.

21       Q    Do you know if the Plaintiff has toured any

22   law schools?

**Andrew C. Verzilli, M.B.A.,**

1      A     I don't recall that she has in the depo, but

2    if she -- again, at the time of reviewing my report, I

3    didn't think she had.  If there's something from the

4    depo that I don't recall, again I would defer to that.

5    I don't -- nothing jumps out at me that she has.

6      Q     Do you know if the Plaintiff has drafted a

7    personal statement for law school applications?

8      A     I don't think so.

9      Q     Do you know if she has requested any official

10   transcripts to be sent for law school applications?

11     A     I don't recall that she has, if that was in

12   the depo.  At the time I gave my report, I assumed she

13   hadn't yet.

14     Q     Would you agree that the types of things

15   we've been discussing, LSAT prep, visiting schools,

16   taking the LSAT, LSAT, getting letters of

17   recommendation are the types of things that someone who

18   is interested in attending law school would do prior to

19   applying to law school?

20          MR. MUNRO:  Objection to form.

21          THE WITNESS:  Again, I'm not an expert on

22   applications of law school.  I mean it would be common

1    can't give a probability opinion.

2         BY MS. HENSLEY:

3    Q    What's the basis of your opinion for assuming

4    she couldn't apply to law school and go in fall 2020,

5    based on her academic performance?

6    A    I -- I know she didn't.  I didn't make any

7    opinion.  When I was contacted and retained, it was

8    conveyed to me that this was her goal, to go fall of

9    2020.  And as of the time I did my report, she had not

10   gone to law school, but she still had aspirations.

11        And I made the assumption -- you know, we

12   were already in June, so I figured if she had already

13   applied, I would have assumed by the fall of this year,

14   but she hadn't yet, so I gave another year.

15        But in terms of why she didn't or why she

16   wasn't able to, I didn't ask, so I'm not really aware.

17   Q    The calculations within your report regarding

18   loss of retirement contributions of five percent of

19   earnings, does that assumption rely -- is that based on

20   an assumption that Ms. Doe is an attorney, unspecified

21   type of attorney working in the United States?

22   A    Yes, it's a normal, average retirement

 1      A    Average the 10th and 25th percentile, $69,760

 2  and $98,000.

 3      Q    Okay, you average the 10th percentile and the

 4  25th percentile?

 5      A    Yes, that's generally the -- the entry-level

 6  falls in the mid there.

 7      Q    What's that based on?

 8      A    My understanding of the statistics and just

 9  doing this for 30 years.

10      Q    Is that the entry-level nationwide, or is

11  that for any particular locale?

12      A    No, that's the nationwide data.  I took it

13  off the -- I downloaded the whole -- I have all the

14  occupations, but this is -- this is just -- this is the

15  occupational profile they call it.

16      Q    Okay, so it's --

17      A    You can see -- you can see where you -- at

18  the top where you highlighted the national, so that's

19  the national.  See the -- that, yeah.  That's what the

20  -- you brought up the nationals.

21      Q    Okay.  So if the Plaintiff lived in a rural

22  location, these figures would change, on average?

```
1              MR. MUNRO:  Objection to form.

2              THE WITNESS:  Most likely.  You can -- so

3   what you can do is, you can get it by what's called

4   metropolitan statistical area.  And you would have to

5   give a definition of what MSA you need to look at, and

6   then you could see if it's -- what the impact is.

7              BY MS. HENSLEY:

8       Q    Okay.  So the $176,470, you're assuming

9   that's going to be the annual salary by the age of 40;

10  is that right?

11      A    Yeah, 14 years into the -- yes.

12      Q    And that -- on this statistic, on this form

13  that I have pulled up here, it's listed as the mean

14  annual wage; is that right?

15      A    Yes.

16      Q    Is that a statistic for any specific type of

17  attorney?

18      A    It's an aggregate, so it's all -- it's all

19  lawyers in the survey.  So it's not specific to private

20  sector, public sector, family law, environmental law,

21  litigation, products liability.  It's an average.

22      Q    But that's not an average salary for a human
```

Andrew C. Verzilli, M.B.A.,

1   rights attorney; right?

2       A    It's not -- it's not a specific for human

3   rights, that's -- yeah, it's not, correct.

4       Q    Would you agree that average salaries depend

5   on the type of law an attorney is practicing, whether

6   they work for a large firm or a small firm or the

7   government, public interest?

8            MR. MUNRO:  Objection to form.

9            THE WITNESS:  I said that earlier, yes.

10           BY MS. HENSLEY:

11      Q    And for purposes of your analysis, you did

12   not assume the Plaintiff would be any specific type of

13   attorney?

14      A    That's correct.  I just used the aggregate.

15      Q    Do you know the Plaintiff's preferred

16   profession within a practice area?

17      A    I think she mentioned human rights.

18      Q    But you didn't factor that in your analysis;

19   right?

20           MR. MUNRO:  Objection to form.

21           THE WITNESS:  I did not look at a specific --

22   I'm not sure there is a specific -- I don't recall

 1   seeing a specific human rights salary like from the

 2   BLS.

 3            BY MS. HENSLEY:

 4       Q    Would you agree -- well, strike that.

 5            Do you know if a human rights attorney would

 6   earn less than, the same as, or more than an attorney

 7   in the private sector?

 8       A    I think it depends.

 9       Q    On average, do you know if they would earn

10   less than, same as, or more?

11       A    I don't know.  I use an aggregate, so I'm

12   capturing all lawyers.

13       Q    Do you have any understanding about whether

14   public interest attorneys earn the lowest of attorneys

15   across the board, or where are they within the pack for

16   earnings?

17            MR. MUNRO:  Objection to form.

18            THE WITNESS:  I don't know.  I'm not -- I'm

19   not sure.  I didn't research that.

20            BY MS. HENSLEY:

21       Q    For purposes of your opinions, are you

22   assuming that all law students who graduate from law

1    school would have equal opportunities with respect to

2    obtaining employment?

3            MR. MUNRO:  Objection to form.

4            THE WITNESS:  I didn't do an opinion of

5    probability.  This is a measure of her potential as an

6    attorney.  I didn't -- I didn't give -- that's more of

7    a vocational issue, and I'm not giving any vocational

8    opinions.

9            BY MS. HENSLEY:

10       Q    So whether or not, depending on what law

11   school she went to, if she graduated, you are not

12   opining as to her likelihood of being able to enter

13   into the profession of her choice?

14       A    I'm not giving a vocational opinion, that's

15   correct.

16       Q    With respect to your analysis, did you make

17   any assumptions about what country the Plaintiff would

18   be living in and working in?

19       A    I assumed the United States.

20       Q    If she intends to work abroad, would that be

21   relevant to your opinions?

22       A    I'd probably have to get a little more

```
 1   information about that meaning.  For instance, you

 2   know, I know firms here in the United States have

 3   offices in other countries, so I'd have to kind of look

 4   into that.  So I don't -- I really couldn't answer that

 5   as we sit here.

 6        Q    If the Plaintiff became a human rights

 7   lawyer, how would that change her average salary by the

 8   age of 40?

 9            MR. MUNRO:  Objection to form.

10            THE WITNESS:  I'd have to research.  I don't

11   -- I don't -- I'm not aware that the Bureau of Labor

12   Statistics breaks it out, so then I'd have to look for

13   other data, and then you have to make sure that the

14   data is reliable.  I don't go to Payscale.com.

15            You know, some -- there could be an

16   organization that does a survey that seems to have some

17   statistical reliability.  So I'd have to look into

18   that, so I really couldn't answer that as we sit here.

19            BY MS. HENSLEY:

20        Q    Did you account for mitigation within your

21   report?

22        A    Yes.
```

1    that opinion.  I'm giving an estimate of her potential.

2              BY MS. HENSLEY:

3        Q    Did you consider Ms. Doe's medical diagnoses

4    when you were considering her potential to work until

5    age 67?

6        A    Can you clarify?  I'm not sure what diagnosis

7    you're talking about.

8        Q    Are you aware of any diagnosis that the

9    Plaintiff has?

10       A    Again, if it's something like that in the

11   deposition, it's not coming to mind, but I'm not -- I'm

12   not aware.  I don't have medical record.  I didn't

13   review any medical records, so I'm not sure what you're

14   talking about.

15       Q    So you didn't factor any of her medical

16   diagnoses into your calculations; is that fair?

17             MR. MUNRO:  Objection to form.

18             THE WITNESS:  I didn't -- I didn't make any

19   -- I'm not a medical doctor, so I did not -- I did not

20   consider any medical diagnosis.

21             BY MS. HENSLEY:

22       Q    In your analysis, did you consider that the

```
 1   Plaintiff might go back to school to get a Ph.D.?

 2       A    No.

 3       Q    If that's her intention, would that change

 4   your opinions within the expert report?

 5            MR. MUNRO:  Objection.

 6            THE WITNESS:  Can you clarify?  When you say

 7   -- can you clarify?  Do you mean in lieu of going to

 8   law school, or that she never would have gone to law

 9   school and she would have gotten a Ph.D.?  I'm not --

10   I'm not sure.  I don't understand.

11            BY MS. HENSLEY:

12       Q    Well, I guess let's do it both ways.  So

13   let's assume she doesn't go to law school and she goes

14   to get a Ph.D., would that change your opinions within

15   your June 12 report?

16       A    If I assumed a doctorate degree instead of a

17   law degree, yes, it would change it.

18       Q    How?

19       A    I would -- I would -- I mean I have the

20   person -- the age-education data.  It would be lower.

21   Just, you know, the average doctor -- doctoral degree

22   is right at 140,000, so lawyer 170-plus, so it would be
```

1    lower, to the extent -- I would have to do the whole

2    age-education profile, which I don't have in front --

3    you know, at the tip of my hands, the tip of my

4    fingers, but it would be -- it would be lower, probably

5    have an entry-level somewhere in the 60, upper 60

6    range, so, yeah, it would be lower.

7        Q    And if the Plaintiff intended to go to law

8    school still and obtained a J.D., but then also went

9    back to get her Ph.D. and then taught, would that also

10   change your calculations?

11            MR. MUNRO:  Objection to form.

12            THE WITNESS:  If you assume that she would

13   have gone back, gotten her J.D. -- did you say Ph.D.,

14   too?

15            BY MS. HENSLEY:

16       Q    Yes.

17       A    And then taught in academia, it would -- it

18   would change.  I'd have to -- in that respect, I'd have

19   to look at data from the Chronicle of Higher Education

20   that has earnings by rank, and we'd probably -- my

21   experience would be start out as a -- I think the

22   assistant professor associate, full -- you know, I'd

Andrew C. Verzilli, M.B.A.,

```
1    have to go through a whole career progression.
2          I don't know off the top of my head what the
3    averages are for those ranks, but I would think they
4    are -- and that -- and that is -- that depends on are
5    you a two-year school, four-year doctorate, doctoral
6    college, Ivy League.  So I think we can get an
7    aggregate on that.  Last time I looked at it, it would
8    be lower.  I just don't -- I can't tell you how much.
9       Q    Do you know how long, how many years it takes
10   to obtain a doctorate on average?
11      A    I don't know if there is specific data on
12   that.  I generally think -- are you talking from the
13   time you finish bachelor -- undergraduate?  It's
14   generally going to be two years for a master's, and I
15   think another two to three for doctorate.  But then
16   there's a lot of people that, you know, go part -- you
17   know, they work a little bit or go part-time, and so
18   that could vary.
19          But I would think from undergraduate to
20   Ph.D., it's probably going to be in the two to -- about
21   three -- probably around five total years, three --
22   three to five years.
```

1      Q    But you didn't -- within your calculations

2   here, you haven't considered any loss of potential

3   earnings with respect to a profession teaching with a

4   doctorate?

5      A    I did not -- I did not look at a career in

6   academia.  What would happen is you'd do that career

7   progression by different -- you know, assistant

8   associate, full professor.  Retirement is certainly

9   going to be higher in academia, probably come in around

10   ten percent.

11             Then you also would have to think about

12   looking at, you know, tenure.  You know, we have

13   faculties -- then that's a whole different -- maybe now

14   look at normal retirement as 67, because professors are

15   tenure, you know, that's terminal employment.  You

16   know, it's a whole different analysis.

17      Q    Have you reviewed any of the Plaintiff's job

18   applications since her graduation?

19      A    No.  I would have cited -- I cited everything

20   I reviewed.

21             Can we take another break?  Or are you --

22      Q    Absolutely.

```
 1    differently.

 2              I assumed that Ms. Doe was -- that was her

 3    career intent, that was her career intention, was she

 4    wanted to go become a lawyer, and that's what I based

 5    this analysis on.

 6              BY MS. HENSLEY:

 7    Q     And can you walk me through table number two?

 8    A     Yes, this assumes that the same -- had she

 9    gone to law school in 2020 in the fall, graduated by

10    26, and grew to 176,000 by age 40.  What this assumes

11    is there is a five-year delay.  So I'm assuming the

12    same -- I have taken everything that I used before, the

13    same starting salary, the same average.

14              I'm just assuming it's five years -- it's

15    starting five years later now, and that she would

16    become a lawyer by age 31, and then get to that full --

17    that average by age 45, 14 years, and that limits the

18    damages.  And then if we assume that five-year delay,

19    it's $847,000.

20              So in this analysis, I'm just assuming she

21    has lost five years of working as an attorney.

22    Q     Did you take into consideration the cost of
```

1    law school in your calculations?

2        A     I did not.

3        Q     Do you know the average cost of attending law

4    school in the U.S.?

5        A     I'd have to look up that.  I know it's three

6    years.  I don't know if it's -- I don't -- I don't want

7    to guess.  I know I can find the data.  I didn't look

8    -- I didn't look at it for this.

9        Q     Wouldn't the amount that she would have to

10   pay for law school make the total loss in earning

11   capacity less?

12            MR. MUNRO:  Objection to form and

13   speculation.

14            THE WITNESS:  I didn't subtract it out.  If

15   you were to subtract it out from the first alternative,

16   it more than likely would be.  But in this alternative,

17   assuming she has a delay, I would just offset the two.

18   You know, she's still going to -- you know, if she has

19   a five-year delay, she still would, you know, have the

20   law school expense, so it wouldn't affect my opinion.

21            BY MS. HENSLEY:

22        Q     So it would affect your opinion as to if she

1   didn't enter law school in 2020 because of the alleged

2   actions of the Defendant; is that right?  Is that what

3   you're saying?

4          MR. MUNRO:  Objection to form.

5          THE WITNESS:  No, what I'm -- no, what I'm

6   saying is I didn't take it out of -- I didn't look into

7   -- I'm not sure if that's something that has to be

8   subtracted.  That may be a legal issue.

9          On the first alternative, where I assumed she

10  is just going to be a paralegal, if you were to

11  subtract out the cost of law school, it would reduce

12  the figure by whatever that annual cost is times three

13  years.

14         In this alternative, since you're assuming --

15  since I'm assuming she is going to be a lawyer, and if

16  she goes to law school and still applies to law school,

17  she's still going to incur that cost, so you wouldn't

18  subtract it.

19         BY MS. HENSLEY:

20      Q   Okay.  Mr. Verzilli, have you ever been

21  convicted of a felony?

22      A   No, I have not.  It's Verzilli.  I'm sorry,

1                        CERTIFICATE

2    COMMONWEALTH OF VIRGINIA )
                              )
3    COUNTY OF CULPEPER       )

4

5              I, Jayne R. Kirby, a Certified Verbatim

6    Reporter, and Notary Public, do hereby certify that I

7    took the stenographic notes of the foregoing

8    proceedings which I thereafter reduced to typewriting;

9    that the foregoing is a true record of said

10   proceedings; that I am neither counsel for, related to,

11   nor employed by any of the parties to the action in

12   which these proceedings were held; and further, that I

13   am not a relative or employee of any attorney or

14   counsel employed by the parties thereto, nor

15   financially or otherwise interested in the outcome of

16   the action.

17

18

19                          JAYNE R. KIRBY, CVM
20                          NOTARY ID NUMBER 161940
                            Notary Public in and for the
21                          State of Virginia, at Large.

22   Commission Expires: January 31, 2026