**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

**JANE DOE,**

                    **Plaintiff,**

**v.**                                       **Case No. 3:23-cv-00018-RSB**

**RECTOR AND VISITORS OF THE
UNIVERSITY OF VIRGINIA,**

                    **Defendant.**

**<u>PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

<u>**TABLE OF CONTENTS**</u>

**STATEMENT OF UNDISPUTED MATERIAL FACTS** ............................................................. 3

**STANDARD OF REVIEW** ............................................................................................. 6

**ARGUMENT** ................................................................................................................ 7

   **I.**   **THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER DOE'S DECEMBER 2018/JANUARY 2019 TITLE IX CLAIMS ARE TIMELY** ................................................... 7

      *A.*  *New information in the Final Investigation Report (FIR)* ........................... 9

      *B.*  *Factual discrepancies in Biemann's accounts* ........................................ 11

      *C.*  *UVA's failure to train Biemann* ............................................................ 20

      *D.*  *Doe's notice of UVA's violation* ............................................................ 21

   **II.**  **THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER UVA WAS DELIBERATELY INDIFFERENT TO DOE'S TITLE IX CLAIMS** ............................................... 21

      *A.*  *UVA's notice of Doe's harassment* ...................................................... 22

      *B.*  *UVA's response to Doe's March 2020 Title IX complaint* ...................... 23

   **III.**  **DAMAGES ARE AVAILABLE TO DOE UNDER TITLE IX** ............................................. 29

      *A.*  *The Court is not bound by Cummings v. Premier Rehab Keller* ............... 30

      *B.*  *Cummings allows recovery of contract remedies* ................................. 33

      *C.*  *Damages that remain unquestionably available after Cummings* ......... 36

      *D.*  *Doe complied with Fed. R. Civ. P. 26(a)(1)(A)(iii)* ............................... 37

      *E.*  *There is a genuine issue of material fact as to Doe's damages* .............. 39

**CONCLUSION** ........................................................................................................... 40

`

## INTRODUCTION

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…." Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).  In violation of Title IX and its implementing regulations, UVA repeatedly failed Jane Doe, the survivor of years of grooming and sexual abuse by an esteemed professor decades her senior, by ignoring clear signs of abuse, minimizing her reports, failing to complete a reasonable and timely Title IX investigation, and denying her necessary protection from her abuser.  As a result, Doe has been functionally unable to move on with her life, and her plans to attend law school and become a professor have been indefinitely put on hold.  This is the opposite of what Title IX promises, and UVA must be held accountable for its failures.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Jane Doe started at UVA as a transfer student in 2018 after attending Northern Virginia Community College for two years.[1] She went on a study abroad trip in December 2018-January 2019 during which her professor, John Roe, sexually assaulted her on multiple occasions.[2] Doe first reported concerns about her relationship with professor John Roe to professor Asher Biemann on February 17, 2020.[3] Biemann did not report this to the Title IX office.[4] Biemann first went to Roe's close friend, professor Jeffrey Grossman, then to study abroad director Dudley Doane, who then went to Dean Laurie Casteen.[5] On February 24, 2020, Casteen met with Doe for an hour and a half, and Doe gave her a detailed account of the relationship.[6] Casteen told Biemann and Doane

---

[1] Ex. 11, Pl. Dep. 9:7-18.
[2] Def.'s Ex. 4 at UVA 002447, ECF No. 67-4.
[3] Def.'s Ex. 2 ¶¶ 21-25, ECF No. 67-2.
[4] Id. at ¶¶ 26-27; Ex. 8, Roe Dep. 55:3-5.
[5] Def.'s Ex. 5 ¶ 9, ECF No. 67-5.
[6] Ex. 4, Pl. Dec. ¶¶ 6-8; Def.'s Ex. 5 at ¶ 14, ECF No. 67-5.

that the relationship did not likely implicate the Title IX Policy.[7] UVA's Title IX Policy defines affirmative consent as follows: "Affirmative Consent is: • Informed (knowing) • Voluntary (freely given) • Active (not passive), meaning that, through the demonstration of clear words or actions, a person has indicated permission to engage in mutually agreed-upon sexual activity."[8]

UVA has no records of ever training Biemann on his obligations under its Title IX policy, and only has records of training Roe, Doane, and Casteen one time each via a digital course in 2021, over a year after Doe made her report.[9] UVA finally initiated an investigation into the report on March 31, 2020.[10] On that date, Title IX Coordinator Emily Babb sent Doe a copy of the Title IX policy and several related documents.[11] That was the first time Doe ever received a copy of UVA's Title IX policy, and the first time she learned of the concept of "affirmative consent."[12] At that time, UVA notified Doe that she was entitled to an advisor in the Title IX investigation.[13] UVA provided Doe with a list of potential advisors.[14] That list contained one name—attorney Palma Pustilnik.[15] Although the list asserted that the advisors listed had "knowledge of UVA's Sexual and Gender-Based Harassment and Other Forms of Interpersonal Violence Policy and Procedures," UVA never provided any training to Pustilnik.[16]

UVA's Title IX policy required the following:

> **Responsibility to Report Prohibited Conduct Where Either the Complainant or the Respondent Is an Employee:** Under this policy, supervisors, management and human resources professionals are required to report to the University's Title IX

---

[7] Def.'s Ex. 5 ¶ 11, ECF No. 67-5.
[8] Policy on Sexual and Gender-Based Harassment and Other Forms of Interpersonal Violence ("Title IX Policy") at 12, ECF No. 11-1.
[9] *See* Ex. 5, Def.'s Jul. 12, 2024, Interrog. Response at 15-16; Ex. 1, Training List.
[10] Def.'s Ex. 4 at UVA 000027, ECF No. 67-4.
[11] *Id.*
[12] Ex. 4, P. Dec. ¶¶ 10-11.
[13] Ex. 2, Advisor List at UVA004603.
[14] *Id.*
[15] *Id.*
[16] *Id.*; Ex. 5, Def.'s Jul. 12, 2024, Interrog. Response at 15-16; Ex. 1, Training List.

> Coordinator all relevant details about an incident of Prohibited
> Conduct where either the Complainant or the Respondent is an
> Employee. Reporting is required when such supervisors,
> management and human resource professionals know (by reason of
> a direct or indirect disclosure) or should have known of such
> Prohibited Conduct. For academic faculty, supervisors include
> department chairs, deans, and other unit administrators.[17]

Biemann never contacted the Title IX office.[18] Grossman only contacted the Title IX office at the end of the investigation, to voice his support for Roe and urge UVA not to terminate his employment.[19]

Before UVA, Title IX Coordinator Emily Babb was an attorney advisor investigator, senior attorney, and specialist at the U.S. Department of Education Office for Civil Rights for twelve years.[20] She investigated complaints against postsecondary institutions, supervised investigators, and reviewed Dear Colleague letters as they were being issued.[21] Before coming to UVA, Interim Title IX Coordinator Akia Haynes Hale had never investigated a single Title IX claim.[22]

The Title IX investigation dragged on for 494 days.[23] During this time, Doe was repeatedly interviewed about the same information she had provided to Casteen on February 24, 2020.[24] At the end of the investigation, Roe was permitted to resign two days after a finding against him with a recommendation for termination was made.[25] In August 2021, after the Title IX process was completed, UVA offered Doe $5000 to pay for professional counseling and holistic healing expenses she incurred from March 2020 to December 2021.[26] No compensation was offered to

---

[17] Title IX Policy at 9, ECF No. 11-1.
[18] Def.'s Ex. 2, Biemann Dec. ¶¶ 26-31.
[19] Ex. 3 at UVA009954-61.
[20] Ex. 9, Babb Dep. 21:17-22:4.
[21] *Id.* at 23:9-19, 24:7-9.
[22] Ex. 10, Haynes Hale Dep. 19:3-20:11.
[23] Def.'s Ex. 4 at UVA 002446, UVA 002448, ECF No. 67-4.
[24] Ex. 4, P. Dec. ¶ 26.
[25] Def.'s Ex. 34, UVA 004544.
[26] *Id.* at 54:3-7; Def.'s Ex. 36, Aug. 6, 2020 Haynes Letter, ECF No. 67-36.

her for any medical, travel, or other costs.[27]  Haynes Hale, then the Acting Title IX Coordinator, provided no rationale for the amount, other than that it was the maximum UVA had offered to other Title IX claimants in the past.[28]  Haynes Hale was not trained in how to determine appropriate remedies in Title IX matters, never asked Babb or her supervisor how to determine an appropriate amount to offer, and never asked Doe what she needed.[29]

Despite everything, Doe graduated with distinction, was inducted into the Phi Beta Kappa honors society, and planned to attend law school, even though she lost her primary recommender.[30] Going to law school and becoming a professor have been her goals since high school.[31] She has been studying for the LSAT and the GRE, and her father recently helped her pay for a study course.[32]  The strain of this lawsuit has kept her and achieving her professional goals.[33]

## STANDARD OF REVIEW

To grant a motion for summary judgment, a court must conclude that the current pleadings, submissions, and affidavits, when taken in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact entitling the moving party to judgment as a matter of law.[34] Summary judgment is only permissible where, after viewing the facts and inferences in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party.[35] A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility.[36]

---

[27] Def.'s Ex. 26, ECF No. 67-36.
[28] Ex. 10, Haynes Hale Dep. 54:8-61:2.
[29] *Id.* at 61:3-62:2.
[30] Ex. 11, Pl. Dep. 16:16-17:12, 198:6-199:12.
[31] *Id.* at 28:8-16.
[32] Ex. 4, Pl. Dec. ¶ 64; Ex. 11, Pl. Dep. 198:6-15; Ex. 12, Ramirez Dep. 86:10-92:14, 167:4-169:1.
[33] Ex. 4, Pl. Dec. ¶ 66.
[34] *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Porter v. U.S. Alumoweld Co.*, 125 F.3d 243, 245 (4th Cir. 1977); *Tolan v. Cotton*, 572 U.S. 650, 659-60 (2014) (per curiam).
[35] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986).
[36] *See Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986).

6

> [T]he issue of material fact required by Rule 56(c) to be present to
> entitle a party to proceed to trial is not required to be resolved
> conclusively in favor of the party asserting its existence; rather, all
> is required is that sufficient evidence supporting the claimed factual
> dispute be shown to require a jury or judge to resolve the parties'
> differing versions of the truth at trial.[37]

A nonmoving party's testimony suffices to raise a genuine dispute of material fact, even if

uncorroborated.[38]

## ARGUMENT

This Court's Memorandum Opinion and accompanying Order of March 29, 2024 (ECF

Nos. 42-43) allowed two of Doe's claims to proceed: 1) Title IX deliberate indifference claim

stemming from the 2018 J-Term incident and Professor Biemann's failure to take action as to this

incident; and 2) Title IX deliberate indifference with respect to the adequacy of UVA's Title IX

investigation.  After development of the factual record, UVA has failed to show that there is no

genuine issue of material fact entitling it to judgment as a matter of law; in fact, UVA's own

exhibits demonstrate the existence of genuine issues of material fact.  Therefore, UVA's Motion

for Summary Judgment must be denied.

### I.   THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER DOE'S DECEMBER 2018/JANUARY 2019 TITLE IX CLAIMS ARE TIMELY

In *Reid v. James Madison University*, the U.S. District Court for the Fourth Circuit

considered the timeliness of an employee plaintiff's Title IX claims.[39]  As the court explained,

> Although state law determines the length of the limitation period,
> accrual of § 1983 claims and Title IX claims is governed by federal
> law … Under federal law's 'standard rule' of accrual, which is

---

[37] *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).

[38] *See*, e.g., *U.S. v. Currency, U.S., $147,900.00*, 450 F. App'x 261, 266 (4th Cir. 2011) (reversing a grant of summary judgment where the nonmoving party provided a "specific and consistent," but uncorroborated, account about the source of a certain sum in question, because "corroboration is unnecessary to establish a genuine issue of material fact"); *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979) (per curiam) (holding that summary judgment is not warranted when there is conflicting testimony requiring credibility determinations); *Nilson v. Historic Inns Grp. Ltd.*, 903 F. Supp. 905, 908-09 (D. Md. 1995) (denying summary judgment because reconciling the conflicting testimony of two witnesses required a credibility determination).

[39] 90 F.4th 311 (4th Cir. 2024).

> informed by common-law tort principles, a plaintiff's claim accrues
> when she has a 'complete and present cause of action.' … In other
> words, 'a cause of action accrues when the plaintiff possesses
> sufficient facts about the harm done to [her] that reasonable inquiry
> will reveal [her] cause of action.'… [G]enerally speaking, Title IX
> employment discrimination claims are subject to the same analysis
> as employment discrimination claims brought under Title VII of the
> Civil Rights Act of 1964….[40]

The *Reid* court looked to *Delaware State College v. Ricks*, a case involving a faculty member's

discrimination claim resulting from a denial of tenure.[41]  The *Ricks* Court found that the statute of

limitations began to run "at the time the tenure decision was made and communicated to Ricks."[42]

Applying that rationale, the *Reid* court wrote:

> We hold *Ricks'* test for when a Title VII employment discrimination
> claim accrues applies to Title IX employment discrimination claims.
> And that means that Reid did not have a complete and present cause
> of action for Title IX discrimination against Defendants until JMU
> made clear its official position that Reid violated university policy.
> *See id*. at 261-62, 101 S.Ct. 498; *see also Doe v. Oberlin Coll*., 60
> F.4th 345, 356 (6th Cir. 2023) (determining that a student's Title IX
> claim was not ripe when filed before any "certainty about what
> action [her college] would take on [her] retaliation claim" brought
> under the college's Title IX policy).  *Ricks* suggests that JMU's
> official position is its non-"tentative"—that is, final—decision in
> Reid's Title IX proceedings. *See* 449 U.S. at 261, 101 S.Ct. 498.[43]

For the reasons outlined below, applying the holdings of *Ricks*, *Reid*, and *Doe v. Oberlin*

*College*, Doe's claim regarding Professor Biemann's failure to report did not begin to accrue until

UVA made its final decision in her Title IX matter.  That occurred on August 6, 2021, when

Executive Vice President and Provost Elizabeth Magill sent Doe her letter of findings in response

to Roe's appeal of the review panel's determination and recommendation.[44]  Therefore, this claim

---

[40] *Id*. at 319.
[41] 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).
[42] *Id*. at 258.
[43] *Reid*, 90 F.4th at 320.
[44] Def.'s Ex. 33 at ¶ 9, ECF No. 67-33.

is timely under Virginia's two-year statute of limitations for personal injury claims.[45]

### A. New information in the Final Investigation Report (FIR)

UVA argues that "Plaintiff can point to no information in the Final Report that informed her about Biemann's alleged knowledge that was not provided to her on August 26, 2020, when she received the Draft Report and its exhibits, which included a transcript of Biemann's interview."[46] UVA cites to her deposition transcript in support. At her deposition, UVA's counsel asked Doe to review the FIR and identify what she learned in the report that led her to believe that Biemann had information about Roe's sexual abuse of her.[47] Doe noted that the report was over 300 pages and asked how much time she would have to do so.[48] UVA's counsel assured Doe that she would have "the rest of the day."[49] However, UVA's counsel did not give Doe the rest of the day to do so.[50] They allowed Doe to review the report for a little over an hour, at which point she skimmed through page 279 out of 319.[51] This was not due to a lack of time—UVA only used four hours and 50 minutes of its allotted seven hours for the deposition.[52]

UVA's attorney's decision to stop Doe before she was able to review the last 40 pages of the FIR meant that she was unable to review much of the information that was not included in the DIR. The FIR was the only document that included a section titled "Application of University's Policy, Conflict of Interest Policy, and Recommended Findings," which started on page 231 and went to page 318.[53] This section included UVA's findings and recommendations and an

---

[45] "[A] two-year statute of limitations applies because Title IX borrows the relevant state's statute of limitations for personal injury … Virginia's statute of limitations for personal injury claims is two years." *Peabody v. The Rector & Visitors of the Univ. of Va.*, No. 3:21-cv-44 at 7 (W.D. Va. Apr 27, 2022) (internal citations omitted).
[46] Def.'s Mot. Supp. Summ. J. at 22, ECF No. 67.
[47] Ex. 11, Pl. Dep. 150:20-153:1.
[48] *Id.* at 152:16-153:3.
[49] *Id.* at 153:3.
[50] *Id.* at 177:12-16.
[51] *Id.* at 160:2-187:10; Def.'s Ex. 4 at UVA 002764, ECF No. 67-4; Ex. 4, Pl. Dec. ¶ 52.
[52] Ex. 11, Pl. Dep. 240:8-9; *see* Fed. R. Civ. P. 30(d)(1).
[53] Def.'s Ex. 4 at 002676-002763, ECF No. 67-4; Def.'s Ex. 26 at UVA 000024-000195, ECF No. 67-26.

explanation of how it weighed evidence, including Professor Biemann's statements.[54]

Had UVA's counsel allowed Doe to continue reviewing the remaining 40 pages of the report, Doe would have had the opportunity to identify the following information she learned for the first time when she received a copy of the FIR on August 26, 2020: (1) that, despite Professor Biemann's assertion that she seemed uncomfortable and reluctant to participate during the J-Term trip, investigators would ultimately find his statement insufficient to prove that Roe had sexually harassed her; and (2) that UVA was not going to analyze or make any findings regarding Professor Biemann's failure to report despite his obligation to do so on a "know…or should have known" basis, as required by UVA's Title IX policy.[55] Doe also testified that she did not recall receiving a copy of the transcript of UVA's interview with Biemann, which included information about his observations of Roe and her during the J-Term trip.[56] UVA makes no argument that Doe did, in fact, receive this transcript. UVA has included as an exhibit an email in which investigator Tosha Barnes sent Doe a link to a Box folder, which, according to the email, contained the Draft Investigation Report (DIR) and related exhibits. But UVA has provided no evidence of what documents or specific exhibits were included in the Box folder.[57] While Barnes' declaration says she "sent" the DIR and exhibits to Doe, the declaration is silent as to anyone ensured that the Box folder actually contained all 46 of the exhibits to the DIR.[58]

Until Doe received the FIR, she had no way to know what Biemann had said about the J-Term trip or how UVA was going to assess and analyze Biemann's credibility and his failure to report.[59] In fact, as she learned for the first time on April 30, 2021 when she received the FIR,

---

[54] Def.'s Ex. 4 at UVA 002676-002763, ECF No. 67-4.
[55] Def.'s Ex. 19 at ¶ 40, ECF No. 67-19; Ex. 4, Pl. Dec. ¶ 57; Title IX Policy at 10, ECF No. 11-1.
[56] Ex. 11, Pl. Dep. 172:3-173:7.
[57] Def.'s Ex. 25, ECF No. 67-25.
[58] Def.'s Ex. 19 at ¶¶ 40-41, ECF No. 67-19.
[59] Ex. 4, Pl. Dec. ¶ 82.

UVA did not assess or analyze Biemann's credibility or his failure to report; then, she could not know that UVA was not going to rectify that issue until she received the Hearing Panel's decision on July 7, 2021.[60] Therefore, there are genuine issues of material fact as to when Doe received a transcript of Biemann's interview and when she was first on notice that UVA was not going to analyze or make any findings regarding Biemann's failure to report.

### B.  Factual discrepancies in Biemann's accounts

In support of its Motion for Summary Judgment, UVA submitted a declaration from Biemann.[61] Much of what Biemann asserts in his declaration contradicts information he provided at his deposition, as outlined in the chart below. In addition, UVA offers inadmissible hearsay via the declaration, in violation of Fed. R. Civ. P. 56(c)(2).

| Declaration 9/23/2024[62] | Deposition 8/9/2024[63] | Analysis |
|---|---|---|
| Professor in the Department of Religious Studies at UVA; worked at UVA as a professor since 2003. Decl. ¶ 3. | Came to UVA in 2003 in a track position as an assistant professor. Dep. 12:10-12, 44:9-10. "Came to UVA as a full time lecturer" Dep. 12:6-7. "Most closely the category of academic faculty." Dep. 37:10-11. "Co-directing the Center in Religious Studies though it could be seen as administering or co-administering a unit." Dep. 37:15. | Contradicts. Declaration changes job title from "assistant professor" or "co-directing or co-administrating" or "academic faculty" at deposition to "professor" in declaration. |
| Aware of identities of Roe and Doe and "generally aware" of Title IX investigation that is the subject of this lawsuit.  Decl. ¶ 4. | Aware of Title IX investigation from initial consideration of an investigation to actual investigation, was interviewed, reviewed transcript of his interview, and commented on | Contradicts. Declaration states "generally aware" of Title IX investigation; testified to his direct involvement, early knowledge, participation in investigation, his involvement |

---

[60] Def.'s Ex. 4 at UVA 002676-002763, ECF No. 67-4; Def.'s Ex. 31 at UVA 004538-004543, ECF No. 67-31.

[61] "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4); see ECF No. 67-2.

[62] See Def.'s Ex. 2, ECF No. 67-2.

[63] See Ex. 13, Biemann Dep.

| | "errors" (interview transcript from investigation and lawsuit complaint) and how Roe thought he was treated unfairly. Dep. 14-20, 44:19, 47:17-48:5, 53-59, 66-67, 80, 81, 84, 85, 95-98; spoke w/ Grossman about complaint from lawsuit. Dep. 25:14-19. | that is the subject of this suit, and his feelings about all of it. |
|---|---|---|
| Co-instructor with Roe for J-term course in Austria/ Hungary in Dec. 2018 and Jan. 2019; taught this course together on several prior occasions, including one time in summer. Decl. ¶ 6. | Took four or five study abroad trips together. Dep. 51:17-19. Other trips include Warsaw, Budapest. Dep. 52:4-7. "Did the study abroad trips together." Dep. 45:8. | Contradicts. Testimony discusses other destinations (ex. Warsaw) signaling other courses were not "this" course. |
| In Dec. 2018, aware of and familiar with UVA's Title IX policy; received training on UVA's Title IX policy prior to departing for all the study-abroad courses he taught. Decl. ¶ 7. | "Vaguely familiar" "not in great detail" re: Title IX policy and "familiar with general Title IX policies" from trainings before study abroad courses. Dep. 31:6-10. Did not remember policy provision, "This is your responsibility to report prohibited conduct where either the complainant or the respondent is an employee." Dep. 36:14-37. | Contradicts. Testified he was "vaguely familiar" with Title IX policy and "did not remember" provision stating his responsibility to report where employee is involved but in declaration he was "aware and familiar" w/ UVA's Title IX policy. Also contradicts with UVA's documentation of his trainings. Ex. 1, Training list. |
| Doe arrived at hotel before the J-Term course was set to begin. To his knowledge, no other students had arrived at this point. Decl. ¶ 9. | Testified "I don't have a clear recollection which students arrived earlier and which ones took our trips, but many arrived earlier and actually went to different cities first to explore another place, another city." Dep. 65:11-12. | Contradicts. Testified no other students had arrived when Doe arrived; declaration says other students arrived earlier and went to other cities. |
| During the J-Term course, he and Roe frequently shared meals with students; considered it normal for Doe to join dinner so she could eat a meal because there were no | When he and Roe discussed a course "it would be just the two of us." Dep. 61:21-22. "It was usually [Roe] and I who would meet and talk at the beginning of the course." Dep. 61:14-16. "When we had a meeting to specifically talk about the | Contradicts. Testified about sharing meal with students on many occasions; however, three times he testified that it was usually only Roe and him at their opening planning meetings to discuss the start of the course and he doesn't remember a similar |

| | | |
|---|---|---|
| other students for her to eat with.  Decl. ¶ 10. | course, then most times [Roe] and I would find time to do that." Dep. 62:9-10.<br>"I don't remember now an incident where we had a student who arrived early and we had a dinner together." Dep. 65:14-16. | incident with a student arriving early and sharing dinner. |
| Doe and Roe interacted normally during dinner. Nothing in behavior of either of them that indicated any romantic or sexual relationship. During dinner, did not see Roe touch Doe in a sexual manner or kiss her. Roe did not say anything sexually suggestive to Doe. Decl. ¶ 11. | Did not recall hearing any suggestive comments. Dep. 100:1-2.  Did not recall seeing any romantic advances. Dep. 99:16-17; Did not see Roe touch Doe in a sexual manner. Dep. 100:7-8.  The word "kiss" is not in the transcript. Dep. Word Index at 9. | Contradicts. Testified he didn't recall hearing any suggestive comments; declaration says Roe did not say anything sexually suggestive (took out he didn't *hear* part, instead making this a declarative statement).<br><br>Expands substantively. Declaration adds statement about kissing, which is not in deposition. |
| During J-Term course, never saw Roe make romantic advances towards Doe; never heard Roe make any sexual comments to Doe or about Doe; never observed Roe touch Doe in a sexual manner.  Decl. ¶ 12. | Did not see Roe touch Doe in sexual manner. Dep. 100:7-8; Did not recall an incident of Doe flirting with Roe. Dep. 100:22-101:1-2. Did not recall seeing any romantic advances. Dep. 99:16-17.  Did not recall hearing any suggestive comments. Dep. 100:1-2. | Contradicts. Testified he did not recall things; declaration states he never saw, heard, or observed things. |
| During J-Term course, he learned Doe became physically ill. He checked on Doe, told her to rest, and asked if there was anything he could do; observed Doe later recovered and felt better physically during J-Term course.  Decl. ¶ 13. | Doe fell ill and told her to rest but did not ask if there was anything he could do. Dep. 102-103. Doe "felt better in the afternoon and returned to the class." Dep. 102:18-19. "I don't recall another time where she was really not well." Dep. 103:7-8. | Contradicts. Testified Doe felt better next afternoon and returned to class, then didn't recall another time where she was not well; declaration states he observed Doe later recovered and felt better physically during course.  Infers no other illness but testimony was no recollection of other illness. |
| In Dec. 2018 and Jan. 2019, did not report any incidents from the J-Term Course to | "She also spoke again about the first encounter in general and had stressed that she was surprised by the encounter. And | Contradicts. Testified that the word "grabbed" caused concern which led him to write memo and inform others, which ultimately |

| | | |
|---|---|---|
| UVA's Title IX Coordinator. Not aware of having witnessed or learned of any acts of sexual harassment or other conduct prohibited by the Title IX policy during the J-Term course.  Decl. ¶ 18. | she used the word that [Doe] had grabbed her, and that word to me raised a concern." Dep. 80:10-14.  Thereafter, testified about internal memo he wrote and sent re: his concerns. Dep. 80:15-22. | led to Title IX investigation; in contrast, declaration more vaguely states he was not aware of having witnessed or learned of any acts… (while the first sentence is isolated to Dec. 2018 to Jan. 2019, the subsequent "aware" statement is not – he did later learn of an act, which led him to send a memo). |
| What Doe told him that day came as a surprise and shock. Before this conversation with Doe on Feb. 17, 2020, no prior knowledge of Roe having a sexual relationship with Doe since the J-Term course and had not remotely suspected it.  Decl. ¶ 22. | Testified about surprise but not shock. Dep. 71:12-20. | Expands substantively by adding shock, no prior knowledge, and not suspecting it. |
| Doe shared that after she and Roe ended their relationship that she had been at UVA's hospital because of suicidal ideation. Doe told him that she had shared information about her relationship with Roe with a mental health professional. After conversation was over, Doe went to stay with her father in northern Virginia. Decl. ¶ 25. | "She ended up in the emergency room with health and mental health and suicidal ideation. And I asked her whether she had spoken to somebody there already at the emergency room, and she indicated to me that she did speak to somebody and that she had already told the story to somebody there." Dep. 70:7-11. "I knew that after this meeting she was being picked up by her father or another family member to go home to her family." Dep. 70:19-21. | Contradicts. Testified Doe ended up in ER; declaration states Doe had been at UVA's hospital. Testified Doe spoke to somebody at ER and told story to somebody, declaration states Doe shared info with a mental health professional. No evidence to show the "somebody" was a mental health professional.  Testified he knew Doe was being picked up by her father or another family member to go home to her family; declaration states Doe went to stay with her father (not family) in northern Virginia (no location specified in deposition). |
| Next day, reported what Doe told me to the chair of Roe's department, Jeffrey Grossman.  Decl. ¶ 26. | Sent an email to Grossman requesting a meeting, then met and told him "what had happened the previous evening," what he heard and should do.  Dep. 72:15-21. Grossman was chair and, "It | Contradicts. He testified he didn't reach out to Grossman to make a "report" *per se* but reached out to Grossman because Grossman and Roe were "friendly" and so maybe Grossman would know of the story of Doe and Roe and |

14

| | also came to my mind, because I know that Professor Grossman and Professor [Roe] are friendly, that they know each other, so I was hoping that maybe Professor Grossman may know something about this story and may help me understand." Dep. 72:9-14. | could help him understand. To claim he "reported" is a contradiction. |
|---|---|---|
| Grossman and I did not make an agreement to not report this matter to the Title IX office to protect Roe. Decision to not report to the Title IX office was not motivated by a desire to protect Roe. To his understanding, a consensual sexual relationship between two adults, even if involving an instructor and a student, did not violate UVA's Title IX policy. Decl. ¶ 27. | After Grossman emailed him a copy of university policy regarding student-teacher relationships "protected under university policy" he still told Grossman he wanted to request a meeting with Doane, shared the memo with Doane, and requested Doane's advice. Dep. 73:9-20. Doane phoned Provost and at some point, Casteen became involved. Dep. 74:4-18. Grossman stated a matter for outside counsel rather than university. Dep. 75:4-19. "Grossman at this point was not certain whether this was something that warranted any internal reporting." Dep. 75:19-21. | Contradicts. He testified he reached out to Grossman, "because I know that Professor Grossman and Professor [Roe] are friendly, that they know each other, so I was hoping that maybe Professor Grossman may know something about this story and may help me understand." Testified he "reported" to Grossman (and not Title IX because he was first motivated by a desire to protect Roe) – he reached out to someone "friendly" he thought might already know about Doe and Roe, rather than first contact the ISO office or Title IX like he said he was trained. |
| On the morning of Feb 19, 2020, he met with and shared the same information with the head of UVA's International Studies Office, Dudley Doane. Thought Doane was an appropriate person to contact because the first incident between Doe and Roe occurred during the J-Term course, which happened abroad. He shared with Doane a memo he prepared after | "I believe, but I'm not entirely sure now, I believe that I told Professor Grossman that I feel the need to talk to Dudley Doane about it as well, because he is the dean of the International Studies Office (ISO) and the initial encounter happened during the trip to Vienna." Dep. 73:3-8. "I shared with him the memo I had written just to get advice as to what should we do." Dep. 73:18-19. | Contradicts. Testified he believed, but not entirely sure, that he told Grossman about need to talk to Doane because he is the dean of ISO and incident occurred during Vienna trip; in declaration, there is a more definitive "I thought Doane was appropriate because ISO and during J-Term course." |

| | | |
|---|---|---|
| meeting with Doe on Feb. 17, 2020.  Decl. ¶ 28. | | |
| While meeting with Doane, he contacted Laurie Casteen, the Associate Dean of Students. Doane and Biemann told Casteen what Doe had disclosed to Biemann on Feb. 17, 2020, that she had been involved in a consensual relationship with Roe since J-Term course. He shared with Casteen that Doe had told him that she had sought assistance regarding suicidal ideation. Decl. ¶ 29. | "I think [Doane] didn't say much. He picked up the phone and called the Provost Office and said, 'We have got a situation here. I am here with my colleague, Asher Biemann, and he has shared with me this memo.' And he explained the memo to somebody in the Provost Office. I don't recall who it was, but I think he was on speaker phone. I was there in the room. And at one point it was connected to Laurie Casteen, the Dean of Students, and her first response was, 'We need to make sure the student is okay, that she has all the resources for counseling,' and that she will reach out to her immediately to offer to meet with her. And from my recollection, this is how the meeting ended, and then I went back to my office after that." Dep. 74:2-21. | Contradicts. Testified Doane picked up the phone and called the Provost Office, spoke to that office, and was connected to Casteen. "[Doane] explained the memo," and Biemann was "there in the room," Casteen made a comment about offering counseling, and then the call ended. Declaration claims both Doane and Biemann told Casteen what Doe disclosed on 2/17, that Doe was in a consensual relationship, and that Biemann told Casteen that Doe had told him she had sought assistance regarding suicidal ideation. Declaration states Biemann talked to Casteen, which contradicts Biemann's testimony that it was Doane who talked to Casteen (and the topics discussed). Declaration states the discussion was about what Doe disclosed on 2/17, about a consensual relationship and that sought assistance re: suicidal ideation. Testimony was that Doane explained *the memo* to Casteen and did not testify specifically about all these details. |
| He expressed to Casteen that he was concerned about Doe's wellbeing. Casteen agreed that Doe's wellbeing was the top priority, and she told me that she would contact Jane Doe to offer her support. Decl. ¶ 30. | "I think he was on speaker phone. I was there in the room. And at one point it was connected to Laurie Casteen, the Dean of Students, and her first response was, "We need to make sure the student is okay, that she has all the resources for counseling," and that she will reach out to her immediately to offer to meet with her. And from my recollection, this is | Contradicts.  Depo testimony is that Doane and Casteen were on phone while Biemann was in room and Casteen said we need to make sure student is okay, and that she has all the resources for counseling, and will reach out to offer to meet with her; declaration states Biemann expressed concern to Casteen about Doe's wellbeing and she agreed that was top priority and would call to offer |

| | how the meeting ended, and then I went back to my office after that." Dep. 74:11-21. | her support. |
|---|---|---|
| In reporting what Doe told him to Jeffrey Grossman, Dudley Doane, and Laurie Casteen, he was not motivated by a desire to protect or help John Roe. Decl. ¶ 31. | See above. | As discussed *supra*, there is contradictory information as to whether what took place with Grossman was "reporting," and Biemann did not make report to Casteen; Doane did, based on testimony. Biemann admitted he reached out to Grossman because Grossman and Roe were friendly, and Grossman might be aware of Roe and Doe's relationship to help him understand.  To reach out to a "friendly" person first (rather than Doane or Title IX) may have been motivated by a desire to protect or help Roe – to discuss whether Grossman was aware of Doe and Roe's relationship and whether Grossman thought it was consensual.<br><br>Biemann did not make a report to Casteen about what Doe told him, Doane made report to Casteen about Biemann's memo, and so Biemann cannot speak to any motivations about his purported reporting to Casteen because he did not report to her. |
| On March 16, 2020, Doe told him a Title IX process had begun and asked if he could be a witness for her if needed. He told her that she had my support at any state in the Title IX process. He told her that he would be a witness if that is what she needed. Decl. ¶ 33. | "From what I recall, there was a fairly immediate response, and Laurie suggested that the word "grabbed" requires -- requires or may require a larger Title IX investigation. And to the best of my knowledge and recollection, a Title IX investigation was launched either that day or very shortly thereafter." Dep. 84:2-10. | Contradicts how he became aware Title IX process began.<br><br>Expands substantively by adding information about  serving as a witness, or offering support, and that Doe informed him Title IX process had begun. |
| Roe and Biemann did | N/A | Contradicts.  Biemann testified |

| | | |
|---|---|---|
| not teach the J-Term course in Austria and Hungary again. Originally scheduled to teach it during J-Term 2021. At some point after Doe telling him that the Title IX process had begun, Roe contacted him to tell him Roe would not be involved in the J-Term 2021 course. UVA later cancelled the J-Term 2021 course because of the COVID-19 pandemic. Decl. ¶ 36. | | that he learned about Title IX investigation from Casteen, not that Doe told him.<br><br>Inadmissible hearsay—Roe contacted Biemann to tell him he wouldn't be involved or Doe told him Title IX process had begun, and if inadmissible at trial, can't be admissible via declaration. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed .R. Civ. P. 56(c)(4). |
| In Feb. 2021, Doe contacted him about providing her with a letter of recommendation. He was happy to provide Doe with a supportive recommendation letter because she was an excellent student. On Feb. 12, 2021, he provided Doe with the recommendation letter. Decl. ¶ 37. | N/A | *Baugh v. City of Milwaukee*, 823 F. Supp. 1452, 1456-57 (E.D. Wis. 1993) (finding no cause to strike new evidence "where the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment"); cf. *Kershner v. Norton*, No. 02-1887, 2003 U.S. Dist. LEXIS 14117, 2003 WL 21960605, at *2 (D.D.C. Aug. 14, 2003) ("[F]iling an affidavit with a reply is appropriate when the affidavit addresses matters raised in the opposition. Such an approach fulfills the purpose of Rule 6(d) [*11] , which is to avoid unfair surprise and permit the court to resolve motions on the merits." (Citations omitted)). |

The Supreme Court has addressed the submission of a declaration with contradictory evidence after the witness's deposition has been taken.  "An[] important consideration arises if the

affiant or declarant has previously testified at a deposition.  Courts have held that witnesses, including experts, may not contradict or undermine their deposition testimony with a later affidavit."[64]  In such a situation, a party cannot rely upon an affidavit or declaration in support of or in opposition to a summary judgment motion if the witness testified previously to the contrary.[65]

Apart from the contradictions between Biemann's deposition testimony and his declaration, there are significant contradictions between the information presented in those two documents and what he told UVA investigators.  In his deposition, Biemann says he did observe any "interaction that suggested anything beyond a teacher-student interaction" during the December 27 J-Term dinner.[66]  However, in his interview with UVA's investigators, he admitted that Roe had made uncomfortable comments about Doe that he noticed only "in retrospect," such as how much Doe "loved" Roe and how Roe would "show" Biemann.[67]

Finally, a portion of Biemann's deposition testimony indicates that he did, in fact, understand that there was a possibility that Roe was engaging in sexual misconduct.  He testified, "[W]hen I met with Professor Grossman, what was one of my main concerns is that Jane Doe would not be further emotionally hurt from the relationship. So one of my main concerns was that [Roe] not be in touch with her and that she simply has time to get over this."[68]  Earlier in his deposition, Biemann testified that "we were taught that if a student approaches us to share a story about how they have been violated, then we should make sure that the student is somewhat contained from the person who violates them."[69]  That is exactly how he responded here.  He stated his concern was for Doe, and he wanted to ensure that Roe would not be in touch with her.  His

---

[64] *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).
[65] *Id*.
[66] Ex. 13, Biemann Dep. 65:19-66:1.
[67] Def.'s Ex. 4 at UVA 003018, ECF No. 67-4.
[68] Ex. 13, Biemann Dep. 78:8-14.
[69] *Id*. at 33:6-10.

desire to "contain" Doe from Roe shows he understood she was experiencing sexual harassment.

As for the inadmissible hearsay UVA offers in Biemann's declaration, this evidence is inadmissible, and its inclusion in the document violates Rule 56(c)(4).[70] A party may object to evidence used in support or opposition to a summary judgment motion on the ground that it "cannot be presented in a form that would be admissible in evidence."[71] Materials offered in support of or in opposition to a summary judgment motion that would be inadmissible at trial, assuming the presence of all testifying witnesses in the courtroom, may be disregarded.[72] "When an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment."[73] This Court must disregard the inadmissible hearsay in Biemann's declaration.[74]

The many discrepancies in the information Biemann provided in his deposition, declaration, and statements to UVA investigators create a genuine issue of material fact as to his credibility, the analysis of which is essential to determine whether UVA was on notice of Jane Doe's December 2018/January 2019 Title IX claim.  Thus, this Court must deny UVA's Motion.

### C.  UVA's failure to train Biemann

UVA did not produce any evidence of training Biemann on his obligations under its Title IX policy.[75] In her deposition, Babb could not recall providing any in-person training to Biemann.[76] Biemann only recalled taking one online training and could not recall when.[77] Biemann said he

---

[70] "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, *set out facts that would be admissible in evidence*, and show that the affiant or declarant is competent to testify on the matters stated." (Emphasis added).
[71] Fed. R. Civ. P. 56(c)(2).
[72] 13 James Wm. Moore et al., Moore's Federal Practice ¶ 56.91[1] (3d ed. 2013).
[73] *Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008).
[74] "Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence…. There is no need to make a separate motion to strike." Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment.
[75] Ex. 5, Def.'s Jul. 12, 2024, Interrog. Response at 15-16; Ex. 1, Training List.
[76] Ex. 9, Babb Dep. 69:11-13.
[77] Ex. 13, Biemann Dep. 38:1-39:6.

was "vaguely familiar" with the Title IX policy, "not in great detail."[78] It is no surprise, then, that Biemann did not recognize any of the interactions Roe and Doe had during the J-Term trip to constitute potential policy violations, or that he did not understand his obligations as a supervisor, even though, during the J-Term trip, he was co-directing the Center in Religious Studies, which "could be seen as administrating or co-administrating a unit."[79] Biemann also said he attended in-person, two- to three-hour "preparatory training" prior to study abroad trips that included Title IX in the subject matter covered.[80] Biemann said, in that training, he was taught not to contact the Title IX coordinator but rather to contact UVA's international studies office.[81] This failure to train creates a genuine issue of material fact as to whether Biemann properly assessed and understood whether Roe's actions constituted Title IX policy violations on the J-Term trip.

### D. Doe's notice of UVA's violation

UVA argues that Doe's claim accrued on January 11, 2019, because "Plaintiff knew that Biemann witnessed the alleged flirtatious interaction, and she knew that he did not report it to UVA's Title IX office."[82] The key fact UVA omits is that, at that time, Doe did not know anything about UVA's Title IX Policy (including its affirmative consent and responsible employee provisions) and had never received a copy of it.[83] Therefore, there is a genuine issue of material fact as to when Doe was on notice of UVA's violation with respect to this incident.

## II. THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER UVA WAS DELIBERATELY INDIFFERENT TO DOE'S TITLE IX CLAIMS

To establish a Title IX claim of sexual harassment in the Fourth Circuit,

> [A] plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently

---

[78] *Id.* at 31:3-10.
[79] *Id.* at 36:14-37:17.
[80] *Id.* at 31:7-33:3.
[81] *Id.* at 33:4-34:15.
[82] Def.'s Br. in Supp. of Mot. for Summ. J. at 22, ECF No. 67.
[83] Ex. 4, Pl. Dec. ¶¶ 9-11, 20,

> severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.[84]

UVA does not dispute the first, second, or third elements of Doe's claims. Its positions are as follows: 1) Title IX deliberate indifference stemming from the 2018 J-Term incident and Professor Asher Biemann's failure to take action as to this incident: UVA disputes only that it had notice of this claim; and 2) Title IX deliberate indifference with respect to the adequacy of UVA's Title IX investigation: UVA disputes only that there is a basis to impute liability upon it for this claim.

### A. UVA's notice of Doe's harassment

In her meeting with Laurie Casteen on February 24, 2020, Doe gave Ms. Casteen a full accounting of her relationship with Roe.[85] The meeting lasted about an hour and a half.[86] At the time, Doe had no idea what "affirmative consent" meant or that it was a required component of consent under UVA's Title IX policy.[87] Doe never saw a copy of UVA's Title IX Policy until March 31, 2020, which was the first time she was able to learn what "affirmative consent" meant.[88] Doe is an immigrant from Peru, who first came to the United States in 2014 when she was sixteen years old.[89] Affirmative consent was not a concept with which she was familiar.[90] Once Doe began to learn what affirmative consent was, she questioned her relationship with Roe.[91] Doe did not understand how she could have affirmatively consented to sexual activity or a relationship with him given that she was his student and that thus there was such a disparity in power between us given his role, his age, his level of education, *his leverage over her as her purported mentor and*

---

[84] *Doe v. Bd. of Educ. of Prince George's Cnty.*, No. 13-2537 (4th Cir. Apr. 7, 2015) (internal citations omitted).
[85] Ex. 4, Pl. Dec. ¶¶ 6-7.
[86] *Id.* at ¶ 8; Def.'s Ex. 5 at ¶ 14, ECF No. 67-5.
[87] Ex. 4, Pl. Dec. ¶¶ 9-11.
[88] *Id.* at ¶¶ 10-11.
[89] *Id.* at ¶ 12.
[90] *Id.* at ¶ 14-15.
[91] *Id.* at ¶ 20.

*potential law school* recommender, and his greater familiarity with the American education system, language, professional codes of conduct, and social norms as a U.S. native.[92]

Biemann and Casteen questioned whether Doe's relationship with Roe was consensual.[93] Doe told Casteen that she was afraid reporting Roe would affect his law school recommendation for her, and Casteen knew the Title IX Policy prohibited *quid pro quo* harassment.[94] Biemann and Doane expressed concern about Doe's well-being and whether the Title IX Policy was implicated.[95] Biemann said Doe had "always struck [him] as a very vulnerable student. Very sensitive and very good student. Very smart, very diligent, but also very vulnerable."[96] Finally, when asked what he thought Doe meant was consensual, Biemann told Title IX investigators:

> I think she was thinking long view of the relationship and the long relationship means *it became* consensual. I should add that she came to, well, she came to see me a second time. Maybe ten days or so, two weeks afterwards and presented what struck me as a slightly different picture of the first encounter. And what was different about that is that the first encounter she did not go into much detail during the first meeting. The second meeting there was a bit more detail.[97]

For these reasons, there is a genuine issue of material fact as to when UVA was on notice of Doe's harassment.

### B. UVA's response to Doe's March 2020 Title IX complaint

#### i.   *Material facts in dispute within UVA's Undisputed Statement of Material Facts*

Multiple "undisputed" material facts asserted by UVA are, in fact, disputed:

| UVA's "undisputed" material fact[98] | Evidence of dispute |
|---|---|
| "Plaintiff told Casteen about her relationship with Roe and emphasized that it was a consensual romantic relationship." Def.'s Mem. Supp. Mot. Summ. J. at 6 ¶ 11. | "I did tell Dean Casteen all, if not most, of the facts when I went to her office that first time and I sat down with her and I told her the whole recollection of events until February 2020, so |

---

[92] *Id.* at ¶ 20.
[93] Def.'s Ex. 5, Casteen Dec. ¶ 14, ECF No. 67-5; Ex. 13, Biemann Dep. 69:7-15.
[94] Ex. 4, P. Dec. ¶ 91; Def. Ex. 4 at UVA 003501-003502, ECF No. 67-4.
[95] Def.'s Ex. 5, Casteen Dec. ¶ 9, ECF No. 67-5.
[96] Def.'s Ex. 69-4 at UVA003011.
[97] *Id.* at UVA003012 (emphasis added).
[98] *See* Def.'s Mem. Supp. Mot. Summ. J., ECF No. 67.

| | she was aware of everything." Ex. 11, Pl. Dep. 231:3-8. |
|---|---|
| "The Title IX Coordinator did not issue a no-contact directive in this matter." Def.'s Mem. Supp. Mot. Summ. J. at 8 ¶ 21. | "On June 25, 2020, a mutual No Contact Directive was issued by the Title IX Coordinator as an interim measure." Def. Ex. 31 at UVA 004539, ECF No. 67-31; "The only interim measure for [Doe]-[Roe] is a mutual No Contact Order. Complainant graduated May 2020, which might have been a factor in assessing which measures were appropriate." Ex. 7, Breen Emails at UVA011820. "I know now that there was a -- what is it called -- no contact. I don't remember -- my attorney reminded me of that, but I don't remember actually receiving it." Ex. 8, Roe Dep. 30:22-31:5. "A: Can you remind me when the no-contact directive was issued? Q: On June 25th, 2020. That appears in Paragraph 225 of your Complaint." Ex. 11, Pl. Dep. 197:9-12. |
| "The Investigators had to interview Plaintiff four times in April and May 2020 because of the new potential policy violations she reported piecemeal during the interviews, the number of interactions between Plaintiff and Roe over more than a year, and to accommodate Plaintiff's time limitation on the interviews." Def.'s Mem. Supp. Mot. Summ. J. at 12 ¶ 38. "Instead of one incident, the Investigators were now investigating 11 incidents of alleged policy violations from December 27, 2018 through February 2020." Def.'s Mem. Supp. Mot. Summ. J. at 12 ¶ 39. | "I did tell Dean Casteen all, if not most, of the facts when I went to her office that first time and I sat down with her and I told her the whole recollection of events until February 2020, so she was aware of everything." Ex. 11, Pl. Dep. 231:3-8. "I guess I assumed that, given that I had spoken to the dean of students, that the information would have been already put in the record and that [UVA's Title IX investigators] would have been made aware of these facts. I couldn't think of a better person to tell Title IX about what had happened, so I assumed that they would know everything I told Dean Casteen." Ex. 11, Pl. Dep. 231:17-232:3. |

UVA asserts, and Doe agrees, that the facts identified above are material. Therefore, material facts are in dispute, and this Court must deny UVA's Motion.

### ii.    *UVA's delayed response to Doe's report*

"A school's delayed response constitutes deliberate indifference *if it prejudices the plaintiff* or if the delay was a 'deliberate attempt to sabotage [the p]laintiff's complaint or its orderly

resolution.'"[99] A Title IX recipient's response is viewed as a whole, rather than piecemeal.[100] While UVA can present evidence that portions of its response to Doe's Title IX complaint were reasonable, it cannot prove that its response *in toto*, particularly the timeline, was reasonable.

UVA's delayed response significantly prejudiced Doe. She was stuck in a Möbius strip of uncertainty from March 15, 2020, until UVA issued the final decision in response to Doe's appeal on August 7, 2021. During this time, Doe completed her final semester of coursework and graduated from UVA. From the time Doe first reported to Biemann on February 7, 2020, two days elapsed before he decided to raise the issue with Doane, and he never reported anything to the Title IX office—that report was made by Casteen, after a game of telephone between Biemann, Doane, and Grossman.[101] UVA glosses over the two weeks Doe was on UVA grounds between her hospitalization and UVA's closure due to Covid-19 at the beginning of spring break, attending classes with no protective measures in place.

UVA tries to blame Doe and her attorney—which UVA recommended to her[102]—for the delays, but a basic review of the evidence demonstrates that the lengthy timeline was not their fault. Doe provided full account of her abuse to Casteen in their February 2020 meeting and did not understand why investigators did not know that information.[103] In addition, the unwieldy, 319-page FIR is filled with unnecessary minutiae, such as:

- A paragraph-long footnote detailing the type of files used to save audio recordings[104]

- Lengthy interview "summaries" that essentially reproduce, word for word, all the

[99] *Karasek v. Regents of the Univ. of Cal*., 956 F.3d 1093, 1106 (9th Cir. 2020) (internal citations omitted) (emphasis added).
[100] *See Davis v. Monroe Cnty. Bd. of Educ*. 526 U.S. 629, 651 (1999).
[101] Def.'s Ex. 2, Biemann Dec. ¶¶ 24, 28, ECF No. 67-2; Def.'s Ex. 5, Casteen Dec. ¶ 12, ECF No. 67-5.
[102] Ex. 2, Advisor List at UVA004603.
[103] Ex. 11, Pl. Dep. 230:7-232:3.
[104] Def.'s Ex. 4 at UVA 002697 Note 13, ECF No. 67-4.

information already included in over a thousand pages of attached exhibits[105]

- Irrelevant segues into pages of information that had nothing to do with whether Roe violated UVA's Title IX policy[106]

The majority of both the DIR and the FIR consist of cut and pasted text from the evidentiary interviews.[107] That it would take two investigators over five weeks, from July 16, 2020 to August 25, 2020, to prepare a cut and pasted DIR is simply not logical.[108] UVA then allowed the parties to continue submitting new information in response to the DIR for over four months, until January 7, 2021.[109] For reasons that remain unexplained, UVA allowed the parties to repeatedly go back and forth responding to one another's responses during that period.[110] Such *ad infinitum* back and forth is neither provided for in the policy nor makes basic logical or investigative common sense.[111] Then, it took two investigators another three and a half months, until April 30, 2021, to prepare the FIR which, again, consisted primarily of cut and pasted text from investigative interviews and text messages.[112] By this point, it had been over a year since Doe had reported to Biemann. The final decision was not issued in her case until August 5, 2021.

For these reasons, there is a genuine issue of material fact as to whether UVA's response timeline was reasonable, and this Court must deny UVA's Motion.

iii.    *UVA failed to provide Doe appropriate supportive measures during the investigation and remedial measures after the investigation*

Schools are required under federal law to provide appropriate supportive measures to

---

[105] *See* Def.'s Ex. 4, ECF No. 67-4.
[106] *See*, e.g., Def.'s Ex. 4 at UVA 002459-2462, ECF No. 67-4 (in which the entire J-Term trip schedule is reproduced with a detailed explanation of journaling projects Roe assigned to students during the trip).
[107] *See* Def.'s Ex. 4, ECF No. 67-4; Def.'s Ex. 26, ECF No. 67-26.
[108] Def.'s Ex. 4 at UVA 002456, ECF No. 67-4.
[109] *Id*. at UVA 002447.
[110] *Id*. at UVA 002456.
[111] *See* Title IX Policy, ECF No. 11-1.
[112] Def.'s Ex. 4 at UVA 002446, ECF No. 67-4.

parties during Title IX investigations.[113] They are also required to provide appropriate remedial measures once investigations conclude.[114] During the investigation, Doe repeatedly asked Casteen for help to protect herself from interactions with Roe.[115] Doe asked Casteen for Roe to be put on leave and his courses to be suspended both in person and via email on May 29, 2020, and again on June 4, 2020.[116] Casteen did not assist.[117] Doe then asked Paula Pustilnik, the sole individual listed on UVA's list of potential advisors, to ask the Title IX office to ban Roe from campus and put him on leave, but Pustilnik refused to do so.[118] Doe limited her visits to campus because she did not feel comfortable there because she had no protective measures during the over two week period she attended classes between her hospitalization and spring break.[119]

At some point, both Doe and Roe both believed UVA implemented a mutual no-contact directive, and both UVA Title IX office staff and the Hearing Panel referenced that a mutual no-contact directive was in place.[120] Doe believed UVA implemented it on June 25, 2020, after she graduated.[121] However, Babb testified that she did not recall implementing a no-contact directive

---

[113] "Supportive measures means non- disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the complainant or the respondent before or after the filing of a formal complaint or where no formal complaint has been filed. Such measures are designed to restore or preserve equal access to the recipient's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the recipient's educational environment, or deter sexual harassment. Supportive measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures…. The Title IX Coordinator is responsible for coordinating the effective implementation of supportive measures." 34 C.FR. § 106.30(a).

[114] "The Title IX Coordinator must promptly contact the complainant to discuss the availability of supportive measures as defined in § 106.30, consider the complainant's wishes with respect to supportive measures…." 34 C.FR. § 106.44(a).

[115] Ex. 11, Pl. Dep. 47:22-48:4, 48:19-51:13.

[116] Id.; Ex. 6, Casteen Emails at UVA004852-54.

[117] Id.

[118] Ex. 11, Pl. Dep. 66:21-67:15.

[119] Id. at 197:22-198:5.

[120] Id. at 196:5-15; Ex. 8, Roe Dep. 30:22-31:5; Ex. 7, Breen Emails at UVA011820; Def.'s Ex. 31 at UVA 004539, ECF No. 67-31.

[121] Ex. 11, Pl. Dep. 197:11-15.

between Roe and Doe.[122] She said, prior to Title IX regulatory changes on August 14, 2020, her office's practice was to issue one-sided no-contact directives rather than mutual no-contact directives.[123] Implementing a mutual no-contact directive would mean that, although she was not accused of any wrongdoing, Doe's constitutional rights were improperly restricted.[124] Not implementing a no-contact directive would mean that UVA had done nothing to protect Doe from encountering Roe. Whether a no-contact directive was issued is a genuine issue of material fact, and if a factfinder finds that a mutual no-contact directive was issued, then UVA restricted Doe without any reasonable basis for doing so and in violation of its own Title IX office's standard practices and federal law. Because she did not believe Roe would simply choose to stay away from her, Doe contacted Haynes Hale asking that Roe be prevented from attending the August 2021 graduation ceremony UVA held for 2020 graduates who had missed having a ceremony due to Covid-19.[125] Instead of ordering Roe not to attend graduation, Haynes Hale simply asked him if he was going to attend, and he said no.[126] Doe did not attend her own graduation ceremony because she did not believe Roe would keep his word and stay away.[127]

UVA also failed to provide Doe with appropriate remedial measures. Federal law required UVA to include the following in its written determination of responsibility: "[W]hether remedies designed to restore or preserve equal access to the recipient's education program or activity will be provided by the recipient to the complainant."[128] Neither the hearing panel's determination nor

---

[122] Ex. 9, Babb Dep. 62:12-17, 63:18-64:4.
[123] *Id.* at 65:19-67:19.
[124] "A recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent….The Department may not deem a recipient to have satisfied the recipient's duty to not be deliberately indifferent under this part based on the recipient's restriction of rights protected under the U.S. Constitution, including the First Amendment, Fifth Amendment, and Fourteenth Amendment." 34 C.FR. § 106.44(a).
[125] Ex. 11, Pl. Dep. 14:20-15:11.
[126] *Id.* at 188:4-190:10.
[127] *Id.*
[128] 34 C.F.R. § 106.45(7)(ii)(E).

28

Provost McGill's determination of Roe's appeal included any such information.[129] The only information about remedial measures Doe received was Haynes Hale's letter telling her that she could submit up to $5000 in reimbursement requests for counseling and holistic healing services from March 2020 to December 2021 only.[130] Haynes Hale, UVA's Acting Title IX Coordinator, made no inquiry into whether that remedy was designed to restore or preserve equal access to Doe's education program or activity at UVA.[131] No UVA employee ever asked Doe whether this would actually remedy the harm she had suffered.[132]

For these reasons, there are genuine issues of material fact as to both the supportive and the remedial measures offered to Doe, and this Court must deny UVA's Motion.

## III.   DAMAGES ARE AVAILABLE TO DOE UNDER TITLE IX

UVA asserts that Doe's claims should be dismissed, in full, on the basis of the United States Supreme Court's April 28, 2022 decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, wherein the Court held, for the first time, that emotional distress damages are not recoverable in private actions to enforce the antidiscrimination provisions of the Rehabilitation Act and the Affordable Care Act.[133] This Court is not bound to apply *Cummings* here, but even if it chooses to do so, UVA's arguments ignore Doe's claims for other compensatory, consequential, and nominal damages, which remain recoverable even in Affordable Care Act and Rehabilitation Act actions post-*Cummings*.

Instead, UVA conflates these other classes of loss with those for emotional distress damages, suggesting that any losses incurred are tied to and therefore indistinguishable from Doe's

---

[129] *See* Def.'s Ex. 31, Review Panel Determination and Recommendation, ECF No. 67-31; Def.'s Ex. 34, Executive Review Letter, ECF No. 67-34.
[130] Ex. 10, Haynes Hale Dep. 54:3-7; Def.'s Ex. 36, ECF No. 67-36.
[131] Ex. 10, Haynes Hale Dep. 54:8-62:2.
[132] Ex. 4, Pl. Dec. ¶ 27.
[133] 142 S. Ct. 2853 (2022).

emotional damage claims. That reading contradicts courts' well-settled understanding of distinct classes of damages, misconstrues the holding in *Cummings,* and is inconsistent with numerous courts' interpretation and application of *Cummings* since that decision was rendered.

### A. The Court is not bound by *Cummings v. Premier Rehab Keller*

As a preliminary matter, *Cummings* was a case involving the availability of damages in private actions under the Rehabilitation Act and the ACA, not Title IX, and there is no binding authority requiring this Court to extend *Cummings* to Title IX actions. *Cummings* is limited to Spending Clause legislation, which relies upon a recipient's consent and notice for enforcement.[134]

#### i.  *Notice*

Arguably, the Supreme Court itself gave notice of the availability of emotional distress damages in Title IX actions in *Guardians Association v. Civil Service Commission of City of New York*.[135] In *Guardians,* the Court stated that recipients of federal funds may be "held liable for *extraordinary harm due to special circumstances* . . . [it] knew or had reason to know . . . made *such extraordinary injury probable.*"[136] *Guardians* centered around a class action claim from New York Police Department officers alleging that the NYPD's use of entry-level employment tests violated Title VI of the Civil Rights Act of 1964. The plaintiffs argued that the tests had a racially disproportionate impact that caused Black and Hispanic officers to be hired later than white officers, which in turn led to them being laid off at disproportionate rates (due to the "hired last, fired first" policy utilized by the NYPD at the time). Because the tests constituted unintentional discrimination on behalf of the NYPD, the Court found that there had not been sufficient notice to the NYPD as a recipient of federal funds that they may be liable for damages on a Title VI claim.[137]

---

[134] *Cummings,* 596 U.S. 212.
[135] 463 U.S. 582 (1983).
[136] *Id.* at 597.
[137] *Id.*

30

The Court upheld its previous ruling in *Pennhurst State School v. Halderman*, stating:

> We have also indicated that 'make whole' remedies are not ordinarily appropriate in private actions seeking relief for violations of statutes passed by Congress pursuant to its 'power under the Spending Clause to place conditions on the grant of federal funds.' …[T]he receipt of federal funds under typical Spending Clause legislation is a consensual matter: the State or other grantee weighs the benefits and burdens before accepting the funds and agreeing to comply with the conditions attached to their receipt. Typically, before funds are advanced, the appropriate federal official will determine whether the grantee's plan, proposal or program will satisfy the conditions of the grant or other extension of federal funds, and the grantee will have in mind what its obligations will be. When in a later private suit brought by those for whose benefit the federal money was intended to be used it is determined, contrary to the State's position, that the conditions attached to the funds are not being complied with, it may be that the recipient would rather terminate its receipt of federal money rather than assume the unanticipated burdens.[138]

Focusing on the line between anticipated and unanticipated burdens, the Court went on:

> Since the private cause of action under Title VI is one implied by the judiciary rather than expressly created by Congress, we should respect the foregoing considerations applicable in Spending Clause cases and take care in defining the limits of this cause of action and the remedies available thereunder…. In cases where intentional discrimination has been shown, there can be no question as to what the recipient's obligation under the program was and no question that the recipient was aware of that obligation. In such situations, it may be that the victim of the intentional discrimination should be entitled to a compensatory award, as well as to prospective relief in the event the state continues with the program.[139]

The *Guardians* Court was clear: a recipient's failure to prevent the known risks of sexual harassment or violence under Title IX authorizes plaintiffs to seek emotional distress damages based on the Court's recognition of such an exception for cases of intentional discrimination in violation of civil rights statutes, and based on the Court's clear notice to recipients of the same.

---

[138] *Guardians* at 596 (citing *Pennhurst State Sch. v. Halderman*, 451 U.S. 1, 15 (1981)) (internal citation omitted).
[139] *Id.* at 597.

### ii.     The Fourteenth Amendment to the U.S. Constitution

Even if this Court finds that *Guardians* did not provide UVA with sufficient notice to be held liable for damages under the Spending Clause, this Court is not bound by the damages permitted in *Cummings*. Title IX may be authorized by the Spending Clause, but it is not *solely* authorized under the Spending Clause. Title IX is also authorized under Section 5 of the Fourteenth Amendment.[140] Congress has authority to pass legislation under multiple Constitutional provisions. *Cummings* does not address the possibility of emotional distress damages being available under Title IX pursuant to Section 5 of the Fourteenth Amendment.[141] Both the Sixth and Eighth Circuits have recognized Congress' authority to enact Title IX under Section 5.[142] Further, Title IX Plaintiffs have long been held to have entitlement to any appropriate remedies based on longstanding common law principles.[143] In 1979, the Supreme Court in *Cannon* found that Title IX contains an implied right of action, and the *Bell* Court has held (as affirmed by *Franklin*) that any appropriate relief may be granted as a result absent an explicit act of Congress to limit the availability of such damages.[144] "[I]t is . . . well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use *any available remedy to make good the wrong done*."[145] Instead of narrowing all available relief, Congress has confirmed that all "remedies (including remedies both at law and in equity) are available" under Title IX "to the same extent as such remedies are . . . in the suit against

---

[140] U.S. Const. amend. XIV, § 5.

[141] *See Franklin v. Gwinnett Cnty. Pub. Schs.,* 503 U.S. 60, 75, n.8 (declining to decide whether Congress used this source of authority without foreclosing the inquiry because damages would be available under either constitutional source for Title IX).

[142] *Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir. 1997) (finding Congress had the authority to pass Title IX pursuant to § 5 of the Fourteenth Amendment); *Prinsloo v. Ark. State Univ.*, 112 F.3d 514 (8th Cir. 1997) (affirming *Crawford*); *Franks v. Kentucky Sch. for the Deaf*, 142 F.3d 360, 363 (6th Cir. 1998).

[143] *Barnes v. Gorman*, 536 U.S. 181, 189 (2002); Franklin, 503 U.S. at 66-68.

[144] *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979); *Franklin*, 503 U.S. at 66-68 (citing *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

[145] *Bell*, 327 U.S. at 684.

any public or private entity other than a State."[146]

Notably, the Court did not rely solely upon a contract analogy in *Franklin*, instead concluding that "a money damages remedy is available under Title IX for an intentional violation *irrespective of the constitutional source of Congress' power to enact the statute*."[147] Further, the *Franklin* Court recognized that Congress has made no effort either "to restrict the right of action recognized in *Cannon* . . . or to alter the traditional presumption in favor of any appropriate relief for violation of a federal right," such that the Court "cannot say . . . that Congress has limited the remedies available to a complainant in a suit brought under Title IX."[148] Congressional action indicates intent for emotional distress damages to be available under Title IX. Title IX is a civil rights statute. Section 5 of the Fourteenth Amendment is the source of authority identified by Congress when enacting the Civil Rights Remedies Equalization Act in 1987.[149] Clearly, the same source of authority would apply for Title IX as a civil rights statue.

Doe maintains that her damages are economic, not emotional distress. However, even if this Court were to find that her damages were emotional distress damages, they should still be permitted because Title IX is not solely authorized by the Spending Clause, and emotional distress damages are still available to legislation authorized by Section 5 of the Fourteenth Amendment. For that reason, Doe maintains that this Court is not bound by *Cummings* and does not have to bar any of her damages, including those the Court determines to arise out of emotional distress.

## B. *Cummings* allows recovery of contract remedies

While there are good arguments for not extending *Cummings* to Title IX cases, Doe acknowledges that most courts considering the question have done so. However, even if this Court

---

[146] 503 U.S. at 72-73 (citing 42 U.S.C. § 2000d–7(a)(2). *See also Cummings*, 142 S. Ct. at 1570 (citations omitted).
[147] 503 U.S. at 75.
[148] *Id.*
[149] 42 U.S.C. § 2000d-7.

decides to join with those courts and find emotional distress damages are unavailable here, dismissal of Doe's claims would still be improper, as she has asserted claims for a variety of compensatory, consequential, and nominal damages that have been long-accepted remedies in contractual breach cases and therefore remain available under *Cummings.* The lynchpin of the *Cummings* decision is the Court's holding that recovery in private actions brought in accordance with legislative acts passed under the Spending Clause should be limited to those remedies traditionally available in actions for breach of contract, which have not traditionally allowed damages for mental anguish.

*Cummings* and its progeny cite to the Restatement (Second) of Contracts in defining "traditional" contract remedies that remain available in Spending Clause cases. According to the Restatement: "[e]very breach of contract gives the injured party a right to damages against the party in breach," and subject to certain limitations, "the injured party is entitled to recover for all loss actually suffered."[150] Addressing remedies for contractual breach, the Restatement explains that, "[o]rdinarily, when a court concludes that there has been a breach of contract, it enforces the broken promise by protecting the expectation that the injured party had" upon entering the contract. The court will therefore "attempt[ ] to put him in as good a position as he would have been … had there been no breach."[151] This "expectation interest," however, is not the only interest that may be protected.[152] If the beneficiary of the contract "changed his position in reliance on the contract by, for example, incurring expenses in preparing to perform, in performing, or in foregoing opportunities to make other contracts…the court may recognize a claim based on his reliance rather

---

[150] Restatement (Second) of Contracts §§ 346, 347 (1981).
[151] *Id.* at § 344(a) (1981).
[152] *Id.*

than on his expectation."[153] "The interest protected in this way is called 'reliance interest.'"[154] Remedies to protect these interests are non-exclusive.[155]

Damages in cases of contractual breach "are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed."[156]  In some cases, "the sum awarded will do this adequately as, for example, where the injured party has simply had to pay an additional amount to arrange a substitute transaction and can be adequately compensated by damages based on that amount."[157] In other cases, however, "the sum awarded cannot adequately compensate the injured party for his disappointed expectation as, for example, where a delay in performance has caused him to miss an invaluable opportunity."[158] Such losses are described in the Restatement as follows:

> Items of loss other than loss in value of the other party's performance are often characterized as incidental or consequential. Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction. Consequential losses include such items as injury to person or property resulting from defective performance.[159]

However, the Restatement cautions, "[t]he terms used to describe the type of loss are not, however, controlling, *and the general principle is that all losses, however described, are recoverable*."[160]

---

[153] *Id.*

[154] *Id.*

[155] *Id.* at § 345(a) (1981).

[156] *Id.* at § 347 (1981).

[157] *Id.*

[158] *Id.*

[159] *Id.* (internal citations omitted).

[160] *Id.* (emphasis added).

**C.  Damages that remain unquestionably available after *Cummings***

The Supreme Court has held that compensatory damages are available for intentional violations of Title IX.[161] Thus, even where courts have found that *Cummings* bars claims for emotional distress damages under Title IX, they have still found that "there is nothing in the decision that bars a plaintiff from seeking other forms of compensatory damages under these three statutes."[162] Accordingly, courts have repeatedly found that *Cummings* does not bar a plaintiff's Title IX claims wholesale where they seek compensatory damages and other remedies beyond emotional distress damages.[163] Because Doe incurred expenses and economic losses as a result of UVA's violations of Title IX, she is "entitled to recover for all loss[es] actually suffered."[164] Finally, nominal damages are available where compensatory damages cannot be proven.[165]

---

[161] *Franklin*, 503 U.S. at 70-71, 76.
[162] *Doe v. Fairfax Cnty. Sch. Bd.*, No. 1:18-CV-614, 2023 WL 424265, at *5 (E.D. Va. Jan. 25, 2023) (finding that "[l]ost educational opportunities lie at the heart of Title IX private right of action cases") (citing *Davis*, 526 U.S. at 650) ("The statute makes clear that, whatever else it prohibits, students must not be denied access to educational benefits and opportunities on the basis of gender"); *A.T. v. Oley Valley Sch. Dist.*, No. CIV 17-4983, 2023 WL 1453143, at *4 (E.D. Pa. Feb. 1, 2023) (denying summary judgment and permitting trial to proceed on claims for lost income, lost opportunity, fringe benefits, attorney fees, costs, and any other non-emotional distress damages); *Williams v. Colorado Dep't of Corr.*, No. 21-CV-02595, 2023 WL 3585210, at *7 (D. Colo. May 22, 2023) (permitting requests for damages for economic loss and physical pain and suffering to remain).
[163] *See*, e.g., *Doe v. Town of N. Andover*, No. 1:20-CV-10310, 2023 WL 3481494, at *12 (D. Mass. May 16, 2023); *McGowan v. S. Methodist Univ.*, No. 3:18-CV-00141, 2024 WL 455340, at *10 (N.D. Tex. Feb. 5, 2024) (declining to "find that compensatory damages for loss of educational opportunities and benefits are precluded as a matter of law"); *Doe v. Univ. of Miss.*, No. 3:18-CV-138 (S.D. Miss. Jun 14, 2024) (allowing plaintiff to seek damages for lost educational opportunities); *Thomas v. E. Carolina Univ.*, No. 4:22-cv-00030 (E.D.N.C. Sep 21, 2023) (allowing claim for out-of-pocket reliance damages to proceed); *J.C. v. Bd. of Regents of the Univ. Sys. of Ga.*, No. 1:20-CV-4445 (N.D. Ga. Aug 1, 2023) (allowing claim for damages for lost educational opportunities in the form of tuition expenses and lost wages, as well as prepaid rent); *see also Luke v. Lee Cnty.*, No. 1:20-CV-388 (W.D. Tex. Sep 20, 2023) (holding in ADA case that expectation damages are not precluded as a matter of law under *Cummings*); *Brown v. Zeta Charter Sch.*, No. 23 Civ. 5593 (S.D.N.Y. Sep 23, 2024) (finding that compensable damages including out of pocket expenses, such as medical expenses or therapy costs, are available under the ADA and Section 504 of the Rehabilitation Act); *N.S. v. W. Pa. Sch. for Blind Children*, No. 2:24-cv-0219 (W.D. Pa. Sep 23, 2024) (finding that compensatory damages are recoverable under the ADA and Section 504); *A.W. v. Coweta Cnty. Sch. Dist.*, No. 22-14234 (11th Cir. Aug 7, 2024) (allowing claims for physical harm, compensation for lost educational benefits, remediation, and nominal damages to proceed under the ADA).
[164] *See* Restatement (Second) of Contracts § 347 (1981).
[165] *See Jimenez v. Eagle Pass Indep. Sch. Dist.*, No. DR-21-CV-0048-AM/JAC (W.D. Tex. Feb. 14, 2024) (finding nominal damages available in ADA case and, if awarded, also attorney's fees and costs); *Nieves v. The Plaza Rehab. & Nursing Ctr.*, No. 1:20-cv-01191 (JLR) (OTW) (S.D.N.Y. Jul 26, 2023) (same in Rehabilitation Act case).

36

### D. Doe complied with Fed. R. Civ. P. 26(a)(1)(A)(iii)

Rule 26(a)(1)(A)(iii) requires that a party provide "a computation of each category of damages claimed," along with supporting documents or evidentiary material.  Rule 26(a)(1)(A)(iii) does not require that a party such as Doe, who has significant financial limitations, provide evidence of an exact dollar amount for every damage claimed.[166] While Doe did not fully outline the exact dollar amount of all her damages in her initial disclosures—because she could not have done so without, at minimum, speculation or, worse, whole-cloth fabrication—she  satisfied the Rule 26(e) duty to supplement through the submission of an expert report. As established in *Silicon Knights, Inc. v. Epic Games, Inc.*, "[A] party may supplement its Rule 26(a)(1)(A)(iii) 'computation' by producing an expert report (including documents) that complies with Rule 26(a)(1)(A)(iii)."[167] Though the motion to exclude evidence of an argument on damages was granted, the limitation was placed due to the unreliability of the expert's methodology rather than a failure to meet the Rule 26 disclosure requirements.[168] Here, Doe's submission of Mr. Verzilli's expert report satisfies the disclosure requirement under Rule 26(a)(1)(A)(iii).

If, however, the Court finds Mr. Verzilli's expert report insufficient to meet the definition of "computation," it should find that Doe's failure to initially include a "full" computation is harmless. In *Proimos v. Marotta Wealth Management*, this Court reviewed whether the failure to disclose damages was substantially justified or harmless using the five-factor test from *Southern*

---

[166] "The elements of Rule 26(b)(1)(iii) address the problem of discovery that is disproportionate to the individual lawsuit as measured by such matters as its nature and complexity, the importance of the issues at stake in a case seeking damages, the limitations on a financially weak litigant to withstand extensive opposition to a discovery program or to respond to discovery requests, and the significance of the substantive issues, as measured in philosophic, social, or institutional terms. Thus the rule recognizes that many cases in public policy spheres, such as employment practices, free speech, and other matters, may have importance far beyond the monetary amount involved. The court must apply the standards in an even-handed manner that will prevent use of discovery to wage a war of attrition or as a device to coerce a party, whether financially weak or affluent." Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment.
[167] 917 F. Supp. 2d 503, 2012 U.S. Dist. LEXIS 63707 at *3 (E.D.N.C. May 7, 2012).
[168] *Id.* at *21-27, 32.

*States Rock & Fixture, Inc. v. Sherwin-Williams Co*.[169] In that case, the U.S District Court for the Fourth Circuit found that "a Rule 37(c)(1) exclusion analysis should be guided by the following factors: (1) The surprise to the opposing party; (2) The ability to cure the surprise; (3) The potential disruption of trial; (4) The importance of the evidence; and (5) The non-disclosing party's explanation for its failure."[170] Other district courts in the Fourth Circuit have exercised broad discretion in determining whether nondisclosure is harmless.[171]

In *Proimos*, this Court found that the plaintiff's nondisclosure was harmless despite a lack of computation in initial disclosures, largely because the opposing party was not surprised by the nature of the damages sought and had received supporting documents beforehand.[172] Similarly, Mr. Verzilli's report and Doe's prescription cost documentation provided UVA with a clear understanding of the damages sought. With no surprise, curing any deficiency is straightforward. As for the remaining three factors, the damages calculation is crucial to Doe's case, and without it, only nominal damages would be available.  For these reasons, UVA's argument that Doe failed to comply with Rule 26(a)(1)(A)(iii) fails.

Finally, even if this court finds that Mr. Verzilli's expert report is insufficient to meet the requirements of Rule 26(a)(1)(A)(iii), summary judgment is still inappropriate. As this Court explained in *Bates v. Strawbridge Studios, Inc.,* "Under Virginia law, the essential elements of a cause of action for breach of contract are (1) a legal obligation of the defendant to the plaintiffs; (2) a violation or breach of that obligation; and (3) consequential injury or damage to the plaintiffs."[173] The *Bates* Court found that plaintiffs were responsible for proving their damages

---

[169] No. 3:22-cv-00023, 2023 U.S. Dist. LEXIS 32537 at *7-8 (W.D. Va. Feb. 27, 2023).
[170] 318 F.3d 592, 597 (4th Cir. Jan. 30, 2003).
[171] *See*, e.g., *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 190 (4th Cir. 2017) and *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014).
[172] *Southern States*, No. 3:22-cv-00023 at *8-14.
[173] No. 7:11CV00216 at *10 (W.D. Va. May 09, 2012), citing *Hamlet v. Haves*, 641 S.E.2d 115, 117 (Va. 2007).

with "reasonable certainty."[174] The Court went on:

> In moving for summary judgment with respect to the plaintiffs' breach of contract claim, Strawbridge challenges the sufficiency of the evidence with respect to the element of consequential injury or damage. Although the plaintiffs maintain that the alleged breach has resulted in lost business opportunities, Strawbridge contends that the evidence proffered by the plaintiffs demonstrates that such losses are purely speculative and cannot be established with reasonable certainty….
>
> Viewing the evidence in the light most favorable to the plaintiffs, however, the court is unable to conclude that Strawbridge is entitled to summary judgment on this ground. As the court noted during the hearing on the instant motion, the plaintiffs may be entitled to an award of nominal damages in the event that they are unable to establish actual compensatory damages with reasonable certainty.[175]

The Court went on to explain that in appropriate circumstances, nominal damages can be sufficient to satisfy the damage element of a *prima facie* case of breach of contract under Virginia law.[176]

### E.  There is a genuine issue of material fact as to Doe's damages

At the eleventh hour of discovery, UVA unearthed a jilted former romantic partner of Doe's, Parwiz Esmati, whose deposition it took in an apparent attempt to refute her damages claims.[177]   After Doe stopped dating Esmati, he began a campaign of harassment against her resulting in her having to leave her job and file a sexual harassment and retaliation complaint with the D.C. Office of Human Rights.[178] UVA relies on Esmati's testimony—and *nothing else*—to counter Doe's assertion that she intended to attend law school after graduating from UVA.[179]

---

[174] *Id.*

[175] *Id.*

[176] *Id.* at 11 (citing *Minn. Lawyers Mut. Ins. Co. v. Batzli*, 442 F. App'x 40, 51-53 (4th Cir. 2011) (holding that nominal damages were sufficient to satisfy the damage element where the plaintiff suffered an actual loss or injury but was unable to prove the amount of damages); *Western Insulation LP v. Moore*, 316 F. App'x 291, 297-299 (4th Cir. 2009) (holding that a plaintiff's failure to prove compensatory damages did not preclude the plaintiff from establishing all the necessary elements for a breach of contract claim under Virginia law).

[177] Ex. 4, Pl. Dec. ¶¶ 31-46.

[178] *Id.*; Ex. 15, Esmati Texts, PLAINTIFF_003070-81; Ex. 16, DC OHR Complaint.

[179] "Plaintiff no longer wants to enter the legal profession and instead desires to work for a non-governmental organization because law school is too costly and time consuming." Def.'s Mem. Law Supp. Mot. Exclude Pl.'s Expert Witness Andrew Verzilli at 3, ECF No. 69.

During Esmati's deposition, his own attorney admitted Esmati had an "ax to grind" against Doe because she not only spurned his romantic advances, she also accused him of sexual harassment and told his wife about their relationship, which he said made him feel "[b]etrayed, lied to, [and] blindsided."[180] UVA relies upon Esmati's testimony to make arguments about Plaintiff's economic damages.  Doe contests almost all of his testimony.[181] This creates a genuine issue of material fact.  Thus, this Court must deny UVA's Motion.

## <u>CONCLUSION</u>

For the foregoing reasons, UVA has failed to demonstrate that there is no genuine issue of material fact entitling it to judgment as a matter of law. Therefore, UVA's Motion for Summary Judgment must be denied.


Dated: October 16, 2024                    Respectfully submitted,

<div style="margin-left:40%">

*s/Elizabeth K. Abdnour*
Elizabeth K. Abdnour
*Pro Hac Vice*
ABDNOUR WEIKER LLP
500 E. Michigan Ave., Suite 130
Lansing, Michigan 48912
Phone: (517) 994-1776
Fax: (614) 417-5081
liz@education-rights.com

Devon J. Munro (VSB # 47833)
Munro Byrd, P.C.
120 Day Ave. SW, First Floor
Roanoke, Virginia 24016
(540) 283-9343
dmunro@trialsva.com

*Attorneys for Plaintiff*

</div>

---

[180] Ex. 14, Esmati Dep. 77:18-80:8.
[181] Ex. 4, P. Dec. ¶¶ 43-44. Notably, none of Esmati's testimony is included in UVA's Statement of Material Undisputed Facts (*see* Def.'s Mem. Law Supp. Mot. Summ. J. at 3-20, ECF No. 67).

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of October, 2024, a true and accurate copy of the foregoing document was filed using the Court's ECM/ECF filing system, which will send an electronic notification to all counsel of record.

<div align="right">

*s/ Elizabeth K. Abdnour*
Attorney at Law

</div>

41