# In the Matter of:

# Jane Doe
# v.
# The University of Virginia, et al.

# Emily Babb

# August 20, 2024



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
 2                     Charlottesville Division

 3   --------------------------------------+
     JANE DOE,                              :
 4              Plaintiff,                  :
                                            :CASE NUMBER:
 5   vs.                                    :3:23-cv-00018-RSB
                                            :
 6   THE UNIVERSITY OF VIRGINIA, et al.,    :
                Defendants.                 :
 7   --------------------------------------+

 8                                 Tuesday, August 20, 2024

 9                      EMILY BABB,

10   called for examination by counsel on behalf of

11   Plaintiff, Jane Doe, pursuant to Notice taken via Zoom,

12   at approximately 10:00 a.m., before Janie Arriaga, a

13   certified Verbatim Reporter and a Notary Public in and

14   for the Commonwealth of Virginia, when there were

15   present on behalf of the respective parties.

16

17

18

19

20

21

22
```

```
 1   APPEARANCES:

 2              On behalf of the Plaintiff:

 3               ELIZABETH ABDNOUR, ESQUIRE

 4              Abdnour Weiker, LLP

 5              500 East Michigan Avenue

 6              Suite 130

 7              Lansing, Michigan 48912

 8              liz@education-rights.com

 9

10              On behalf of Defendants:

11               CHRISTOPHER P. BERNHARDT, ESQUIRE

12               AMY HENSLEY, ESQUIRE

13               Office of the Attorney General

14               202 North Ninth Street

15               Richmond, Virginia 23219

16               Cbernhardt@oag.state.va.us

17

18

19   ALSO PRESENT:  Jane Doe

20

21

22
```

| | |
|---|---|
| 1 | C O N T E N T S |
| 2 | WITNESS                                              PAGE |
| 3 | EMILY BABB |
| 4 |     Examination by Ms. Abdnour                    4 |
| 5 |     Examination by Mr. Bernhardt                 81 |
| 6 |     Further Examination by Ms. Abdnour           89 |
| 7 | |
| 8 | E X H I B I T S |
| 9 | |
| 10 | (NONE) |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

1   received my J.D. from the University of Oklahoma in

2   2004.

3       Q    And what year did you receive your DuPaul Paul

4   degree?  I'm sorry, if I missed it?

5       A    It's DePauw, with a W.

6       Q    DePauw, I'm sorry.

7       A    D-E-P-A-U-W.  I graduated in 2011.

8       Q    Did you work at all between high school and

9   undergrad or did you go straight to undergrad?

10      A    I went straight to undergrad.

11      Q    And what did you do then after you graduated

12  with your J.D.?  Can you give me a summary of your

13  professional experience after that?

14      A    Sure.  I spent about a year-and-a-half as a

15  plaintiff's employment law attorney in a small law firm

16  in Dallas, Texas, called Janette Johnson and Associates.

17           In October of 2005, I joined the U.S.

18  Department of Education Office for Civil Rights in

19  Dallas, Texas, where I served as an attorney advisor

20  investigator, a senior attorney and specialist to the

21  chief attorney.

22           In 2015, I transferred to the Cleveland

1   regional office for OCR, where I served as a supervisory
2   attorney program manager overseeing investigatory teams
3   in the Cleveland office, which oversaw Michigan and
4   Ohio.
5           After -- in 2017, I joined the University of
6   Virginia as the assistant vice president for Title IX
7   compliance and Title IX coordinator.  I served in that
8   role for about three-and-a-half years before joining the
9   University of Denver as an associate vice chancellor for
10  Equal Opportunity in Title IX and Title IX coordinator
11  in January of 2021.
12          I served in that role until May of 2023, where
13  I joined Northwestern University as the associate vice
14  president for civil rights and Title IX compliance and
15  Title IX coordinator, and that is my current position.
16      Q   Thank you so much.
17          So let me go back and just ask a few questions
18  about each of those roles.  When you moved from the
19  private from doing plaintiff's employment law to OCR in
20  2005, what led you to make that transition?
21      A   I was looking for a better worklife balance.
22  My husband and I are both attorneys and we're

| | |
|---|---|
| 1 | litigators.  We were starting a family.  And I knew that |
| 2 | there was an opportunity for us to find a little bit |
| 3 | better worklife balance through an administrative |
| 4 | position. |
| 5 |     Q   Got it.  Did you find that? |
| 6 |     A   Yes. |
| 7 |     Q   And then what led you to transfer from Dallas |
| 8 | to Cleveland in 2015? |
| 9 |     A   This was a promotional opportunity.  In |
| 10 | Denver, I was an investigator attorney, which means I |
| 11 | investigated complaints The Office for Civil Rights |
| 12 | postsecondary institutions in Arkansas, Louisiana, |
| 13 | Mississippi, and Texas. |
| 14 |     The role in the Cleveland office was |
| 15 | supervising investigators.  So I supervised about four |
| 16 | team leaders, who in turn supervised five to eight |
| 17 | attorney or non-attorney investigators.  I oversaw the |
| 18 | intake, the assignment, the case processing, ensured |
| 19 | fair, thorough, and complete investigations. |
| 20 |     Q   And then in 2017, is when you left to go to |
| 21 | the UVA; is that right? |
| 22 |     A   Yes. |

```
 1      Q    During the course of your time in OCR, did you
 2   have any involvement on developing policies or guidance
 3   documents?
 4      A    No.  The regional offices had the opportunity
 5   to review Dear Colleague letters as they were issued,
 6   but we did not develop them.
 7      Q    Did you ever review any of the Dear Colleague
 8   letters?
 9      A    As they were going out the door, yes.
10      Q    Which ones did you review?
11      A    The only one I recall is a retaliation Dear
12   Colleague letter.
13      Q    And can you give me the approximate date on
14   that one, if you recall?
15      A    Sometime when I was in Cleveland.
16      Q    Okay.
17      A    2017 to 2020.  That's on the Department of
18   Education's website, either archived or still in place.
19      Q    And just to clarify the record, you just said
20   sometime in 2017 and 2020, but I think you had told me
21   before you were in Cleveland from 2015 to 2017.
22      A    Thank you.  2015 to 2017.
```

```
 1   with the Zoom link, and so we were trying to do this via

 2   a conference call.

 3          So I believe, based on those emails, that it

 4   is likely that we met and would have had some post

 5   notice of investigation meeting to walk through the

 6   process.

 7      Q   Do you recall anything about the meeting?

 8      A   I don't recall anything about the meeting.

 9      Q   Okay.  Did you ever meet with the respondent

10   in this matter?

11      A   I don't recall meeting with the respondent.

12      Q   On June 25th of 2020, according to the

13   documentation that we have, you issued a mutual

14   no-contact directive between the parties in this matter.

15   Do you remember that?

16      A   I do not recall issuing any mutual no-contact

17   directive in this case.

18      Q   Okay.  Is that something that you did as

19   matter of routine?

20      A   No.  We did not --

21          MR. BERNHARDT:  Objection.

22          THE WITNESS:  Sorry, Chris.
```

| | |
|---|---|
| 1 | A    No.  We did not issue a mutual no-contact |
| 2 | directive in every formal investigation.  We considered |
| 3 | the facts and circumstances of the matter, the requests |
| 4 | of the parties, and evaluating whether to issue a |
| 5 | one-sided or mutual no-contact directive. |
| 6 | BY MS. ABDNOUR: |
| 7 | Q    So let me ask this first, was there ever a |
| 8 | situation in which you did not issue any no-contact |
| 9 | directives? |
| 10 | A    Yes. |
| 11 | Q    Okay.  And then sometimes there were |
| 12 | situations in which you were issued one-sided, |
| 13 | no-contact directives, correct? |
| 14 | A    Yes. |
| 15 | Q    And then sometimes there were situations in |
| 16 | which you issued mutual no-contact directives, correct? |
| 17 | A    Yes. |
| 18 | Q    But you testified that you don't recall |
| 19 | issuing a mutual no-contact directive in this case; is |
| 20 | that right? |
| 21 | A    Yes.  I do not recall issuing a mutual |
| 22 | no-contact directive in this case. |

```
 1       Q    Do you recall issuing a one-sided no-contact
 2   directive in this case?
 3       A    No, I do not recall issuing any no-contact
 4   directive in this case.
 5       Q    What are the factors that you would be
 6   considering to issue a no-contact directive or not?
 7       A    We would consider the request of the parties.
 8   We would consider the likelihood of the actions.  We
 9   would consider whether there were health and safety
10   risks at play that would lend itself to a no-contact
11   directive.
12       Q    And do you think a no-contact directive was
13   appropriate for this matter?
14            MR. BERNHARDT:  Objection; form.
15       A    I did not issue a no-contact directive in this
16   matter.
17   BY MS. ABDNOUR:
18       Q    Why not?
19       A    As I recall, that was not -- I don't see any
20   documentation that that was requested by either party.
21   And we -- I'm not sure the rationale of the time, but we
22   would have considered those factors in determining
```

```
 1   whether to issue a no-contact directive.
 2        Q    If a no-contact directive had been requested
 3   in this matter, would you have issued it?
 4             MR. BERNHARDT:  Objection; form.
 5        A    If a party requests a no-contact directive, we
 6   still evaluate whether that is an appropriate measure
 7   for us to implement.
 8   BY MS. ABDNOUR:
 9        Q    And so in this case, would it have been an
10   appropriate measure to implement?
11             MR. BERNHARDT:  Objection; form.
12        A    It's possible that that could have been a
13   supportive measure that would have been.
14   BY MS. ABDNOUR:
15        Q    Would it have been appropriate to issue a
16   no-contact directive against the claimant in this
17   matter?
18             MR. BERNHARDT:  Objection; form.
19        A    The time prior to August of 2020, on the
20   August 14th regulatory change, typically we were issuing
21   one-sided no-contact directives against just the
22   respondent.  So it would have typically been, at that
```

```
 1  time, a one-sided if it had been issued.
 2  BY MS. ABDNOUR:
 3      Q    Who would that have been against?
 4      A    The respondent.
 5      Q    Why is that?
 6      A    That was the practice --
 7           MR. BERNHARDT:  Objection; form.
 8      A    That was generally the practice of our Title
 9  IX office prior to the regulatory change.
10  BY MS. ABDNOUR:
11      Q    Why was that the practice?
12           MR. BERNHARDT:  Objection; form.
13      A    That was how they were implemented when I
14  started, and we continued that practice.
15  BY MS. ABDNOUR:
16      Q    So making sure I understand your testimony,
17  the office's practice changed as a result of the 2020
18  regulation change that went into effect on August 14th
19  of 2020; is that right?
20           MR. BERNHARDT:  Objection; form.
21      A    The office's practice with regard to one-sided
22  or mutual no-contact directives shifted to mutual
```

```
 1   no-contact directives in response to the August 14th,
 2   2020 implementation of the Title IX regulation changes.
 3   BY MS. ABDNOUR:
 4       Q   Okay.  And so just so that I can understand,
 5   is it your testimony that the reason the office's
 6   practice changed from one-sided to mutual no-contact
 7   directives on August 14th of 2020 is because those
 8   regulations required that change?
 9           MR. BERNHARDT:  Objection; form.
10       A   We shifted the way we implemented our
11   supportive measures and moved towards more mutual
12   no-contact directives in response to the Title IX
13   regulatory changes.
14   BY MS. ABDNOUR:
15       Q   Okay.  What in the regulatory changes caused
16   that shift?
17           MR. BERNHARDT:  Objection; form.
18       A   The 2020 regulations regarding supportive
19   measures and burden.
20   BY MS. ABDNOUR:
21       Q   What was the last word, I'm sorry?
22       A   Burden.
```

```
 1   Finder?

 2       A    Not that I recall.

 3       Q    I may have asked this before, I just can't

 4   remember if I asked it, so I apologize if I did ask it:

 5   As far as you recall, did you ever provide any training,

 6   any in-person training to Gabriel Finder?

 7       A    I don't recall.

 8       Q    The next person is Asher Biemann.  Have you

 9   ever interacted directly with Asher Biemann?

10       A    I don't recall.

11       Q    Have you ever provided any in-person training

12   to Asher Biemann?

13       A    I don't recall.

14       Q    Elizabeth McGill, other than the emails that I

15   saw that were exchanged, have you ever interacted with

16   her directly?

17            MR. BERNHARDT:  Objection; form.

18       A    Yes.

19   BY MS. ABDNOUR:

20       Q    Tell me generally about the nature of those

21   interactions.

22       A    With McGill, with the provost at the
```