In the Matter of:

Jane Doe
v.
The University of VA, et al

Akia Haynes Hale

September 6, 2024



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
 2

                                  )
 3   JANE DOE,                    )
                                  )
 4          Plaintiff,            )
                                  )
 5   v.                           )    Civil Action No.
                                  )    3:23-cv-00018
 6   THE UNIVERSITY OF            )
     VIRGINIA, et al.,            )
 7                                )
            Defendants.           )
 8
 9
10          DEPOSITION of AKIA HAYNES HALE in the
11          above-entitled matter, held via
12          video-conference, on September 6, 2024,
13          stenographically reported by Jacqueline
14          Bennett, Registered Professional Reporter and
15          Notary Public in and for the Commonwealth of
16          Virginia.
17
18
19
20
21
22
```

```
 1              A P P E A R A N C E S
 2         (All appearances via video-conference.)
 3
 4   ON BEHALF OF PLAINTIFF:
 5         ABDNOUR WEIKER LLP
              400 E. Michigan Avenue, Suite 130
 6            Lansing, Michigan 48912
         BY:  ELIZABETH K. ABDNOUR, ESQUIRE
 7            RENEE STROMSKI, ESQUIRE
              Liz@education-rights.com
 8
 9   ON BEHALF OF THE DEFENDANTS:
10         OFFICE OF THE ATTORNEY GENERAL
              202 North Ninth Street
11            Richmond, Virginia 23219
         BY:  CHRISTOPHER P. BERNHARDT, ESQUIRE
12            SolicitorGeneral@oag.state.va.us
13         THE OFFICE OF THE UNIVERSITY COUNSEL
              Madison Hall
14            P. O. Box 400225
              Charlottesville, Virginia 22904
15       BY:  AMY E. HENSLEY, ESQUIRE
              aehensley@virginia.edu
16
17   ALSO PRESENT:
18         JANE DOE, Plaintiff
19         KATHRYN DUNLEAVY (Chirdon), Law Clerk
20         LORAINE HARMER, Law Clerk
21         ANNA KUEBLER, Legal Intern
22
```

```
                                                              3
                    Akia Haynes Hale                    9/6/2024
```

```
 1                        I N D E X

 2              THE DEPOSITION OF AKIA HAYNES HALE

 3

 4                    E X A M I N A T I O N S

 5

 6   WITNESS                                              PAGE

 7   AKIA HAYNES HALE

 8        Examination by Ms. Abdnour                      4

 9        Examination by Mr. Bernhardt                    66

10        Continued Examination by Ms Abdnour             71

11

12

13                       E X H I B I T S

14               (Attached to the transcript.)

15

16   ID.       DESCRIPTION                                PAGE

17   1         Privileged Recommendation Letter           44

18   2         Review Panel Determination                 72

19

20

21

22
```

Casamo & Associates        703 837 0076        www.casamo.com

```
 1   meetings, like evaluation panel meetings, things like

 2   that.

 3       Q.   And then was that the first time you ever

 4   conducted Title IX investigations in that role?

 5       A.   So conducted investigations, no.  When I was

 6   with the Civil Rights Commission, I was responsible

 7   for issuing notices of findings for the entire state

 8   of Indiana and that handled Title VI, VII, VIII, and

 9   IX, and so there were times where I would issue

10   notices of finding on Title IX matters.

11       Q.   And so what is a notice of finding?

12       A.   Yes.  And so we would have investigators who

13   would investigate the matter, and then they would

14   draft a document that was sort of their assessment of

15   the facts and what happened and whether that would

16   violate the Indiana Civil Rights Act, which was

17   substantially similar to Title VII and IX and VIII and

18   in a lot of areas.

19            I would then go and review those drafted

20   notices to make sure that they're legally sound and

21   accurate to make sure the facts supported their

22   recommended finding, and if they did, then I would
```

```
 1   essentially issue that notice of finding saying this
 2   person has been found responsible for violating the
 3   Indiana Civil Rights Act.
 4           That finding, though, looked very much like a
 5   Title -- a finding under Title VII or under Title VIII
 6   or under Title IX, and so I did have some of those
 7   instances prior to joining the university.
 8       Q.  And just so I understand, though, had you
 9   ever actually done the investigative portion before
10   coming to UVA?
11       A.  No.
12       Q.  Okay.  During your time at UVA, about how
13   many Title IX investigations did you conduct?
14       A.  A lot.  Probably in excess of 50, maybe in
15   excess of 100.  I can't say for certain, but a lot.
16       Q.  Okay.  And so I'm asking this question now
17   about any time prior to starting at UVA.  I'm going to
18   ask it about other times, but the question I'm asking
19   right now is:  What training did you receive in how to
20   conduct Title IX investigations prior to starting at
21   UVA?
22       A.  So Title VII is very similar to Title IX, and
```

```
 1    reviewed that e-mail; is that right?  Or that letter?
 2         A.   Yes.
 3         Q.   Okay.  And in that letter, she was offered
 4    also $5,000 to reimburse her for mental health therapy
 5    and costs that she incurred through December of 2021.
 6    Do you recall that?
 7         A.   Yes.
 8         Q.   Okay.  Can you take me through how the
 9    decision was made to offer that -- that resolution to
10    her?
11         A.   And so the max amount that I recall at that
12    point to offer anyone for a finding of responsibility
13    is $5,000 to reimburse for any sort of mental health
14    services someone would have needed during the pendency
15    of the investigation or in light of that, and also for
16    holistic type services.
17              And so that is a process that you would kind
18    of go through.  There's a finding.  You'd kind of
19    gauge based on the duration of sort of the allegations
20    at hand and things of that nature.  This is what could
21    be a reasonable amount to assist someone after that.
22         Q.   You said the maximum amount was $5,000.  What
```

```
 1  does that mean?
 2       A.  So the maximum amount that I recall at that
 3  point that was offered for those types of measures was
 4  $5,000.
 5       Q.  Is that a max amount that you decided?
 6       A.  That was an amount that I believe was decided
 7  before me, and I did not want to change that in my
 8  role as interim.
 9       Q.  And what was the rationale for that max
10  amount, if you know?
11       A.  I don't know.
12       Q.  Okay.  And what was the reason for the
13  deadline on using that amount?
14       A.  And so I can only speculate because I don't
15  remember, but typically you give -- you give people a
16  period of time in order to seek counseling and
17  whatnot.  I think the goal was to try to not have sort
18  of an infinite deadline that someone could tender
19  invoices years beyond the fact, and so I think that's
20  why it was sort of time parameters placed on there,
21  but I can't give a specific answer.
22       Q.  So do you -- was it your opinion that --
```

```
 1   then, that giving that deadline would provide

 2   sufficient remedy to the claimant in this matter?

 3           MR. BERNHARDT:  Objection.  Form.

 4       A.  Yes.

 5       Q.  Okay.  Why is that?

 6       A.  Because that was our process previously.

 7   Again, I wasn't going to deviate from that process,

 8   and previously when there were findings of

 9   responsibility over a period of time, that was the

10   amount that was deemed appropriate, and so I didn't

11   deviate from that.

12       Q.  So if I'm understanding you correctly, there

13   was no consideration of the individual factors of this

14   claimant in making that determination; is that right?

15           MR. BERNHARDT:  Objection.  Form.

16       A.  That's incorrect.  Looked at the nature of

17   the allegations, sort of the duration of it, and based

18   on, at that point, previous matters that had sort of a

19   similar duration of time, things of that nature, that

20   was the amount that was given.  And so that was the

21   amount that was given at that point but, again, I

22   didn't want to deviate from the previous process.
```

```
 1       Q.  So I'm just trying to understand here.  So
 2   tell me if this summary of what you're saying is
 3   incorrect.  You selected the duration of time that the
 4   remedy would be available based on other previous
 5   decisions in other similar matters; is that correct?
 6           MR. BERNHARDT:  Objection.  Form.
 7       A.  No.  What I'm saying is I looked at that
 8   matter and I noticed, okay, the conduct at issue
 9   occurred for X amount of time.  Let me go back and --
10   and I don't have any independent recollection of any
11   of these matters, to be clear.
12           But at that point, I went back and said,
13   okay, let me find another matter that had a
14   responsibility of finding that had, you know, a period
15   of prohibited conduct that occurred over a long period
16   of time.  Let me see what the sanctions looked like at
17   that point.  And then I used that to inform the
18   decision on that, because as interim, I wasn't going
19   to deviate from the previous amounts that had been
20   given.
21       Q.  Why not?
22       A.  Because I was interim and I didn't know sort
```

```
 1   of how that came to be, anyway.  I was not the
 2   permanent Title IX coordinator.  That would be a
 3   decision that the permanent Title IX coordinator would
 4   have probably made in consultation with the assistant
 5   vice president, and as I was not the permanent
 6   Title IX coordinator at that point, I did not have
 7   that kind of conversation with her to determine
 8   whether or not this amount should be changed.
 9        Q.   So -- so were you not permitted to do that
10   because you were interim?
11        A.   There was no prohibition to my knowledge, but
12   as interim, I did not feel comfortable deviating from
13   the process that had been followed at that point, and
14   I did not see a reason to do so there.
15        Q.   Okay.  Why not?
16        A.   As I said, I didn't see a reason to deviate
17   from it.  I looked at prior matters for a duration of
18   time with not necessarily similar facts but facts kind
19   of similar in the sense of this is a period of time of
20   which prohibited conduct may have occurred, but this
21   is a finding -- I did not see a reason to deviate from
22   that process.
```

| | |
|---|---|
| 1 | Q.  So were the amounts issued in the other cases |
| 2 | that you looked at appropriate? |
| 3 | MR. BERNHARDT:  Objection.  Form. |
| 4 | A.  I can't answer that question because I didn't |
| 5 | issue those amounts. |
| 6 | Q.  So how did you know that basing this amount |
| 7 | on those amounts was the correct decision? |
| 8 | A.  It was the decision that I made at the time |
| 9 | and it seemed appropriate. |
| 10 | Q.  Why did it seem appropriate? |
| 11 | A.  Because I didn't -- |
| 12 | MR. BERNHARDT:  Objection.  Asked and |
| 13 | answered. |
| 14 | Q.  You still need to answer. |
| 15 | A.  I didn't see a need to deviate from what I |
| 16 | had previously seen. |
| 17 | Q.  Okay.  I'm trying to understand why you |
| 18 | didn't see a need to deviate.  I mean, you would have |
| 19 | had the independent authority to make that decision as |
| 20 | the interim coordinator, correct? |
| 21 | A.  Yes. |
| 22 | Q.  Okay.  So what I'm understanding is you just |

| | |
|---|---|
| 1 | looked at other cases, that you didn't have any |
| 2 | knowledge about how the decision was made, and applied |
| 3 | the same decision here; is that correct? |
| 4 | MR. BERNHARDT:  Objection.  Form. |
| 5 | A.  Not exactly.  The other cases I was somewhat |
| 6 | familiar with the facts at hand -- either there are |
| 7 | cases I personally investigated or there are cases |
| 8 | where I reviewed the report -- and so I was aware of |
| 9 | the facts. |
| 10 | And based on those factors, the duration of |
| 11 | the time period, the nature of the allegations, I did |
| 12 | not see a reason to deviate from the prior decisions. |
| 13 | I would have no basis on which to do so. |
| 14 | Q.  So why were those prior decisions |
| 15 | appropriate? |
| 16 | A.  I can't answer that because I did not make |
| 17 | those prior decisions, but based on those prior |
| 18 | decisions being deemed appropriate by presumably the |
| 19 | prior Title IX coordinator and the prior assistant |
| 20 | vice president, I did not see any factors that led me |
| 21 | to believe that this case should be treated |
| 22 | differently than those that other folks who had more |

```
 1  authority than I did as the assistant vice president,
 2  for instance, deemed appropriate.
 3       Q.  So did you talk to the former Title IX
 4  coordinator about your decision?
 5       A.  No, she was no longer with the university.
 6       Q.  And did you talk to the associate vice
 7  president about your decision?
 8       A.  No, because the one that was there at --
 9  certain parts of other cases I looked at that were
10  similar were no longer with the university.
11       Q.  What training had you undertaken at that
12  point about determining remedies?
13       A.  I don't recall any specific question --
14  trainings about remedies, no.
15       Q.  Okay.  And did you ever talk to the claimant
16  about whether she had incurred any costs in this case?
17       A.  No.
18       Q.  Did you ever inquire as to what her needs
19  were?
20       A.  No.
21       Q.  Did you ever talk to her about what her needs
22  were with respect to remedies or compensation in
```

```
 1   general?
 2        A.  No.
 3        Q.  Okay.  During the course of time that you
 4   were at UVA, were you aware of any Title IX lawsuits
 5   filed against UVA?
 6        A.  Yes, I'm aware that lawsuits were filed.
 7        Q.  Okay.  Tell me about those lawsuits.
 8        A.  I don't know anything specifically about
 9   them, but I'm aware generally that they were filed.
10        Q.  Do you know how many were filed?
11        A.  I do not.
12        Q.  Okay.  And were you involved at all in any of
13   those lawsuits?
14        A.  No.
15        Q.  Okay.  What about any OCR complaints that
16   were filed against UVA during your time there?  Are
17   you aware of any of those?
18        A.  Yes, I'm aware generally that they were
19   filed.
20        Q.  Okay.  And were you involved in any of them?
21        A.  While at UVA, no.
22        Q.  Okay.  During your time at OCR, were you
```