IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| **JANE DOE,** | |
| **Plaintiff,** | |
| v. | Case No. 3:23-cv-00018-RSB |
| **RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA,** | |
| **Defendant.** | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO EXCLUDE PLAINTIFF'S EXPERT ANDREW C. VERZILLI**

**Introduction**

Plaintiff Jane Doe ("Doe" or "Plaintiff") hereby opposes Defendant's Motion to Exclude Andrew C. Verzilli (ECF No. 68) and Memorandum (ECF No. 69) as a damages expert quantifying potential economic loss. The law permits Plaintiff to prove and recover damages to her education and earnings due to delayed or lost educational opportunities. As an economist, Verzilli does not propose to testify about any vocational analysis or opinions, neither about Doe's pre-injury career probabilities nor the causative effects of the injuries on her career outcomes. He provides straightforward quantifications of year-by-year income values and losses, based upon a foundation that the Plaintiff will prove by lay evidence, and that the jury must weigh, decide, and value. His projections of income differential based upon the loss or delay of an attorney career are based upon sound and reliable premises, methodology, and sources, and will assist the jury in reaching a flexible and reasonable estimate of consequential damages, should it decide the evidence warrants such.

**Statement of Facts**

Doe was born and grew up in Peru. P. Dec. ¶ 12, ECF No. 88-4. She moved to the United States in 2014. *Id*. She has wanted to be a lawyer and a professor since she was in high school, and she has never abandoned that goal. *Id*. at 59; P. Dep. 28:8-29:16, ECF No. 88-11. In the Fall of 2018, Doe created a Law School Admission Council account, started researching the process of applying to law school, and started practicing with free materials online since that was all she could afford. Ex. 4, P. Dec. ¶ 61, ECF No. 88-4. Throughout 2019 and into 2020—a time when Doe was supposed to be taking the LSAT and planning for her future post-graduation—she ended up in the hospital with suicidal ideation. P. Dep. 47:15-17, 51:14-18, ECF No. 88-11; Ex. 2, Pl. Email to Casteen at UVA008166. Doe was experiencing suicidal ideation due to the trauma of abusive relationship with her professor John Roe. P. Dec. ¶¶ 3-4, ECF No. 88-4. Doe had to make a choice, and she sacrificed her future to survive her present. *Id*. at ¶ 62. Doe knew she could always apply later to law school, but she could never fix her grade point average, so she had to choose. *Id*. Doe chose to focus on her GPA, which she was able to maintain at nearly 4.0 by the time of her graduation. *Id*.; *see* ECF No. 67-21 (Transcript).

Doe has had a very difficult time obtaining gainful employment since graduation, due to her ongoing mental health concerns. P. Dep. 209:2-212:22, ECF No. 88-11; Ramirez Dep. 79:5-95:20, ECF No. 88-12. She has applied for, and been rejected by, numerous employment positions. *Id*. She had to leave her most recent job as a paralegal at Immigration Counsel because she was being sexually harassed by a coworker, Parwiz Esmati, and her employer did nothing to protect her and retaliated against her when she filed a complaint against Esmati. DC OHR Complaint, IMM0024-0026, ECF No. 88-16. UVA relies on Esmati's testimony—and nothing else—to

counter Doe's assertion that she intended to attend law school after graduating from UVA.[1] During Esmati's deposition, his own attorney admitted Esmati had an "ax to grind" against Doe because she not only spurned his romantic advances, she also accused him of sexual harassment and told his wife about their relationship, which he said made him feel "[b]etrayed, lied to, [and] blindsided." Esmati Dep. 77:18-80:8, ECF No. 88-14.

The jury will hear evidence that Doe's plan to attend law school, albeit on a delay, remains intact. Rather than the LSAT, Doe has recently been studying for the GRE, as she has researched each of the law school programs she will be applying for, and all of them accept GRE scores. P. Dec. ¶¶ 64-65, ECF No. 88-4. A GRE would qualify Doe for both law school and a Ph.D. program so she would not need to take two different tests. *Id*. The stress and exhaustion of this lawsuit has made it impossible for Doe to take the LSAT or the GRE yet, as, despite her efforts, she continues to score lower than she thinks she should on practice exams. *Id*. at ¶ 66.

Andrew C. Verzilli ("Verzilli") is a qualified economist with an M.B.A. He has extensive experience in performing forensic economic loss calculations of various kinds in litigation contexts, for individuals and for businesses. He has taught economics at Drexel University, and published in related fields. Ex. 1 (c.v.). Ostensibly, Defendant does not challenge his basic qualifications, though it spend extensive time attempting to impugn his credibility as an expert who has primarily been retained by injured plaintiffs to calculate economic losses on the natural premise that a future loss has occurred, which the Plaintiff (not Verzilli) has the burden to prove. ECF No. 69 at 4.

---

[1] "Plaintiff no longer wants to enter the legal profession and instead desires to work for a non-governmental organization because law school is too costly and time consuming." Def.'s Mem. Law Supp. Mot. Exclude Pl.'s Expert Witness Andrew Verzilli at 3, ECF No. 69.

As UVA acknowledges, Verzilli is not a vocational expert, nor was he retained to establish the premise that Doe would have gone to law school as she planned, nor to opine on the probability that she achieves her future career goals, or to establish Plaintiff's particular facts supporting UVA's causation of the economic loss itself. *Id*. at 5. Rather, Plaintiff retained him to perform a straightforward lost income calculation based upon two different outcome scenarios, quantifying those losses year-by-year to assist a jury with a reasonable estimate of damages to consider, should they find that the lay evidence supports an award of lost income.

Verzilli's damage calculations employ standard lost earnings projection methodology. ECF No. 67-43 at 2-4. The factual premise for the losses themselves is that but for the injuries caused by UVA, Plaintiff would have gone to law school in Fall 2020 and become an attorney as she had planned. Doe, not Verzilli, has the burden to establish these facts sufficiently and to a jury's satisfaction at trial as a foundational matter from lay evidence. Using this factual foundation and considering Plaintiff's actual transcript and work history since her graduation, Verzilli first estimated Plaintiff's earnings differential between beginning an entry-level attorney salary at age 26 as anticipated and earning a paralegal salary instead for the projected earnings through age 67, using Bureau of Labor Statistics (BLS) and industry-recognized factors accounting for wage growth, benefits, and a discount rate for present value. ECF No. 67-43 at 2-3, Table 1 and Appx. Table. This estimate assumed, as a value of expected *mitigation* by an alternate income, the reduction of damages by the value of a paralegal's salary. *Id.* Verzilli considered that during the post-injury time period, Plaintiff had indeed worked as a paralegal for a short period, demonstrating both the qualifications and potential to mitigate losses to that degree. So, even though Doe has not maintained that employment or salary consistently for the past four years and mitigated damages to that level, Verzilli conservatively applied that high mitigation credit to reach

4

a very reasonable damages differential projection on which a jury could estimate reasonable, overall projected loss attributable to actionable injuries.

Verzilli's second estimate assumed the premise that to the extent the evidence warranted a more aggressive mitigation, Doe would enter law school in the Fall of 2025, and thereby the legal profession, on a delay of five years. ECF No. 67-43 at 2. This would permit the jury to reasonably estimate the effects of Doe's injuries on the expectation that in reasonable mitigation, she may overcome their effects and ultimately attend law school. It also respects the evidence from Doe herself that she still intends to enter law school and become an attorney and provides a jury that finds such a mitigation expectation to be reasonable an estimate of what her projected income might be on that course. ECF No. 67-43, Table 2 and Appx. Table.

In summary, Verzilli's report respects the known facts about Doe's graduation from UVA post-injury in May 2020 and work history, her plan for law school and steps forward, and provides a reliable year-by-year schedule of estimated loss differential. As prepared, this provides a jury the reasonable projected values of future lost income from an attorney position, minus the mitigation values of either an alternate expected minimum income for which Doe is actually qualified already, or a delay in which she enters the profession later as she projects. From these values, a jury may reasonably estimate damages with the deduction of expected mitigation, depending upon what the jury considers likely from the evidence, and for what duration the jury finds reasonable. ECF No. 67-43, Appx. Table.

**Argument**

Federal Rule of Evidence 702 ("Testimony by Expert Witnesses") governs the present motion. The rule explicitly provides that expert testimony is admissible if (a) the expert's … specialized knowledge will help the trier of fact to understand the evidence or to determine a fact

5

in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702 (quotes removed).

The Western District summarized the standards for reviewing a motion to exclude a damages expert:

> "The Federal Rules of Evidence provide that a qualified expert witness 'may testify in the form of an opinion or otherwise if [his] scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.'" "Implicit in the text of Rule 702, ... is a district court's gatekeeping responsibility to 'ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" "With respect to reliability, the district court must ensure that the proffered expert opinion is based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." With respect to relevance, the district court must ensure the proffered testimony will help "the trier of fact to understand the evidence or to determine a fact in issue."

*Acosta v. Vinoskey,* 310 F. Supp. 3d 662, 666–67 (W.D. Va. 2018) (citations removed).

As this District has also recognized, "courts may not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology." *Acosta,* 310 F. Supp. 3d 662, 666–67 (citing *Bresler v. Wilmington Tr. Co.,* 855 F.3d 178, 195 (4th Cir. 2017)). If Verzilli's calculation methodology is reliable, "further criticisms of the expert's testimony will go to its weight, not its admissibility." *Id.*

When evaluating the reliability of an economic expert's projections of a plaintiff's future career and losses, "statistical evidence alone is too speculative," but an expert may rely upon statistics blended with his consideration of "facts and circumstances personal to the plaintiff as an individual, not merely to [her] membership in a statistical class." *Musick v. Dorel Juvenile Group, Inc.*, 818 F. Supp. 2d 960, 963, 2011 WL 4851552 (W.D. Va. 2011) (citing *Bulala v. Boyd*, 239

6

Va. 218, 389 S.E.2d 670 (1990)).

**I. Plaintiff Doe claims lost earnings arising from a delay in employment due to a loss of educational opportunities of law school, which is a recoverable, consequential damage under Title IX after *Cummings*. Verzilli's calculations of those lost earnings on a year-by-year basis are relevant.**

Defendant first argues that "Plaintiff's claim for lost earning capacity damages based on her 'aspiration,' as stated by Verzilli, is unavailable" as a category of damages. ECF No. 69 at 8. Citing *Cummings v. Premier Rehab Keller, PLLC,* 596 U.S. 212, 220-221 (2022) for the proposition that Title IX claims are restricted to consequential damages arising from breach of contract, UVA argues that a plaintiff may never recover future lost earnings in a Title IX case absent proof of "identifiable professional opportunities." ECF No. 69 at 8-9 (citing *Rice v. Cmty. Health Assn.,* 203 F.3d 283 (4th Cir. 2000) and *B.R. v. F.C.S.B.,* 2024 U.S. Dist. LEXIS 57019, 2024 WL 1254826 (E.D. Va. 2024)).

In *B.R. v. F.C.S.B.,* the Eastern District adopted the premises of *Cummings* and *Rice* to rule that, in a Title IX case, an injured plaintiff could present evidence of future lost earnings if she could prove "future identifiable professional opportunities that would have been available." *B.R. v. F.C.S.B.*, 2024 WL 1254826, at *7 (citing *Rice*). Applying this rule to the facts of that case, the Court held that the plaintiff's lost earnings were "too speculative and attenuated" where the plaintiff alleged that because of Title IX violations arising from an assault in her seventh grade year, she was now "incapable of maintaining a job and that, but for the alleged assaults that are the subject of this case, B.R. would have been a highly successful lawyer or surgeon." *Id.* at *8. B.R.'s expert based the projections of a top-market lawyer or surgeon salary upon little more than that plaintiff having served in an apparent internship as a project assistant at Sidley Austin, rather than any steps or testimony specific towards planning for legal or medical opportunities. *Id.*

7

As applied by the Eastern District, the principal rule from *Rice* is that, if defined by a contractual damage calculus, future losses "relating to lost economic opportunities are not recoverable simply because a plaintiff specifies an aspirational position, as they must have been anticipated or contemplated at the time of contracting." *Id.* at *8. In the present case, Doe will present supporting evidence that goes beyond specifying an aspiration to become a lawyer. Her enrollment in law school after graduating from UVA, as a scholarship student with an exemplary GPA, was both the anticipated and contemplated plan at the time of UVA's breaches during her junior and senior years of college. By the Fall of 2018, Doe had created a Law School Admission Council account, started researching the process of applying to law school, started practicing with free materials online, and had notified UVA's Career Services Center that she intended to pursue a career as a lawyer. For a student graduating from a top-10 undergraduate school with a near-4.0 GPA, law school followed by employment as an entry-level attorney was a reasonable and identifiable professional plan, irrespective of whether she already had particular offers from law schools at the time UVA's breaches began.

As a result, Doe's facts are distinguishable from the nonspecific, attenuated "aspiration" in *B.R., supra.* This case is also distinguishable from *Rice,* as the identified opportunity loss that Doe has suffered is the delay of her planned law school enrollment and subsequent attorney career. These damages have indeed already occurred and are not speculative. In *Rice,* the Fourth Circuit held (under a "reasonable certainty" standard from West Virginia law) that a plaintiff physician proving breach of an employment contract could not recover "lost professional opportunities" attributed to speculative expert evidence that other hospitals would not hire him due to the defendant hospital's breaches and resulting "damage to reputation." 203 F.3d at 289-90. The Fourth Circuit concluded that to the extent that the physician sought to prove that damage to his

8

reputation actually prevented the losses projected, he had to identify particular jobs that had passed on him as a proximate result of that reputational damage. *Id.*

By contrast, in Doe's case, she will present the evidence that tie her delay in applying to and enrolling in law school specifically to her injuries from UVA's breaches as a matter of fact and necessity. It is probable and not speculative that with her qualifications, plans, and steps taken already, she would, but for the injury, have enrolled in law school in Fall 2020, and pursued an entry-level attorney career thereafter. As a result, her claim is effectively for a denial of educational opportunities in law school, the lost income from which Verzilli reasonably and conservatively estimates.

In *Rullo v. University of Pittsburgh - of Commonwealth System of Higher Education*, the Western District of Pennsylvania overruled a motion to exclude an economic expert's lost income projections on a similar posture. No. CV 17-1380, 2021 WL 640063 (W.D. Pa. Feb. 18, 2021). There, the plaintiff alleged that because of a sexual assault and breaches by the University of Pittsburgh, she had to leave law school, transfer to a lower-ranked law school, and delay her graduation date and entry into the legal profession. This, she argued, caused her a loss of future earning capacity, the subject of the expert's opinions. *Id.* at *1. She introduced an expert economist's opinions on the difference in her earning potential caused by attending Florida Coastal School of Law, instead of the University of Pittsburgh, for both public and private sector employment; and (2) the "difference in her earning potential as a result of her diminished ability to become a healthcare attorney, also based on her attendance at Florida Coastal rather than the University [of Pittsburgh]." *Id.*

In denying the motion to exclude these opinions as too speculative in a Title IX setting, the *Rullo* court allowed Rullo to claim a lost future earnings differential arising from the "lost

9

educational opportunities" of transferring to an inferior law school and held that the economist's projections of the resulting career impact and lower wage differential on Rullo was sufficiently reliable under Federal Rule of Evidence 702. This included the expert conclusion that Rullo was "less likely to become a healthcare attorney simply because she attended Florida Coastal instead of Pitt." *Id.* at *4. Verzilli's projections are comparably simpler and more reliable, in that they calculate reasonable lost earnings due to the delays Ms. Doe has already suffered by her inability to enter law school as planned after graduation in Fall 2020. The resulting delay has necessarily put off her entry into the foreseeable attorney career. Unlike the opinion upheld in *Russo,* Verzilli's report does not venture into likelihoods of employment based upon different law schools, strata of different law careers, or other variables that introduce more speculative probabilities. *See generally* ECF No. 69-43.

The Northern District of Georgia recently upheld similar damage claims in a post-*Cummings* Title IX matter when denying summary judgment, confirming their availability in a scenario such as Doe's. *See J.C. v. Bd. of Regents of the Univ. Sys. of Ga.*, No. 1:20-CV-4445 (N.D. Ga. Aug 1, 2023). There, J.C. argued her Title IX rights were violated after she reported a sexual assault at Georgia College and State University, where she had been a nursing student for about three semesters. *Id.* at *4-5. As a result of the violations, she withdrew from GCSU and later pursued an online degree at Herzing University with a higher tuition. J.C. claimed, among other damages, two years of delay in beginning her nursing salary. *Id.* at *4. The defendant challenged the entire Title IX claim, and specifically lost educational opportunities and claimed lost earnings, as a result of the holding in *Cummings, supra. Id.* at *2. The court held that J.C.'s claimed injuries including "the denial of educational opportunities and the subsequent delay in her education… fall

10

within the realm of 'compensatory damages' that are available under Title IX." *Id.* at *4 (citations omitted).

Applying that rationale, Doe may present to a jury the evidence in support of her claim that UVA's breaches caused her to forego, or at least delay, educational opportunities in her planned law school enrollment. The resulting delay in her entry into a legal career—necessarily quantified as a lost earnings damage based upon statistics and reliable expert methodology—are an available damage claim. Based upon the evidence Doe will present, her entry into law school and future employment as an attorney are not speculative as a matter of law under *Rice* and *B.R., supra.* They were her specific plan and probable outcome, but for UVA's breaches of Title IX. Thus, she should be permitted to introduce Verzilli's calculations as relevant quantifications of that damage.

II. **Andrew Verzilli provides a reliable economic loss projection, estimating future lost income damages according to standard methodology, accepted federal statistics, and conservative discount factors for present value. UVA conflates disputes with Doe about the factual premises for those losses with Verzilli's own "foundation" for his calculations.**

UVA's challenge to the reliability of Andrew Verzilli's calculations conflates his reasonable inferences from disputed facts about Jane Doe's law school opportunities and career potential with the foundation of his economic damage quantifications, which will be premised upon Doe's proof of loss or delay of those opportunities to a jury's satisfaction at trial. UVA's arguments center primarily on disputes of fact, or subjects for cross-examination that go to the weight of Plaintiff's lay evidence—issues a jury must resolve—not defects in the foundation of an expert's purely economic calculations crediting the Plaintiff's positions.

Verzilli is neither a vocational expert nor is he offering vocational opinions on Doe's particular vocational potential, intelligence, capability, or career probabilities pre- or post-injury. He is merely providing lost income estimates and differential calculations based upon alternate scenarios, with standard considerations including factors for wage increases, present value

11

discounts, and values taken from industry indexes and recognized BLS sources.

Yet throughout its brief, UVA myopically argues that Verzilli's calculations are unreliable because they begin with a factual premise supplied by the Plaintiff that, but for UVA's breaches, she would have begun law school in Fall 2020 and become an attorney at age 26. UVA argues that there are numerous disputed facts and inferences that it maintains Verzilli should agree discredit this premise, such as:

- "Doe's high school grades, which showed she earned Bs and Cs in addition to As," instead of her 3.9+ GPA and degree at UVA (ECF No. 69 at 11; *see also id.* at 3);

- That Doe has recently studied for the GRE, which UVA argues proves she is not going to be a lawyer (also apparently implying she never would have gone to law school or been an attorney in the first place) (ECF No. 69 at 2, 3);[2] and

- That Doe has not taken numerous precursor steps that UVA believes would show legitimate intent to return to law school (*Id*. at 3-4).

In addition, UVA argues throughout its motion that Verzilli has some sort of duty to assess (as a vocational expert might) the probabilities as to whether Doe really would have gone to law school in Fall 2020, or still intends to go to law school on a delayed basis of five years precisely *Id*. at 11. UVA suggests that Verzilli should have divined what kind of attorney Doe may have

---

[2] Quixotically, UVA's *own law school* accepts the GRE in lieu of the LSAT for admission:

> To be eligible for consideration for admission to the J.D. program, you must have a bachelor's degree from an accredited institution by August of the year you intend to enroll. To apply for admission, candidates should submit a completed application for admission; the $85 application fee; a transcript of undergraduate and any graduate work submitted through the Credential Assembly Service (CAS); a valid, reportable score on the Law School Admission Test (LSAT), the Graduate Management Admission Test (GMAT), or the GRE General Test; and two letters of recommendation.

UNIVERSITY OF VIRGINIA SCHOOL OF LAW, *Frequently Asked Questions - J.D. Admissions: The Application Process*, https://www.law.virginia.edu/admissions/admissions/jd-admissions/faqs#standardtest (last visited Oct. 16, 2024).

12

become, then found and used non-BLS statistics on that sub-class of income, should they even have existed. *Id*. at 12. In short, UVA's primary arguments about "reliability" have little to do with the soundness of Verzilli's sources, methodology, or mathematical conclusions offered as an economist, but charge him with the irrelevant and inappropriate burdens of a vocational expert offering substantive analysis and prediction of Doe's vocational outcomes. This, UVA argues, justifies a categorical exclusion of Verzilli before Plaintiff has any opportunity to introduce her trial evidence to permit the jury to consider the foundation for the damages Verzilli estimates.

To be clear, as Verzilli's Rule 26 report details, he has calculated a year-by-year schedule of damage numbers based upon the primary factual premise that the Plaintiff would have entered law school in Fall 2020 absent UVA's breaches and entered the legal profession at age 26. He then estimates yearly wage values based upon Doe never becoming an attorney but mitigating at a minimum salary level of the paralegal sector (informed by her highest achieved employment to date as a paralegal) over that work life, or alternatively, still becoming an attorney but on a delayed basis at least five years. For the purposes of his data-driven projections and the mathematical calculations he makes in his tables, Verzilli clearly offers no opinions nor factual projections about Doe's actual future vocational outcomes and confirmed this in deposition. That is the province and burden of Doe's lay evidence, and the jury will weigh that evidence against the defense's own, to decide what her consequential losses actually are. To the extent that the jury ultimately decides that such evidence justifies an award of lost income, the jury will determine the most probable vocational outcome. Verzilli will merely provide the jury a yearly schedule (in his tables) to assist in a reasonable estimate of the losses it finds to be warranted, as Virginia law requires.

Indeed, Verzilli's calculations will assist a jury in estimating damages and are flexible for application to the jury's factual findings, regardless of how many years of losses they may decide

13

to award Doe, if any. Verzilli's estimates do not wed a jury to awarding the total amount of an age 67 work life but allow it the flexibility to award partial losses based upon a shorter duration of years, a delay in beginning law school of more than five years, or a mitigation deduction for a paralegal salary, or not. Verzilli's projections allow the jury that flexibility; they do not depend upon rigid assumptions about Doe's vocational potential or outcomes.

Verzilli indeed considered relevant facts provided by Plaintiff and her counsel. Plaintiff must in turn prove these facts at trial as a foundation for any lost earnings award at all, as well as how the injuries likely affected her plans and outcomes. Verzilli will not opine that Plaintiff would have achieved certain vocational goals or schedules, but his reliance upon those premises from Plaintiff is reasonable and an industry standard practice for the purpose of quantifying their value in his role as an economist.

Like economists calculating future income projections, Verzilli had to begin with some parameters and assumptions on which to project the extent and duration of loss, in a situation where the future was not certain. Verzilli's starting point was based upon the Plaintiff's premise that she intended to go to law school upon graduation from UVA in Fall 2020, and would have, but for UVA's breaches. Her evidence will show that this was indeed very likely; she had excellent grades, a long-term plan and interest in attending law school and becoming a lawyer, had taken demonstrated steps to achieve those goals, and, despite her injuries, graduated with excellent grades, on time, from a top undergraduate institution.

In *Musick v. Dorel Juvenile Group, Inc.*, *supra*, this Court evaluated an economist's future lost income projections for a child who suffered a severe brain injury when she was five years old (who, unlike Doe, was unavailable to testify). *Id.,* 818 F. Supp. 2d at 960, 963, 2011 WL 4851552 (W.D. Va. 2011). The defense moved to exclude the opinions of a vocational expert testifying that

14

the child had suffered a total loss of earning capacity and projected her pre-injury capacity including anticipated level of education to high school or an associate's degree, and an economist's quantification of the entire lost work-life value, based upon U.S. Census statistics for a female working to retirement age (or alternatively, age 45). *Id.,* 818 F. Supp. 2d at 962.

*Musick* applied the Virginia damages rule requiring evidence sufficient to permit a jury to make a reasonable damage estimate should it find injury. The Court explained that "[a]lthough 'mathematical precision' is not required, the plaintiff must 'furnish evidence of sufficient facts or circumstances to permit at least an intelligent and probable estimate' of damages." 818 F. Supp. 2d at 963 (citations omitted). Based on this standard and the Virginia Supreme Court decision in *Bulala v. Boyd*, 239 Va. 218, 389 S.E.2d 670, 677 (1990), this Court concluded that while statistical evidence alone would be too speculative as a basis for damages, a blend of evidence derived from "facts and circumstances personal to the plaintiff as an individual" and statistical class evidence could satisfy the standard for reliability. Overruling the motion to exclude, the Court reasoned that because "the plaintiff's experts combine facts personal to the plaintiff with national data that corresponds to the individualized evidence," the evaluation "complies with the Supreme Court of Virginia's call for a more individualized analysis of lost earning capacity." *Musick*, 818 F. Supp. 2d at 963-64; *see also Bagheri v. Bailey,* W.D. Va. No. 1:14CV00077, 2015 WL 6824713, at *4 (W.D. Va. Nov. 6, 2015) ("The portion that uses statistics to calculate consumption does so because it would be difficult, if not impossible, to perform that calculation with individualized data. As such, Dr. Lynch's combination of personal and statistical data is appropriate in this case.")

The *Musick* Court responded to defense arguments—just as UVA makes here—challenging the experts' inability to predict "the plaintiff's exact vocational path if not for her accident" and failures to credit disputed variables. The Court reasonably found:

15

> [Q]uantification of damages is frequently not an exact undertaking. Precise calculations of actual lost earnings are impossible, especially when the plaintiff is an infant…. The fact that the plaintiff's ascertainable characteristics are limited by her youth is unavoidable and should not prevent her from presenting evidence to a jury of lost earning capacity.

*Musick,* 818 F. Supp. 2d at 964.

For the same reasons, UVA cannot exclude Verzilli by demanding that he agree with UVA's inferences about the likelihood of Plaintiff's chosen career path, but for the injury she suffered. Weighing those likelihoods is the jury's role, not Verzilli's. Plaintiff has the burden of proving to a jury the effects of her injury, whether in a delayed or lost career as an attorney. Like the plaintiff in *Musick,* Doe had not yet reached her potential career or earnings at the time of her injury. But the evidence supporting Doe's particular probability of entering law school in the Fall of 2020 and becoming an attorney at age 26 but for the injuries at issue is based upon a more reliable and developed record than in *Musick.* Doe is available to personally testify about those plans and capabilities, and her academic record and actions corroborate that potential. As a result, Verzilli had a sounder foundation for projecting income potential than the economist permitted to provide expert testimony in *Musick*.

Finally, UVA repeatedly makes the red-herring argument that Verzilli's opinions must be stricken because of some perceived failure to properly value "mitigation" deductions. Specifically, UVA charges that Verzilli "failed to account for mitigation" because he a) did not deduct the $10,000 that Doe made working for a short time as a paralegal or other "earnings since her graduation" (ECF No. 69 at 4, 5, 6, 11-12), yet b) somehow also over-credited mitigation value in his total work-life differential projections by projecting a mitigation deduction value based upon an alternative paralegal salary, and deducting that from the lost potential earnings of an attorney through age 67, "even though the record contains no evidence that Plaintiff intends to become a

16

paralegal." ECF No. 69 at 6.

First, the Plaintiff has no duty whatsoever to present any value or evidence of mitigation, nor does her expert. Mitigation is a defense for which the *defendant* bears the entire burden of proof. *Brown v. Mountainview Cutters, LLC*, 222 F. Supp. 3d 504, 509, 2016 WL 6996204 (W.D. Va. 2016); *R.K. Chevrolet, Inc. v. Bank of Commonwealth,* 256 Va. 74, 77, 501 S.E.2d 769, 771 (1998). Here, UVA has introduced no evidence of a failure to mitigate in this case, let alone expert evidence to permit a jury to value mitigation as a deduction against future lost income. Despite this, Verzilli has responsibly chosen to offer a very conservative mitigation deduction from his income projections, because it is reasonable to assume (and expect) that Doe will obtain some replacement employment, and she has demonstrated the ability to work as a paralegal for at least some period.

Because Doe had a strong demonstrated interest in the law, and the highest value job she has held since graduation was her paralegal position, Verzilli responsibly based potential mitigating values upon a reliable paralegal income from the generally accepted BLS index. Thus, should the jury decide to impose an expected mitigation discount upon Doe when valuing damages—and it does not have to—Verzilli has included a projected year-by-year value for assistance. It would have been improper and unreliable for him to—as UVA oddly argues— instead calculate a deduction based on Doe's precise $10,000 earnings from her temporary paralegal position for Immigration Counsel and project a lifelong salary at that value, since one brief previous job would not be a reliable predictor of alternative career value as a paralegal, compared to BLS sector statistics.

Nor would it have been appropriate for Verzilli to deduct the $10,000 Doe earned in the past from his projected schedule of lost income damages as some minor credit against the *future*

17

projected losses. UVA references this about five times but apparently fails to consider that Verzilli's lost income damage projections do not start until age 26 (for the differential with a mitigation valuation at a paralegal salary) or 31 (accounting for a five-year delay), long after Doe's minimal earnings from her scattered past employment to date. Of course, as Verzilli noted in his deposition, should the jury decide to deduct the $10,000 (or Doe's other earnings) from any damages it awards, it could easily do so. ECF No. 69 at 12 (citing deposition). That deduction would, of course, be the defense's burden to establish and quantify. Regardless, Verzilli's quantifications of future lost income after age 26 are no less reliable or valid regardless of what little she earned previously.

## Conclusion

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant's motion to exclude Andrew Verzilli. His projected opinions comply with the requirements of FRE 702 and will assist the jury in making a reasonable estimate of damages, should the jury find that the trial evidence supports the foundation for finding injuries and loss of income potential as Verzilli quantifies.

Dated: October 16, 2024                    Respectfully submitted,

*s/Elizabeth K. Abdnour*
Elizabeth K. Abdnour
*Pro Hac Vice*
ABDNOUR WEIKER LLP
500 E. Michigan Ave., Suite 130
Lansing, Michigan 48912
Phone: (517) 994-1776
Fax: (614) 417-5081
liz@education-rights.com

Devon J. Munro (VSB # 47833)
Munro Byrd, P.C.
120 Day Ave. SW, First Floor

18

Case 3:23-cv-00018-RSB-JCH   Document 89   Filed 10/16/24   Page 19 of 19   Pageid#: 4354

                                        Roanoke, Virginia 24016
                                        (540) 283-9343
                                        dmunro@trialsva.com

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

       I hereby certify that on this 16th day of October, 2024, a true and accurate copy of the foregoing document was filed using the Court's ECM/ECF filing system, which will send an electronic notification to all counsel of record.

                                        *s/ Elizabeth K. Abdnour*
                                        Attorney at Law

19