CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
November 14, 2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
       DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# CHARLOTTESVILLE

| | |
|---|---|
| JANE DOE, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 3:23-CV-00018 |
| ) | |
| v. ) | By: Hon. Robert S. Ballou |
| ) | United States District Judge |
| THE UNIVERSITY OF VIRGINIA *et al.*, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Jane Doe, a former University of Virginia student, was sexually assaulted for over a year by a UVA professor. She alleges that UVA acted with deliberate indifference to the professor's behavior and her Title IX complaint. UVA moves for summary judgment arguing that Doe's claims are barred by the statute of limitations and do not meet the high bar for deliberate indifference. Because I find that Doe's claims arising from the 2018 J-Term are time-barred and that no reasonable jury could find that UVA acted with deliberate indifference to Doe's claims, I **GRANT** UVA's motion for summary judgment.

### I.   Background and Procedural History

The record evidence, viewed in the light most favorable to Doe, shows that Doe was enrolled as a student at UVA and attended a winter 2018–2019 "J-Term" trip to Europe led by Professors John Roe and Asher Biemann. Doe arrived in Vienna, Austria before the other students, and, on December 27, 2018, had dinner with Roe, Biemann and Biemann's then girlfriend. After dinner, Doe went to Roe's room to return a charger and was sexually assaulted by Roe. UVA's Title IX investigation concluded that Roe assaulted Doe two additional times during the trip.

On January 11, 2019, the last night of the trip, Roe and Biemann stopped by Doe's hotel room. Doe testified, "Roe was drunk, and he came to my hotel room where I was staying with a roommate and knocked on my door and acted in a flirtatious way." She also testified that Biemann was with Roe during this interaction and that he had "witnessed" Roe's "bizarre" behavior.

Doe returned to UVA for the spring 2019 semester. Doe and Roe continued to have sexual contact between February 2, 2019 and February 15, 2020, when Roe ended the relationship. On February 17, 2020, Doe told Biemann that she had been in a consensual relationship with Roe since the 2018–2019 J-Term trip. The next day, Biemann reported the relationship to Jeffrey Grossman, Roe's supervisor and long-time friend. On February 19, 2020, Biemann reported Doe and Roe's relationship to Dudley Doane, the Head of UVA's International Studies Office. The following afternoon, Laurie Casteen, Associate Dean in the Office of the Dean of Students, learned of Doe and Roe's relationship and reported it to UVA's Title IX coordinator. Casteen also reached out to Doe and offered to meet the following day. On February 24, 2020, Doe and Casteen met for an hour and a half. Doe gave Casteen a detailed account of her relationship with Roe but stated that the relationship was consensual. Casteen told Doe that because the relationship was consensual it did not implicate Title IX. Casteen and Doe also "discussed a variety of things that [Casteen] could do to support her personally and academically," and Casteen encouraged Doe to follow up with UVA's Counseling and Psychological Services. Casteen ultimately arranged an academic accommodation for Doe, who was under severe stress.

In mid-March 2020, Doe emailed Casteen to say that she had reconsidered her relationship with Roe and wanted to hold him accountable. On March 19, 2020, with Doe's

2

permission, UVA initiated a formal Title IX investigation. Doe continued as a student at UVA and finished all requirements to complete her degree and graduate in May 2020 although UVA did not have a formal graduation ceremony in 2020 because of the COVID-19 pandemic. Doe left UVA after she obtained her degree and moved out of Charlottesville.

On May 29, 2020, a Title IX investigator informed Doe that UVA was "extending the anticipated date of distribution of the Draft Investigation Report due to delays in obtaining information from parties/witnesses, the increased scope of the investigation, and issues related to the COVID-19 global pandemic" to July 31, 2020.[1] On July 31, 2020, a Title IX investigator informed Doe that UVA was again "extending the anticipated date of distribution of the Draft Investigation Report" due to the "significant volume of evidence submitted by both parties in this matter."

On August 26, 2020, UVA's Title IX investigators sent Doe and Roe the "Draft Investigation Report." Both Doe and Roe submitted responses. In early November 2020, UVA issued an Amended Notice of Investigation which stated that following the issuance of the Draft Investigation Report, Doe described "additional conduct implicat[ing] the University's Conflict of Interest Policy and the Title IX Policy with regard to Sexual Harassment and Sexual Assault. The investigators are charged with investigating this alleged conduct and potential policy violations in the current investigation."

On February 26, 2021, an investigator emailed Doe sating that the "Final Report will be released sometime in late March 2021." The investigator explained, "[d]ue to all of the new evidence (including new WhatsApp/text messages) submitted after the Draft Report, and the

---

[1] Absent good cause, UVA's Title IX procedures require that Title IX investigations be completed in 60 days.

3

scope of the investigation, the Final Report will likely double in size from the Draft Report, to approximately 300 pages. Incorporating and analyzing this volume of information is the cause of the brief, additional delay in issuing the report." The following month, the report was further delayed due to the purported need to "incorporate[e] and analyz[e] the volume of evidence submitted in this case."

UVA finally sent Doe and Roe the Final Investigation Report on April 30, 2021. The report concluded that there was sufficient evidence to find Roe responsible for five incidents of sexual assault in violation of UVA's Title IX Policy and for violation the school's Conflict of Interest Policy. Both Doe and Roe were given an opportunity to respond.

In the meantime, UVA held an in-person graduation ceremony in May 2021 for students in the class of 2020, whose ceremony was cancelled due to the COVID-19 pandemic. Doe and her attorney contacted UVA's Title IX office about her concerns that Roe might be present at the graduation. The office confirmed with Roe that he would not be present and informed Doe. Doe ultimately decided not to attend the graduation. She testified that she "didn't feel like there were . . . guarantees. [She] was not offered any sort of escort or anything. [She] was not really provided any other form of support." She also noted that she "felt uncomfortable" and "a bit humiliated" because "there were also students from J-Term who were going to be there who had been part of the investigation." Despite these feelings, neither Doe nor her attorney followed up with UVA's Title IX office about an escort or other precautionary measures.

On July 1, 2021, UVA convened a hearing comprised of three faculty members and a non-voting chair to review the Final Investigation Report. On July 7, 2021, the Review Panel issued a written decision recommending that Roe be terminated from his position at UVA. The Panel's recommendation was sent to Provost Elizabeth Magill. Under the school's Title IX

4

Policy, the Provost had seven days to review the recommendation but requested an extension due to "previously scheduled time out of the office and [her] other obligations as executive vice president and provost." Two days later, on July 9, 2021, Roe resigned from UVA. Provost Magill eventually issued an opinion barring Roe from all future employment and volunteer roles at UVA and disqualifying him from emeritus status. Doe and Roe have not had contact in any way since February 2020.

Doe initiated this action on April 29, 2023. On August 16, 2023, she filed an amended complaint asserting a claim for deliberate indifference to sex discrimination under Title IX against UVA, equal protection, denial of due process claims, and denial of right to free speech under 42 U.S.C. § 1983 against UVA's Title IX Coordinator and Deputy Title IX Coordinator. Doe voluntarily dismissed the claims against UVA's Title IX staff. Dkt. 38. UVA moved to dismiss the Title IX claim. Dkt. 22. The Court issued an order granting in part and denying in part UVA's motion. Dkt. 43. The Court held "the case will proceed as to the Title IX deliberate indifference claim stemming from the 2018 J-Term incident, and Professor Biemann's failure to take action as to this incident, and the adequacy of the University of Virginia's Title IX investigation only." *Id.*

UVA filed the pending motion for summary judgment on September 24, 2024. As to Doe's claims stemming from the 2018 J-Term incident, UVA argues they are 1) time-barred and 2) there is no evidence that Professor Biemman had actual notice or knowledge of the J-Term incident. Dkt. 62. As to Doe's claims about the adequacy of UVA's investigation, UVA argues that 1) its investigation was reasonable and 2) the school provided adequate protection to Doe. *Id.* Finally, UVA argues that it is entitled to summary judgment on Doe's claims for lost income damages because Doe's claims are speculative. *Id.*

5

I find that Doe's claims stemming from the 2018 J-Term incident are time-barred. I also find that UVA's delayed investigation, its alleged failure to provide adequate protection to Doe during the pendency of the investigation, and the purported lack of remedial measures do not rise to the level of deliberate indifference. Accordingly, summary judgment is appropriate. Because Doe's substantive claims fail, there is no reason to reach UVA's arguments regarding Doe's claims for damages.

## II. Standard of Review

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Once the movant properly makes and supports a motion for summary judgment, the opposing party must show that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine dispute of material fact exists, the Court views the facts in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. However, the nonmoving party cannot defeat a properly supported motion for summary judgment with mere conjecture and speculation. *See Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001). Rather, the "nonmoving party must [] go beyond the pleadings and affidavits and show that there are 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 709–10. The "mere existence of a scintilla of evidence" is insufficient to repel an "adequately supported summary judgment motion." *Anderson*, 477 U.S. at 252. Further, "conclusory allegations or denials, without more, are insufficient to preclude" summary judgment. *Bandy v. City of Salem*, 59 F.4th 705, 710 (4th Cir. 2013).

### III. Analysis

#### A. Doe's Claims Stemming From The 2018 J-Term

Doe claims that Biemann had notice or actual knowledge of Roe's inappropriate behavior towards Doe and failed to act in violation of Title IX. In support of her claim, Doe alleges that Biemann was aware of Roe's behavior based on the following: "[D]uring the Vienna trip in December 2018, Plaintiff, Roe, Biemann, and Biemann's girlfriend had dinner together," Dkt. 21 at ¶ 174; "[D]uring the Vienna trip, Biemann saw Roe standing in the hallway outside Plaintiff's hotel room when Roe was intoxicated, as Biemann happened to walk by at the same time," *id.* at ¶ 177; and "Biemann observed Roe talking to Plaintiff and attempting to flirt with her while he was intoxicated," *id.* at ¶ 178.

UVA argues that any claims stemming from these allegations are time-barred because Doe was aware of all the facts necessary to bring a cause of action stemming from the J-Term by January 11, 2019, and thus, the statute of limitations on these claims expired on January 11, 2021—two years before Doe brought her suit. Dkt. 67 at 21. I agree and grant UVA's motion for summary judgment as to Doe's J-Term.

"There is no dispute that . . . Title IX claims are subject to the two-year statute of limitations provided by Virginia's personal injury cause of action." *Reid v. James Madison Univ.*, 90 F.4th 311, 318 (4th Cir. 2024). A Title IX plaintiff's claim accrues when she has a "complete and present cause of action." *Id.* In other words, "a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to [her] that reasonable inquiry will reveal [her] cause of action." *Id.*

7

Here, the evidence shows that by the time the J-Term group returned to UVA in early 2019, Doe was aware that Roe had assaulted and behaved inappropriately towards her, that Biemann witnessed at least some of this behavior, and that he failed to act. It is evident on the face of the allegation that Doe knew that Roe had taken her to dinner with Biemann and his then-girlfriend, and Doe testified that on the last night of the J-Term trip when Roe stopped by her room she could see Biemann was with Roe when he was "drunk," "leaning over the door frame," and "act[ing] in a flirtatious way" outside of her hotel room.[2] This is all the factual information she needed to assert a claim under Title IX. *Doe 1 v. Roanoke Cnty. Sch. Bd.,* 2023 WL 2674864, at *10 (W.D. Va. Mar. 29, 2023) (citing *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263–64 (4th Cir. 2021))("To establish a Title IX sexual harassment claim, a plaintiff must show: (1) she was a student at an educational institution receiving federal funds; (2) she suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived her of equal access to the educational opportunities or benefits provided by her school; (3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and (4) the school acted with deliberate indifference to the alleged harassment.").

Doe argues that her claims did not accrue until the provost made her final decision on the Final Investigative Report. She also argues that she did not have all the relevant information until she received a copy of the Final Investigative Report and learned that UVA was "not going to

---

[2] To the extent Doe bases her 2018 J-Term claims on the fact that Biemann noticed a change in her demeanor during the trip but did not act, *see* Dkt. 21 at ¶ 182, these claims are also time barred. The Draft Investigative Report, which was sent to Doe in August 2020, contained Biemann's recollection that Doe did not seem like her usual self over the course of the trip. Thus, Doe knew that Biemann had noticed a change in her demeanor following Roe's assault in 2018 and did not act by, at the latest, August 2020. Accordingly, the statute of limitations on these claims ran two years later in August 2022.

analyze or make any finding regarding Professor Biemann's failure to report despite his obligation to do so . . . ."[3] But the cases Doe cites do not support her argument. In *Reid*, the plaintiff's claims stemmed from the way in which the university conducted a Title IX investigation. The Fourth Circuit concluded that plaintiff could not have asserted her claim before the university reached a final decision because, until the university reached its decision, the university could have corrected the alleged errors in the investigation. *Reid*, 90 F.4th at 320–22. Likewise in *Ricks*, the Supreme Court held that a plaintiff's Title VII claim accrued when the university informed the plaintiff that she had been denied tenure. This makes sense—the *Ricks* plaintiff could not have filed suit for failure to grant her tenure in violation of Title VII until she learned that she had been denied tenure. Here, Doe had all the information she needed when Biemann did not report the harassment to the Title IX office. There is nothing UVA could have done in its investigation to remedy that failure, nor did Doe require additional information from UVA before she asserted her claim.

Doe also argues that she did not have sufficient factual information to pursue her claim in January 2019 because she "did not know anything about UVA's Title IX Policy (including its affirmative consent and responsible employee provisions) and had never received a copy of it." Dkt. 88. But Doe's argument overstates the knowledge required for the statute of limitations to accrue. "[A] cause of action accrues…when [a plaintiff] is put on notice—e.g., by the knowledge of the fact of injury and who caused it—to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." *Kathryn A. Nuzback Revocable Trust v. Prince*

---

[3] Doe also argues that until she "received the FIR, she had no way to know what Biemann had said about the J-Term Trip . . . ." Dkt. 88 at 10. However, the portions of Biemann's interview that were relevant to Biemann's understanding of Doe and Roe's relationship during the trip were included in the Draft Investigation Report.

*George's County*, 2024 WL 3949264, *1 (4th Cir. Aug. 27, 2024). In other words, a plaintiff does not need to understand that she has a viable legal claim. Rather, she need only understand that she has suffered an injury. Here, Doe knew, by January 2019, that Roe had behaved inappropriately toward her and that Biemann witnessed that behavior. With that knowledge, a reasonable inquiry would have revealed her Title IX claim. Accordingly, I find that the statute of limitations on Doe's claims arising from Biemann's failure to act during or immediately after the 2018 J-Term trip are time-barred.

### B. UVA's Title IX Investigation

Doe also seeks damages for UVA's deliberate indifference to Doe's Title IX claims after they were reported. She alleges that UVA was deliberately indifferent in three ways: 1) the university took too long to resolve its Title IX investigation; 2) it failed to implement adequate measures to protect Doe during the pendency of the investigation; and 3) it failed to implement adequate remedial measures. UVA moves for summary judgment on all three claims.

"A [university] is deliberately indifferent to known acts of sexual harassment "only where the [university's] response . . . is clearly unreasonable. This high standard precludes a finding of deliberate indifference in all but limited circumstances." *Doe v. Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d 641, 654 (D. Md. 2013), *aff'd*, 605 F. App'x 159 (4th Cir. 2015) (internal quotations omitted). A "negligent, lazy, or careless response will not suffice." *Oden v. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006). Instead, the plaintiff must demonstrate that the school's actions amounted to "an official decision . . . not to remedy the discrimination." *Id.* Because I find that UVA's response to Doe's Title IX claims was not so unreasonable as to show deliberate indifference, I grant UVA's motion for summary judgment as to Doe's claims arising from the university's investigation and remedial and disciplinary measures.

### i.     Delays in UVA's Investigation

There is no dispute that UVA's investigation was delayed. It took UVA almost a year and a half from the time Doe filed her formal complaint for UVA to impose sanctions on Roe. However, delay alone does not rise to the level of deliberate indifference. Rather, "[a] school's delayed response constitutes deliberate indifference if it prejudices the plaintiff or if the delay was a 'deliberate attempt to sabotage [the p]laintiff's complaint or its orderly resolution.'" *Karasek v. Regents of the Univ. of Cal.*, 956 F.3d 1093, 1106 (9th Cir. 2020) (citing *Oden v, N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006)).

Here, Doe has offered no evidence that she was prejudiced by UVA's delay. She argues only that "[s]he was stuck in a Mobius strip of uncertainty," Dkt. 88 at 25, but concedes that she graduated on time, in May 2020, with a 3.98 GPA.

Similarly, there is no evidence that UVA's delay was an attempt to undermine Doe's complaint. Doe argues that UVA's delay was unreasonable for three reasons. First, UVA's Title IX investigators repeatedly expanded the scope of the investigation even though Doe described every incident of sexual assault when she first met with Casteen in 2020. Second, Doe argues that there is no reason the investigators' report, which "consist[s] of cut and pasted text from the evidentiary interviews," took as long as it did to compile. Third, she maintains that there is no "justification for permitting the parties to continue to 'go back and forth responding to one another's [evidence] during the investigation." Dkt. 88 at 25–26. However, even if true, this evidence does not show that UVA sought to undermine the investigation. At most, it demonstrates a lack of efficiency, which does not alone constitute deliberate indifference.

11

In *Karasek* and *Oden*, the Ninth Circuit found that eight-month and nine-month delays, respectively, between the plaintiffs' Title IX complaints and the ultimate disciplinary hearings did not constitute deliberate indifference, because there was evidence that the colleges took action to investigate and resolve the complaint in the intervening period. *See Karasek*, 956 F.3d at 1106. The *Karasek* Court summarized the *Oden* holding:

> In *Oden*, the plaintiff argued that a nine-month delay between the plaintiff's report of sexual assault and a formal hearing held by her college established deliberate indifference. We rejected that argument. We noted that the college acted shortly after the plaintiff's report by providing counseling, helping her file a formal complaint, and ordering her assailant not to contact her. Although the nine-month delay was 'negligent, lazy, or careless,' it did not amount to deliberate indifference, given the school's actions in the meantime.

956 F.3d at 1106 (citing *Oden*, 440 F.3d at 1089). Likewise, here, the record is clear that UVA did not sit idly during the investigation into Roe's conduct. As soon as Dean Casteen learned of Doe's relationship with Roe, she offered Doe access to counseling services. Additionally, once Doe indicated that she wished to file a formal complaint, UVA promptly initiated an investigation, and began conducting interviews. UVA provided Doe with academic accommodations, kept her and her attorney up to date about the investigation, and made them aware of their progress on the final report. Thus, in the absence of evidence showing prejudice or an effort to sabotage the investigation, I find that the delay in UVA's Title IX investigation is not deliberate indifference.

  ii.  **UVA's Alleged Failure to Protect Doe**

Doe also argues that UVA was deliberately indifferent in failing to implement sufficient protections for Doe while its investigation was pending. Doe points to three failures: 1) UVA's failure to help protect Doe from interactions with Roe; 2) UVA's refusal to place Roe on leave and ban him from campus in Spring 2020, despite her requests; and 3) UVA's failure to ban Roe

12

from Doe's graduation ceremony. UVA moves for summary judgment on all three claims. Given the high standard for deliberate indifference, I find that no reasonable juror could conclude that UVA was deliberately indifferent. *See S.B. ex rel. A. L. v. Board of Education of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016) ("[A] school will be liable . . . only where its 'response or lack thereof is clearly unreasonable in light of the known circumstances.'")

First, Doe alleges that UVA failed to help protect her from interactions with Roe after she filed her complaint.[4] Dkt. 88 at 27. However, it is unclear what additional steps UVA should have taken. In her opposition to UVA's motion for summary judgment, Doe notes that 34 C.F.R. § 106.30 (a) defines "supportive measures" as including "counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures." *Id.* at n.113. The record shows that UVA offered Doe counseling, arranged the extension of certain academic deadlines, and warned Roe that he could not retaliate against Doe for making a Title IX claim. The other proposed supportive measures would have been meaningless in March 2020. For one, Roe had already taken leave for the Spring 2020 semester. For another, UVA was entirely remote beginning in March 2020 and students were not able to return to the school grounds until after Doe graduated.[5] As a result, there was little

---

[4] To the extent Doe argues that a no-contact order should have been implemented in February 2020 after she reported her relationship with Roe to Biemann, the Court has already held that claims stemming from UVA's failure to act in February 2020 are time-barred. *See* Dkt. 42.

[5] Notably, the list of supportive services includes "mutual restrictions on contact." The Parties dispute whether a mutual no-contact order was put in place here. However, Doe argues that, if such an order was implemented, it was unreasonable because it limited Doe's speech. Dkt. 88 at 27–28. Doe's argument is immaterial. If UVA did implement a mutual no-contact, the parties agree that it was implemented *after* Doe graduated and was no longer affiliated with the university. Accordingly, the order had no binding effect on Doe and did not limit her speech.

13

chance that Doe would run into Roe on campus. Doe suggests that UVA should still have imposed a formal "no-contact" order on Roe. That may be so, but under the circumstances, I cannot conclude that it was clearly unreasonable for UVA not to implement a one-sided no contact order.

Moreover, even assuming UVA's failure to implement additional support services during the pendency of its investigation was clearly unreasonable, Doe has "not offered evidence to support the conclusion that the college's shortcomings in this regard deprived her of the educational opportunities or benefits to which she was entitled." *Shank v. Carleton College*, 993 F.3d 567, 576 (8th Cir. 2021). Under Title IX, a "plaintiff is deprived access to educational opportunities or benefits in a least three different ways: if the harassment 1) results in the physical exclusion of the victim from an educational program or activity; 2) so undermines and detracts from the victim['s] educational experience as to effectively den[y her] equal access to an institution's resources and opportunities; or 3) has a concrete, negative effect on [the victim's] ability to participate in an educational program or activity." *Doe*, 1 F.4th at 275. (alterations in original) (quotations omitted). Doe has not offered any such evidence. To the contrary, the record shows that Doe was able to attend class virtually like other students in the spring of 2020 and was able to graduate on time. Thus, even if UVA failed to implement appropriate protections, there is no evidence that Doe was denied educational opportunities and therefore, summary judgment on this claim is appropriate.

Second, Doe argues it was unreasonable for UVA to ignore her requests to place Roe on leave and ban him from campus. Dkt. 88 at 27. I disagree. Doe requested that Roe be put on leave on May 29, 2020, and again on June 4, 2020. Both requests came after Doe graduated from UVA on May 17, 2020, had left Charlottesville, and was living in northern Virginia. Putting Roe

14

on leave at that time would have had no impact on the likelihood Doe would have to interact with Roe because she was no longer on campus. Similarly, the fact that UVA did not accede to Doe's requests does not rise to the level of deliberate indifference. A Title IX complainant is not entitled to any specific remedy, *see Davis Next Friend LaShonda D. v. Monroe County Bd. Of Educ.*, 526 U.S. 629, 648 (1999), and a school does not incur liability by failing to "impose the disciplinary sanctions sought by a victim." *S.B.*, 819 F.3d at 77. And, in any case, it was not clearly unreasonable for UVA to decline to place a faculty member on leave before it completed its investigation. *See Johnson v. Northeast School Corp.*, 972 F.3d 905, 913 (7th Cir. 2020) ("[I]t was not clearly unreasonable for [defendant school] to decline to expel [a student] after [another student's] individual, uncorroborated allegation.").

Third, Doe alleges that UVA was deliberately indifferent by not banning Roe from campus during her graduation. Dkt. 88 at 28. The record shows that Doe and her attorney contacted UVA's Title IX office about her concerns that Roe might be present at the graduation. The office confirmed with Roe that he would not be present and relayed that information to Doe, but she ultimately decided not to attend the graduation, because she did not trust Roe's assurances. Here, UVA took steps to address Doe's concerns about Roe attending her graduation. These steps, though perhaps insufficient, were not clearly unreasonable in light of the fact that Roe had made no attempt to contact Doe since the investigation began, UVA had instructed Roe not to contact Doe, and Doe did not ask UVA to bar Roe from graduation.

### iii. UVA's Alleged Inadequate Remedial Measures

Doe also alleges that UVA's remedial measures were so insufficient as to show deliberate indifference. Specifically, Doe argues that UVA violated federal law by not including "whether remedies designed to restore or preserve equal access to the recipient's education program or

15

activity will be provided by the recipient to the complainant" in its written determination of responsibility. *Id.* However, she concedes that UVA's Acting Title IX Coordinator provided Doe written notice that "she could submit up to $5,000 in reimbursement for counseling and holistic healing services from March 2020 to December 2021 only." *Id.* Given UVA's offer, there is no prejudice from UVA's failure to include the reimbursement in its findings. To the extent Doe contests the offer for reimbursement itself, the case law is clear that, "victims do not have a right to specific remedial measures." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012). Rather, the court can only second guess a school's response to a Title IX violation if that response is clearly unreasonable. Here, because Doe suffered emotional distress because of Roe's abuse, I cannot find that UVA's offer of reimbursement for counseling services was clearly unreasonable.

Finally, to the extent Doe argues that it was unreasonable for UVA to permit Roe to resign, any prejudice was remedied by the provost's decision to bar Roe from all future employment and volunteer roles at UVA and to disqualify him from emeritus status. Moreover, even if UVA erred in permitting Roe to resign, it is not the court's role to "second guess a school's disciplinary decisions—even a school's decision not to impose any disciplinary measures—so long as those decisions are not clearly unreasonable." *Johnson v. Ne. Sch. Corp.*, 972 F.3d 905, 912 (7th Cir. 2020). *See Davis*, 526 U.S. at 648 (admonishing that courts "should refrain from second-guessing the disciplinary decisions made by school administrators."). Here, given the severity of the penalty ultimately imposed on Roe, I find that UVA's decision to permit Roe to resign was not clearly unreasonable. And thus, UVA's disciplinary actions do not show deliberate indifference.

**IV.   Conclusion**

Considering the record as a whole and drawing all inferences in the light most favorable to Doe, I find that Doe's claims arising from the 2018 J-Term trip are time-barred. I also find that a reasonable jury could not conclude that UVA acted with deliberate indifference to Doe's Complaint. Accordingly, UVA's Motion for Summary Judgment (Dkt. 66) is **GRANTED**.

Entered:  November 14, 2024

*Robert S. Ballou*

Robert S. Ballou
United States District Judge